## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SINOBIA N. BRINKLEY<br>1123 State Route 3 North #114<br>Gambrills, Maryland 21054 | ) )<br>)<br>) | |
| | )<br>) | |
| Plaintiff, | )<br>) | |
| | )<br>) | Civil Action No. |
| vs. | )<br>) | |
| DISTRICT OF COLUMBIA<br>MURIEL BOWSER, MAYOR<br>1350 Pennsylvania Avenue, NW<br>Washington, DC 20001 | )<br>)<br>)<br>)<br>) | **Jury Demanded** |
| Serve:  DC Attorney General<br>        Carl Racine, or his designed<br>        Representative<br>        441 – 4th Street, N.W.<br>        Washington, DC 20001 | )<br>)<br>)<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

_____)

## COMPLAINT

**COMES NOW**, the Plaintiff Sinobia N. Brinkley, by and through undersigned counsel,

with her COMPLAINT against Defendant the District of Columbia (hereinafter "DC" or

"Defendant") for the causes of action stated below:

## PARTIES

1.      Plaintiff Sinobia N. Brinkley ("Plaintiff" or "Ms. Brinkley") was an employee of the

District of Columbia Metropolitan Police Department (hereinafter "MPD").   Prior to her

termination, she was assigned to the MPD Special Operations Division in Washington, DC.  Ms.

Brinkley is a resident of the State of Maryland.

2.     Defendant District of Columbia is a municipality governed by Mayor Muriel Bowser and the City Counsel of the District of Columbia.

3.     The DC Metropolitan Police Department is a law enforcement agency and department of the District of Columbia Government.

## JURISDICTION

4.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it asserts claims that arise under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*, The Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981 by way and through 42 U.S.C. § 1983, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, the Americans with Disabilities Act of 1967, 42 U.S.C. 126, § 12101 *et seq.*, and the District of Columbia Whistleblower Protection Act, District of Columbia Code § 1-615-51, *et seq.*

## VENUE

5.     Venue is proper in the District of Columbia under 28 U.S.C. § 1331 and 29 U.S.C. § 1402 substantially all the acts and omissions that give rise to this complaint occurred in the District of Columbia.  Further, this Court has jurisdiction over this Complaint because there is diversity of the parties, and a question of federal law is presented.  28 U.S.C. §§ 1331 (federal question) and 1332 (diversity).  Venue properly lies within this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).  There are also pendant state law claims that this Court has authority to adjudicate.

## EXHAUSTION OF REMEDIES

6.     Plaintiff has exhausted all administrative remedies.

7.      On or about December 23, 2020, Plaintiff timely filed a formal EEO Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") for discrimination based on race (African American), sex (female), disability (depression) and retaliation for prior and ongoing EEO activity, her claims being based on disparate treatment and the creation of a hostile work environment.

8.      On March 8, 2021, the EEOC issued a Dismissal and Notice of Right to Sue, giving Plaintiff ninety (90) days to file a civil action.

9.      Plaintiff now timely files this action pursuant to federal law.

### RELEVANT FACTS COMMON TO ALL CLAIMS

### INITIAL EMPLOYMENT WITH MPD

11.     Plaintiff began her employment with MPD in October 1988.  She was hired as an officer and was a member of the union, Fraternal Order of Police, Lodge # 1 (hereinafter "FOP" or "Union").

12.     She initially was assigned to the Morals Division and later to Patrol District One.  In 1992, she was chosen for, and assigned to the Special Operations Division (hereinafter "SOD") as an Emergency Response Team Station Clerk.

13.     That same year, Plaintiff married fellow MPD officer, Matthew Brinkley.  They both served on the MPD until 2014, when Mr. Brinkley retired.  Plaintiff continued working at the MPD well after he retired.

14.     SOD ERT unit of the MPD deals with hostage situations and other volatile and delicate circumstances where a person might be barricaded in a building, refusing to cooperate with officer demands, or holding or endangering others.

15.     SOD is an elite unit, and a desirable and sought-after assignment.  Officers are screened and chosen for their suitability to ERT and are trained in crisis management and tactics.

16.     After about eighteen years in ERT as a negotiator, the Plaintiff was assigned to the DC Public Schools, and served there for approximately two years.

17.     To round out her policing experience, Plaintiff requested and was reassigned to a Patrol District.  Policing a Patrol District involves working closely with the community, being visible and present, as both a resource to residents and to deter malign activities, and handling calls when residents seek police assistance.

18.     From approximately 2012 to November of 2016, Plaintiff served continuously in the First District Patrol unit without serious employment issues.

19.     In November of 2016, Plaintiff became eligible to retire and took retirement from the MPD.

20.     In March 2017, Plaintiff was asked to return to active policing because MPD needed to increase its officer headcount, most especially with respect to seasoned officers with specialized training and skills.

21.     At the time, MPD was bringing back strong and experienced officers as full-time employees, but employed them by way of individual contracts, not as members of the FOP bargaining unit.

22.     MPD offered Plaintiff a contract to return as a Senior Police Officer (hereinafter "SPO") within Special Operations to assist in the selection process and training of new reserve negotiators.

23.     Plaintiff's contract was for a year, renewable annually if she remained able to meet physical and other requirements.

## SECOND EMPLOYMENT TERM WITH MPD

24.     Plaintiff began her second stint as a DC Police Officer on April 3, 2017, assigned to SOD, ERT as a negotiator.  At the time, her immediate supervisor, and the person responsible for her actual assignments was Sergeant Kevin O'Bryant (Black male).

25.     However, because SOD was a specialized unit, it had its own administrative chain of command, responsible for coordination, logistics and allocation of resources such as vehicles and protective equipment. At that time, the administrative Sergeant for SOD ERT was Michael Boyd (Black male) (hereinafter "Sgt. Boyd").

26.     Plaintiff's partner at the time was officer Kia Mitchell (Black female) (hereinafter "SPO Mitchell").  Plaintiff had served and partnered with SPO Mitchell during her first employment with MPD for approximately twenty years.  They were close confidants, and often shared private matters with each other.

27.     Sgt. Boyd treated Plaintiff and SPO Mitchell more harshly and negatively than any other officers in the unit, and more harshly than other non-Black female officers, and used his authority and position to make things difficult and unpleasant for them.

28.     On or about May 2017 he assigned Plaintiff and SPO Mitchell vehicles that had been used by the K-9 unit and had been infested with fleas.  Plaintiff and SPO Mitchell used the vehicle for a few days, but then notice's the flea bites and resultant rashes, and asked Sgt. Boyd for different

vehicles.  Plaintiff asserts, and on information and belief, there were other vehicles available at the time located on the top parking lot of SOD.

29.     Despite multiple requests, and having other options, Sgt. Boyd obstinately refused to assign Plaintiff and her partner different vehicles.  Sgt. Boyd's recalcitrance with respect to Plaintiff's request was disparate and unlike his response to requests from non-Black female officers and male officers.

30.     On or about June 2017, Plaintiff and SPO Mitchell went to the SOD Lieutenant, Kenny Taylor (Black male) (hereinafter "Lt. Taylor"), Sgt. Boyd's superior, and complained about the fact that Sgt. Boyd refused to assign them a clean and un-infested vehicle.  Plaintiff at the time alleged that Sgt. Boyd targeted her and her partner for disparate treatment because they were African American women, and that he treated similarly situated non-African American female officers more favorably.

31.     To remedy their concerns, Lt. Taylor allowed them to use the ERT Suburban, a large and comfortable vehicle.

32.     Plaintiff and SPO Mitchell were driving in the Suburban when they received an irate phone call from Sgt. Boyd, demanding that they return the Suburban, despite the fact that his superior had authorized Plaintiff and her partner to use the Suburban.

33.     From that point on, and for months thereafter, Sgt. Boyd undertook a campaign to retaliate against, undermine, isolate, spread false claims against and harass Plaintiff and SPO Mitchell. Given his seniority and position of authority, Sgt. Boyd was able to effectively execute his scheme to retaliate against Plaintiff and SPO Mitchell because he saw them virtually every day and was in regular contact with their fellow officers.

## PLAINTIFF LOSES HER HUSBAND

34.     On or about July 9, 2019, Plaintiff tragically and suddenly lost her husband and lifetime partner to an aneurysm.

35.     The loss was devastating to her, and she exhausted all of her accumulated sick and annual leave while on bereavement leave from the MPD.

36.     During her bereavement leave, Plaintiff suffered from anxiety and depression, and sought the care of a medical professional and spiritual guidance to help manage her mental health challenges.

37.     Plaintiff returned to work on or about September 23, 2019, but was still struggling with depression, and sleeplessness. She did seek counseling from the MPD-provided counseling service, as well as private counseling and medical care.

38.     On or about September 24, 2019, Plaintiff entered the roll call room for a major detail assignment.  At the time the room was full of officers in formal uniform.  This triggered thoughts of her late-husband and her grief overwhelmed her in that moment.  Her sobbing and emotional pain caused her to hyperventilate, and struggle with breathing.

39.     An ambulance was called, and upon arriving, the paramedics took her vital signs.  By then, her breathing had improved, and SPO Mitchell offered to take Plaintiff home.

40.     Plaintiff returned to work a few days later.  When she did, SPO Mitchell and Officer Tabatha Knight (Black female) (hereinafter "Officer Knight"), informed her superior, Lieutenant Darnell Robinson (hereinafter "Lt. Robinson") had made derogatory comments about her extreme

grief, had publicly denigrated her for exhibiting symptoms of depression and anxiety, and had threatened to send Plaintiff for a fitness for duty evaluation.

41.     Plaintiff was shocked to hear and learn that her superior held her in such low esteem that he would speak in a denigrating manner about her disability. Plaintiff further understood that Lt. Robinson had no concern for her, or her well-being, and that she needed to hide her symptoms or face retaliation or discrimination based on her disability.  Lt. Robinson's comments made clear that he disfavored Plaintiff as a result of her disability.

### THE COLD TREATMENT

42.     Plaintiff's experiences with Sgt. Boyd marked the first time in her 26-year MPD career that she was personally singled out for the systematic, orchestrated and intentional micro-aggressive retaliation that has become a cancer in the MPD that targets Black women officers, and particularly harms those who complain about the disparate and unfair treatment they endure.

43.     For the purposes of this Complaint, the systematic, coordinated and intentional hostile treatment of Black women officers by way of a pattern of hyper-scrutiny, disparate and over-harsh discipline, assignment to dangerous or undesirable tasks, denial of leave, denial of promotional and training opportunities, denigrating and attacking comments, unresponsiveness to complaints, and attacks on their reputations and ability to bond with their colleagues will be referred to as "The Cold Treatment."

44.     "The Cold Treatment" is particularly pernicious because it slowly undermines the trust and confidence that officers must have in each other to function well on the job.  Once an officer is targeted for "The Cold Treatment," every aspect of her work life becomes fraught with conflict

and constant marginalization to the point that the stress and unhappiness causes the officer to leave the MPD voluntarily, if the orchestrated attacks fail to procure the targeted officer's termination.

45.     An officer becomes the subject of "The Cold Treatment" when a leader or person of influence in the MPD decides that they want to be rid of her.  Black women officers are disproportionately affected and targeted for "The Cold Treatment" by both their superiors and fellow officers.

46.      When they seek help from MPD leadership or from the EEO office, "The Cold Treatment" campaign against them escalates and intensifies. Not only are their complaints not taken seriously, but the MPD EEO Director, Alphonso Lee (Black male) (hereinafter "Mr. Lee"), personally ensures that their complaints are dismissed out of hand, and worse, that the allegations made get leaked to their fellow officers.

47.     Mr. Lee is a central figure in the harassment and retaliation suffered by Black women officers who dare to complain about the treatment they endure because he has personally and specifically directed his staff to invalidate complaints against the MPD leaders and officers he favors.  Mr. Lee has determined for himself that those persons are "good leaders," and therefore protects them from any consequences for their frequent and unacceptable abuses of Black women officers under their control.

48.     Mr. Lee himself, or his staff, at his direction, has leaked confidential statements from Black women officers so frequently, and to such disastrous consequence to the complainants, that he has effectively chilled officers from raising concerns to the EEO office altogether.

49.     The damage Mr. Lee has done to Black women officers who have complained about discrimination cannot be overstated, nor can his negative and chilling impact on MPD.

## PLAINTIFF'S COMPLAINT REGARDING OFFENSIVE COMMENTS

50.    On or about December 14, 2018, Plaintiff's supervisor, Sgt. O'Bryant, left ERT SOD and was reassigned to the Mayor's detail.  Sgt. O'Bryant was known as a devout Christian, and very professional officer.  He ensured that people in his department adhered to a high level of decorum and respect for each other.  Upon his departure, the culture of ERT changed dramatically.

51.    Sgt. O'Bryant was replaced by Sgt. John Brown (Black male) sometime in June of 2019, who had a totally different leadership style.  Sgt. Brown was far more permissive and tolerant of unprofessional and inappropriate comments, most especially by male officers towards female officers.

52.    Upon the change in leadership, it became a common occurrence for officers in SOD to use foul language and make inappropriate sexual comments.  Plaintiff had raised concerns about the declining professionalism of the unit to Sgt. Brown, but he ignored her concerns.

53.    SOD roll call is an official meeting of officers on their shifts to discuss assignments and share information from previous shifts or other units.  Roll call is also an opportunity for department leaders to check-in with their officers and receive feed-back and give daily instructions, updates and important information.

54.    Roll call is also an opportunity for officers to see and engage with their colleagues. Because officers disperse during their shifts, roll call can be the only place where officers get to know each other.

55.    On or about February 4, 2020, Plaintiff was the only female officer in a roll call meeting conducted by Sgt. Thomas Miller (White male) (hereinafter Sgt. Miller) and Sgt. Brown.

56.     When Sgt. Brown told Officer Eric Harrison (White male) (hereinafter "Officer Harrison") to work with another officer, Officer Harrison responded by shouting "he can suck my dick." Plaintiff immediately looked up to the Sgts. in attendance, and heard several members laughing. But neither Sgt. Miller nor Sgt. Brown addressed the foul and inappropriate comment.

57.     This was the one of the straws that broke the camel's back for Plaintiff.  She got up from the meeting and walked out, rather than confront again the unprofessionalism and obscenity of her co-worker.

58.     Plaintiff spoke to Sgt. Brown after the meeting, who admitted that the comment was inappropriate, but who refused to do anything to stop such comments and re-establish and enforce the professionalism standards of the department.

59.     Plaintiff later texted Lt. Robinson to complain about the offensive language because she felt the complaint would not be handled by Sgts. Miller and Brown.

60.     Lt. Robinson replied "until further notice he will show his presence in roll call, etc." However, he did not follow through with his assurances to Plaintiff, and did not attend roll thereafter.

61.     Having received no action from Lt. Robinson to rectify a work environment that had devolved into "lock-room talk" central, and that constantly made her, the only female in the room, uncomfortable, Plaintiff went to the MPD EEO office to complain.

62.     On or about February 5, 2020, Plaintiff was advised by Lt. Robinson to make a complaint to MPD EEO Mr. Lee, in which she was contacted to by EEO officer Doreen Haines (Black woman) (hereinafter "Ms. Haines") about Officer Harrison's comment, and the fact that Sgt. Brown had permitted the comment to go without any action or redress. She further complained

that Sgt. Brown was permitting her workplace to become a hyper-sexualized and obscenity-laden workplace.

63.     During her interview with MPD EEO office, the Plaintiff did not believe that EEO investigator Ms. Ranae Lee (hereinafter "Ms. Lee") had offered advice and guidance to Plaintiff or taken her concerns seriously.  All the EEO interviews were recorded.

64.     On information and belief, Ms. Lee played the recording for Mr. Alphonso Lee, her supervisor in the EEO department.  Mr. Lee disciplined Ms. Lee for being "too helpful" to Plaintiff, and for giving any credence to Plaintiff's complaint.

65.     On information and belief, Mr. Lee leaked to Sgt. Boyd that Plaintiff had complained about him and the toxic work-environment he was fostering.

66.     From that point on, Plaintiff became the target of a concerted, intentional and systematic campaign to drum her out of the MPD.  In other words, Plaintiff became the target of "The Cold Treatment."

## THE CAMPAIGN TO RETALIATE AGAINST PLAINTIFF

67.     According to EEO Counselor Harry Carter (Black male) (hereinafter "Mr. Carter"), who worked directly for Mr. Lee and was privy to Mr. Lee's comments about Plaintiff, Mr. Lee told Ms. Doreen Haines and Ms. Ranae Lee before an investigation had been conducted regarding Plaintiff's complaint, as well as complaints from several other Black female officers, that "MPD would be better off if they figured out how to fire officers like [Plaintiff], Officer Karen Carr (Black female), and Officer Tabatha Knight (Black female) because all they did was file complaints."

68.     In short, EEO Director Lee made a decision that the MPD would benefit from moving out Plaintiff and some of the other Black female officers with similar complaints, and initiated a campaign in MPD to achieve that goal.

69.     Plaintiff became alarmed at the retaliation and discrimination that was taking place at the MPD and wrote to Mayor Muriel Bowser to report what was going on.  Plaintiff received a response from the Mayoral office on or about March 26, 2020.

70.     On or about March 25, 2020, there was a scheduled meeting with Lt. Robinson, Sgt. Brown, Plaintiff's partner SPO Mitchell and Plaintiff. When Plaintiff asked about the status of her complaint, Lt. Robinson became hostile, dismissing her concerns and simply stating that such investigations "take time."

71.     Even more troubling to Plaintiff, towards the end of the meeting, Lt. Robinson indicated that he would be separating Plaintiff and her long-time partner SPO Mitchell, because there were "red flags," with regards to them and that "they were being watched" and seen transferring bags from one car to another.  Lt. Robinson further stated that Plaintiff and SPO Mitchell needed to "watch the company they kept."

72.     Plaintiff interpreted these statements as both a warning and a threat, and as thinly veiled retaliation for her reporting her concerns of discrimination and retaliation to the Mayor's Office. Lt. Robinson was telegraphing to her that her concerns were unimportant, and also that in raising her concerns, she was becoming the subject of scrutiny and a target for retaliation.

73.     Lt. Robinson decision to separate Plaintiff from her long-time partner was, and was meant to be, punitive.  Both Plaintiff and SPO Mitchell felt the move to separate them was punitive in nature, and very destabilizing and unsettling to their work life.

74.     Worse still, around the time of the meeting, Lt. Robinson chose to discipline Plaintiff for arriving at work _too early_, something that in all her years in the MPD, Plaintiff had never seen another officer disciplined for.

75.     On or about April 9, 2020, Plaintiff went on sick leave due to exposure to the coronavirus because she had been around SPO Mitchell, who had tested positive for the virus.  Plaintiff went on leave per Center for Disease Control (hereinafter "CDC") protocols.  However, when she was tested, she came up negative, so she returned to work prior to completing the full 14-day quarantine period.

76.     On or about April 21, 2020, Plaintiff elected to file a District of Columbia Office of Human Rights complaint, alleging discrimination and retaliation and seeking redress for her concerns about the treatment of Black Women Officers in the MPD.

77.     According to CDC guidelines, the entrance and exit of the SOD building was limited to one door, so that persons entering could have their temperatures taken, and answer health questions to assess their risk.

78.     From June 5, 2020, to June 12, 2020, the officials of SOD ERT failed to post someone at the door to conduct the health assessments.  So, when Plaintiff arrived at work, she looked around, and then entered the building.  Obviously, several other officers did the same thing.

79.     On or about June 9, 2020, Plaintiff notified Sgt. Brown about the fact that there was no one conducting health screening assessments at the SOD entrance, to which Sgt. Brown unhelpfully responded that he was "drawing a blank." Plaintiff raised the issue because she had already been exposed to COVID-19 at work and lived through the anxiety of waiting for a test result, which exacerbated her anxiety condition. She had no desire to repeat the experience.

80.     On June 16, 2020, Plaintiff reasserted her concerns about the fact that the CDC-mandated health assessments were not being conducted because there was no one stationed at the entrance to do them.  She spoke with Sgt. Brown, who told her to speak to Lt. Robinson.

81.     The same day, Plaintiff reached out to Lt. Robinson, who answered her concern with a one-word response: "noted."

82.     Subsequently Lt. Robinson sent Plaintiff an email about her duties for an upcoming detail, but made no mention of the mandatory health assessment, or her legitimate concerns regarding the fact that they were not being conducted.

83.     On June 17, 2020, Sgt. Miller raised to SPO Mitchell that "someone complained" about the health assessments not being done, thus letting SPO Mitchell know that the leadership was annoyed with Plaintiff's persistent complaints about the issue.

84.     When Plaintiff arrived at work that day, a tactical officer on limited duty stationed at the door took her temperature but did not ask the health assessment questions.

85.     On June 19, 2020, when Plaintiff reported for duty, again there was no one at the SOD entrance to conduct the assessment.  Plaintiff entered the building and went to the negotiator's office, where Sgt. Brown, took her temperature.

86.     Again, Sgt. Brown, and the rest of the leadership team failed to take Plaintiff's concerns seriously and made her feel like a pariah for raising the issue. This compounded her stress and anxiety about entering a workplace that was clearly not abiding by CDC-guidelines.

87.     On or about July 10, 2020, Plaintiff was shocked to receive an email from Captain Michelle Caron (White female) (hereinafter "Capt. Caron"), that was curt and aggressive, demanding that Plaintiff provide an explanation as to why she had not submitted a written statement regarding an incident she had witnessed between Sgt. Boyd and Officer Carr.

88.     In fact, Plaintiff was not evading Captain Caron's request, but was simply on leave during the time of her request.  Had Captain Caron simply inquired, rather than sending Plaintiff a sharp-edged and accusatory email, the Captain would have discovered that Plaintiff was not being evasive.  Again, this incident was part of a pattern in which Plaintiff was treated with suspicion and disregard.

89.     Three days after receiving Captain Caron's unnecessarily accusatory email, Plaintiff was called in to Internal Affairs Department (hereinafter "IAD") to answer to a charge that she had missed a health assessment in roll call.

90.     This was precisely the issue that Plaintiff not only raised to her leadership, but was persistently ignored about.  When she pointed out that there was no one stationed at the designated entrance, IAD informed Plaintiff that she should have "gone in and looked" for an official. Plaintiff responded that there was no one to find on that particular date.

91.     This episode of intimidation and retaliation was particularly stunning to Plaintiff, because of her efforts to address the issue of health assessments at the entrances, and was ignored by her chain of command.  But rather than simply dismissing the claim, IAD kept the case open and refused to clear Plaintiff of the allegation.

92.     As mentioned above, MPD EEO and IAD were blithely leaking and sharing information from confidential interviews with rank-and-file officers, which spread like wildfire through the department. This was a concerted effort by EEO Director Lee and others to sow distrust and anger in the department, and to isolate and intimidate Plaintiff.

93.     Thus, at the roll call that took place on or about July 17, 2020, Officer Anthony Campanale (White male) (hereinafter "Officer Campanale") shouted at Plaintiff asking if she was recording

the roll call.  Plaintiff took immediate offense at his volatile and physically aggressive stance and

tone, and asked Officer Campanale "who are you talking to?"

94.     Officer Campanale continued to aggressively question and move into Plaintiff's personal

space and had to be restrained by other officers in the room.  Officer Campanale was so aggressive,

that he made Plaintiff fear for her personal safety.

95.     Sgt. Luke Foskett was conducting the roll call.  When Plaintiff asked him if he was going

to do anything about Officer Campanale aggressively charging her, Sgt. Foskett asked Plaintiff:

"well are you recording?"

96.     The Sgt.'s response was so offensive, and so inappropriate, that Plaintiff simply walked

out of the roll call, shaking with anger and anxiety.

97.     Plaintiff immediately notified her union representatives Hiram Rosario and Officer Knight,

who notified the chain of command.

98.     On or about July 22, 2020, Plaintiff met with EEO Director Lee and complained about the

retaliation from members of the SOD unit.  Mr. Lee informed Plaintiff that she could file an EEOC

charge, which was his way of communicating that his department would not be investigating her

claims.

99.     As part of his ongoing campaign of petty attacks, on or about August 14, 2020, Sgt. Boyd

ordered Plaintiff to put her cell phone away at roll call, even though he kept both of his cell phones

visible on the table in front of him, and he allowed other male tactical officers to keep their cell

phones out and visible.  Plaintiff could not help but feel embarrassed and singled out as the only

female officer in the roll call, targeted for blatantly disparate application of the rules.

100.    On or about August 16, 2020, Plaintiff was off work when the ERT unit issued a policy

change requiring officers to wear their ballistic vests at roll call.  Because Plaintiff was off that

day, she was not informed of the policy change, but all the other tactical officers were aware of the change.

101.     On or about August 18, 2020, on Plaintiff's first shift after her day off, Sgt. Boyd publicly embarrassed and singled out Plaintiff in the roll call meeting for not wearing her protective vest, even though he knew she was off when the policy change occurred, and that he, as her supervisor, failed to give her a heads' up about the new rule. Sgt. Brown used this innocuous and unintentional oversight as a basis to further humiliate Plaintiff, and belittle her in front of her colleagues.

102.     On or about August 27, 2020, Plaintiff was summoned to IAD again, to receive a disciplinary charge related to the incident with Officer Campanale. Although Officer Campanale physically charged and threatened Plaintiff, and had to be physically restrained from harming her, the Department decided to punish Plaintiff for "raising her tone," which they deemed inappropriate. Plaintiff was charged with conduct unbecoming an officer, and no discipline, at that time, was given to Officer Campanale.

103.     On or about September 1, 2020, Plaintiff was disciplined for missing a call out on a barricade. Not only was she the first officer in the history of ERT to be disciplined for that, but to add insult to injury, the Department went back in time to add the call-out she missed on Mother's Day in May. In other words, the Department leadership manufactured something to discipline Plaintiff for, and then went looking for a way to increase the severity of the punishment.

104.     On September 8, 2020, Capt. Caron asked Plaintiff to write yet another statement regarding the incident involving Sgt. Boyd's disrespectful and rude behavior towards Officer Carr, who is also an African American female officer. Capt. Caron asked specific questions in her request to Plaintiff designed to entrap Plaintiff into making contradictory statements. Plaintiff, however, did not modify her original statement.

105.    On or about September 10, 2020, Plaintiff entered the SOD building to begin her shift, but found no one stationed there to take temperatures and conduct health assessments. Again, this was a management failure and oversight that was used as an excuse to discipline Plaintiff a few months prior, despite the fact that she had no authority to ensure that MPD adhered to CDC guidelines.

106.    The lack of consistent manning of the SOD entrance with someone to conduct health assessments and take temperatures is evidence that the Department was not serious about protecting the health of its officers (which explains why Plaintiff was twice exposed to COVID-19 from her co-workers) but was instead only serious about manufacturing phony violations for which to discipline Plaintiff.

107.    On October 29, 2020, Plaintiff was given an assignment by Sgt. Boyd.  All the other personnel with a similar assignment were relieved, but Plaintiff was not.  Plaintiff had to call in to remind Sgt. Brown that she needed to be relieved.  Again, Plaintiff had to work longer than her colleagues, and had to ask for the courtesy and concern that was automatically given to her male counterparts.

108.    On October 31, 2020, Plaintiff sent an email to Chief of Police Peter Newsham (White male) (hereinafter "Chief Newsham") and Assistant Chief Jeffery Carroll (White male) (hereinafter "Asst. Chief Carroll") and others in the chain of command to complain and inform of the systemic and sustained disparate treatment and discriminatory actions against Black female officers in the MPD.

109.    On or about November 3, 2020, Sgt. Brown allowed tactical members to come in before their scheduled duty and gave them assignments without disciplining them.  This stands in sharp contrast to the discipline Plaintiff received for coming in early for one single shift, and is further evidence of disparate treatment.

110.    Sgt. Brown did not conduct a roll call that day, nor a health assessment, but he did give Plaintiff an assignment for ballot box detail, which she executed.  Plaintiff was shocked to be later written up for not attending the roll call or health assessment, that Sgt. Brown failed to hold or provide.

111.    This disciplinary write up was yet another example of breathtakingly unfair discipline, based on pretext and false evidence, was designed to demoralize and break down Plaintiff's will.

112.    On or about November 10, 2020, Plaintiff received her job performance documentation. In it she found several supposed "violations" that were basically trumped-up, fabricated, unjust, disparate or exaggerated charges, that formulated a basis for the Department to terminate her employment.

113.    On or about November 24, 2020, Plaintiff was exposed a second time to COVID-19, this time from one of the tactical officers who had tested positive, and therefore went back into quarantine until her test results were returned.

114.    That day, Plaintiff received a telephone call from her union representative Officer Rosario advising her that IAD was moving forward with the "conduct unbecoming" charge against her for the incident with Officer Campanale.

115.    When Plaintiff returned to work, she was told to report to IAD to sign paperwork related to the discipline over the Officer Campanale incident. Plaintiff strongly disagreed with the disciplinary finding but signed the document anyway, noting on the document that she was signing under duress, in order to be left alone.

116.    In the normal course of business, Plaintiff would have received her performance evaluation, and any notice of deficiencies, in order for her to have an opportunity to improve on those deficiencies.

117.    However, in her case, Plaintiff had to ask Sgt. Brown for her performance evaluation, and she was never given a list of deficiencies, or time to fix them.  Instead, she was given a very low performance evaluation based almost entirely on minor disciplinary matters that were either fabricated, disproportionate, disparate or unfair.

118.    Plaintiff, therefore asked for a meeting to discuss her concerns about her performance evaluation and to explore how she could engage with management about her concerns with the way she was being treated.

119.    During Plaintiff's shift on or about December 8, 2020, while Plaintiff was talking on the phone with her union representative, Sgt. Brown approached Plaintiff to direct her to go to the roll call room for the performance evaluation meeting she had asked for.

120.    Rather than allowing Plaintiff to finish her call, Sgt. Brown rudely and loudly interrupted her, and gave her the directive about the meeting in a condescending, hostile and disrespectful manner.

121.    Plaintiff had asked her union representative to hold while she spoke with Sgt. Brown, but because Sgt. Brown was speaking so loudly and aggressively, Officer Knight, the representative, was able to hear the entire exchange.

122.    Officer Knight took note and was dismayed at the disrespectful and hostile tone that Sgt. Brown used to convey a simple directive.

123.    Plaintiff went to the meeting as directed but asked for, and received, representation from her union representative Officer Knight at the meeting.

124.    Once Plaintiff arrived at the performance evaluation meeting, she found Sgt. Brown and one other Sgt. from a different department, whom Plaintiff did not know or recognize.

125.    Officer Knight, in her role as union representative, insisted that the performance evaluation meeting only be attended by SOD managers.  Thus, the non-SOD Sgt. who was initially there, left the meeting and was replaced Sgt. Jane Barrientos (Hispanic female) (hereinafter "Sgt. Barrientos").

126.    At the meeting, Officer Knight questioned and challenged Sgt. Brown about the disciplinary matters in the evaluation, but Sgt. Brown refused to make any substantial or meaningful changes to the evaluation.   Plaintiff then formally appealed the content of her performance evaluation.

127.    On or about December 9, 2020, while on shift, Plaintiff started experiencing anxiety and migraine headache symptoms related to the stress of what had happened in her performance evaluation meeting.  She notified Sgt. Miller of her worsening condition and asked to go to the Police and Fire clinic for assistance.

<u>PLAINTIFF'S ENGAGEMENT IN PROTECTED ACTIVITY</u>

128.    On or about December 23, 2020, Plaintiff filed a formal charge with the EEOC, alleging race, age, gender and disability discrimination, and retaliation, and disparate treatment.

129.    After seeing the clinic's psychologist and speaking with the clinic's Physician Assistant Tasha Williams, Plaintiff was placed on sick leave to mitigate her anxiety symptoms, until December 31, 2020.

130.    While on sick leave, Plaintiff was notified on or about December 12, 2020, that Sgt. Brown had tested positive for COVID-19, and that she would have to be tested again for having been exposed for the third time, to a co-worker who had tested positive.

131.    Plaintiff reported to the Police and Fire Clinic for testing, and luckily tested negative. However, the inconvenience and anxiety related to this third potential exposure, in conjunction

22

with the fact that her concerns and inquiries about non-compliance with coronavirus protocols by SOD management went unaddressed, caused Plaintiff to experience even more frustration with her situation.

132.    Despite her union representative's efforts to address the inaccurate and unfair disciplinary actions in Plaintiff's evaluation, SOD management was unwilling to modify the assessment. Therefore, on or about January 9, 2021, Plaintiff wrote to MPD Assistant Chief Carroll and several city council members regarding the disparate treatment, racial inequality, retaliatory behavior, harassment and criminal actions of the IAD.

133.    The Assistant Chief replied on January 11, 2021, denying that any discriminatory practices existed in SOD, and referred Plaintiff back to EEO for investigations of her concerns.  His response was a slap in the face to Plaintiff, inasmuch as she had complained of the fact that EEO was systematically ignoring and dismissing claims from Black female officers.

134.    On or about January 11, 2021, Plaintiff received denial of her performance evaluation appeal from Master Patrol Officer Kevin Brittingham (White male) (hereinafter "MPO Brittingham").

135.    On or about February 17, 2021, Lt. Robinson ordered Plaintiff to attend a mental evaluation and assessment, as a final step to proving that the allegations and claims against Plaintiff that resulted in a pattern disciplinary actions, was justified.  This directive was also discriminatory and disparate based on her disability.

136.    On or about February 19, 2021, Plaintiff wrote to the District of Columbia City Council to complain about the discrimination and retaliation she was being subjected to, and to inform them of the systemic discrimination and lack of EEO support in the MPD.

137.   On or about March 1, 2021, in furtherance of the campaign to harass Plaintiff, Captain Caron told her subordinates to direct Plaintiff to respond to another request for a statement related to a barricade that took place on or about February 23, 2021, and to answer specific questions by the end of Plaintiffs' shift.  This request put Plaintiff on notice that the Department was looking for yet another reason to discharge her.

138.   On or about March 2, 2021, union representative Rosario replied to Captain Caron's request via email, stating that the request violated Article 13 of the Labor Agreement.

139.   On or about March 8, 2021, the Plaintiff received her Notice of Right to Sue letter from the EEOC.

140.   On or about March 23, 2021, Plaintiff attended a virtual meeting to dispute the decision of the clinic that Plaintiff's anxiety and stress was "not work-related."  This was an entirely self-serving conclusion, designed to protect and give cover to the SOD personnel who were engaged in an active and coordinated campaign against Plaintiff.  Again, Plaintiff was the victim of "The Cold Treatment," which had the exact effect and outcome its perpetrators desired.

<u>PLAINTIFF'S UNJUSTIFIED AND RETALIATORY TERMINATION</u>

141.   On or about April 13, 2021, a grievance meeting was conducted to hear Plaintiff's grievance related to her performance evaluation.  Plaintiff attended the meeting with MPO Brittingham, who was serving as her representative.  The grievance hearing panel consisted of Union representative Hiram Rosario, Captain Sean Conboy and Sergeant Shavaun Ross.  The panel concluded and said they would get back to Plaintiff within two weeks.

142.   On or about April 28, 2021, Sgt. Brown told Plaintiff to report to Human Resource the following day. When Plaintiff asked Sgt. Brown why she need to do so, he stated that he did not know the reason for the meeting.

24

143.    On or about April 29, 2021, Plaintiff reported to Human Resources as directed, along with her union representative Rosario. At that time, she received paperwork terminating her employment, effective April 30, 2021.

## CAUSES OF ACTION

**Claims Under Title VII of the Civil Rights Act of 1964, as amended,**
**42 U.S.C. § 2000e, *et seq.* and Under the District of Columbia Human Rights Act**
**District of Columbia Code § 2-1401.01 *et seq.***
**(Employment Discrimination on the Basis of Race)**

### COUNT I – Disparate Treatment on the Basis of Race

144.    Plaintiff restates and incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

145.    Plaintiff is African American, and as such, is a member of a protected class.

146.    Plaintiff was treated differently and subjected to disparate and more harsh treatment in comparison to similarly situated non-African American police officers.

147.    Plaintiff was disciplined for minor violations for which other non-African American Officers were not disciplined.

148.    Plaintiff was assigned an unclean and unhygienic vehicle, and was prohibited from using a clean vehicle, which constituted unjustifiable and disparate negative treatment, and was on the basis of her race.

149.    Plaintiff was given consistently undesirable assignments, rather than such assignments being spread equitably across her unit and was chosen for those undesirable assignments on the basis of her race.

150.    Plaintiff was given assignments with insufficient manpower, leaving her to man areas or respond to calls that required two officers by herself.  Plaintiff's physical safety was put at risk by improper assignment and dispatching because of her race.

151.    Plaintiff's legitimate concerns about the SOD's noncompliance with CDC COVID-19 protocols were ignored, and instead, her management punished her for not having obtained a health assessment, rather than admitting its failure in not assigning anyone to conduct such assessments. The disregard of her concerns, and the punishment handed down to her was fundamentally unjust and was given to Plaintiff because of her race.

152.    Plaintiff's performance evaluation is based on false and illegitimate disciplinary actions and were pretext to discriminate against Plaintiff on the basis of race.

153.    Defendant terminated Plaintiff's employment because of her race and used false and inaccurate evaluation of her performance as a pretext for its discrimination against her on the basis of her race.

154.    Plaintiff was treated differently and subjected to different and more harsh terms and conditions of her employment due to her race.

155.    Similarly situated SPO's who were not Black, such as Officer Campanale, have been treated more favorably than Plaintiff in the terms and conditions of employment.

156.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race.

157.    As a direct and proximate cause of Defendant's conduct alleged in this Complaint, Plaintiff suffered, and continues to suffer mental and physical injury, and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, expenses, and costs – and is entitled to all available legal and equitable remedies.

158.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

159.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

160.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## COUNT II – Hostile Work Environment on the Basis of Race

161.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

162.    Defendant has fostered and permitted to flourish a work climate and culture that is hostile to SPO's who are African American.

163.    Defendant's EEO Director, Alphonso Lee, either directed or permitted, confidential statements made by Plaintiff when she went to the EEO department to complain of racial discrimination, to be leaked to Plaintiff's co-workers and supervisors.

164.    Defendant permitted or encouraged these leaks for the express purpose of turning Plaintiff's co-workers against her, and to treat her with contempt and disdain, because of her race.

165.    Defendant nurtured and tolerated a work environment in which negative comments and disparate treatment of African American officers was tolerated and accepted.

166.    Defendant subjected Plaintiff to constant denigrating comments, overly harsh discipline for picayune transgressions that other non-African American officers were not disciplined for, repeated relegation to undesirable assignments, repeated disregard for Plaintiff's physical safety

27

and well-being, and false and inaccurate evaluation of her performance, such pattern creating a hostile work environment for Plaintiff on the basis of her race.

167.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

168.   Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT III – Retaliation for Complaining of Race Discrimination

169.   Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

170.   As outlined in the facts above, on no less than three occasions Plaintiff went to Defendant's EEO Office to complain of being discriminated against on the basis of her race.

171.   As outlined in the facts above, Plaintiff sought out and spoke with senior management and leaders of the SPO Department to complain about the racial discrimination and disparate treatment directed at her.   After her complaint, the discriminatory treatment against her escalated in retaliation for engagement in statutorily protected activity.

172.   On or about October 31, 2020, Plaintiff wrote to the Chief of Police and others to complain about the hostile work environment, disparate treatment, and retaliatory discipline she was being subject to because of her race, such communication constituting a protected activity.

173.   On or about December 9, 2020, Plaintiff filed a formal EEOC charge alleging race discrimination against the MPD.  In doing so, Plaintiff engaged in statutorily protected activity.

174.    On or about April 29, 2021, Plaintiff was wrongfully terminated from her employment in retaliation for complaining about racial discrimination that had been directed at her.

175.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

176.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

177.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.


**Claims Under Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e, *et seq.* and Under the District of Columbia Human Rights Act
District of Columbia Code § 2-1401.01 *et seq.*
(Employment Discrimination on the Basis of Sex)**

**COUNT IV – Disparate Treatment on the Basis of Sex (Female)**

178.    Plaintiff restates and incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

179.    Plaintiff is a woman, and as such, is a member of a protected class.

180.    Plaintiff was treated differently and subjected to disparate and more harsh treatment in comparison to similarly situated male police officers.

181.    Plaintiff was disciplined for minor violations for which male Officers were not disciplined.

182.    Plaintiff was assigned an unclean and unhygienic vehicle, and was prohibited from using a clean vehicle, which constituted unjustifiable and disparate negative treatment, and was on the basis of her sex.

183.    Plaintiff was given consistently undesirable assignments, rather than such assignments being spread equitably across her unit, and was chosen for those undesirable assignments on the basis of her sex.

184.    Plaintiff was given assignments with insufficient manpower, leaving her to man areas or respond to calls that required two officers by herself.  Plaintiff's physical safety was put at risk by improper assignment and dispatching because of her sex.

185.    Plaintiff's legitimate concerns about the SOD's noncompliance with CDC COVID-19 protocols were ignored, and instead, her management punished her for not having obtained a health assessment, rather than admitting its failure in not assigning anyone to conduct such assessments.

186.    The disregard of her concerns, and the punishment handed down to her was fundamentally unjust and was given to Plaintiff because of her sex.

187.    Plaintiff's performance evaluation is based on false and illegitimate disciplinary actions and were pretext to discriminate against Plaintiff on the basis of sex.

188.    Defendant terminated Plaintiff's employment because of her sex and used false and inaccurate evaluation of her performance as a pretext for its discrimination against her on the basis of her sex.

189.    Plaintiff was treated differently and subjected to different and more harsh terms and conditions of her employment due to her sex.

190.    Similarly situated male SPO's, such as Officer Campanale, have been treated more favorably than Plaintiff in the terms and conditions of employment.

191.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her sex.

192.     As a direct and proximate cause of Defendant's conduct alleged in this Complaint, Plaintiff suffered, and continues to suffer mental and physical injury, and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, expenses, and costs – and is entitled to all available legal and equitable remedies.

193.     Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

194.     Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

195.     Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT V – Hostile Work Environment on the Basis of Sex

196.     Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

197.     Defendant has fostered and permitted to flourish a work climate and culture that is hostile to female SPOs.

198.     Defendant's EEO Director, Alphonso Lee, either directed or permitted, confidential statements made by Plaintiff when she went to the EEO department to complain of sex discrimination, to be leaked to Plaintiff's co-workers and supervisors.

199.     Defendant permitted or encouraged these leaks for the express purpose of turning Plaintiff's co-workers against her, and to treat her with contempt and disdain, because of her sex.

200.   Defendant nurtured and tolerated a work environment in which negative comments and disparate treatment of female officers was tolerated and accepted.

201.   Defendant subjected Plaintiff to constant denigrating comments, overly harsh discipline for picayune transgressions that male officers were not disciplined for, repeated relegation to undesirable assignments, repeated disregard for Plaintiff's physical safety and well-being, and false and inaccurate evaluation of her performance, such pattern creating a hostile work environment for Plaintiff on the basis of her sex.

202.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

203.   Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## COUNT VI – Retaliation for Complaining of Sex Discrimination

204.   Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

205.   As outlined in the facts above, on no less than three occasions Plaintiff went to Defendant's EEO Office to complain of being discriminated against on the basis of her sex.

206.   As outlined in the facts above, Plaintiff sought out and spoke with senior management and leaders of the SPO Department to complain about the sex discrimination and disparate treatment directed at her.   After her complaint, the discriminatory treatment against her escalated in retaliation for engagement in statutorily protected activity.

207.    On or about October 31, 2020, Plaintiff wrote to the Chief of Police and others to complain about the hostile work environment, disparate treatment, and retaliatory discipline she was being subject to because of her sex, such communication constituting a statutorily protected activity.

208.    On or about December 9, 2020, Plaintiff filed a formal EEOC charge alleging sex discrimination against the MPD.  In doing so, Plaintiff engaged in statutorily protected activity.

209.    On or about April 29, 2021, Plaintiff was wrongfully terminated from her employment in retaliation for complaining about sex discrimination that had been directed at her.

210.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

211.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

212.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

**Claims Under the Civil Rights Act of 1866**
**Discrimination Based on Race in the Makin and Enforcing of Contracts**
**42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983**

**COUNT VII – Disparate Treatment on the Basis of Race**

213.    Plaintiff restates and incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

214.    Plaintiff is African American, and as such, is a member of a protected class.

215.    Plaintiff was treated differently and subjected to disparate and more harsh treatment in comparison to similarly situated non-African American police officers.

216.    Plaintiff was disciplined for minor violations for which other non-African American officers were not disciplined.

217.    Plaintiff was assigned an unclean and unhygienic vehicle, and was prohibited from using a clean vehicle, which constituted unjustifiable and disparate negative treatment, and was on the basis of her race.

218.    Plaintiff was given consistently undesirable assignments, rather than such assignments being spread equitably across her unit, and was chosen for those undesirable assignments on the basis of her race.

219.    Plaintiff was given assignments with insufficient manpower, leaving her to man areas or respond to calls that required two officers by herself. Plaintiff's physical safety was put at risk by improper assignment and dispatching because of her race.

220.    Plaintiff's legitimate concerns about the SOD's noncompliance with CDC COVID-19 protocols were ignored, and instead, her management punished her for not having obtained a health

221.    Defendant disciplined Plaintiff for not obtaining a health assessment, rather than admitting its failure in not assigning anyone to conduct such assessments. The disregard of her concerns, and the punishment handed down to her was fundamentally unjust and was given to Plaintiff because of her race.

222.    Plaintiff's performance evaluation is based on false and illegitimate disciplinary actions and were pretext to discriminate against Plaintiff on the basis of race.

223.    Defendant terminated Plaintiff's employment because of her race and used false and inaccurate evaluation of her performance as a pretext for its discrimination against her on the basis of her race.

224.    Plaintiff was treated differently and subjected to different and more harsh terms and conditions of her employment due to her race.

225.    Similarly situated SPO's who were not black, such as Officer Campanale, have been treated more favorably than Plaintiff in the terms and conditions of employment.

226.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race.

227.    As a direct and proximate cause of Defendant's conduct alleged in this Complaint, Plaintiff suffered, and continues to suffer mental and physical injury, and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, expenses, and costs – and is entitled to all available legal and equitable remedies.

228.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

229.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

230.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## COUNT VIII – Hostile Work Environment on the Basis of Race

231.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

232.    Defendant has fostered and permitted to flourish a work climate and culture that is hostile to SPO's who are African American.

233.    Defendant's EEO Director, Alphonso Lee, either directed or permitted, confidential statements made by Plaintiff when she went to the EEO department to complain of racial discrimination, to be leaked to Plaintiff's co-workers and supervisors.

234.    Defendant permitted or encouraged these leaks for the express purpose of turning Plaintiff's co-workers against her, and to treat her with contempt and disdain, because of her race.

235.    Defendant nurtured and tolerated a work environment in which negative comments and disparate treatment of African American Officers was tolerated and accepted.

236.    Defendant subjected Plaintiff to constant denigrating comments, overly harsh discipline for picayune transgressions that other non-African American officers were not disciplined for, repeated relegation to undesirable assignments, repeated disregard for Plaintiff's physical safety and well-being, and false and inaccurate evaluation of her performance, such pattern creating a hostile work environment for Plaintiff on the basis of her race.

237.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

238.     Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT IX – Retaliation for Complaining of Race Discrimination

239.     Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

240.     As outlined in the facts above, on no less than three occasions Plaintiff went to Defendant's EEO Office to complain of being discriminated against on the basis of her race.

241.     As outlined in the facts above, Plaintiff sought out and spoke with senior management and leaders of the SPO Department to complain about the racial discrimination and disparate treatment directed at her.  After her complaint, the discriminatory treatment against her escalated in retaliation for engagement in statutorily protected activity.

242.     On or about October 31, 2020, Plaintiff wrote to the Chief of Police and others to complain about the hostile work environment, disparate treatment, and retaliatory discipline she was being subject to because of her race, such communication constituting a protected activity.

243.     On or about December 9, 2020, Plaintiff filed a formal EEOC charge alleging race discrimination against the MPD.  In doing so, Plaintiff engaged in statutorily protected activity.

244.     On or about April 29, 2021, Plaintiff was wrongfully terminated from her employment in retaliation for complaining about racial discrimination that had been directed at her.

245.     Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

246.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

247.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### Claims Under the Age Discrimination in Employment Act 29 U.S.C. §§ 621-634 (Employment Discrimination on the Basis of Age)

### COUNT X -- Disparate Treatment on the Basis of Age (Over 40)

248.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

249.    Plaintiff was over the age of forty (40) at the time of the above discriminatory actions, and as such, is a member of a protected class.

250.    Because of her age, Plaintiff, a Senior Police Officer was denied sick leave, weekend days off, duty assignments, training, and health assessments, while these same opportunities and benefits were given to much younger police officers.

251.    Plaintiff was terminated from her employment because of her age, and the reasons given for her termination were false and pretextual to hide a discriminatory intent.

252.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

253.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

254.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

**Claims Under the Americans with Disabilities Act of 1990**
**42 U.S.C. 126, § 12101 *et seq.***
**(Employment Discrimination on the Basis of Mental and Physical Disability)**

**COUNT XI -- Disparate Treatment Due to Disability**

255.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

256.    After the death of her husband, Plaintiff suffered from depression and an anxiety condition for which she was under the care of medical professionals, and which was known to the Defendant, and as such, is a member of a protected class.

257.    The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement or discharge of employees, employment compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

258.    Plaintiff's disability substantially limited at least one of Plaintiff's major life activities, sleeping.  Plaintiff is an individual with a disability under the ADA.

259.    On several occasions, as described above, Defendant asked Plaintiff inappropriate questions about her disability, and commented about her disability to her colleagues and co-workers.

260.    On one occasion, as a result of having an episode related to depression and anxiety, Plaintiff's supervisor made negative comments about her to her colleagues and threatened to send

her for a fitness for duty evaluation, which was intended to be, and was a threat to her future employment and a reprisal for her suffering from a disability.

261.    When Plaintiff complained about her serious and legitimate concerns regarding her Department's failure to comply with CDC guidelines regarding personnel entering the SOD building, she was ignored or humiliated for raising the issue.  Later, management disciplined her for not obtaining a health assessment upon entering the building, when it was her management that failed to station a person at the entrance to conduct the assessment.

262.    Defendant's actions were intended to mock Plaintiff for suffering from anxiety, and to add to exasperate her condition by forcing her to be even more worried for her health due to potential exposure to COVI-19.

263.    On three occasions, as described above, Plaintiff was exposed to COVID-19 from colleagues who had tested positive and was forced to quarantine as a result.  Each such instance was the result of Defendant's lackadaisical attitude to compliance with CDC COVID-19 protocols.

264.    On at least two occasions, personal and confidential information about Plaintiff's mental health condition and disability was discussed or leaked to her colleagues by her supervisors, causing Plaintiff's co-workers to not want to work with her, and shaming Plaintiff and creating a stigma related to her disability.

265.    Defendant's actions constituted disparate and discriminatory treatment that caused Plaintiff to suffer and punished her for having a disability.

266.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

267.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

268.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.


### Claims Under the District of Columbia
### Whistleblower Protection Act
### D.C. Code § 1-615-51 *et seq.*

### COUNT XII -- Whistleblower Retaliation

269.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

270.    Pursuant to the D.C. Whistleblower Protection Act, Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

271.    Plaintiff is an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that

discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

272.    As a direct result of Plaintiff's protected disclosures, Defendants gradually, and continuously, retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

273.    As a result of Defendants' actions, Plaintiff suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

274.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

275.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

276.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

a.  Award Plaintiff compensatory damages consistent with statutory limits and where appropriate in excess thereof, in their proven amount;

b.  Award Plaintiff future pecuniary and nonpecuniary compensatory damages in a proven amount not to exceed lawful amounts provided by law.

c.  Award Plaintiff such injunctive and equitable relief deemed appropriate;

d.  Award Plaintiff reasonable attorney's fees and costs;

e.  Provide Plaintiff with all necessary health care connected to and associated with any diagnosis and treatment for Coronavirus (COVID-19) illness;

f.  Reinstate Plaintiff to her position as Senior Police Officer;

g.  Provide Plaintiff with applicable backpay, benefits and interest;

h.  Provide Plaintiff with a clean record of any adverse/negative personnel actions/records, including all adverse/negative performance appraisals, disciplinary records, and substitute accurate agency records on the Plaintiff;

i.  Reimburse Plaintiff for all sick leave that she was forced to use due to the Defendant's discrimination and retaliation;

j.  Award such other and further relief as this Honorable Court deems just and proper.

277.  Because of the actions alleged herein, the continued employment of the supervisors at issue herein without training in equal employment opportunity law, rules, and regulations, present a clear and present danger to Defendant's employees and could result in further illegal actions on the part of Defendant, by and through their respective agents, servants, and employees.


**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.  Order Defendant to institute a policy and procedure to be implemented against discrimination, retaliation, and hostile work environments.

b.  Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein.

c.  Supervisory training for the supervisors at issue herein; and

d.  Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Donald M. Temple*
Donald M. Temple
Pamela M. Keith
Temple Law Offices
1310 L St. NW
Suite 750
Washington, DC 20005
Dtemplelaw@gmail.com
pamkeithtemplelaw@gmail.com
202-628-1101 (o)
202-302-0383 (m)
*Counsel for Plaintiff*