# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SINOBIA N. BRINKLEY<br>1123 State Route 3 North #114<br>Gambrills, MD 21054 | ) ) ) ) ) | Civil Action No. 1:21-CV-01537 (RBW) |
| TIARA BROWN<br>12th St. SW<br>Lehigh Acres, FL  33976 | ) ) ) ) | |
| KAREN CARR<br>8333 Daydream Cres.<br>Pasadena, MD 21122 | ) ) ) ) | **Jury Trial Demanded** |
| LESLIE CLARK<br>16708 Rolling Tree Rd.<br>Accokeek, MD 20607 | ) ) ) ) | |
| CHANEL DICKERSON<br>5634 Hartfield Ave.<br>Camp Springs, MD 20746 | ) ) ) ) | |
| REGENNA GRIER<br>10606 Cedarwood Ln.<br>Fort Washington, MD 20744 | ) ) ) ) | |
| TAMIKA HAMPTON<br>723 Congress St. SE<br>Washington, DC 20032 | ) ) ) ) | |
| LASHAUN LOCKERMAN<br>11925 Provident Dr.<br>LaPlata, MD 20603 | ) ) ) ) | |
| TABATHA KNIGHT<br>12704 Lusby Ln.<br>Brandywine, MD 20613 | ) ) ) ) | |
| and | ) ) | |
| KIA MITCHELL<br>1614 St. James Rd.<br>Accokeek, MD 20607 | ) ) ) ) | |

1

|  |  |
|---|---|
| *On behalf of themselves and all similarly situated African American female police officers employed by the Metropolitan Police Department between January 1, 2011 and the present,* | ) ) ) ) ) ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| DISTRICT OF COLUMBIA | ) ) |
| MURIEL BOWSER, MAYOR | ) ) |
| and | ) ) |
| ROBERT CONTEE CHIEF OF THE METOROPOLITAN POLICE DEPARTMENT | ) ) ) ) ) |
| Serve:  DC Attorney General       Carl Racine, or his designed       Representative       441 – 4th Street, N.W.       Washington, DC 20001 | ) ) ) ) ) ) |
| *Defendants.* | ) ) |

**PLAINTIFFS SINOBIA BRINKLEY, TABATHA KNIGHT AND KAREN CARR'S FIRST AMENDED AND CONSOLIDATED COMPLAINT, AND PLAINTIFFS' TIARA BROWN, LESLIE CLARK, CHANEL DICKERSON, REGENNA GRIER, TAMIKA HAMPTON, LASHAUN LOCKERMAN AND KIA MITHCHELL'S FIRST CONSOLIDATED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND <u>COMPENSATORY RELIEF</u>**

## INTRODUCTION

**COMES NOW**, Plaintiffs *Sinobia N. Brinkley* (hereinafter "Plaintiff Brinkley"); *Tiara Brown* (hereinafter "Plaintiff Brown"); *Karen Carr* (hereinafter "Plaintiff Carr"); *Leslie Clark* (hereinafter "Plaintiff Clark"); *Chanel Dickerson* (hereinafter "Plaintiff Dickerson"); *Regenna Grier* (hereinafter "Plaintiff Grier"); *Tamika Hampton* (hereinafter "Plaintiff Hampton"); *Tabatha Knight* (hereinafter "Plaintiff Knight"); *LaShaun Lockerman* (hereinafter "Plaintiff Lockerman"), and *Kia Mitchell* (hereinafter "Plaintiff Mitchell"), collectively hereinafter "the Class Representative Plaintiffs" or "CRPs", by and through undersigned counsel, with their FIRST AMENDED AND CONSOLIDATED COMPLAINT against Defendant the District of Columbia (hereinafter "DC" or "Defendant") Metropolitan Police Department (hereinafter "MPD").

Plaintiffs are a group of African American (hereinafter "Black") female police officers. All Plaintiffs, except Plaintiff Brown, have served the District of Columbia government as law enforcement officers for more than fifteen (15) years. Plaintiff Brown served the District of Columbia for five (5) years and was honored as MPD Officer of the Year during her tenure. Their contributions to the police force and experience on the job have been assets to the MPD for more than 100 years combined. Sadly, each Class Representative Plaintiff has had to endure the victimization of an MPD enterprise-wide culture of race and sex discrimination and intense pervasive retaliation against those who dared to complain about, report or oppose unlawful discrimination.

In this case, every Class Representative Plaintiff has complained multiple times about unfair treatment on the basis of their race and gender to either the Department's EEO officials and/or their managers, to no avail. They come together as a class here to describe how the MPD has, for decades, treated Black women police officers with contempt, to the point of systematic

psychological abuse.  As is often the case, the abuse is often not visible by looking at one person, or one incident. There are four fundamental characteristics of the MPD that this class action lawsuit seeks to change: 1) MPD has a male-dominated culture that accepts and perpetuates the most demeaning, degrading and disrespectful discourse and actions by and between officers; 2) MPD has a culture that nurtures and encourages supervisory and management officers to abuse their power to exact petty vengeance on subordinates and make their lives miserable; 3) MPD has a profoundly dysfunctional and corrupt EEO Office run by a man who has repeatedly expressed hostility to women officers, and who colludes with management to crush Black women who complain about race and gender discrimination and sexual harassment; and 4) MPD, with the full participation and/or approval of the Chiefs of Police, engages in repeated, coordinated and relentless retaliation campaigns against Black women officers who complain about or oppose discrimination, or other police misconduct.  In combination, these four MPD characteristics create a profoundly toxic work environment for Black woman officers.

This lawsuit seeks to ensure that MPD's discriminatory practices are eradicated for current and future Black women police officers, and to obtain full redress for Class Representative Plaintiffs and the class members who have been harmed by MPD's consistent system-wide pattern, practice, and custom of race and gender discrimination and retaliation.

## PARTIES

### THE CLASS

1.　　Plaintiffs seek to represent a class, broken into sub-classes as deemed appropriate by this Court after appropriate pre-class certification discovery, of all Black women police officers employed by the MPD between January 1, 2011, and the present.

2.      On information and belief, the class will potentially consist of more than seven hundred (700) current and former Black women police officers, broken down into management officers, bargaining unit officers, Senior Police Officers, and academy cadets.

3.      All class members were subject to the direct authority of the respective present and past Chiefs of Police, governed by universally applicable MPD policies and practices.

## THE CLASS REPRESENTATIVE PLAINTIFFS

4.      The individual Class Representative Plaintiffs (hereinafter "Plaintiffs" or "CRPs") are ten (10) Black women police officers who are, or were recently, employed by the MPD.

### A.      <u>Sinobia Brinkley</u>

5.      Plaintiff Sinobia Brinkley is a Maryland resident. She was a sworn police officer with the MPD from 1988 until November of 2016, when she retired.  In March of 2017, she was asked to come out of retirement and return to the MPD as a Senior Police Officer (hereinafter "SPO"), assigned to the Special Operations Department (hereinafter "SOD") Emergency Response Team (hereinafter "ERT") Unit. Her employment was terminated on or about April 21, 2021.

### B.      <u>Tiara Brown</u>

7.      Plaintiff Tiara Brown became a sworn officer with the MPD in 2015. She was assigned to patrol in the Fairfax Villages area.  She was certified to patrol by bicycle and was given specific duties as a community liaison officer. Plaintiff Brown was honored as Officer of the Year in 2019. She resigned from the MPD in December of 2020, and is currently a resident of Florida.

### C.      <u>Karen Carr</u>

9.      Plaintiff Karen Carr is a Maryland resident. She has been a sworn police officer with the MPD since April 1998.  She is currently assigned to the Special Events Department.

### D.   Leslie Clark

10.    Plaintiff Leslie Clark is a Maryland resident.  Plaintiff Clark has been a sworn police officer with the MPD since May of 1989.

### E.   Chanel Dickerson

11.    Plaintiff Chanel Dickerson is a resident of Maryland. Plaintiff Dickerson was first employed as a sworn officer for the MPD between 1990 and 1991.  In 1994, she returned to the MPD as a civilian, and worked in that capacity until 1997.

12.    In 1997, she became a sworn officer again, and is currently an Assistant Chief of Police.

### F.   Regenna Grier

13.    Plaintiff Regenna Grier is a resident of Maryland.  She was initially employed as an officer with the MPD from 1989 until she retired in May of 2015.  Plaintiff Grier was asked to return to the MPD to serve as an SPO in November of 2017, and served in that capacity until she resigned in March of 2021.

### G.   Tamika Hampton

15.    Plaintiff Tamika Hampton is a resident of Maryland. She has been a sworn officer at the MPD since December of 2003.  She is currently a Sergeant assigned to the Seventh District.

### H.   Tabatha Knight

16.    Plaintiff Knight is a resident of Maryland. She began working for the MPD in 1989, and was employed until she retired in February of 2021.  She served as the union shop steward for SOD from 2018 until her retirement.

### I.   LaShaun Lockerman

18.    Plaintiff Lockerman is a resident of  Maryland.  She began working for the MPD in 2003 is currently assigned as a Lieutenant in District 3D.

### J.    Kia Mitchell

19.    Plaintiff Mitchell is a resident of Maryland. She was employed by the MPD from 1985 to 2016, when she retired.  In 2017 she was asked to return to the MPD as an SPO, and was assigned to the ERT unit, where she is currently working.

## DEFENDANT DISRICT OF COLUMBIA

20.    Defendant District of Columbia (hereinafter "DC") is a municipality governed by Mayor Muriel Bowser and the City Counsel of the District of Columbia.  The DC Metropolitan Police Department (hereinafter "MPD" ) is a DC government law enforcement agency and department.

## JURISDICTION AND VENUE

21.    This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it asserts claims that arise under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*, The Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981 by way and through 42 U.S.C. § 1983, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, the Americans with Disabilities Act of 1967, 42 U.S.C. 126, § 12101 *et seq.*, the District of Columbia Whistleblower Protection Act, District of Columbia Code § 1-615-51, *et seq.,* and pendant tort claims against the District of Columbia for negligent supervision.

22.    Venue is proper in the District of Columbia under 28 U.S.C. § 1331 and 29 U.S.C. § 1402 because substantially all the acts and omissions that give rise to this complaint occurred in the District of Columbia.  Venue properly lies within this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3). This Court is also the proper venue to adjudicate Plaintiffs' pendant state law claims.

## FACTS RELEVANT TO ALL CLASS MEMBERS

## THE MPD STRUCTURE AND CULTURE

### MPD'S CENTRALIZED TOP-DOWN POWER HIERARCHY

23.    Much like the military, the MPD has a strict hierarchical decision-making structure and rigid chain of command.  While each level of leader in the hierarchy is granted some authority over day-to-day activities or routine police matters, the ultimate decision-maker on all police matters is the Chief of Police.

24.    The Chief of Police maintains a degree of supervision over the Department's various managers and its Equal Employment Office, and  accessibility to all MPD employees who are able to speak directly to him or her upon request and appointment.

25.    There are seven (7) classes of employees at MPD:

a.    Probationary cadets: persons hired via the police academy who are in their training phase, and are subject to discharge with little recourse other than through the EEOC charge process.

b.    Probationary civilians: persons hired for civilian positions, and who have been employed for less than one year.  They can be terminated without cause within the probationary period with little recourse other than through the EEOC charge process.

c.    Sworn Bargaining Unit officers: officers who are full members of the Fraternal Order of Police, Lodge #1, and benefit from all terms and conditions of employment contained in the Collective Bargaining Agreement (hereinafter "CBA"), including just cause termination and the right to grieve any disciplinary action.

d.    Civilian employees: persons who are governed by the District of Columbia employee manual terms.

e.      Senior Police Officers (hereinafter "SPO's"):  retired officers who have been asked to come back to the MPD as full-time officers, but not as bargaining unit members.  SPO's can receive the assistance of a union representative, but are not subject to just cause termination protections in the CBA.

f.      Management-Level Sworn Officers:  officers with the rank of Lieutenant or Captain or Inspector.

g.      Executives: senior civil service civilians, and sworn officers with the rank of Commander, Assistant Chief (broken into three levels), or Chief.

26.      The MPD is divided into administrative departments, specialized units, and geographically delineated patrol districts. For example, the MPD has an administrative unit responsible for investigating all officer-involved traffic accidents, regardless of district or unit.

27.      It also has operational units, some of which are patrol and community based, others of which are specialized units such as SWAT Team or Harbor Patrol.  The operational functions are broken down into Departments.  The Departments are made up of Bureaus, and the Bureaus are broken down into separate Divisions.

28.      Each Department is overseen by a Bureau Chief.  With respect to policing of the community through patrol district, each district has one Commander, a few Captains (the number of which varies by district), Lieutenants and Sergeants.

29.      MPD Sergeants have the authority to set employee schedules, make daily assignments, determine partnership arrangements, monitor and supervise officer conduct, track officer movements and account for their activities, grant or deny requests for up to eight (8) hours of leave, approve or assign overtime work, verify time sheets, provide content and input to officer performance evaluations, and assign officers vehicles and equipment.

30.     MPD Lieutenants have supervisory authority over Sergeants and serve as the first level of dispute management when officers have concerns or problems with the decisions of their district Sergeants.  Lieutenants ensure that departmental operational goals are met, are responsible for officer evaluations and minor discipline, and have significant input into what officers will be assigned to their department.  Lieutenants have the absolute authority to override the decisions of their subordinate Sergeants.

31.     While minor disciplinary matters can be handled by Sergeants or Lieutenants, the authority to enact major discipline such as suspensions or terminations rests with the Chief of Police and is delegated to the Internal Affairs Bureau, but can be overridden by the Chief of Police at any time.

32.     Regardless of the authority delegated to subordinates, the Chief of Police retains total discretion to override the decisions of his or her subordinates. He or she also enjoy the authority to order any of his or her subordinates to carry out his or her wishes with respect to any employee of the MPD.

33.     The MPD maintains one centralized EEO office for all personnel, whether civilian, SPO, sworn officer or management. This is the office that handles all internal complaints regarding unfair or discriminatory treatment. In theory, it is supposed to investigate, mediate, and address equal opportunity concerns.

34.     All bargaining unit members are subject to the same pay, promotion, assignment, and disciplinary procedures as negotiated by the Union and outlined in the Collective Bargaining Agreement.

**MPD'S CULTURE OF ALLOWING AND ENCOURAGING FRONT-LINE SUPERVISORY ABUSE OF POWER**

35.    The majority of day-to-day operational decisions are made by district Sergeants and Lieutenants. This gives them the ability to make decisions that make an officer's work pleasant, or very unpleasant.

36.    Sergeants and Lieutenants also have the authority and responsibility to rate officers' performance, which has a direct impact on their promotability and job security. They set the tone for their officers during regular meetings, such as roll call (a regularly scheduled meeting of all officers on a shift to discuss daily assignments).

37.    For the duration of the relevant period, the MPD has been aware that its Sergeants and Lieutenants have used their power to abuse, harass, isolate, intimidate, bully and denigrate Black women police officers.  *See., e.g.,* factual narratives of Plaintiffs Brown, Knight, Hampton, Grier.

38.    In many instances when MPD leadership has been informed that a Sergeant or Lieutenant targeted a Black women officer for abuse which resulted in discrimination, MPD management chose to ignore or encourage that abuse.  *See., e.g.,* factual narratives of Plaintiffs Carr, Clark, Knight, Hampton.

39.    MPD management maintains a pattern and practice of refusing to transfer Black female officers who've asked to be transferred away from an abusive supervisor.  *See., e.g.,* factual narratives herein of Plaintiff Lockerman and Hampton.

40.    MPD's highest management maintains a pattern, practice and/or custom of refusing to counsel or discipline supervisors who make or condoned sexist, racist, harassing or inappropriately sexualized comments.  *See., e.g.,* factual narratives of Plaintiffs Brinkley, Mitchell, and Grier.

41.    MPD's highest management maintains a pattern and practice and/or custom of allowing and encouraging supervisors to retaliate against Black women officers who've complained about

11

the treatment they received by giving them undesirable assignments, assigning them inferior equipment, refusing overtime, refusing to give them desirable work schedules, denying them training opportunities, imposing disparate disciplinary standards, and falsely and inappropriately lowering their performance evaluations.   *See., e.g.,* factual narratives below of Plaintiffs Dickerson, Clark, Mitchell, Knight.

42.     MPD's highest management maintains a pattern and practice and/or custom of allowing supervisors to use the minor infraction disciplinary process to hyper-scrutinize, harass and attack Black women officers in an effort to demoralize them and make them suffer for having opposed or complained about race or gender discrimination. *See., e.g.,* factual narratives below of Plaintiffs Hampton, Brinkley, Carr, Clark, and Grier.

43.     MPD's highest management maintains a pattern and practice and/or custom of refusing to investigate or act upon complaints of Black women officers who seek redress for discrimination, unfair and disparate treatment, and retaliation by their supervisors.  *See., e.g.,* factual narratives below of Plaintiffs Dickerson, Knight, Carr, Brinkley, and Lockerman.

44.     All CRPs have suffered from, and have complained to management about the MPD's culture and practice of allowing supervisors to abuse, attack, bully, harass, discriminate and retaliate against them.

45.     The requested class relief herein includes: appropriate compensation to class victims and corresponding declaratory and injunctive relief that remedies the MPD's culture, pattern practice and/or custom of allowing supervisory employees to abuse their power with impunity for vindictive, petty, racist, sexist, and retaliatory reasons.

## THE MPD'S SYSTEMATIC EEO PROBLEMS

### MPD'S DYSFUNCTIONAL AND CHILLING EEO OFFICE

46.     Upon information and belief, Alphonso Lee(hereinafter "Mr. Lee"),Director of the MPEEO Office,  has held his position since 2017.

47.     Between December of 2020 and June of 2021, the EEO Office was managed by Mr. Lee, and three (3) subordinate EEO Counselors: Doreen Haines (hereinafter "Ms. Haines"); Rosemarie Lucero (hereinafter "Ms. Lucero"); and Renae Lee (hereinafter "Ms. Lee").  All three of these EEO Counselors have made internal complaints against Mr. Lee.[1]

48.     Between February and December of 2020, Harry Carter (hereinafter "Mr. Carter") was an EEO Counselor.

49.     The sworn affidavits of Ms. Rosemarie Lucero, Harry Carter and Renae Lee are attached here to as EXHIBITS 1, 2 and 3, respectively.  They explain in detail how the MPD EEO Office operated during their respective tenures, and reveal through sworn affirmations the extent degree of its corruption and dysfunction.

50.     During his tenure as MPD's EEO Director, Mr. Lee has maintained a system that intentionally discredits Black women complainants, effectuates a pattern and practice of retaliation, and bullies his subordinates into disavowing any and all claims of discrimination filed by Black women officers, thereby resulting in the Defendant's sanctioning of discriminatory practices against Plaintiffs.

---

[1] In June of 2021, David Simmons (white male) joined the office as an EEO Counselor.

51.     As attested by Ms. Lucero in her affidavit, included as EXHIBIT 1, Mr. Lee holds and expresses denigrating views about female police officers in general, and Black female police officers.

52.     Mr. Lee has repeatedly expressed to his staff his belief that female complainants are "liars" and "lazy," and that they make EEO complaints to be manipulative.  See EXHIBIT 1 & 2.

53.     Mr. Lee has made his views, which demonstrate sexist and racist behaviors, known to his subordinates so frequently that they refer to it as his "mantra."  *See* EXHIBITS 1 & 2.

54.     Upon information and belief, in the course of four years, Mr. Lee has not permitted *a single claim* of race or gender discrimination filed in his office to be substantiated.  Emphasis added. *See* EXHIBITS 1, 2 &3.

55.     As can be seen in Mr. Carter, Ms. Lee's and Ms. Lucero's affidavits, Mr. Lee believes, and has repeatedly stated that MPD is not subject to federal equal employment and non-discrimination laws.  See EXHIBITS 1, 2 & 3.

56.     Mr. Lee demands that his subordinates report to him what EEO complainants have said in initial interviews, and then goes to management himself, to coordinate what the management response will be ***prior to*** the commencement of any investigation. *See* EXHIBITS 1, 2 & 3.

57.     Mr. Lee required that EEO Counselors record all initial interviews, and then provided and or played these recordings for Assistant Chief Manlapaz (hereinafter "Asst. Chief Manlapaz"), the Bureau Head of IAD, and/or other management personnel.  *See* EXHIBITS 1 & 2.

58.     According to Mr. Carter and Ms. Lucero, this practice of playing recordings for management contributed directly to immediate retaliation against complainants, and the pervasive perception that EEO interviews and complaints were not confidential.  See EXHIBITS 1 & 2, and *see., e.g.,* factual narratives of Plaintiffs Brinkley, Hampton.

14

59.     Mr. Lee's habit of violating confidentiality is a pattern, practice and/or custom designed to discourage Black woman police officers from using the EEO office and has succeeded in doing so.

60.     Mr. Lee demands that his subordinates investigate, not with an impartial eye to ascertain the truth, but with an agenda to find facts that will undermine complainants' claims as well as their credibility.  *See* EXHIBITS 1, 2 & 3.  In doing so, he directs his subordinates to place statements in investigative reports to paint complainants in a negative light. *See* EXHIBITS 1 & 2.

61.     Mr. Lee edited and manipulated written reports, exit letters and other documents that are supposed to reflect the issues raised by a complainant, to ensure that the DC Office of Human Rights (hereinafter "OHR"), or the EEOC was misled about what it should be investigating.  See EXHIBITS 1 & 2, and *see., e.g.,* below factual narrative of Plaintiff Knight.

62.     Mr. Lee's actions were maliciously designed to derail the ability of complainants to obtain redress from external entities.

63.     Mr. Lee worked with MPD management to coordinate management responses to undermine complainants, and to assist in bullying them and/or forcing them out.  *See* EXHIBITS 1, 2 & 3.

64.     If Mr. Lee's subordinates refused or push-backed on his demands to discredit a complainant, he would retaliate against them by threatening their employment or by putting them on a Performance Improvement Plan (hereinafter "PIP").  He placed his EEO Counselors Ms. Lucero and Ms. Haines on PIPs multiple times for frivolous or fictitious reasons in order to coerce them to comply with his unlawful mandates.  *See* EXHIBITS 1 & 2.

65.     On information and belief, Mr. Lee maintains an EEO Office so hostile and toxic that ***every woman*** who has worked for him has filed a complaint against him, either internally or externally.

66.     On one occasion, a subordinate filed an EEO claim against Mr. Lee for screaming at, and bullying her.  Mr. Lee, as EEO Director, chose to investigate her complaint against him *by self-investigation, and*, not surprisingly, exonerated himself.  *See* EXHIBITS 1 & 2.

67.     This inappropriate exoneration violated MPD EEO policies that require (at least in theory) that complaint investigations be conducted impartially.

68.     Mr. Lee also maintains an unlawful pattern and practice of threatening to investigate persons who file EEO claims.  *See* EXHIBIT 1.  Among other things, he repeatedly requested Asst. Chief Manlapaz of IAD to open investigations into complainants as punishment for complaining. *See* EXHIBITS 1 & 2.

69.     The Mayor's Office, District of Columbia City Council, OHR, IAD, Office of the Inspector General (hereinafter "DC IG"), and the DC Attorney General's Office have received multiple complaints and allegations against Mr. Lee and the MPD EEO Office but have either refused to acknowledge them, or to heretofore engage in any meaningful action to remedy the entrenched aforementioned polices, practices and/or customs.

70.     Because of the dysfunctional and retaliatory nature of the MPD EEO Office, Black women officers are left with little recourse but to seek assistance from external entities, DC OHR, the EEOC, and the DC IG office.  But, as soon as they did so, Mr. Lee ensured that they would become victims of systemic and coordinated retaliatory efforts to bully, harass and force them out of their employment.

71.     MPD executive management has received numerous complains about Mr. Lee and has refused to take any action to mitigate his obvious, and systemic pattern of EEO abuses.

72.     The CRPs have been harmed and affected by Mr. Lee and the MPD EEO Office's default dismissal of their complaints of race and gender discrimination and retaliation complaints in the same or similar way.

73.     All putative class members (hereinafter "PCMs") have been negatively affected by the unlawful and discriminatory practices of the MPD EEO Office in the same or similar way.

74.     All PCMs would benefit from a class-wide remedy based on declaratory and injunctive relief to repair the MPD EEO Office and bring it into alignment with federal law, DC human rights law, EEOC guidance, and industry best practices.

### THE MPD EEO DIRECTOR USES THREATS AND INTIMIDATION TO CHILL THE REPORTING OF DISCRIMINATION AND ABUSE

75.     In furtherance of the MPD EEO Director's efforts to breach  complainant confidentiality, Mr. Lee requires his subordinates to sign an over-broad and unlawful non-disclosure agreement that prohibits them from reporting or speaking out against anything that transpires in the EEO Office.  A copy of the MPD EEO NDA is attached hereto as EXHIBIT 4.

76.     The terms of the NDA extend far beyond confidentiality with respect to specific cases; it also prohibits EEO Counselors from discussing any actions and activities of the EEO Office, including discriminatory and unlawful actions.

77.     Mr. Lee frequently reminds his counselors of its terms, and threatens to terminate them if they report or complain about his actions. *See* EXHIBITS 1 & 2.

78.     Mr. Lee also requires complainants to sign the same over-broad NDA, and threatened them with serious disciplinary action if they speak out about any component of the EEO process.

79.     This explains why the EEO Counselors have filed EEOC complaints with respect to the way Mr. Lee has treated them, but did not feel at liberty to report what Mr. Lee was doing to Black women MPD police officers who complained of discrimination.  *See* EXHIBITS 1 & 3.

80.     Plaintiffs assert that Mr. Lee's NDA is *per se* unlawful and was used to bully and intimidate EEO Counselors into complying with his intentional discrimination against Black women police officers.

81.     There is no reason why EEO Counselors should be prohibited from speaking to third parties such as lawyers, City Council members, the Mayor's Office or others about MPD EEO discriminatory "methods and practices."

82.     On multiple occasions, the CRPs attempted to speak directly with their supervisors, managers, and/or senior department leadership about attacks on their credibility and the skewed and dishonest conclusions in EEO reports.  *See., e.g.,* factual narratives of Plaintiffs Brinkley, Carr, Knight and Grier.

83.     MPD management, up to and including MPD Chiefs of Police, maintain a pattern and practice of ignoring, rebuffing, rebuking, and disbelieving the complaints from Black women officers about the malfeasance of Mr. Lee, which effectively sanctioned his behaviors and nullified EEO protections for victims of discrimination.

84.     All PCMs are being harmed by Defendant's pattern and practice and/or custom of discrimination via Mr. Lee's threats and coercion of EEO staff.

85.     All PCMs are harmed by Mr. Lee's unlawful use of NDAs to chill proper enforcement of the Department's anti-discrimination laws.

86.     All PCMs would obtain a remedy if the Court were to order declaratory and injunctive relief mandating that the MPD EEO Office cease and desist from using over-broad and misleading NDAs, and threatening EEO Counselors with termination should they reveal or report malfeasance in the MPD EEO Office.

87.

**FACTS APPLICABLE TO THE PUTATIVE CLASS RELATED
TO SYSTEMIC RETALIATION**

**THE MPD MAINTAIS A PATTERN AND PRACTICE OF RETALIATORY IAD INVESTIGATIONS OF BLACK WOMEN POLICE OFFICERS WHO COMPLAIN ABOUT RACE OR GENDER DISCRIMINATION OR RETALIATION**

88.     For the duration of the relevant period, MPD IAD has used its investigatory power to bully, harass and retaliate against Black women officers.

89.     On information and belief, and in accordance with Mr. Lee's repeated admissions, Asst. Chief Manlapaz has a close personal relationship with Mr. Lee.  See EXHIBITS 1, 2 & 3.

90.     Whenever a complaint was made against Asst. Chief Manlapaz, Mr. Lee chose to "investigate" it personally, and then dismissed the allegation.  *See* EXHIBIT 1 & 2.

91.     The converse is also true.  Asst. Chief Manlapaz would "investigate" any and all claims against Mr. Lee, and dismiss them.  *See* EXHIBIT 1 & 2.

92.     Mr. Lee has repeatedly informed his subordinates of the mutually beneficial arrangement he has with Asst. Chief Manlapaz, going so far as to insist that no allegation against him will ever be substantiated.  *See* EXHIBIT 1 & 2.

93.     Mr. Lee has repeatedly informed his subordinates that he has the power to ask Asst. Chief Manlapaz to open an investigation into a complainant for no other reason than to taint the complainant's credibility.  *See* EXHIBITS 1 & 2.

94.     Asst. Chief Manlapaz has maintained a pattern and practice of opening investigations into Black women officers who complain about discrimination, mistreatment or misconduct for the express purpose of retaliating against them and chilling others from complaining.

95.     Asst. Chief Manlapaz has intentionally sabotaged investigations into allegations made by Black women officers to undermine their authority and ability to manage their staff, attack their

19

credibility, and stymie their ability to obtain redress of serious complains.  *See., e.g.,* factual narrative of Plaintiff Dickerson.

96.     Because Asst. Chief Manlapaz has principle investigative authority through his role as the Bureau Chief of IAD, he has the ability to affect officers at every level, in every department of MPD.

97.     Thus, all PCMs were affected by Asst. Chief Manlapaz' abuse of power, and his pattern and practice of retaliating against Black women officers for complaining about discrimination, misconduct, harassment or retaliation.

98.     The Chief of Police, the Mayor's Office, the AG's Office, the DC City Council, the DC IG, and DC OHR have all received complaints about MPD IAD, and Asst. Chief Manlapaz, detailing how he has abused his power as Bureau Chief of IAD, and that he opens frivolous and fraudulent investigations into Black women police officers to intimidate and retaliate against them. All of those complaints were ignored by DC government entities.

99.     The entire putative class is negatively affected by Defendant's maintenance of a pattern and practice and/or custom of retaliatory investigating via Asst. Chief Manlapaz's actions.

100.    The entire putative class is negatively affected by Defendant's pattern and practice of undermining or refusing to investigate allegations made by Black women police officers via Chief Manlapaz's actions.

101.    All PCMs would obtain redress from a declaratory or injunctive remedy that revamps IAD to repair its policies and practices and retrains its agents to cease using their investigative powers to retaliate against complainants.

102.

**MPD'S MAINTAINS A PATTERN, PRACTICE AND/OR CUSTOM OF RETALIATING AGAINST BLACK WOMEN COMPLAINANTS BY WAY OF INVOLUNTARILY TRANSFERS**

103.    Another way in which the Chiefs of Police have used his power to retaliate against Black women who opposed or reported misconduct was to destabilize their work schedules and remove them from their assignments or departments.

104.    As mentioned above, MPD has several specialized units that are competitive to be assigned to, and are considered "elite" units.

105.    Many of these units are within the Special Operations Department (hereinafter "SOD"). They include:   K-9 Unit; Explosive Ordinance Division (hereinafter "EOD"); Emergency Response Team (hereinafter "ERT"); SWAT; Search and Rescue Team; Harbor Patrol; Special Events Detail; Presidential and Vice-Presidential Detail; Mounted Police; Motorcycle Police; Helicopter Patrol; and Traffic Division.

106.    MPD Chiefs of Police have removed Black Female officers from their long-standing favorable assignments on nothing more than an accusation of an infraction.  *See., e.g.,* factual narratives of Plaintiffs Knight & Clark.

107.    MPD Chiefs of Police, or their designates, have threatened Black women officers with transfer if they complain about a co-worker or supervisor discriminating against, harassing or bullying them.  *See., e.g.,* factual narrative of Plaintiff Dickerson.

108.    MPD has weaponized the IAD investigative process, using it to threaten and bully officers into compliance with an outcome desired by the Chief of Police, or his or her designates.  *See., e.g.,* factual narratives of Plaintiffs Brown, Brinkley, Carr, Knight, Dickerson, Hampton.

109.     The MPD maintains a pattern, practice and/or custom of forcing Black women officers to relinquish desirable assignments in exchange for not being fraudulently and unfairly "investigated" by IAD, or otherwise disciplined.

110.     Black women have been disproportionately targeted for transfer out of desirable or elite units.

111.     When a Black woman is actually cleared of an allegation of misconduct, MPD does not immediately reinstate her to the desirable unit or assignment.  *See., e.g.,* factual narratives of Plaintiff Knight & Hampton.

112.     MPD's pattern and practice of retaliatory transfer of complainants creates a chilled environment for Black women officers, and discourages them from complaining about race and gender discrimination and retaliation.

113.     The CRPs have been negatively affected by MPD's pattern and practice of retaliatory and abusive departmental transfer.

114.     Because the Chiefs of Police have sole power and discretion to order, or intercede to prevent a transfer as described herein, all PCMs are affected by this rampant and harmful employment practice.

115.     All PCMs will obtain a remedy should this Court order declaratory or injunctive relief and take action to curb the MPD's long-standing pattern and practice of retaliatory job transfers.

**MPD CHIEFS OF POLICE MAINTAIN A PATTERN AND PRACTICE OF INSTIGATING, ORDERING, APPROVING AND CONDONING COORDINATED DISCIPLINARY CAMPAIGNS TO PUSH OUT BLACK WOMEN OFFICERS WHO OPPOSE OR COMPLAIN ABOUT RACE OR GENDER DISCRIMINATION OR MISCONDUCT**

116.    MPD Chiefs of Police have final say in the termination of any police officer, or put another way, an MPD police officer will not be terminated without the Chief of Police's direct or indirect approval.

117.    When an MPD Chief of Police decides that he or she no longer wants a Black women officer to be employed by the MPD, the Chief orchestrates and coordinates a campaign to push that officer out.

118.    The narratives of the CRPs clearly outline how these bullying, harassment and retaliation campaigns are carried out.

119.    Black women officers who are no longer welcome at the MPD because they have opposed race or gender discrimination and retaliation, are hyper-scrutinized (or "bird-dogged") by their immediate supervisors for every kind of minor issue or transgression, and are made to feel they are walking on eggshells.  *See., e.g.,* factual narratives below of Plaintiffs Hampton, Mitchell, Lockerman, Dickerson, Knight, and Carr.

120.    This practice is so prevalent and such a part of the culture, that MPD officers have a slang term for it: "being hot."  When an officer is described as "being hot," by and amongst other officers, it means that the officer has been targeted for reprisal and punitive treatment, and is used as a warning to steer clear of that officer to avoid being collaterally damaged by the intentional retaliation aimed at the targeted officer.

121.    For the duration of the relevant period, MPC Chiefs of Police have been aware of, and have directed their subordinates to execute campaigns that target an individual officer for removal from MPD.

122.   Black women officers have been disproportionately targeted for such campaigns of bullying, isolation, harassment and retaliation for complaining about race and gender discrimination, or for reporting fellow police officers for misconduct.

123.   Black women who become the subject of such campaigns are made to feel unwelcome and like second class citizens.

124.   Black women officers who are no longer welcome at the MPD are, and have been repeatedly disciplined to lower their performance appraisal rates and thereby justify their terminations.  *See., e.g.,* factual narratives of Plaintiffs Brinkley, Knight.

125.   IAD targeted and investigated Black women officers who opposed discrimination or complained about, or reported, misconduct; these same women have been ignored when they've sought redress for the coordinated retaliation against them.

126.   MPD Police Chiefs are extremely effective in fashioning and executing these coordinated campaigns to bully, harass and retaliate against Black women police officers, which causes a disproportionate number of them to resign or retire early.

127.   Black women who are targeted for retaliatory harassment are falsely accused of serious misconduct and made to defend themselves against often-times outrageous accusations.  When those accusations are proven to be unfounded, there is no redress of any kind.  *See., e.g.,* factual narratives of Plaintiffs Mitchell, Knight, Brown.

128.   Black women police officers with decades of service to the MPD, once they become the subject of a targeted bullying campaign, are found to be deficient in every category of performance, with no explanation as to what caused the purported dramatic decline in performance.  *See e.g., See., e.g.,* factual narratives of Plaintiffs Brinkley, Mitchell, Clark, Carr, Knight.

129.    Black women officers who are targeted by the Chiefs of Police in such a fashion are bullied and harassed to such an extent that it adversely affects their mental and physical health, and places them in a position in which leaving the MPD becomes the only way in which they can protect their mental and physical wellbeing.  *See., e.g.,* factual narratives below of Plaintiffs Dickerson, Brinkely, Knight, Carr, Clark, and Brown.

130.    Because of the complete and total dysfunction of the MPD EEO Office, Black women officers are unable to obtain any kind of internal intervention to help protect their rights.

131.    Those that obtain the benefit of union representation often encounter management's intentional delay(s) and refusal(s) to provide information to the union.

132.    When the union is successful in proving that the disciplinary action against a Black woman officer was unjust, days or weeks later, the Black woman officer will be disciplined *again* for something else.

133.    The design and intention of the coordinated attacks by MPD Chiefs of Police is to make Black women who oppose gender and race discrimination feel as if there is an incessant onslaught of harassment and bullying against them, that chokes the life out of their professional competencies and emotional strength such that it becomes  easier to simply give up.  MPD Chiefs of Police approve of, and use, such tactics for unlawful purposes and disproportionately against Black women officers.

134.    MPD Police Chief tactics to push out Black women police officers constitute unlawful retaliation.

135.    All CRPs have been affected by the MPD's pattern, practice and/or custom of targeted harassment and bullying in retaliation for complaining about or opposing race and gender discrimination and police misconduct.

136.    Because of MPD's top-down structure all PCMs are similarly affected by, and equally vulnerable to, its pattern, practice and/or custom of coordinated and targeted retaliatory bullying of Black women police officers.

137.    All putative class members would obtain a remedy if the Court were to order declaratory and injunctive relief against the MPD, ordering it to cease and desist from engaging in coordinated bullying and harassment of Black women officers who oppose race and gender discrimination and retaliation.

**FACTS COMMON TO THE CLASS RELATED TO MPD'S
SYSTEMIC DISPARATE TREATMENT OF BLACK WOMEN OFFICERS
<u>BASED ON RACE AND GENDER</u>**

**MPD MAINTAINS A PATTERN AND PRACTICE OF INTENTIONALLY
DENYING PROMOTIONS TO BLACK WOMEN OFFICERS**

138.    MPD's process for promoting officers up the ranks disproportionately adversely affect Black women police officers.

139.    On information and belief, Black women are promoted less than any other group at MPD, the disparity is statistically significant, and is the result of practices that amount to both disparate treatment of, and disparate impact on Black women police officers.

140.    Actual promotions are based on how many openings are available, and the ranking order of the results of the officers who took the promotion exam, which is published.  Thus, the highest performer is ranked number one, the second number two, and so forth.

141.    If, for example, a Department has three Lieutenant openings, in theory the top three performers on the Lieutenant exam would be promoted into those roles.

142.    However, MPD has maintained a pattern, practice and/or custom of filling openings with "Acting Officials" who are favored by the Chief of Police or the Departmental Commander, to foreclose or delay the promotion of a Black women officer who earned the promotion because of

her performance on the exam. *See., e.g.,* factual narratives below of Plaintiffs Hampton, Lockerman, and Dickerson.  Promotion delays adversely affect Black woman officers' pay and career development opportunities.

143.    MPD Chiefs of Police have used this practice to harm Black women officers for the duration of the relevant period and to retaliate against Black women officers for complaining about race or gender discrimination, and/or other police misconduct.

144.    Because the Chief of Police has absolute discretion to make such determinations in all Departments, all PCMs who seek promotions are affected by this pattern, practice, and/or custom.

145.    All PCMs who seek to be promoted would obtain a complete remedy if a declaratory or injunctive remedy was ordered that prohibited or severely restricted the practice of promoting "Acting Official" over fully qualified and promotion-eligible Black women police officers.

### MPD'S PATTERN, PRACTICE AND/OR CUSTOM OF DENYING BLACK WOMEN OFFICERS CAREER DEVELOPMENT OPPORTUNITIES

146.    MPD maintains a pattern, practice and/or custom of denying Black women officers the ability to transfer into elite or desirable specialized units, particularly if they have complained about race or gender discrimination, or have accused an officer of misconduct. *See., e.g.,* factual narrative below of Plaintiff Carr.

147.    Several of the MPD's elite and most desirable units have physical requirements that all officers have to meet. Some of the units administer physical fitness exams that determine who can be assigned to them.

148.    MPD maintains a pattern, practice and/or custom of holding back those Black women officers who do pass the physical requirements from transferring into the units they qualify for.

149.    MPD denies these transfers to Black women officers if they are perceived to be "trouble-makers," i.e., someone who reports or opposes misconduct or discrimination.  *See., e.g.,* factual narratives below of Plaintiffs Knight, Brinkley, Mitchell, Carr, and Grier.

150.    When Black women officers complain about being denied job opportunities, they are further retaliated against.

151.    Defendant maintains a pattern, practice and/or custom of allowing MPD management to deny transfers and job opportunities to Black women officers without any legitimate explanation or business justification for doing so.

152.    This MPD policy, practice, and/or custom disproportionately harms Black women officers, and affects all PCMs in the same way.

153.    All PCMs would obtain a remedy to a discriminatory and retaliatory practice if the Court granted them declaratory and injunctive relief that requires MPD management to justify or explain denials of requested job transfers to Black women officers when an opening is available.

**MPD'S POLICY, PATTERN AND PRACTICE, AND/OR CUSTOM OF ENFORCING DISPARATE DISCIPLINARY STANDARDS WHICH FAVOR WHITE MALE OFFICERS**

154.    Upon information and belief, to a statistically significant degree, Black women officers are disciplined more frequently, and face harsher punishments than white male officers, black male officers, or white female officers for the same transgressions.

155.    Upon information and belief, to a statistically significant degree, Black women officers are frequently disciplined for actions that are not transgressions at all.

156.    For example, when MPD suspected that Plaintiff Tabatha Knight had been recording some of her meetings with supervisors and management to protect herself from the onslaught of false

accusations made against her, she was subjected to an IAD investigation, and threatened with a twenty-eight (28) day suspension.

157.    Plaintiff Knight's recording of conversations did not violate District of Columbia law, nor MPD policy.

158.    Rather, Plaintiff Knight was investigated and threatened with suspension because any recording could potentially prove malfeasance on the part of the parties she recorded.

159.    Black women officers are also disciplined for infractions that they could not avoid, such as Plaintiff Brinkley, who was disciplined for not having her temperature taken when MPD posted no one to execute the COVID protocol task.

160.    Plaintiff Mitchell was disciplined for missing a call-out while she was on approved FMLA leave, and not meant to be disturbed because she was caring for a sick parent.

161.    Black women officers are disproportionately disciplined for alleged infractions that were based on completely fictitious allegations. *See., e.g.,* factual narratives below of Plaintiffs Brown, Knight and Mitchell.

162.    And when the claims are proved not only to be false but to have been made in bad faith, the accuser is not disciplined.

163.    In sharp contrast to the rampant and free-flowing discipline of Black women officers, white male officers are highly favored and forgiven for very serious transgressions.

164.    For example, on one occasion, a white male sergeant took out his penis and urinated into a bottle while riding in a police vehicle with a female officer, instead of asking to pull over and urinate in a bathroom or in the woods. *See., e.g.,* factual narratives below of Plaintiffs Brinkley and Mitchell. Rather than being disciplined for this serious violation, the officer was promoted to

Lieutenant shortly thereafter, and Plaintiff Mitchell  was retaliated against for making "a big deal" of it.

165.    MPD has maintained a pattern, practice, and custom of not only excusing misconduct from white male officers with respect to their conduct within the MPD, but also with respect to their interactions with the community.

166.    Upon information and belief, and to a statistically significant degree, white male officers are the subjects of more complaints of use of excessive force than any other group of officers at MPD.

167.    However, they are not disciplined for their actions, even when the MPD is forced to compensate the victims of their excessive force.

168.    Several MPD officers were involved in a Facebook forum for the MPD that devolved into a platform to attack and denigrate fellow officers.  Several male officers on the forum engaged in systematic bullying of fellow officers based on race and gender.

169.    IAD was ultimately asked to investigate the forum, and the forum was eventually shut down.  Upon information and belief, not a single male officer involved in the cyber-bullying was held to account for his actions.

170.    Upon information and belief, a second MPD officers Facebook forum currently exists, and MPD male officers continue to make racist and sexist comments.

171.    Upon information and belief, the MPD maintains a pattern, practice and custom of not taking appropriate disciplinary action against officers who openly express racist and sexist views. Nor does it track or monitor whether those views affect the involved officers' performance of their policing duties as per the community at large or their fellow officers.

**MPD HAS A PATTERN, PRACTICE AND CUSTOM OF CONDONING SEXUAL HARASSMENT, SEX-BASED DISCRIMINATION AND MISCONDUCT, AND REWARDING AND PROTECTING MALE OFFICERS WHO ENGAGE IN SEXUALLY INAPPROPRIATE CONDUCT OR SPEECH**

172.   As can be seen in the individual narratives of the CRP's, MPD has a long history of protecting men who sexually harass Black women police officers.  *See., e.g.,* factual narratives below of Plaintiffs Dickerson, Hampton, Knight, and Grier.

173.   It also has a pattern, practice and custom of being dismissive of sexually charged language or "locker-room talk" in police meetings and gatherings in which women officers are present, thus condoning and encouraging officers to use inappropriate and patently sexist language in the workplace.

174.   When Black women police officers have complained about sexual harassment, or inappropriate sexist language, they have been targeted for retaliation by their supervisors; when they seek intervention by the upper chain of command, their complaints are dismissed or ignored.

175.   MPD's Chiefs of Police have the authority and the capacity to instill a zero-tolerance policy throughout MPD for the use of sexist language, locker room talk, and abusive and denigrating comments.  To date, the MPD Chiefs of Police who have presided during the relevant period, have not set or enforced such a policy.

176.   On the contrary, they have instilled and perpetuated a culture permissive of denigration and disrespect, one that welcomes and promotes bullying, retaliation, isolation, targeting and harassment of Black women officers who oppose such sexist and discriminatory speech and actions.

177.   All of the CRPs have identified this abusive, sexist culture as a central component of the hostile work environment created for Black women police officers.

178.   All PCMs are subjected to the same culture and social dynamics within the MPD.

179.    All PCMs would obtain a remedy if the Court were to grant declaratory and injunctive relief to the class, and mandate that the MPD Chiefs of Police issue new policy with respect to appropriate tone and culture for professionals at the MPD.

180.    All class members would obtain a remedy if the Court were to grant declaratory and injunctive relief to the class with respect to mandating that the MPD cease and desist retaliating against Black women officers who complain of, or oppose the use of sexist and derogatory language by MPD officers.

181.    All class members would obtain a remedy if the Court were to grant declaratory and injunctive relief to the class with respect to mandating that the MPD revamp its EEO Office, and update its EEO counseling and investigative policies and practices.

### MPD HAS A PATTERN, PRACTICE AND CUSTOM OF WITHHOLDING RESOURCES FROM BLACK WOMEN POLICE OFFICERS AND UNDERMINING THEIR AUTHORITY AND ABILITY TO EXECUTE THEIR DUTIES

182.    As part of its culture, pattern, practice and custom of treating Black women police officers as second-class citizens, the MPD routinely provides Black women police officers poor, or inappropriate equipment.  *See., e.g.,* factual narratives below of Plaintiffs Brinkley, Mitchell, and Clark.

183.    In one case it assigned a pair of Black women police officers a flea-infested vehicle and refused to permit them to use a cleaner or better car.

184.    In another instance MPD refused to provide a Black female officer with the appropriate vehicle to execute her duties on a presidential detail.

185.    Black women police officers promoted into management roles are given less resources than their colleagues and are placed in control over smaller and/or less desirable districts, divisions and departments. *See., e.g.,* factual narratives of Plaintiffs Dickerson & Lockerman.

186.    MPD management often undermines the authority of Black women officers in the management structure by allowing or encouraging insubordination, usurping discretion form Black women officers, and sabotaging their management decisions.  *See., e.g.,* factual narratives below of Plaintiffs Lockerman, Hampton, and Dickerson.

187.    When Black women officers complain about disparate treatment in the provision of department resources, they are at best, ignored, and more often, retaliated against.

188.    The claims of the class representative plaintiffs with respect to being denied appropriate gear, vehicles, staff and other resources, to execute their duties safely and adequately, are typical of the claims of the PCMs, such that resolution on a class basis will remedy all claims.

## RULE 23 FACTORS

## RULE 23(a) FACTORS

### NUMEROSITY

189.    At the time of this filing, the exact number of the members of the class is not known. Plaintiffs will seek appropriate pre-certification discovery to ascertain the exact number.  On information and belief, based on the current number of Black women officers employed by the MPD, and the estimated rate of turn-over, the putative class would be in excess of minimally seven hundred (700) putative class members.

190.    That number well exceeds the standard for meeting the numerosity standard, and the interest of judicial efficiency will clearly be served by class treatment of the claims herein.

191.    Joinder of the cases is impractical, inefficient, and likely to deny justice to the class, inasmuch as the substantial potential for retaliation against litigants from the MPD would dissuade putative plaintiffs from filing individual actions.

## COMMONALITY

192.    Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

193.    The questions of fact common to the class are outlined in the factual section above.

194.    The questions of law common to the class include, but are not limited to, the following:

a.      Whether MPD's practice of systematic retaliation against Black women police officers who complain about race or sex discrimination, or misconduct violates the law and Plaintiffs' civil rights?

b.      Whether MPD maintenance of an EEO office predisposed to dismiss and invalidate any and all claims of discrimination or workplace harassment violates federal and DC law?

c.      Whether MPD permitting an EEO Director to make false statements in EEO investigations, and to violate confidentiality to chill and discourage the use of the EEO process violates federal and DC law?

d.      Whether MPD's used of an overbroad NDA to prevent EEO Department employees from reporting unlawful EEO violates federal and DC law.

e.      Whether MPD's practice of promoting male officers into "Acting Official" positions in order to deny or delay promotions for Black women officers violates federal and DC law?

f.      Whether MPD's use of the IAD's investigative process to retaliate against Black women officers who complain about race or gender discrimination, or police misconduct violates federal and DC law?

g.      Whether MPD's systematic withholding of desirable assignments, and career growth opportunities from Black women officers is a violation of federal and DC law?

h.      Whether MPD's custom and culture of permitting male officers to use sexist and sexually charged language in the workplace, creates a hostile work environment for women officers, according to the law?

i.      Whether Defendant breached a duty to Plaintiffs by failing to monitor and manage the MPD EEO Department, thus allowing it to violate Plaintiffs' civil rights?

j.      Whether Defendant's pattern, practice and/or custom of involuntarily transferring Black women officers who report race or gender discrimination, or police misconduct violates the DC Whistleblower law?

k.      Whether MPD's systematic bullying and retaliation against Black women officers who testify before the DC City Council, or who informed the Mayor's office of race or gender discrimination, or police misconduct, violates DC law?

## TYPICALITY

195.    As can be seen in the individual narratives and claims *infra*, while all Plaintiffs do not have the exact same story, they do all have the same experience with MPD management and the MPD EEO Department.

196.    The CRPs who complained to EEO were subject to the same treatment and their respective claims were similarly ignored, minimized, and dismissed. Their claims are typical of all Black women officers who attempted to report workplace complaints to MPD's EEO Department in order to resolve their discrimination claims.

197.    The CRPs who complained to their managers and supervisors about disparate and unfair treatment were treated in precisely the same way.  Their claims are typical of all Black women officers who sought help from their management leaders, and were rebuffed or ignored.

198.    The CRPs who became the subject of a campaign to be pushed out of the MPD, were all the victims of the whims of the Chief of Police, and were treated in the exact same way.  Their claims are typical of the many Black women officers who have been similarly targeted by the Chiefs of Police and harassed and pressured into resigning or prematurely retiring.

199.    The CRPs who were subjected to a work environment rife with sexist and sexually charged language were all dismissed when they complained about it. Their claims are typical of all the Black women who were forced to endure a sexually charged and sexist work environment.

200.    The CRPs who were investigated or threatened with investigation in retaliation for complaining about race and gender discrimination, or police misconduct, have claims that are typical of all Black women officers who were so targeted.

## ADEQUACY OF REPRESENTATION

201.    The cadre of CRPs are made up of Black women that represent or have experience in all components of MPD.  Two are management employees.  Four are Senior Police Officers.  Three are currently employed sworn officers.  Three are recently retired.  One was terminated in retaliation for opposing discrimination.  One worked in the Academy for long enough to adequately represent academy-level trainees.

202.    The CRPs are from a variety of departments, and all have substantial experience on the force.  Combined, they have over 100 years of professional police experience.

203.    One CRP is a member of the Senior Executive Leadership Team of the MPD, and has a unique perspective on how senior management, and especially Chiefs of Police, wield their power.

204.    Class Counsel, Temple Law Offices, has been in operation in the District of Columbia since 1991 and known to represent victims of workplace wrongs and commercial discrimination. Donald M. Temple has practiced law for more than 42 years, 31 years in private practice.  He has

successfully litigated multiple civil rights and workplace-based race discrimination to successful jury verdicts in the D.C. and Maryland federal courts which include *Squires v. District of Columbia*, *Eric Payne vs. the District of Columbia et al.,* Case No. 10-cv-00679-PLF (USDC)(after eight years of litigation); *Proctor et al. v. Washington Suburban Sanitation Commission*; *Laura Jackson v. District of Columbia Department of Health, et, al.*, Case No. 2013 CA 003442 P(MPA) (DCSC) (after nine years of litigation).

205.   Attorney Temple has also obtained successful appellate reversals in both the D.C. state and federal courts, the Fourth Circuit, and the United States Supreme Court including, but not limited to, the following decisions:   *Linwood Q. Ham et al. v. Washington Suburban Sanitation Commission,* Appeal No, 04-2021  (CA4thCircuit), *Stephanie Brown v. Allen Sessoms*, *President University of District of Columbia*, Case No. 13-Y7027 (US Court of Appeals,   DC Circuit), *Nanko Shipping, USA, Parent Company of Nanko Shipping Guinea, et al., v. ALCOA, INC., Alcoa World Alumina*, CASE No. 15-7070 (US Court of Appeals for DC), *Capital Services Management, Inc. v. Vesta Corporation* (US Court of Appeals D.C. Circuit), *and Stephanie Artis v. District of Columbia (Co-Counsel)*, United States Supreme Court.

206.   Class Counsel, Pamela Keith, has been a labor and employment attorney for twenty-one (21) years.  She worked at some of the most prestigious labor and employment firms in Washington, DC: Jones Day, Morgan Lewis & Bockius and Ogletree Deakins, prior to joining Temple Law Offices.  Attorney Keith worked extensively on one of the largest class actions in American history (*Dukes, et al. v. Walmart*) while employed with Jones Day, and spent years working extensively on Rule 23 litigation.

207.   Temple Law Offices have the experience, reputation, and stability to adequately represent the interests of the litigants and the putative class.

## RULE 23(b)(2) FACTORS

208.    Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

209.    While the CRPs do have individual claims for which they seek redress, certification of the putative class under Rule 23(b) is appropriate because declaratory and injunctive relief will provide a remedy to all PCMs with respect to MPD policies and practices that violate the law.

210.    The fact that MDP is a top-down chain of command structure ensures that unlawful or discriminatory policies and practices that emanate from the Chiefs of Police are carried out by their subordinates through the entire enterprise.

211.    Conversely, discriminatory acts or practices engaged in by individual officers, through acts of individual discretion, can be mitigated or reversed by the Chief of Police.  Thus, the failure to intercede and stop reported and documented individual acts of discrimination and retaliation, is a failure that can be remedied by declaratory, injunctive and affirmative means.

212.    Thus, declaratory, injunctive and affirmative relief to the entire class flows directly and automatically from proof of the facts herein, and the establishment that such facts constitute violations of the law.

213.    The entitlement to declaratory, injunctive and affirmative relief to the entire class necessarily predominates the litigation, and provides a one-time remedy to all officers negatively affected by the unlawful policies and practices described herein.

214.    Furthermore, the entitlement to declaratory, injunctive and affirmative relief forms the factual and legal predicate for appropriate monetary damages as well as non-monetary remedies for individual losses caused by the systemic and enterprise-wide unlawful conduct at MPD.

215.    Thus, certification of the class to test and answer the questions of law and fact common to the class is appropriate, inasmuch as final legal resolution of those question will provide remedy and closure for both the putative class and the MPD.

## RULE 23(b)(3) FACTORS

216.    What is clear from the factual allegations herein is that nearly all that has transpired to the CRPs, and thus to the putative class, is the result of deeply embedded race and gender discrimination, exacerbated by a profound culture of silencing, bullying and intimidating those who complain about their respective and similar victimization.

217.    There is no real or meaningful way for the putative class to otherwise obtain relief but through the class action process.

218.    The MPD has been sued numerous times during the relevant period for race and gender discrimination and retaliation; none of those cases have produced any meaningful cultural or systemic change with respect to its treatment of Black women police officers.

219.    If, in this litigation, Plaintiffs are able to prove the allegations herein, then the declaratory, injunctive and affirmative relief that flows therefrom will not simply remedy the injustice to them, it will modify policy, procedures, practices, customs, and modes of accountability.  This will ensure that future Black women police officers won't have to endure the same hostile, sexist, racist and retaliatory environment that presently exists.

220.    This is precisely what the class action vehicle was designed to achieve, and why it is superior to any other available means for the adjudication of the claims of the CRPs or the class members.

221.    Discovery related to the key decision-makers at MPD, and their policies and practices, is best done once, on a class wide basis, rather than dozens or hundreds of times, for each litigant.

Such would be incredibly expensive, as well as time consuming and distracting for the key decision-makers.

222.     Allowing this matter to proceed as a class action will achieve economies of scale and cost, minimize the use of court recourses and time, ensure a consistent result applicable to all members of the class, and ensure that declaratory and injunctive relief provides a resolution that can move forward and prevent future claims.

223.     Plaintiffs intend to communicate with the PCMs via electronic and regular mailings to last known street address and email address, and any other method ordered by the court. Defendant is in possession of all information necessary to inform the PCMs of this action, and to inform them of their options as determined by this Court.

### RULE 23(b)(5) FACTORS

224.     Plaintiffs represent bargaining unit and non-bargaining unit members, sworn officers and Senior Police Officers, and management and executive officers.

225.     As deemed appropriate by this Court after conducting pre-certification discovery, Plaintiffs will seek the establishment of sub-classes to dispose of individual claims more efficiently.

### CLASS CAUSES OF ACTION

226.     On behalf of themselves and the putative class (and/or appropriate sub-classes) of all similarly situated Black women police officers who are currently employed by the MPD, or who have been employed by the MPD between January 1, 2011, and the present, the class-representative Plaintiffs assert the following CLAIMS.

### RACE DISCRIMINATION CLAIMS

### COUNT I

Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,*

## COUNT II

Violation of the District of Columbia Human Rights Act
District of Columbia Code § 2-1401.01 et seq.

## COUNT III

Violation of the Civil Rights Act of 1866
Discrimination Based on Race in the Making and Enforcing of Contracts
42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983

227.    MPD discriminated against Plaintiffs and the putative class of Black women police officers on the basis of race, by way of maintaining a system-wide pattern and practice of disparate treatment against Black women officers on the basis of race, creating and maintain a work environment hostile to Black women officers on the basis of race, fostering an EEO Office inherently and irredeemably hostile to Black women officers on the basis of race, denying promotion and career development opportunities to Black women officers, subjecting them to disparate disciplinary standards, undermining the rank and authority of Black women, systematically disparaging the character and credibility of Black women officers, and systematically refusing to investigate or take seriously claims of discrimination lodged by Black women officers due to their race.

228.    MPD perpetuates and maintains a pattern and practice of systematic retaliation against Black women police officers who oppose, complain about or report race discrimination.

## SEX DISCRIMINATION CLAIMS

## COUNT IV

Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,*

## COUNT V

Violation of the District of Columbia Human Rights Act
District of Columbia Code § 2-1401.01 et seq.

229.     The MPD discriminated against Plaintiffs and the putative class of Black women police officers on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* by way of maintaining a system-wide pattern and practice of disparate treatment against Black women officers on the basis of sex, creating and maintain a work environment hostile to Black women officers on the basis of sex, fostering an EEO Office inherently and irredeemably hostile to Black women officers on the basis of sex, and systematically refusing to investigate or take seriously claims of discrimination lodged by Black women officers due to their sex.

230.     MPD perpetuates and maintains a pattern and practice of systematic retaliation against Black women police officers who oppose, complain about or report sex discrimination or sexual harassment.

## ADDITIONAL CLAIMS

## COUNT VI

Violation of the District of Columbia Whistleblower Protection Act
D.C. Code § 1-615-51 *et seq.*

231.     Pursuant to the D.C. Whistleblower Protection Act, Defendant is prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

232.     Defendant violated this Act by, in a coordinated and systematic way, retaliating against Black women officers whose protective disclosures included among others, the following:

allegations of discrimination to their superiors in MPD, in testimony before the City Council, and direct communications to the Office of the Mayor about rampant racism, sexism, retaliation as well as police misconduct.

233.    Defendant engaged in a pattern, practice, and custom of retaliation against those who complained to Superiors inside and outside side the confined of the MPD, and improperly used the IAD investigatory process to threaten and intimidate Black women officers into remaining silent, and investigating those who chose to come forward.

## COUNT VII

Failure to Train, Supervise and Discipline Officers
Responsible for Continuous Violations
of  Departmental Policies, General Orders, and  Plaintiffs' Civil and Constitutional Rights

234.    Plaintiffs incorporate and restate all information and allegations contained in the preceding paragraphs as if fully set forth herein.

235.    MPD management maintains an enterprise-wide culture, pattern and practice of subjecting Black women officers to false accusations, unfair and disparate treatment and discipline, unfair and unjustified changes to job assignments and duties, retaliatory investigations and other violations of their civil and constitutional rights.

236.    Defendant fosters a culture and environment where such violations were not only allowed to occur, but were encouraged and fully tolerated.

237.    On multiple occasions, Plaintiffs complained of this systemic violation of their civil and constitutional rights, going up their chain of command, all the way to the Chief of Police, the Mayor and City Council.

238.    None of the entities to which Plaintiffs complained took any action to address the continuous violation of their civil and constitutional rights.

239.    Plaintiffs assert that the District of Columbia owed them a duty of proper supervision of its MPD leadership, and that it has a responsibility to investigate and properly respond to their claims and concerns, which it, on multiple occasions, failed to do.   MPD Departments policies and procedures, including its General Orders, as well as DC Municipal Regulations, require certain specific supervisory protocols for honesty, accuracy, and completeness, among other things.

240.    On multiple occasions, when it became clear that a member of the MPD made false or salacious accusations against Plaintiffs, Defendant failed to properly discipline those persons, allowing them to remain in positions of power, and to continue to engage in violations of Plaintiffs' civil and constitutional rights.

241.    On multiple occasions, when it became clear that a member of the MPD had engaged in unlawful retaliation against Plaintiffs for engaging in constitutionally protected activity, Defendant failed to intercede, take appropriate remedial action, or admonish or discipline such persons.

242.    Plaintiffs assert that Defendant owed them a duty and had a responsibility to properly supervise MPD leadership and officers consistent with its policies and procedures, general orders, and DC Municipal Regulations, and that it failed to do so when it failed to hold persons accountable for retaliating against Plaintiffs for engaging in constitutionally protected activity.

243.    The duty that Defendant owed to Plaintiffs to properly supervise and hold accountable the management of the MPD extends equally to all members of the putative class of Black women police officers.

244.    As a direct and proximate cause of Defendant's negligence, Plaintiffs suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, and damage to their professional reputation, and significant mental and emotional distress.

245.    The losses, damages and injuries suffered by Plaintiffs are a direct and proximate result of Defendant's negligent supervision of the Chief of Police, the MPD EEO Office, and other MPD senior leaders are common and typical of the harms suffered by the PCMs in this matter.

246.    All PCMs would obtain a remedy if this Court were to grant declaratory, injunctive, and compensatory relief to the class as a remedy for harms caused by Defendants' breach of the duty owed to the class to properly supervise MPD management.

## PRAYER FOR RELIEF ON BEHALF OF THE CLASS

WHEREFORE, PLAINTIFFS, upon certification of the class/classes in accordance with the request herein, seek the following compensatory, declarative, and injunctive relief:

### COMPENSATORY RELIEF

247.    An ORDER mandating that Defendant establish a fund to compensate the CRPs and PCMs of no less than $100,000,000.00.

248.    An ORDER appointing Class Counsel as administrator of the fund.

249.    An ORDER granting Class Counsel attorney's fees as agreed to by and between the CRPs and Class Counsel.

250.    Any and all such additional compensatory remedies as deemed appropriate by this Court.

### DECLARATORY AND INJUNCTIVE RELIEF

251.    An ORDER declaring that the MPD's employment policies, practices and procedures towards Black women police officers constitute unlawful discrimination and retaliation and violate the laws cited herein.

252.    An ORDER permanently enjoining the MPD from engaging in discrimination based on race.

253.    An ORDER permanently enjoining the MPD from engaging in discrimination based on gender.

254.    An ORDER appointing a Special Master to temporarily take over personnel management of the MPD, and to re-vamp and re-write the MPD's personnel and EEO policies and procedures, and that places the EEO Department directly under the Special Master's supervision and control.

255.    An ORDER mandating a full and complete audit by the Special Master of the MPD's disciplinary practices, and the drafting by the Special Master of a report to the Court on recommended changes to ensure fair, equitable and non-discriminatory discipline of employees.

256.    An ORDER mandating a full and complete audit by the Special Master of the MPD's Internal Affairs Department, and the drafting by the Special Master of a report to the Court on recommended changes to IAD to ensure the investigative function is no longer weaponized to retaliate against Black women officers who complain about or oppose race or gender discrimination, or police misconduct.

257.    An ORDER mandating that the Special Master conduct a full and complete audit of the MPD's promotion and assignment practices, and that the Special Master makes recommendations to the Court on changes to such policies and procedures to ensure that Black women are no longer denied promotions or career opportunities.

258.    An ORDER mandating that the Special Master provide the Court recommendations on methods of retraining police officers to cease using, accepting, perpetuating, enabling or condoning harassment, bullying or retaliation as a means of silencing dissent and complaints.

259.    An ORDER mandating that the Special Master provides the Court recommendations on policies, procedures and best practices to ensure that Black women officers who are promoted into

management are supported in their roles, and are not usurped of authority, or denied the personnel or resources necessary to execute their duties.

260.    An ORDER to the Mayor, creating a new role in the Mayor's Office of "Liaison to the MPD on Civil Rights and Social Justice."  The purpose and role of the Liaison Officer would be to provide an independent assessment of allegations of discrimination within the MPD, or with respect to treatment of the community by the MPD, that is not predicated on principally defending the Mayor or the District of Columbia from liability for misconduct or unlawful acts.  The role of the Liaison Officer will be to identify and raise to the Mayor's awareness, cases and circumstances when the benefit of the public is best served by affirmative intercession by the Mayor's Office to attain and ensure justice and equality.

261.    An ORDER mandating that the MPD immediately cease and desist from using coordinated harassment, "bird-dogging," frivolous and frequent discipline, and bullying as a means of forcing out Black women police officers who complain about discrimination or retaliation.

262.    An ORDER mandating that the Special Master draft and present to the Court recommendations for ensuring that Black women who are whistleblowers are not retaliated against.

263.    An ORDER mandating that the Special Master remains in his/her oversight role until such time as the Court is satisfied that the pattern and practice of race and gender discrimination and retaliation at MPD has been severed, and that all MPD officers are being treated fairly and in accordance with the laws of the Unite States and the District of Columbia.

264.    Any and all additional declaratory and injunctive relief as deemed appropriate by this Court.

**FACTUAL ALLEGATIONS AND CLAIMS**
**OF THE INDIVIDUAL PLAINTIFFS**

**PLAINTIFF BRINKLEY'S INDIVIDUAL CLAIMS**

**Facts Related to Plaintiff Brinkley's Individual Claims**

265.    Plaintiff Brinkley began her employment with MPD in October 1988.  She initially was assigned to the Morals Division and later to Patrol District One.

266.    In 1992, she was chosen for, and assigned to the Special Operations Division (hereinafter "SOD") as an Emergency Response Team (hereinafter "ERT") Station Clerk.

267.    That same year, Plaintiff Brinkley married fellow MPD officer, Matthew Brinkley.  They both served on the MPD until 2014, when Mr. Brinkley retired.  Plaintiff Brinkley continued working at the MPD well after he retired.

268.    The ERT unit of the MPD deals with hostage situations and other volatile and delicate circumstances where a person might be barricaded in a building, refusing to cooperate with officer demands, or holding hostages.

269.    ERT is an elite unit, and considered a desirable and sought-after assignment.  Officers are screened and chosen for their suitability to ERT and are trained in crisis management and tactics.

270.    After about eighteen years in ERT as a negotiator, Plaintiff Brinkley was assigned to the DC Public Schools, and served there for approximately two years.

271.    To round out her policing experience, Plaintiff Brinkley requested and was reassigned to a Patrol District.

272.    From approximately 2012 to November of 2016, Plaintiff Brinkley served continuously in the First District Patrol unit without any complaint from her management about her performance.

273.    In November of 2016 Plaintiff Brinkley chose to retire from the MPD.

274.    In March of 2017, Plaintiff Brinkley was asked to return to active policing because MPD needed to increase its officer headcount, most especially with respect to seasoned officers with specialized training and skills.

275.    At the time, MPD was bringing back strong and experienced officers as full-time employees, but employed them by way of individual contracts, not as members of the FOP bargaining unit.

276.    MPD offered Plaintiff Brinkley a contract to return as a Senior Police Officer (hereinafter "SPO") within SOD to assist in the selection process and training of new reserve negotiators.

277.    Plaintiff Brinkley's contract was for a year, renewable annually if she remained able to meet physical and other requirements.

278.    Plaintiff Brinkley began her second stint as a DC Police Officer on April 3, 2017, assigned to ERT as a negotiator.

279.    At the time, her immediate supervisor, and the person responsible for her actual assignments was Sergeant Kevin O'Bryant (hereinafter "Sgt. O'Bryant").

280.    However, because ERT was a specialized unit, it had its own administrative chain of command, responsible for coordination, logistics and allocation of resources such as vehicles and protective equipment.

281.    At that time, the administrative Sergeant for ERT was Sergeant Michael Boyd (hereinafter "Sgt. Boyd."

282.    Plaintiff Brinkley's partner at the time was officer Kia Mitchell who is a co-Plaintiff in this case, (hereinafter "Plaintiff Mitchell").

283.   Plaintiff Brinkley had served and partnered with Plaintiff Mitchell during her first employment with MPD for approximately twenty years.  They were close confidants, and often shared private matters with each other.

284.   Sgt. Boyd treated Plaintiff Brinkley and SPO Mitchell more harshly and negatively than any other officers in the unit, and more harshly than other non-Black female officers, and used his authority and position to make things difficult and unpleasant for them.

285.   On or about May 2017 he assigned Plaintiff Brinkley and SPO Mitchell vehicles that had been used by the K-9 unit and had been infested with fleas.

286.   Plaintiff Brinkley and SPO Mitchell used the vehicle for a few days, but then notice's the flea bites and resultant rashes, and asked Sgt. Boyd for different vehicles.

287.   Plaintiff Brinkley asserts, and on information and belief, there were other vehicles available at the time located on the top parking lot of SOD.

288.   Despite multiple requests, and having other options, Sgt. Boyd obstinately refused to assign Plaintiff Brinkley and her partner different vehicles.

289.   Sgt. Boyd's recalcitrance with respect to Plaintiff's request was disparate and unlike his response to requests from non-Black female officers and male officers.

290.   On or about June 2017, Plaintiff Brinkley and SPO Mitchell went to the SOD Lieutenant, Kenny Taylor (Black male) (hereinafter "Lt. Taylor"), Sgt. Boyd's superior, and complained about the fact that Sgt. Boyd refused to assign them a clean and un-infested vehicle.

291.   To remedy their concerns, Lt. Taylor allowed them to use the ERT Suburban, a large and comfortable vehicle.

292.    Plaintiff Brinkley and SPO Mitchell were driving in the Suburban when they received an irate phone call from Sgt. Boyd, demanding that they return the Suburban, despite the fact that his superior had authorized Plaintiff Brinkley and her partner to use the Suburban.

293.    From that point on, and for months thereafter, Sgt. Boyd undertook a campaign to retaliate against, undermine, isolate, spread false claims against and harass Plaintiff Brinkley and SPO Mitchell. Given his seniority and position of authority, Sgt. Boyd was able to effectively execute his scheme to retaliate against Plaintiff Brinkley and SPO Mitchell because he saw them virtually every day and was in regular contact with their fellow officers.

294.    On or about July 9, 2019, Plaintiff Brinkley tragically and suddenly lost her husband and lifetime partner to an aneurysm.

295.    The loss was devastating to her, and she exhausted all of her accumulated sick and annual leave while on bereavement leave from the MPD.

296.    During her bereavement leave, Plaintiff Brinkley suffered from anxiety and depression, and sought the care of a medical professional and spiritual guidance to help manage her mental health challenges.

297.    Plaintiff Brinkley returned to work on or about September 23, 2019, but was still struggling with depression, and sleeplessness. She did seek counseling from the MPD-provided counseling service, as well as private counseling and medical care.

298.    On or about September 24, 2019, Plaintiff Brinkley entered the roll call room for a major detail assignment.  At the time the room was full of officers in formal uniform.  This triggered thoughts of her late-husband and her grief overwhelmed her in that moment.  Her sobbing and emotional pain caused her to hyperventilate, and struggle with breathing.

299.    An ambulance was called, and upon arriving, the paramedics took her vital signs.  By then, her breathing had improved, and SPO Mitchell offered to take Plaintiff Brinkley home.

300.    Plaintiff Brinkley returned to work a few days later.  When she did, SPO Mitchell and Officer Tabatha Knight (Black female) (hereinafter "Officer Knight"), informed her superior, Lieutenant Darnell Robinson (hereinafter "Lt. Robinson") had made derogatory comments about her extreme grief, had publicly denigrated her for exhibiting symptoms of depression and anxiety, and had threatened to send Plaintiff Brinkley for a fitness for duty evaluation.

301.    Plaintiff Brinkley was shocked to hear and learn that her superior held her in such low esteem that he would speak in a denigrating manner about her disability.

302.    Plaintiff Brinkley further understood that Lt. Robinson had no concern for her, or her well-being, and that she needed to hide her symptoms or face retaliation, or discrimination based on her disability.  Lt. Robinson's comments made clear that he disfavored Plaintiff as a result of her disability.

303.    Plaintiff Brinkley's experiences with Sgt. Boyd marked the first time in her 26-year MPD career that she was personally singled out for the systematic, orchestrated and intentional micro-aggressive retaliation that has become a cancer in the MPD that targets Black women officers, and particularly harms those who complain about the disparate and unfair treatment they endure.

304.    On or about December 14, 2018, Plaintiff's supervisor, Sgt. O'Bryant, left ERT SOD and was reassigned to the Mayor's detail.  Sgt. O'Bryant was known as a devout Christian, and very professional officer.  He ensured that people in his department adhered to a high level of decorum and respect for each other.

305.    Upon his departure, the culture of ERT changed dramatically.

306.    Sgt. O'Bryant was replaced by Sgt. John Brown (Black male) sometime in June of 2019, who had a totally different leadership style.  Sgt. Brown was far more permissive and tolerant of unprofessional and inappropriate comments, most especially by male officers towards female officers.

307.    Upon the change in leadership, it became a common occurrence for officers in SOD to use foul language and make inappropriate sexual comments.  Plaintiff Brinkley had raised concerns about the declining professionalism of the unit to Sgt. Brown, but he ignored her concerns.

308.    SOD roll call is an official meeting of officers on their shifts to discuss assignments and share information from previous shifts or other units.  Roll call is also an opportunity for department leaders to check-in with their officers and receive feed-back and give daily instructions, updates and important information.

309.    Roll call is also an opportunity for officers to see and engage with their colleagues. Because officers disperse during their shifts, roll call can be the only place where officers get to know each other.

310.    On or about February 4, 2020, Plaintiff was the only female officer in a roll call meeting conducted by Sgt. Thomas Miller (White male) (hereinafter Sgt. Miller) and Sgt. Brown.

311.    When Sgt. Brown told Officer Eric Harrison (White male) (hereinafter "Officer Harrison") to work with another officer, Officer Harrison responded by shouting "he can suck my dick." Plaintiff Brinkley immediately looked up to the Sgts. in attendance, and heard several members laughing.

312.    But neither Sgt. Miller nor Sgt. Brown addressed the foul and inappropriate comment.

313.   This was the one of the straws that broke the camel's back for Plaintiff Brinkley.  She got up from the meeting and walked out, rather than confront again the unprofessionalism and obscenity of her co-worker.

314.   Plaintiff Brinkley spoke to Sgt. Brown after the meeting, who admitted that the comment was inappropriate, but who refused to do anything to stop such comments and re-establish and enforce the professionalism standards of the department.

315.   Plaintiff Brinkley later texted Lt. Robinson to complain about the offensive language because she felt the complaint would not be handled by Sgts. Miller and Brown.

316.   Lt. Robinson replied "until further notice he will show his presence in roll call, etc." However, he did not follow through with his assurances to Plaintiff Brinkley, and did not attend roll thereafter.

317.   Having received no action from Lt. Robinson to rectify a work environment that had devolved into "lock-room talk" central, and that constantly made her, the only female in the room, uncomfortable, Plaintiff Brinkley went to the MPD EEO office to complain.

318.   On or about February 5, 2020, Plaintiff Brinkley was advised by Lt. Robinson to make a complaint to MPD EEO Mr. Lee, in which she was contacted to by EEO officer Doreen Haines (Black woman) (hereinafter "Ms. Haines") about Officer Harrison's comment, and the fact that Sgt. Brown had permitted the comment to go without any action or redress.

319.   She further complained that Sgt. Brown was permitting her workplace to become a hyper-sexualized and obscenity-laden workplace.

320.   During her interview with MPD EEO office, the Plaintiff Brinkley did not believe that EEO investigator Ms. Ranae Lee (hereinafter "Ms. Lee") had offered advice and guidance to Plaintiff or taken her concerns seriously.

321.    All the EEO interviews were recorded.

322.    On information and belief, Ms. Lee played the recording for Mr. Alphonso Lee, her supervisor in the EEO department.  Mr. Lee disciplined Ms. Lee for being "too helpful" to Plaintiff Brinkley, and for giving any credence to Plaintiff Brinkley's complaint.

323.    On information and belief, Mr. Lee leaked to Sgt. Boyd that Plaintiff Brinkley had complained about him and the toxic work-environment he was fostering.

324.    From that point on, Plaintiff Brinkley became the target of a concerted, intentional and systematic and retaliatory campaign to drum her out of the MPD.

325.    According to EEO Counselor Harry Carter (Black male) (hereinafter "Mr. Carter"), who worked directly for Mr. Lee and was privy to Mr. Lee's comments about Plaintiff Brinkley, Mr. Lee told Ms. Doreen Haines and Ms. Ranae Lee before an investigation had been conducted regarding Plaintiff Brinkley's complaint, as well as complaints from several other Black female officers, that "MPD would be better off if they figured out how to fire officers like [Plaintiff], Officer Karen Carr (Black female), and Officer Tabatha Knight (Black female) because all they did was file complaints."

326.    In short, EEO Director Lee decided that the MPD would benefit from moving out Plaintiff and some of the other Black female officers with similar complaints and initiated a campaign in MPD to achieve that goal.

327.    Plaintiff Brinkley became alarmed at the retaliation and discrimination that was taking place at the MPD and wrote to Mayor Muriel Bowser to report what was going on.

328.    Plaintiff Brinkley received a response from the Mayoral office on or about March 26, 2020.

329.    On or about March 25, 2020, there was a scheduled meeting with Lt. Robinson, Sgt. Brown, Plaintiff Brinkley's partner SPO Mitchell and Plaintiff Brinkley.

330.    When Plaintiff Brinkley asked about the status of her complaint, Lt. Robinson became hostile, dismissing her concerns and simply stating that such investigations "take time."

331.    Even more troubling to Plaintiff Brinkley, towards the end of the meeting, Lt. Robinson indicated that he would be separating Plaintiff Brinkley and her long-time partner SPO Mitchell, because there were "red flags," with regards to them and that "they were being watched" and seen transferring bags from one car to another.

332.    Lt. Robinson further stated that Plaintiff Brinkley and SPO Mitchell needed to "watch the company they kept."

333.    Plaintiff Brinkley interpreted these statements as both a warning and a threat, and as thinly veiled retaliation for her reporting her concerns of discrimination and retaliation to the Mayor's Office.

334.    Lt. Robinson was telegraphing to her that her concerns were unimportant, and also that in raising her concerns, she was becoming the subject of scrutiny and a target for retaliation.

335.    Lt. Robinson decision to separate Plaintiff Brinkley from her long-time partner was, and was meant to be, punitive.

336.    Both Plaintiff Brinkley and SPO Mitchell felt the move to separate them was punitive in nature, and very destabilizing and unsettling to their work life.

337.    Worse still, around the time of the meeting, Lt. Robinson chose to discipline Plaintiff Brinkley for arriving at work *too early*, something that in all her years in the MPD, Plaintiff had never seen another officer disciplined for.

338.    On or about April 9, 2020, Plaintiff Brinkley went on sick leave due to exposure to the coronavirus because she had been around SPO Mitchell, who had tested positive for the virus. Plaintiff went on leave per Center for Disease Control (hereinafter "CDC") protocols.

339.    However, when she was tested, she came up negative, so she returned to work prior to completing the full 14-day quarantine period.

340.    On or about April 21, 2020, Plaintiff Brinkley elected to file an OHR complaint, alleging discrimination and retaliation and seeking redress for her concerns about the treatment of Black Women Officers in the MPD.

341.    According to CDC guidelines, the entrance and exit of the SOD building was limited to one door, so that persons entering could have their temperatures taken, and answer health questions to assess their risk.

342.    From June 5, 2020, to June 12, 2020, the officials of SOD ERT failed to post someone at the door to conduct the health assessments.  So, when Plaintiff arrived at work, she looked around, and then entered the building.  Obviously, several other officers did the same thing.

343.    On or about June 9, 2020, Plaintiff Brinkley notified Sgt. Brown about the fact that there was no one conducting health screening assessments at the SOD entrance, to which Sgt. Brown unhelpfully responded that he was "drawing a blank."

344.    Plaintiff Brinkley raised the issue because she had already been exposed to COVID-19 at work and lived through the anxiety of waiting for a test result, which exacerbated her anxiety condition. She had no desire to repeat the experience.

345.    On June 16, 2020, Plaintiff Brinkley reasserted her concerns about the fact that the CDC-mandated health assessments were not being conducted because there was no one stationed at the entrance to do them.  She spoke with Sgt. Brown, who told her to speak to Lt. Robinson.

346.    The same day, Plaintiff Brinkley reached out to Lt. Robinson, who answered her concern with a one-word response: "noted."

347.    Subsequently Lt. Robinson sent Plaintiff Brinkley an email about her duties for an upcoming detail, but made no mention of the mandatory health assessment, or her legitimate concerns regarding the fact that they were not being conducted.

348.    On June 17, 2020, Sgt. Miller raised to SPO Mitchell that "someone complained" about the health assessments not being done, thus letting SPO Mitchell know that the leadership was annoyed with Plaintiff Brinkley's persistent complaints about the issue.

349.    When Plaintiff Brinkley arrived at work that day, a tactical officer on limited duty stationed at the door took her temperature but did not ask the health assessment questions.

350.    On June 19, 2020, when Plaintiff Brinkley reported for duty, again there was no one at the SOD entrance to conduct the assessment.  Plaintiff Brinkley entered the building and went to the negotiator's office, where Sgt. Brown, took her temperature.

351.    Again, Sgt. Brown, and the rest of the leadership team failed to take Plaintiff Brinkley's concerns seriously and made her feel like a pariah for raising the issue. This compounded her stress and anxiety about entering a workplace that was clearly not abiding by CDC-guidelines.

352.    On or about July 10, 2020, Plaintiff Brinkley was shocked to receive an email from Captain Michelle Caron (White female) (hereinafter "Capt. Caron"), that was curt and aggressive, demanding that Plaintiff provide an explanation as to why she had not submitted a written statement regarding an incident she had witnessed between Sgt. Boyd and Officer Carr.

353.    In fact, Plaintiff Brinkley was not evading Captain Caron's request, but was simply on leave during the time of her request.

354.    Had Captain Caron inquired, the Captain would have discovered that Plaintiff Brinkley was not being evasive.

355.    Again, this incident was part of a pattern in which Plaintiff Brinkley was treated with suspicion and disregard.

356.    Three days after receiving Captain Caron's accusatory email, Plaintiff Brinkley was called in to IAD to answer to a charge that she had missed a health assessment in roll call.

357.    This was precisely the issue that Plaintiff Brinkley not only raised to her leadership, but was persistently ignored about.  When she pointed out that there was no one stationed at the designated entrance, IAD informed Plaintiff Brinkley that she should have "gone in and looked" for an official.

358.    Plaintiff Brinkley responded that there was no one to find on that particular date.

359.    This episode of intimidation and retaliation was particularly stunning to Plaintiff Brinkley, because of her efforts to address the issue of health assessments at the entrances, and was ignored by her chain of command.

360.    But rather than simply dismissing the claim, IAD kept the case open and refused to clear Plaintiff Brinkley of the allegation.

361.    As mentioned above, MPD EEO and IAD were blithely leaking and sharing information from confidential interviews with rank-and-file officers, which spread like wildfire through the department. This was a concerted effort by EEO Director Lee and others to sow distrust and anger in the department, and to isolate and intimidate Plaintiff Brinkley.

362.    Thus, at the roll call that took place on or about July 17, 2020, Officer Anthony Campanale (White male) (hereinafter "Officer Campanale") shouted at Plaintiff Brinkley asking if she was recording the roll call.  Plaintiff Brinkley took immediate offense at his volatile and physically aggressive stance and tone, and asked Officer Campanale "who are you talking to?"

363.    Officer Campanale continued to aggressively question and move into Plaintiff Brinkley's personal space and had to be restrained by other officers in the room.

364.    Officer Campanale was so aggressive, that he made Plaintiff Brinkley fear for her personal safety.

365.    Sgt. Luke Foskett (hereinafter "Sgt. Foskett") was conducting the roll call.

366.    When Plaintiff Brinkley asked him if he was going to do anything about Officer Campanale aggressively charging her, Sgt. Foskett asked Plaintiff Brinkley: "well are you recording?"

367.    The Sgt.'s response was so offensive, and so inappropriate, that Plaintiff Brinkley simply walked out of the roll call, shaking with anger and anxiety.

368.    Plaintiff Brinkley immediately notified her Union Steward Hiram Rosario (hereinafter "Union Steward Rosario") and Officer Knight, who notified the chain of command.

369.    On or about July 22, 2020, Plaintiff Brinkley met with EEO Director Lee and complained about the retaliation from members of the SOD unit.

370.    Mr. Lee informed Plaintiff Brinkley that she could file an EEOC charge, which was his way of communicating that his department would not be investigating her claims.

371.    As part of his ongoing campaign of petty attacks, on or about August 14, 2020, Sgt. Boyd ordered Plaintiff to put her cell phone away at roll call, even though he kept both of his cell phones visible on the table in front of him, and he allowed other male tactical officers to keep their cell phones out and visible.

372.    Plaintiff Brinkley could not help but feel embarrassed and singled out as the only female officer in the roll call, targeted for blatantly disparate application of the rules.

373.    On or about August 16, 2020, Plaintiff Brinkley was off work when the ERT unit issued a policy change requiring officers to wear their ballistic vests at roll call.

374.    Because Plaintiff Brinkley was off that day, she was not informed of the policy change, but all the other tactical officers were aware of the change.

375.    On or about August 18, 2020, on Plaintiff Brinkley's first shift after her day off, Sgt. Boyd publicly embarrassed and singled out Plaintiff in the roll call meeting for not wearing her protective vest, even though he knew she was off when the policy change occurred, and that he, as her supervisor, failed to give her a heads' up about the new rule.

376.    Sgt. Brown used this innocuous and unintentional oversight as a basis to further humiliate Plaintiff Brinkley, and belittle her in front of her colleagues.

377.    On or about August 27, 2020, Plaintiff Brinkley was summoned to IAD again, to receive a disciplinary charge related to the incident with Officer Campanale.

378.    Although Officer Campanale physically charged and threatened Plaintiff Brinkley, and had to be physically restrained from harming her, the Department decided to punish Plaintiff Brinkley for "raising her tone," which they deemed inappropriate.

379.    Plaintiff Brinkley was charged with conduct unbecoming an officer, and no discipline, at that time, was given to Officer Campanale.

380.    On or about September 1, 2020, Plaintiff Brinkley was disciplined for missing a call out on a barricade.  Not only was she the first officer in the history of ERT to be disciplined for that, but to add insult to injury, the Department went back in time to add the call-out she missed on Mother's Day in May.

381.    In other words, the Department leadership manufactured something to discipline Plaintiff Brinkley for, and then went looking for a way to increase the severity of the punishment.

382.   On September 8, 2020, Capt. Caron asked Plaintiff Brinkley to write yet another statement regarding the incident involving Sgt. Boyd's disrespectful and rude behavior towards Officer Carr, who is also an African American female officer.

383.   Capt. Caron asked specific questions in her request to Plaintiff Brinkley designed to entrap Plaintiff Brinkley into making contradictory statements.

384.   Plaintiff Brinkley, however, did not modify her original statement.

385.   On or about September 10, 2020, Plaintiff Brinkley entered the SOD building to begin her shift, but found no one stationed there to take temperatures and conduct health assessments. Again, this was a management failure and oversight that was used as an excuse to discipline Plaintiff Brinkley a few months prior, despite the fact that she had no authority to ensure that MPD adhered to CDC guidelines.

386.   The lack of consistent manning of the SOD entrance with someone to conduct health assessments and take temperatures is evidence that the Department was not serious about protecting the health of its officers (which explains why Plaintiff Brinkley was twice exposed to COVID-19 from her co-workers) but was instead only serious about manufacturing phony violations for which to discipline Plaintiff.

387.   On October 29, 2020, Plaintiff was given an assignment by Sgt. Boyd.  All the other personnel with a similar assignment were relieved, but Plaintiff was not.  Plaintiff Brinkley had to call in to remind Sgt. Brown that she needed to be relieved.

388.   Again, Plaintiff Brinkley had to work longer than her colleagues, and had to ask for the courtesy and concern that was automatically given to her male counterparts.

389.   On October 31, 2020, Plaintiff sent an email to Chief of Police Peter Newsham (White male) (hereinafter "Chief Newsham") and Assistant Chief Jeffery Carroll (White male)

(hereinafter "Asst. Chief Carroll") and others in the chain of command to complain and inform of the systemic and sustained disparate treatment and discriminatory actions against Black female officers in the MPD.

390.    On or about November 3, 2020, Sgt. Brown allowed tactical members to come in before their scheduled duty and gave them assignments without disciplining them.  This stands in sharp contrast to the discipline Plaintiff Brinkley received for coming in early for one single shift, and is further evidence of disparate treatment.

391.    Sgt. Brown did not conduct a roll call that day, nor a health assessment, but he did give Plaintiff Brinkley an assignment for ballot box detail, which she executed.  Plaintiff was shocked to be later written up for not attending the roll call or health assessment, that Sgt. Brown failed to hold or provide.

392.    This disciplinary write up was yet another example of breathtakingly unfair discipline, based on pretext and false evidence, was designed to demoralize and break down Plaintiff Brinkley's will.

393.    On or about November 10, 2020, Plaintiff Brinkley received her job performance documentation.  In it she found several supposed "violations" that were basically trumped-up, fabricated, unjust, disparate or exaggerated charges, that formulated a basis for the Department to terminate her employment.

394.    On or about November 24, 2020, Plaintiff Brinkley was exposed a second time to COVID-19, this time from one of the tactical officers who had tested positive, and therefore went back into quarantine until her test results were returned.

395.    That day, Plaintiff Brinkley received a telephone call from her union representative Officer Rosario advising her that IAD was moving forward with the "conduct unbecoming" charge against her for the incident with Officer Campanale.

396.    When Plaintiff Brinkley returned to work, she was told to report to IAD to sign paperwork related to the discipline over the Officer Campanale incident. Plaintiff strongly disagreed with the disciplinary finding but signed the document anyway, noting on the document that she was signing under duress, in order to be left alone.

397.    In the normal course of business, Plaintiff Brinkley would have received her performance evaluation, and any notice of deficiencies, in order for her to have an opportunity to improve on those deficiencies.

398.    However, in her case, Plaintiff Brinkley had to ask Sgt. Brown for her performance evaluation, and she was never given a list of deficiencies, or time to fix them.  Instead, she was given a very low performance evaluation based almost entirely on minor disciplinary matters that were either fabricated, disproportionate, disparate or unfair.

399.    Plaintiff Brinkley, therefore asked for a meeting to discuss her concerns about her performance evaluation and to explore how she could engage with management about her concerns with the way she was being treated.

400.    During Plaintiff Brinkley's shift on or about December 8, 2020, while Plaintiff was talking on the phone with her union representative, Sgt. Brown approached Plaintiff Brinkley to direct her to go to the roll call room for the performance evaluation meeting she had asked for.

401.    Rather than allowing Plaintiff Brinkley to finish her call, Sgt. Brown rudely and loudly interrupted her, and gave her the directive about the meeting in a condescending, hostile and disrespectful manner.

402.   Plaintiff Brinkley had asked her union representative to hold while she spoke with Sgt. Brown, but because Sgt. Brown was speaking so loudly and aggressively, Officer Knight, the representative, was able to hear the entire exchange.

403.   Officer Knight took note and was dismayed at the disrespectful and hostile tone that Sgt. Brown used to convey a simple directive.

404.   Plaintiff Brinkley went to the meeting as directed but asked for, and received, representation from her union representative Officer Knight at the meeting.

405.   Once Plaintiff Brinkley arrived at the performance evaluation meeting, she found Sgt. Brown and one other Sgt. from a different department, whom Plaintiff did not know or recognize.

406.   Officer Knight, in her role as union representative, insisted that the performance evaluation meeting only be attended by SOD managers.  Thus, the non-SOD Sgt. who was initially there, left the meeting and was replaced Sgt. Jane Barrientos (Hispanic female) (hereinafter "Sgt. Barrientos").

407.   At the meeting, Officer Knight questioned and challenged Sgt. Brown about the disciplinary matters in the evaluation, but Sgt. Brown refused to make any substantial or meaningful changes to the evaluation.  Plaintiff Brinkley then formally appealed the content of her performance evaluation.

408.   On or about December 9, 2020, while on shift, Plaintiff Brinkley started experiencing anxiety and migraine headache symptoms related to the stress of what had happened in her performance evaluation meeting.

409.   She notified Sgt. Miller of her worsening condition and asked to go to the Police and Fire clinic for assistance.

410.     On or about December 23, 2020, Plaintiff Brinkley filed a formal charge with the EEOC, alleging race, age, gender and disability discrimination, and retaliation, and disparate treatment.

411.     After seeing the clinic's psychologist and speaking with the clinic's Physician Assistant Tasha Williams, Plaintiff Brinkley was placed on sick leave to mitigate her anxiety symptoms, until December 31, 2020.

412.     While on sick leave, Plaintiff was notified on or about December 12, 2020, that Sgt. Brown had tested positive for COVID-19, and that she would have to be tested again for having been exposed for the third time, to a co-worker who had tested positive.

413.     Plaintiff reported to the Police and Fire Clinic for testing, and luckily tested negative. However, the inconvenience and anxiety related to this third potential exposure, in conjunction with the fact that her concerns and inquiries about non-compliance with coronavirus protocols by SOD management went unaddressed, caused Plaintiff to experience even more frustration with her situation.

414.     Despite her union representative's efforts to address the inaccurate and unfair disciplinary actions in Plaintiff's evaluation, SOD management was unwilling to modify the assessment. Therefore, on or about January 9, 2021, Plaintiff wrote to MPD Assistant Chief Carroll and several city council members regarding the disparate treatment, racial inequality, retaliatory behavior, harassment and criminal actions of the IAD.

415.     The Assistant Chief replied on January 11, 2021, denying that any discriminatory practices existed in SOD, and referred Plaintiff back to EEO for investigations of her concerns. His response was a slap in the face to Plaintiff, inasmuch as she had complained of the fact that EEO was systematically ignoring and dismissing claims from Black female officers.

416.    On or about January 11, 2021, Plaintiff Brinkley received denial of her performance evaluation appeal from Master Patrol Officer Kevin Brittingham (White male) (hereinafter "MPO Brittingham").

417.    On or about February 17, 2021, Lt. Robinson ordered Plaintiff Brinkley to attend a mental evaluation and assessment, as a final step to proving that the allegations and claims against Plaintiff that resulted in a pattern of disciplinary actions, was justified.   This directive was also discriminatory and disparate based on her disability.

418.    On or about February 19, 2021, Plaintiff Brinkley wrote to the District of Columbia City Council to complain about the discrimination and retaliation she was being subjected to, and to inform them of the systemic discrimination and lack of EEO support in the MPD.

419.    On or about March 1, 2021, in furtherance of the campaign to harass Plaintiff Brinkley, Captain Caron told her subordinates to direct Plaintiff Brinkley to respond to another request for a statement related to a barricade that took place on or about February 23, 2021, and to answer specific questions by the end of Plaintiffs' shift.

420.    This request put Plaintiff Brinkley on notice that the Department was looking for yet another reason to discharge her.

421.    On or about March 2, 2021, Union Steward Rosario replied to Captain Caron's request via email, stating that the request violated Article 13 of the Labor Agreement.

422.    On or about March 8, 2021, the Plaintiff Brinkley received her Notice of Right to Sue letter from the EEOC.

423.    On or about March 23, 2021, Plaintiff Brinkley attended a virtual meeting to dispute the decision of the clinic that Plaintiff Brinkley's anxiety and stress was "not work-related."

424.   This was an entirely self-serving conclusion, designed to protect and give cover to the SOD personnel who were engaged in an active and coordinated campaign against Plaintiff Brinkley.

425.   Again, Plaintiff Brinkley was the victim of coordinated retaliation which had the exact effect and outcome its perpetrators desired.

426.   On or about April 13, 2021, a grievance meeting was conducted to hear Plaintiff Brinkley's grievance related to her performance evaluation.

427.   Plaintiff Brinkley attended the meeting with MPO Brittingham, who was serving as her representative.

428.   The grievance hearing panel consisted of Union Steward Rosario, Captain Sean Conboy and Sergeant Shavaun Ross.  The panel concluded and said they would get back to Plaintiff Brinkley within two weeks.

429.   On or about April 28, 2021, Sgt. Brown told Plaintiff Brinkley to report to Human Resource the following day.

430.   When Plaintiff Brinkley asked Sgt. Brown why she needed to do so, he stated that he did not know the reason for the meeting.

431.   On or about April 29, 2021, Plaintiff Brinkley reported to Human Resources as directed, along with her Union Steward Rosario.

432.   At that time, Plaintiff Brinkley was terminated from her employment, effective April 30, 2021.

### Plaintiff Brinkley's Individual Causes of Action

#### *Race Discrimination and Retaliation Claims*

433.   Plaintiff incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

434.    Plaintiff Brinkley, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

435.    Plaintiff was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

436.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

437.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern, practice and custom of race discrimination against Black women police officers on the basis of race.

438.    The facts alleged by Plaintiff Brinkley that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

439.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Brinkley was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

440.    Plaintiff Brinkley has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

441.    Plaintiff Brinkley seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00 plus interest, costs, fees and all other remedies the Court deems appropriate.

*Sex Discrimination and Retaliation Claims*

442.   Plaintiff Brinkley incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

443.   Plaintiff Brinkley, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

444.   Plaintiff was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination she was subjected to.

445.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

446.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

447.   The facts alleged by Plaintiff Brinkley that establish that she was treated disparately than her male colleagues are typical of, and consistent with, the claims of the other nine (9) CRPs.

448.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Brinkley was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

449.   Plaintiff Brinkley has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

450.   Plaintiff Brinkley seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00 plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

451.    Plaintiff Brinkley incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

452.    Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

453.    Plaintiff Brinkley was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

454.    As a direct result of Plaintiff Brinkley's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

455.    As a result of Defendants' actions, Plaintiff Brinkley suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

456.    Plaintiff Brinkley was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

457.    Plaintiff Brinkley has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

458.    Plaintiff herein seeks compensatory damages, and damages for mental pain and suffering of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

### *Age Discrimination and Retaliation Claim*

459.    Plaintiff Brinkley incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

460.    Plaintiff Brinkley asserts that she was discriminated against and retaliated against, in part, because of her age (over 40), in violation of the Age Discrimination in Employment Act 29 U.S.C. §§ 621-634.

461.    At least in part, because of her age, Plaintiff Brinkley, a Senior Police Officer was denied sick leave, weekend days off, duty assignments, training, and health assessments, while these same opportunities and benefits were given to much younger police officers.

462.    At least in part, Plaintiff Brinkley was terminated from her employment because of her age, and the reasons given for her termination were false and pretextual to hide a discriminatory intent.

463.    MPD's termination of Plaintiff Brinkley was motivated, at least in part, to retaliate against her for opposing age discrimination at MPD.

464.    Plaintiff Brinkley was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that materially caused her severe mental anguish.

465.    Plaintiff Brinkley has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

466.    Plaintiff Brinkley herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00 plus interest, costs, fees and all other remedies the Court deems appropriate.

*Disability Discrimination and Retaliation Claim*

467.    Plaintiff Brinkley incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

468.    Plaintiff Brinkley asserts herein that MPD violated her rights under the Americans with Disabilities Act of 1990, 42 U.S.C. 126, § 12101 *et seq.*

469.    After the death of her husband, Plaintiff suffered from depression and an anxiety condition for which she was under the care of medical professionals, and which was known to the Defendant, and as such, is a member of a protected class.

470.    The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement or discharge of employees, employment compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

471.    Plaintiff's disability substantially limited at least one of Plaintiff's major life activities, sleeping.  Plaintiff is an individual with a disability under the ADA.

472.    On several occasions, as described above, Defendant asked Plaintiff inappropriate questions about her disability, and commented about her disability to her colleagues and co-workers.

473.    On one occasion, as a result of having an episode related to depression and anxiety, Plaintiff's supervisor made negative comments about her to her colleagues and threatened to send her for a fitness for duty evaluation, which was intended to be, and was a threat to her future employment and a reprisal for her suffering from a disability.

474.    When Plaintiff complained about her serious and legitimate concerns regarding her Department's failure to comply with CDC guidelines regarding personnel entering the SOD building, she was ignored or humiliated for raising the issue.  Later, management disciplined her for not obtaining a health assessment upon entering the building, when it was her management that failed to station a person at the entrance to conduct the assessment.

475.    Defendant's actions were intended to mock Plaintiff for suffering from anxiety, and to add to exasperate her condition by forcing her to be even more worried for her health due to potential exposure to COVID-19.

476.    On three occasions, as described above, Plaintiff was exposed to COVID-19 from colleagues who had tested positive and was forced to quarantine as a result.  Each such instance was the result of Defendant's lackadaisical attitude to compliance with CDC COVID-19 protocols.

477.    On at least two occasions, personal and confidential information about Plaintiff's mental health condition and disability was discussed or leaked to her colleagues by her supervisors,

causing Plaintiff's co-workers to not want to work with her, and shaming Plaintiff and creating a stigma related to her disability.

478.    Defendant's actions constituted disparate and discriminatory treatment that caused Plaintiff to suffer and punished her for having a disability.

479.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

480.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

481.    Plaintiff herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## PLAINTIFF BROWN'S INDIVIDUAL CLAIMS

### Facts Relevant to Plaintiff Brown's Individual Claims

482.    Plaintiff Brown began her employment with the MPD in 2015.

483.    Plaintiff was mountain-bike certified, a process that took substantial effort and excellent physical fitness. Cdr. Taylor, therefore asked her to maximize her time patrolling her turf by bicycle, which allowed Plaintiff to have close proximity to the community.

484.    During the first year of her employment, she was appointed the Community Patrol Officer in a neighborhood known as Fairfax Village.

485.    This beat was historically given to an officer with years of experience, and was viewed by many officers as a desirable assignment.

486.    The Fairfax Village community had specifically asked the Departmental Commander David Taylor (hereinafter "Cdr. Taylor"), that Plaintiff Brown be assigned to that beat.

487.    Plaintiff's schedule for the Fairfax Village beat was somewhat unusual, in that it split shifts. She came in after day shift roll call, and worked into the evening on night shift.  She was therefore supervised by Sergeants on two different shifts.

488.    From approximately 2015 to early 2019, the Departmental Lieutenant was Jonathan Munk (hereinafter "Lt. Munk"), who reported to directly to Cdr. Taylor because all of the Departmental Captains remained in a different section.

489.    Several of Plaintiff's fellow officers, and the day shift Sergeants Robert Drummond (hereinafter "Sgt. Drummond") and Sergeant James Weathersby (hereinafter "Sgt. Weathersby") resented that Plaintiff Brown was given such a desirable assignment, and responded by harassing, denigrating, undermining and bullying her on the job.

490.    Most importantly, Plaintiff's direct supervisors constantly tried to impede her from patrolling the community by bike, and assigned her to patrol by car, informing Plaintiff that she needed to "earn the right" to patrol Fairfax Village by bicycle.

491.    There was no MPD policy requiring that an officer has to "earn the right" to any beat or patrol area, and Plaintiff Brown's supervisors had no basis to make such a demand of her.

492.    When Plaintiff Brown reminded her Sergeants Drummond and Weathersby that she had qualified to patrol by bicycle, and was personally requested by the Fairfax Village community, they would tell Plaintiff that she was subject to their power and would have to do what they wanted.

493.    There was no legitimate reason or justification for the way Plaintiff's supervisors treated her.

494.    When Plaintiff brought her concerns about being bullied and denied the benefit of a positive assignment to the attention of Lt. Munk, the Lieutenant attempted to intercede.  But he was not always there, and he had little power in the department.

495.    As soon as the coast was clear, Plaintiff's supervising Sergeants retaliated against her for going up the chain of command by escalating the harassment and bullying.

496.    On one occasion in 2018, Sgt. Michael Grey (hereinafter "Sgt. Grey"), another Sergeant on day shift, took Plaintiff's radio, an essential piece of equipment and hid it for an entire shift, and told her that she should not have left it unattended and unsecured in the police station.

497.    This was an uncalled-for act of demeaning bullying of Plaintiff because the station was a secured location which was attended by the station clerk, who watched over all of the radios that were placed on the radio charger.

498.    All of the Department's officers left their radios in that location to be charged.

499.    Sgt. Grey did not take anyone's radio except Plaintiff's.  Even radios that were left for several days because the officers were scheduled off were left untouched.

500.    Plaintiff was also targeted by her fellow officers for bullying through small acts of micro-aggressions such as repeatedly taking her lunch.  She was the only officer on either shift who was treated that way.

501.    Plaintiff's supervising Sergeants were aware that she was being bullied by her fellow officers, and instead of preventing it, they actually permitted and encouraged such unprofessional behavior.

502.    The lack of basic respect from her fellow officers made Plaintiff feel isolated and as if she could not rely on their support and back-up.

503.    Plaintiff considered going to EEO to complain, but was intimidated out of doing it because she had heard that others who went to EEO were retaliated against.

504.    As a relatively junior officer, Plaintiff did not feel she had the standing to challenge her superiors.

505.    Plaintiff suffered small acts of disrespect and unprofessional bullying nearly every day, and was treated as a second-class citizen in her department because of her race and gender.

506.    While Plaintiff continued to suffer within the workplace, her relationship with community continued to get stronger because of her proactive approach to policing.

507.    Every other weekend Plaintiff would buy pizza for the people who were regulars in her patrol area. She would buy cases of water for the homeless people and put water in a cooler and pass it out on Fridays and Saturdays.

508.    Plaintiff would make care packages with socks, water, snacks and sanitary items in them and hand out to the homeless.

509.    Plaintiff often chose to do these positive things for the community while in uniform so that people would develop a positive view of police officers.

510.    Plaintiff's positive approach to policing made her an outcast amongst several of her co-workers, most especially white male officers.

511.    Many would tell her that she was wasting her time and was foolish for trying to help people in the community.

512.    For years during her employment, Plaintiff's fellow officers would write about her on a Facebook page called the MPD Forum.

513.    The other officers would say things like Plaintiff was a fake police officer, that she didn't work, and that she was a "part-time" cop.

514.    The campaign to cyber-bully Plaintiff began with white male police officers, and then was joined by Black male officers.

515.    Several MPD Sergeants and Lieutenants were on the forum and participated in the cyber-bullying aimed at Plaintiff because of her race and gender.

516.    In 2019 Plaintiff Brown was selected as MPD Officer of the Year for the previous year, due to her hard work in community service and improving community relations.

517.    Once she received the honor of Officer of the Year, the bullying from her fellow officers escalated.

518.    Additionally, at that time, a change in leadership occurred.  Lt. Munk was replaced by Lt. Hawkins.

519.    Plaintiff was frequently denigrated and disrespected during roll call meetings, in full view of her departmental Sergeants.

520.    Rather than insisting on a professional and respectful workplace, Plaintiff's supervisors and managers fostered and encouraged a hostile, attacking, and bullying work environment.

521.    At some point after Plaintiff was awarded the Officer Of The Year award, a significant break down of the chain of command occurred.

522.    Plaintiff's Departmental Commander at that time was Darriya Habbebulah (hereinafter "Cdr. Habbebulah"), a Black woman officer.

523.    Cdr. Habbebbulah made it clear to her subordinate Lieutenants and Sergeants that she wanted Plaintiff to spend as much time in the Fairfax Village community as possible, cruising in the specially marked vehicle Plaintiff was awarded as Officer of the Year.

524.    Cdr. Habbebbulah  even had a bike rack placed on Plaintiff's car so she could park the car and ride around the neighborhoods.

525.    Not only was Cdr. Habbebbulah's order disregarded, but there was no discipline or consequences for the Sergeants and Lieutenants who defied it.

526.    Eventually, Plaintiff Brown was involuntarily moved from the Fairfax Village beat without explanation or justification.

527.    When Plaintiff was taken from the Fairfax Village beat, crime went up significantly.

528.    Despite being involuntarily reassigned, the daily and systematic bullying of Plaintiff did not improve.

529.    The situation deteriorated so much that the bullying bled over into the workplace, and Plaintiff felt she had to report it.  Plaintiff reached to Assistant Chief Chanel Dickerson, who initiated an investigation into the forum.

530.    At the time, the forum was rife with comments of a racist and sexist nature, posted by officers who were ostensibly supposed to serve the community in an unbiased manner.

531.    IAD conducted the investigation of the forum, and it was ultimately shut down.  As far as Plaintiff is aware, no officers were disciplined for their comments or activities on the forum, including their bullying of Plaintiff.

532.    ***On or about [month/day], Plaintiff's department received a complaint about her, but the name and email address of the complainant were fictitious.***

533.    It was not lost on Plaintiff that shortly after the MPD Forum was investigated and shut down, she became the subject of an investigation.

534.    The "anonymous" complaint against Plaintiff contained allegations that made it clear it came from within the MPD, and was rife with unfounded accusations.

535.    The gravamen of the complaint was that Plaintiff wasn't making enough arrests and getting enough weapons off of the street. It was essentially denigrating Plaintiff for being too friendly and kind to the community.

536.    Despite the obvious bias of the "anonymous" complaint, Plaintiff was nevertheless placed under investigation.

537.    Plaintiff Brown was ultimately cleared of any wrongdoing, but had to endure the stress and uncertainty of being the subject of a frivolous and unjustified investigation.

538.    Plaintiff had experienced the culture of intimidation when she attempted to report to Lt. Preston an incident that Plaintiff observed, of what she believed to be illegal stop and frisk activity.

539.    The incident involved plain-clothes officers from another unit, who cruised into Plaintiff's beat area, came up to a group of young Black men, jumped out of the vehicle, lined the young men up against a gate, and started emptying their pockets, without any radio call or Be On The Lookout (hereinafter "BOLO") notice related to an incident.

540.    Plaintiff believed that this incident was unlawful, and attempted to report it.

541.    Lt. Preston listened to Plaintiff Brown's recounting, and asked Plaintiff if she would write a formal statement.

542.    Then, Lt. Preston told Plaintiff that the officers involved were going to be told who reported ("snitched") them, and then asked Plaintiff again, if she wanted to bother with a formal report.

543.    Plaintiff interpreted that as a warning to keep silent, and therefore kept silent.

544.    Under MPD rules and polices, Lt. Preston herself had a duty to report the incident, and should have escalated the matter, rather said something that encouraged Plaintiff not to pursue the matter.

**545.**     ***In addition to, and compounding the day-to-day stress that Plaintiff Brown felt from the constant harassment and belittling she endured on the job, an incident occurred on or about [date], that deeply disturbed her.***

546.     That day, an officer-involved shooting occurred in the 7th District.

547.     Plaintiff Brown was on duty and was deployed from the Police Academy to the 7th District Police Station.

548.     The community was protesting in front of the building because an officer had shot and killed a young African American male, and the crowd was agitated by a false rumor that the officer had shot the young man in the back.

549.     When Plaintiff arrived on scene, the heated  and angry crowd was attempting to break into the station.

550.     Plaintiff Brown and her fellow officers placed themselves around the building to make a protective barricade, and held that post for hours.

551.     At approximately midnight, the size of the crowd had grown significantly,  but the push to breach the building had completely stopped, and the perimeter was not being challenged.

552.     The crowd was still angry and upset, it was flashing lights in the faces of the officers, and chanting BLM. Plaintiff Brown saw that many people were crying and extremely upset,  but none of the protesters were being physical or violent with the officers on the perimeter.

553.     At the same time, Plaintiff observed several white officers taunting the citizens and flashing their lights in their eyes and acting very unprofessional.

554.     Plaintiff observed white officers smacking their lips, laughing at the protesters and taunting them.

555.    One protester looked at Plaintiff and said "Brown look, they are laughing at the fact that a black boy is dead. They don't even care Brown, he looked just like you, his skin matched your skin, and they are laughing Brown," or words to that effect.

556.    Observing her fellow officers treat the community with the kind of racial bias and disrespect that they treated her, and other Black women police officers in the MPD, constituted the final straw for her, and promoted Plaintiff Brown to resign from the MPD

### Plaintiff Brown's Individual Causes of Action

*Race Discrimination and Retaliation Claims*

557.    Plaintiff Brown incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

558.    Plaintiff Brown, on her own behalf, asserts herein claims pursuant to the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

559.    Plaintiff Brown was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

560.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

561.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

562.    The facts alleged by Plaintiff Brown that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

563.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Brown was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

564.    Plaintiff Brown has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

565.    Plaintiff Brown seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Sex Discrimination and Retaliation Claim*

566.    Plaintiff incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

567.    Plaintiff Brown, on her own behalf, asserts herein claims pursuant to the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

568.    Plaintiff Brown was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination to which she was subjected.

569.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

570.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

571.    The facts alleged by Plaintiff Brown that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

572.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Brown was underlined humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

573.    Plaintiff Brown has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

574.    Plaintiff Brown seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00 plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

575.    Plaintiff Brown incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

576.    Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

577.    Plaintiff Brown engaged in protected disclosures when she reported police misconduct to Lt. Preston, and race and gender harassment to her Asst. Chief.

578.    As a direct result of Plaintiff Brown protected disclosures, Defendants systematically and continuously retaliated against Plaintiff Brown, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

579.    As a result of Defendants' actions, Plaintiff Brown suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

580.    Plaintiff Brown was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

581.    Plaintiff Brown has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

582.    Plaintiff Brown herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00 plus interest, costs, fees and all other remedies the Court deems appropriate.

## PLAINTIFF CARR'S INDIVIDUAL CLAIMS

### Facts Related to Plaintiff Carr's Individual Claims

583.    Plaintiff Carr began her employment with MPD in April of 1998.

584.    Plaintiff Carr was one of only three (3) Black female officers in her class of predominately white men, and one Black man.

585.    Despite the imbalance of her class, and a pattern of sexist and racist comments, and acts of favoritism shown the white male trainees, Plaintiff Carr was selected to be a squad leader for a portion of the training.

586.    After her time at the police academy, Plaintiff Carr was assigned to the Sixth District Police Station.

587.    At the time of her initial training and during her first MPD assignment, Plaintiff Carr was a United States Army National Guard soldier.  Plaintiff's Army specialty was as a vehicle repair specialist.

588.    As such, she was required to drive to Ft. Pickett, Virginia one weekend per month to fulfill her reserve duties and obligations.

589.    Plaintiff Carr had completed four (4) years of active-duty services in the United States Army before joining the MPD, and it was her desire and intention to serve in the reserve component for a full twenty (20) year career, and to earn a full reservist retirement with all benefits related thereto.

590.    Despite the fact that her service in the Army Reserve was protected by Federal Law, the Sixth District leadership refused to work with her to fulfill her obligation, forcing her to remain on duty late on Fridays when she had reserve drill, thus incumbering her ability to reach Ft. Pickett on time.

591.    Furthermore, even though Plaintiff had leave to complete her two-weeks-per-year reserve obligation, and the fact that such service is protected by law, the Commander of the 6th District made it very challenging to get the time off that she needed.

592.    The obstacles and push-back Plaintiff Carr received from her superiors when it came to fulfilling her reserve duty became so stressful, that she ultimately had to resign from the Army

Reserve, and relinquish and abandon the time-in-service equity she had built towards a full 20-year reservist retirement.

593.    At the time, several male MPD officers were also military reservists, and were given both the time off, and all reasonable accommodation needed to fulfill their reserve without difficulty.

594.    When Plaintiff Carr complained to her leadership about the disparity in treatment, her concerns were ignored.

595.    This was the first serious circumstance in Plaintiff Carr's career at MPD when her management subjected Plaintiff to unequal and disparate terms and conditions of employment based on her race and gender.

596.    MPD offered Plaintiff Carr no recourse to address the disparate treatment from her leadership, and established a pattern of dismissing and ignoring concerns raised by Plaintiff.

597.    From 2001-2002, Plaintiff  Carr was detailed to the Harbor Patrol Branch of MPD during a recovery from knee surgery.

598.    Plaintiff  Carr did an excellent job while in that department, and the Harbor Master at the time Lt. Paul Niepling (hereinafter "Lt. Niepling"), requested that Plaintiff be permanently assigned to the Harbor Patrol Branch.

599.    Plaintiff  Carr asked her leadership for the permanent reassignment, but her request was denied.  No explanation was given to Plaintiff  Carr for the denial of her request.

600.    Instead, a male officer was assigned to the Harbor Patrol Branch and Plaintiff  Carr was sent back to the Sixth District.

601.    Plaintiff Carr asserts and alleges that she was denied a desirable job opportunity because of her race and gender, and that such denial had a continuing effect on her earnings and promotional opportunities.

602.    In 2002 Plaintiff Carr attempted to expand her developmental and job opportunities by applying to be a helicopter pilot.

603.    Plaintiff Carr took the swim test and was one of the only female police officers to pass the strenuous test.

604.    Plaintiff Carr successfully passed all of the interview and testing components of the selection process, and was selected for the position, which was posted by teletype announcing Plaintiff as selected for the Air Support Unit.

605.    The departmental Sergeant, Steve Smith (hereinafter "Sgt. Smith), a white male, was unhappy that Plaintiff had been selected over a white male that Sgt. Smith favored, and accused Plaintiff, without evidence of any kind, of cheating on the swim test.

606.    The swim test portion was monitored by Lt. Niepling of Harbor Patrol, and several other supervisors were present.  None of the people who witnessed the test accused Plaintiff Carr of any impropriety with respect to the swim test.

607.    While this dispute regarding assignment to the Air Support Branch was transpiring, in 2003, Plaintiff Carr applied to be transferred to the Patrol K9 Unit and the EOD K-9 Unit, to have an opportunity to work with police dogs.

608.    was selected to take the EOD K-9 training test, but never received the notice to report to the Physical Training ("PT") part of the test.

609.    Plaintiff Carr later discovered that Commander William Dandridge (hereinafter "Cdr. Dandridge"), intentionally sabotaged Plaintiff getting the notification of the test in order to take from her the opportunity to go to the EOD K-9 unit.

610.    Plaintiff Carr went directly to (then) Cdr. Cathy Lanier, who was the Commander of SOD at the time, to complain about what had happened, and was told that there was nothing that could be done, and that she should focus on patrol duties.

611.    No investigation or disciplinary action was taken against Cdr. Dandridge for sabotaging Plaintiff's opportunity by MPD management.   Plaintiff's concern and complaint was simply ignored.

612.    By chance, a few weeks later, one of Plaintiff Carr's colleagues (not Plaintiff's supervisor or management team) informed her of the date and time of an upcoming PT test for the Patrol K-9 Unit.

613.    Plaintiff Carr was the only female officer who was able to pass the PT portion of the K-9 test and advance to the interview portion for selection.

614.    Plaintiff Carr, who had a side job as a dog groomer, received one of the highest scores during the interview portion because of her extensive knowledge of dogs, and held two certifications for dog grooming and handling.

615.    Despite her strong testing and performance, Sergeant Duane Beuthe (hereinafter "Sgt Beuthe")  interceded to keep Plaintiff from being transferred to the Patrol K-9 unit.

616.    When asked about his objection to Plaintiff Carr going to Patrol K-9 Unit, Sgt. Beuthe indicated that the work of the Patrol K-9 Unit was too rigorous, and that Plaintiff Carr would be better suited to the EOD K-9 unit because it did "less work."

617.    Plaintiff Carr asserts that Sgt. Beuthe had a problem with female officers being in the K-9 Patrol unit, and acted to limit the job opportunities for women officers who wanted to work with police dogs.

618.     Plaintiff Carr immediately complained about the unfair and disparate treatment that she was being subjected to, speaking with her union representative Bernard Richardson, to see if she had recourse under the terms of the collective bargaining agreement.

619.     Plaintiff Carr filed a grievance over the unfair treatment with the support of her union.

620.     Because Plaintiff Carr was willing to escalate the matter and speak out against the gender bias within the K-9 Patrol Unit, she was labeled a "trouble-maker" and subjected to systematic and repetitive retaliation.

621.     Plaintiff Carr, with the assistance of her union, again escalated matters to Cdr. Lanier explaining that she was being discriminated against in by both the Air Support Branch and the K-9 Units, because of her race and gender.

622.     In order to appease Plaintiff Carr, and get her to drop her grievance, Cdr. Lanier agreed to give Plaintiff Carr her choice of the Air Support Unit or the K-9 Unit.

623.     However, Cdr. Lanier discouraged Plaintiff Carr from choosing the Air Support Unit by warning Plaintiff Carr of the challenges of working for a sexist Sergeant.

624.     Cdr. Lanier did not take any action to address Sgt. Smith or Sgt. Beuthe's discriminatory actions or attitudes.

625.     Plaintiff chose the K-9 Unit, but was denied K-9 Patrol, even though she had earned a position in that Unit, and settled for the EOD K-9 Unit. Plaintiff Carr went to EOD K-9 Unit in 2003.

626.     In 2006, Plaintiff Carr filed an OHR complaint alleging gender discrimination, because she was consistently treated less favorably than male officers in the SOD K-9 Unit.

627.     Plaintiff Carr's complaint was not taken seriously, and was dismissed without thorough investigation.

628.     Immediately thereafter, Plaintiff Carr was subjected to an even more hostile work environment, suffering from snide and sexist comments from her co-workers, and even more unfavorable treatment.

629.     Importantly, no disciplinary action was taken against Sgt. Smith or Sgt. Greg Jackson (hereinafter "Sgt. Jackson") for the blatantly sexist and discriminatory treatment of Plaintiff Carr.

630.     No disciplinary action was taken against Sgt. Smith for maligning Plaintiff Carr's character and defaming her by falsely accusing her of cheating on the Air Support swim test.

631.     In 2010, Plaintiff Carr position in the EOD K-9 Unit was unilaterally eliminated by management, and despite a still-pending union grievance on the matter, Plaintiff was transferred to the Special Events Branch in 2011.

632.     Plaintiff Carr continued to suffer from retaliation and a hostile work environment while in Special Events Branch, but was afraid to file another EEO complaint because of the retaliation she suffered from the 2006 complaint.

633.     In 2014, at the request of Cdr. Steven Sund (hereinafter "Capt. Sund), Plaintiff Carr was transferred to the Administrative Office.

634.     However, when Cdr. Sund retired, (then) Captain Robert Glover (hereinafter "Capt. Glover") began taking steps to force Plaintiff Carr out of the Administrative Department and replace her with a white male officer, Robert Wells (hereinafter "Officer Wells").

635.     Plaintiff Carr successfully completed her job duties in the Administrative Department, without serious error or the need for substantial revision of her work, for three years.

636.     Yet, the excuse that Capt. Glover gave for replacing Plaintiff Carr with Officer Wells was that Officer Wells was "college educated."

637.     A college degree was never required, or even particularly relevant, for the position.

638.    Plaintiff Carr was then transferred against her wishes to the Special Events/Escort Unit from the Administrative Department in 2016, and the hostile and unfair treatment aimed at Plaintiff Carr continued.

639.    In 2019, Plaintiff Carr filed an EEO complaint alleging unfair treatment, disparate terms and conditions of employment, and a hostile work environment.

640.    Because MPD's EEO Officer, Mr. Lee had a practice of leaking what complainants said in EEO interviews, Plaintiff's accusations against Lt. Andrew Margiotta (hereinafter "Lt. Margiotta") and Capt. Glover made it immediately back to them.

641.    Thereafter, the retaliation against Plaintiff Carr began to escalate.

642.    It increased so much that Plaintiff Carr went directly to the Chief of Homeland Security Bureau (hereinafter "HSB"), Jeffrey Carroll (hereinafter "Chief Carroll") to complain.

643.    Chief Carroll dismissed and ignored Plaintiff Carr's complaints, and took no action against either Sgt. James Rogers (hereinafter "Sgt. Rogers") or Lt. Margiotta, both white male officers, for their consistent and concerted efforts to bully Plaintiff, and undermine her ability to do her job.

644.    Plaintiff's supervisors routinely withheld vital information from her, gave her undesirable assignments that they would not give to others, issued discipline for small mistakes that were not subject to discipline when other officers made the same mistakes, and unfairly and harshly evaluated Plaintiff's performance.

645.    For example, Sgt. Rogers unilaterally revoked Plaintiff Carr's "expected tardiness privilege," which is given to officers to allow them to manage their respective schedules, when necessary, without punishment.

646.    Sgt. Rogers had absolutely no basis for doing so. Plaintiff Carr had zero tardies during that period, so she had in no way abused the privilege.

647.   The revocation was just an act of unnecessary and disparate harshness against Plaintiff Carr.

648.   Plaintiff Carr was systematically attacked, undermined, isolated, held to impossible standards, and unfairly disciplined, and when she complained to EEO, her complaints would go back to the people she was seeking EEO assistance to investigate and reign in.

649.   Plaintiff suffered such severe bullying and hostility at work that it impacted her mental health and caused extreme stress, anxiety and depression. Plaintiff was seen by the MPD physician, but denied that she needed extended care because she feared it would be used as an excuse to terminate her employment.

650.   Plaintiff Carr's fears were corroborated when the Director of the DC Fire and Police Clinic, Matthew Miranda, shared Plaintiff's private medical information with Mr. Lee without her consent, which was a violation of Plaintiff Carr's HIPPA rights, and further chilled her willingness to seek assistance for her hostile work-environment-related stress and anxiety.

651.   On or about August 19, 2020, the ERT Sgt. Boyd got into a confrontation with Plaintiff Carr during roll call.

652.   He then filed an EEO complaint against Plaintiff Carr for creating a hostile work environment for him, even though he outranked her, and she had no power over him.

653.   At the time, Sgt. Boyd had already been the subject of several EEO complaints from several difference female officers.

654.   Sgt. Boyd filed his EEO Complaint against Plaintiff Carr as an act of aggression and retaliation.

655.   Unlike Plaintiff Carr's EEO Complaints, Sgt. Boyd's complaint was immediately investigated, and Plaintiff Carr was threatened with a 30-day suspension.

656.   The EEO Officer, Mr. Harry Carter (hereinafter "Mr. Carter") who conducted the investigation and interviewed the witnesses to the incident, concluded that Sgt. Boyd was the one at fault, and dismissed the complaint.

657.   Mr. Lee then interceded, demanding that Mr. Carter alter his findings, and eventually fired Mr. Carter for refusing to issue discipline against Plaintiff, in defiance of Mr. Lee's unlawful demand that Mr. Carter do so.

658.   Although Plaintiff Carr narrowly escaped discipline for her role in the incident, she was unable to get any MPD management to take her allegations against Sgt. Boyd seriously, and he was not disciplined for his act of bad faith bullying and retaliation.

659.   Because MPD refused to act against male officers who bullied Plaintiff Carr, the retaliatory and hostile behavior continued.

660.   In February of 2020, Plaintiff Carr went to her CDR Guillermo Riveira (hereinafter "Cdr. Rivera"), the new commander of SOD, with a recording of a confrontation between herself and Lt. Margiotta.

661.   However, Cdr. Rivera refused to even listen to the recording, and again dismissed Plaintiff Carr's concerns.

662.   Despite the fact that Plaintiff Carr's recording of the incident proved that Lt. Margiotta lied during an investigation by Internal Affairs, MPD management disciplined Plaintiff and ***suspended her*** for twenty-five (25) days for having recorded the incident.

663.   Recording incidents is not unlawful in the District of Columbia, and does not require the consent of the person recorded to be lawful.

664.    Plaintiff Carr was reduced to having to record the hostile work environment she was dealing with because neither MPD EEO, nor any of her chain of command would take her complaints seriously or believe her.

665.    On Plaintiff Carr's behalf, the Union appealed the suspension and went directly to the Chief Contee to obtain redress for the unfair discipline.

666.    Plaintiff Carr also appealed directly to Chief Contee about the racism, sexism, hostile work environment, and retaliation that she was enduring on the job.

667.    In a ruse to get Plaintiff Carr to voluntarily leave the SOD department, in lieu of having to involuntarily transfer her out, which could and would have been appealed, SOD management entered into an agreement with Plaintiff that if she "voluntarily" transferred, they would rescind the disciplinary suspension for the recording.

668.    Plaintiff Carr had no desire to transfer into yet another department, but felt that she had no real choice, and did not want a long suspension on her record for an incident in which she was not at fault.

669.    Plaintiff Carr therefore signed the agreement, and was transferred out of SOD.

670.    MPD then reneged on the agreement and *suspended Plaintiff Carr anyway*, demonstrating how unfair, biased, and unjust it was willing to be to Black women officers.

671.    Plaintiff Carr has since returned to work, but lives in constant fear and stress of the retaliation, discrimination and unfair treatment she continues to be subject to at the MPD.

## Plaintiff Carr's Individual Causes of Action

### *Race Discrimination and Retaliation Claims*

672.    Plaintiff Carr incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

96

673.   Plaintiff Carr, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

674.   Plaintiff Carr was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

675.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

676.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

677.   The facts alleged by Plaintiff Carr that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

678.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Carr was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

679.   Plaintiff Carr has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

680.    Plaintiff Carr seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Sex Discrimination and Retaliation Claims*

681.    Plaintiff Carr incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

682.    Plaintiff Carr, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

683.    Plaintiff Carr was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination to which she was subjected.

684.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

685.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

686.    The facts alleged by Plaintiff Carr that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

687.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Brinkley was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

688.    Plaintiff Carr has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

689.    Plaintiff Carr seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

## *Whistleblower Retaliation Claim*

690.    Plaintiff Carr incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

691.    Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

692.    Plaintiff Carr engaged in protected disclosures when she reported race and gender discrimination to the Chief of Police.

693.    As a direct result of Plaintiff Carr's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

694.    As a result of Defendants' actions, Plaintiff Carr suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

695.    Plaintiff Carr was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

696.    Plaintiff Carr has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

**697.**    Plaintiff Carr herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00 plus interest, costs, fees, and all other remedies the Court deems appropriate.

## PLAINTIFF CLARK'S INDIVIDUAL CLAIMS

### Facts Relevant to Plaintiff Clark's Individual Claims

698.    Plaintiff Leslie Clark began her employment with the MPD in May of 1989.  She was initially assigned to Seventh District.

699.    In April of 2001, she was transferred to SOD, and worked there until 2014.

700.    Plaintiff Clark's tenure with the MPD was relatively uneventful until on or about July 11, 2012.  On that date, while sitting at a restaurant having breakfast with her partner Officer Darren Edwards, the subject came up about the then First Lady, Michelle Obama's threat level.

701.    During the conversation, Officer Christopher Picciano, a white male, told Plaintiff Clark that he wanted to kill First Lady Michelle Obama, and showed Plaintiff Clark a picture of a gun that he indicated he was going to use to do it.

702.    Plaintiff Clark had every reason to take the threat seriously, as on occasion, MPD officers provide added security to events in Washington, DC at which the President and First Lady could have been present.

703.    Plaintiff Clark reported the threat to IAD, as she believed it was her sworn duty to do.

704.    It is unclear if IAD investigated the claim, but it leaked to others that Plaintiff Clark had reported the threat.

705.    Thereafter, all the white officers and several white MPD officials started treating Plaintiff Clark differently.  No members of MPD senior leadership stepped in to manage the situation.

706.    Thereafter, Plaintiff Clark was isolated and shunned by her peers, and consistently given dangerous and undesirable assignments by her supervisor Sgt. Steve Urps (hereinafter "Sgt. Urps") and (then) Lt. Glover.

707.    In July of 2012, Officer John Felenchak (hereinafter "Lt. Felenchak") approached Plaintiff Clark, and told her that she needed to "mind [her] mother-f****ing business," (or words to that effect).

708.    Plaintiff Clark was labeled "a snitch," and MPD leadership, including Sgt. Urps and Lt. Glover nurtured and permitted to flourish a work environment in which officers were told to watch out for Plaintiff Clark and to ostracize her.

709.    Plaintiff Clark went to the MPD EEO office to complain about the way she was being treated.

710.    EEO did not take her claims seriously, failed to investigate or intervene in any way, and allowed Plaintiff to continue to be subject to a hostile work environment.

711.    Plaintiff Clark ultimately chose to retire, on or about May 31, 2014.

712.    However, because of manning shortages, MPD asked Plaintiff Clark to return to employment as an SPO.

713.    On or about February 6, 2017, Plaintiff Clark returned to MPD in the Special Operations Department as an SPO.

714.    On or about February 18, 2017, Lt. Margiotta informed Plaintiff Clark that she would not allow her to work the day schedule, and that he was permanently assigning her to the evening shift. Lt. Margiotta gave no explanation or justification for this decision.

715.    This schedule presented a hardship for Plaintiff Clark because of her family obligations.

716.    On or about February 26, 2017, Plaintiff Clark asked Lt. Margiotta if she could replace SPO Chris Coles, who was on day shift, but was being transferred out of the department. Without explanation or justification, Lt. Margiotta refused Plaintiff's request.

717.    Approximately three weeks later, Plaintiff Clark requested to work a modified shift, as was allowed for Officer Felenchak.

718.    Lt. Margiotta asked Plaintiff Clark what hours what hours she was actually requesting. When she told him 1100-1900, he refused to allow it, insisting that Plaintiff was only going to be allowed to work night shifts.

719.    Officer Felenchak, a white male, was allowed to change his tour of duty when he wanted to, in order to accommodate his home life.

720.    Other, similarly situated  officers in the department who were not Black women were allowed to switch from a night to a day schedule, or vice versa.

721.    Plaintiff Clark was singled out for disparate and harsher treatment because of her race and gender, and because of the racial and gender animus of Lt. Margiotta.

722.    On or about March 8, 2017, Plaintiff Clark requested to speak with Capt. Glover about the harsh and inflexible schedule she was placed on by Lt. Margiotta. Plaintiff Clark asked if she could work a modified shift to ease the burden on her and her family.  Capt. Glover did not immediately respond to Plaintiff Clark.

723.    On or about March 10, 2017, Plaintiff Clark went back to Capt. Glover who informed Plaintiff Clark that she was not allowed to work a day schedule, and that he would not let Plaintiff Clark work a modified shift until some unspecified time when there would be new hires.

724.    Plaintiff Clark was later informed by Officer Arnett Perkins that Capt. Glover went into a rampage when he found out that Plaintiff was returning to the MPD as an SPO, because he had personal animus against Plaintiff Clark, and was infuriated that he was not consulted prior to her return.

725.    Plaintiff Clark was assigned to the Vice-Presidential escort detail in the Special Events division of SOD.

726.    However, Plaintiff Clark was assigned the least secure vehicle in the fleet to do her work.

727.    Plaintiff Clark was assigned the "plate reader car," which used by the SOD Events unit to run the license plates of cars along the routes that would be traveled by the President or Vice President, to make sure there were no suspicious vehicles on the route.

728.    The "plate reader" vehicle was a sedan, without reinforced ballistic-proof doors. All other vehicles in the detail were heavy SUV/Truck with ballistic doors.

729.    On or about April 26, 2017, Plaintiff Clark asked Lt. Margiotta if she could be assigned a vehicle that had ballistic doors because she was working the more dangerous evening schedule.

730.    For no apparent reason, Lt. Margiotta denied the request and forced Plaintiff Clark to continue using the "plate reader" unreinforced sedan vehicle.

731.    Plaintiff Clark worked the Vice-Presidential detail as her permanent assignment.

732.    By contrast, Officer Anna DaRoo (hereinafter "Officer DaRoo") (white female).  Officer DaRoo was assigned a new ballistic door SUV/Truck even though she was only on temporarily assignment to SOD from the 4th District.

733.    Plaintiff Clark, who had the permanent Vice-Presidential escort assignment, was denied the appropriate and safer vehicle because she is Black and female, and because her superior harbored animus against her because of her race and gender.

734.    Unsure what to do about her superior's racial and gender animus, Plaintiff asked her union representative, Officer Michael Pratt (hereinafter "Officer Pratt"), what to do.

735.    Officer Pratt went to speak with Lt. Margiotta about switching Plaintiff Clark to a day schedule.

736.    Officer Charles Marshall (hereinafter "Officer Marshall") was in the room when Lt. Margiotta and Officer Pratt spoke about Plaintiff Clark's schedule.

737.    During that meeting, Lt. Margiotta asserted that Plaintiff could file whatever paperwork she wanted to file, but that he was never going to change Plaintiff's work schedule from the evening shift.

738.    Again, no explanation or justification was given for Lt. Margiotta's position other than personal racial and gender animus.

739.    In September of 2019, Plaintiff Clark asked for a temporary schedule change to help take care of her granddaughter who had suffered second degree burns on her stomach and legs.

740.    At the time, Officer Shawn Caldwell (hereinafter "Officer Caldwell)(white male) was seeking to switch from the day schedule to an evening schedule.  Thus, there was day shift work available for Plaintiff Clark.

741.    Instead of giving Plaintiff Clark the temporary day shift she requested, Lt. Margiotta moved two white male officers to day schedule, Officer Michael Tucker and Officer David Baker, to prohibit Plaintiff Clark from being able to workdays.

742.    Again, there was no basis or justification for this decision other than animus towards Plaintiff Clark.

743.    Lt. Margiotta routinely allowed officers in the department to trade days off to accommodate family events.  On or about May 21, 2020, Plaintiff requested to change one of her days off to attend her niece's graduation.

744.    Lt. Margiotta refused to allow the trade of days off for Plaintiff Clark, and forced her to use a day of leave instead.  This was yet another example of disparate and unfair treatment leveled at Plaintiff Clark.

745.    A month later during the Black Lives Matter protest, when all days off were cancelled and leave was restricted, SPO Christopher Bell (hereinafter "Officer Bell")(white male) was granted leave by Lt. Margiotta for his daughter's virtual graduation.

746.    In July of 2020 while Plaintiff Clark was on limited duty, Sgt. Jane Barrientos told Plaintiff Clark that Cdr. Rivera put out a memo stating that persons on limited duty had to report to work in "courtroom" attire.

747.    However, Officer Charles Marshall (black male) and Officer David Baker (white male) came to work in jeans, t-shirts, and tennis shoes.  Essentially, Cdr. Rivera's "rule" did not apply to male officers he favored.

748.    In March of 2019, Former SPO Arlinda Page (hereinafter "SPO Page"), in the Traffic Unit, requested of Capt. Glover that Plaintiff be allowed to replace her. The unit's Lieutenant, Ronald Wilkins (hereinafter "Lt. Wilkins") told Plaintiff Clark that he would speak with Capt. Glover about allowing Plaintiff to fill the Traffic Unit vacancy.

749.   Lt. Wilkins later told SPO Page that he did not talk to Capt. Glover because he already knew that Capt. Glover was going to say no.  Plaintiff Clark thus lost a job opportunity because of the racial and gender animus of Cpt. Glover.

750.   On or about August 19, 2020, Plaintiff approached Lt. Walter Flemings in the Time and Attendance Department (hereinafter "Lt. Flemings.")   Plaintiff Clark had worked in that Department for ten (10) years before becoming an SPO, so was very well qualified for the position.

751.   On August 25, 2020, Cdr. Rivera denied Plaintiff Clark's request for the transfer, giving Lt. Flemings no justification or explanation for the denial.

752.   On or about August 29, 2020, Plaintiff Clark met with Cdr. Rivera and her union representative, Officer (and Plaintiff herein) Tabatha Knight.

753.   At the meeting, Plaintiff Clark asked Cdr. Rivera if she could be detailed to work during the day schedule in order to accommodate her family needs. Cdr. Rivera denied her request because, according to him, it would generate too many complaints from other (non-Black female) officers.

754.   Plaintiff Clark then asked if she could be moved to a different division in SOD.  Cdr. Rivera flatly refused to answer her question.

755.   In May of 2020, Plaintiff Clark learned that Officer Knight was retiring and going to leave her position on the Crash Review Board, which was an administrative position.  Officer Knight indicated that Plaintiff was well qualified for the position, and Plaintiff asked Cpt. Glover to be transferred to that office.

756.   Instead of granting Plaintiff's request, which would have been best for the MPD, Cpt. Glover tried to force Officer Charles Culver (hereinafter "Officer Culver") to take the job.  Officer Culver had no administrative experience and did not want the job.

106

757.    Again, MPD management went out of its way to deny Plaintiff Clark job opportunities, and to treat her harshly and with clear animus and hostility, because of her race and gender.

758.    Similarly situated officer in SOD, who are not Black females, frequently asked for and were granted job and schedule changes.  Such requests were denied to Plaintiff Clark and other Black women officers.

759.    Upon information and belief Cdr. Riveria, Cpt. Glover and Lt. Margiotta harbor racial animus against Plaintiff Clark, and were overheard talking about their specific intent to retaliate against her have pushed out of the MPD.

760.    On or about July 24, 2020, Lt. Margiotta wrote Plaintiff Clark up because she came to work on limited duty on the day shift schedule, and worked the entire week, Monday thru Friday, on day shift.

761.    Plaintiff Clark broke no rules or policies in doing so, and was free to do so because she was on limited duty.

762.    Lt. Margiotta wrote Plaintiff up for doing so because for one week, she thwarted his concerted and intentional campaign to harass and attack her, and prohibit her from working her preferred schedule.

763.    Once she found out she was going to be disciplined for working the day shift, Plaintiff Clark called IAD to ascertain the status of the investigation into her actions. IAD refused to speak to Plaintiff about the status of the discipline.

764.    Instead of allowing Plaintiff Clark to work the day shift while she was limited duty, when there was work to be done, Lt. Margiotta forced Plaintiff to evening shift, when there was nothing to do.

765.     Plaintiff Clark ended up sitting in the locker room for the duration of her schedule because there was no work for her to complete.

766.     This episode was another example of intentional hostile and abusive treatment of Plaintiff Clark, to the actual detriment of the MPD, by Lt. Margiotta, for the sole purpose of fostering a hostile work environment.

767.     Plaintiff Clark's Union Steward, Officer Rosario, had to ask management three separate times for the status of the investigation into Plaintiff Clark's actions, before he was told that Cpt. Glover had cancelled the investigation.

768.     In October 2020, the Department Sergeant, Keith Jackson (hereinafter "Sgt. Jackson") gave everyone in his squad, including Plaintiff, a #4 rating on their performance evaluations, which meant he had to write a memo justifying the #4 ratings.

769.     Cdr. Rivera approved everyone in the department getting a #4 rating on their performance evaluation, except Plaintiff, who was given a #3 rating, with no explanation as to why she would be singled out for a lower rating.

770.     Union Steward Rosario requested that Plaintiff's rating be changed back to a #4, but MPD has refused to do so.

771.     Plaintiff Clark asserts that her #3 performance evaluation rating is fraudulent and the result of racial and gender animus, and was modified by MPD management in retaliation for Plaintiff's engagement in protected activity.

## Plaintiff Clark's Individual Causes of Action

### Race Discrimination and Retaliation Claims

772.     Plaintiff Clark incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

773.    Plaintiff Clark, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

774.    Plaintiff Clark was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

775.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

776.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

777.    The facts alleged by Plaintiff Clark that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

778.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Clark was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

779.    Plaintiff Clark has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

780.    Plaintiff Clark seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Sex Discrimination and Retaliation Claims*

781.    Plaintiff Clark incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

782.    Plaintiff Clark, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

783.    Plaintiff Clark was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination she to which she was subjected.

784.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

785.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

786.    The facts alleged by Plaintiff Clark that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

787.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Brinkley was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

788.   Plaintiff Clark has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

789.   Plaintiff Clark seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

790.   Plaintiff Clark incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

791.   Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

792.   Plaintiff Clark was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, and Chief Contee about the discrimination at MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

793.   As a direct result of Plaintiff Clark's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff Clark, including but not limited to unwarranted

disciplinary actions against Plaintiff Clark, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

794.    Plaintiff Clark was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

795.    Plaintiff Clark has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

796.    Plaintiff Clark herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

<em>Age Discrimination and Retaliation Claim</em>

797.    Plaintiff Clark incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

798.    Plaintiff Clark asserts that she was discriminated against and retaliated against, in part, because of her age (over 40), in violation of the Age Discrimination in Employment Act 29 U.S.C. §§ 621-634.

799.    At least in part, because of her age, Plaintiff Clark, a Senior Police Officer was denied sick leave, weekend days off, duty assignments, training, and health assessments, while these same opportunities and benefits were given to much younger police officers.

800.    At least in part, Plaintiff Clark was terminated from her employment because of her age, and the reasons given for her termination were false and pretextual to hide a discriminatory intent.

801.    MPD's termination of Plaintiff Clark was motivated, at least in part, to retaliate against her for opposing age discrimination at MPD.

802.     Plaintiff Clark was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that materially caused her severe mental anguish.

803.     Plaintiff Clark has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

**804.**     Plaintiff Clark herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees, and all other remedies the Court deems appropriate.

### PLAINTIFF DICKERSON'S INDIVIDUAL CLAIMS

### Facts Relevant to Plaintiff Dickerson's Individual Claims

805.     Plaintiff Dickerson joined the MPD in 1988, at the age of 17 as a police cadet.

806.     In 1990, while assigned to the Seventh District, Plaintiff Dickerson was offered money, clothes, and a car by Lieutenant William Roberts (hereinafter Lt. Roberts) and Detective Roosevelt Askew (hereinafter "Det. Askew) in exchange for intimate dates and a willingness to perform sexual acts.

807.     Plaintiff Dickerson was told by Lt. Roberts and Det. Askew that she needed to agree to intimate dates and sex acts with them in order to be promoted and get good assignments.

808.     Plaintiff Dickerson did not welcome or accept their advances, but instead asked to be transferred to the Office of Finance and Resource Management.

809.     The hostile environment that she was subject to was one of the reasons why Plaintiff Dickerson resigned from the MPD in 1991.

810.     Plaintiff Dickerson returned to the MPD in 1994 as a civilian employee.

811.    In 1995, Plaintiff Dickerson started being sexually harassed by Lieutenant Benjamin Preston (hereinafter "Lt. Preston"), who made continued, unwanted sexual advances on Plaintiff Dickerson.

812.    Plaintiff Dickerson rejected Lt. Preston's overtures and eventually complained to Captain Dewey Wiseman about the unlawful and inappropriate advances from Lt. Preston.

813.    Rather than being disciplined, Lt. Preston was allowed to remain in his position of authority over Plaintiff Dickerson, and immediately began to retaliate against her for reporting his behavior.

814.    Lt. Preston reduced Plaintiff Dickerson's lunch period from an hour to 30 min, while the one-hour lunch was kept for all other employees.

815.    Lt. Preston created a log wherein Plaintiff Dickerson had to sign in and out every time she left the office, including for restroom breaks, when no one else was required to do so.

816.    Lt. Preston was also seen on several occasions outside of Plaintiff Dickerson's home, somewhere he had no legitimate business reason to be because she lived in Maryland.

817.    Cpt. Wiseman took no steps to protect Plaintiff Dickerson from harassment or retaliation, and failed to take any meaningful action against Plaintiff Dickerson's harasser.

818.    In 1997, while Plaintiff Dickerson was still a probationary patrol officer, Lieutenant Ronnie Foye (hereinafter "Lt. Foye") made continued sexual advances and comments to Plaintiff Dickerson during her training at the Third District.

819.    Lt. Foye often commented on Plaintiff Dickerson's physical attributes and described the sexual acts that he wanted to perform on her.

820.    For example, in one incident that took place in the Fall of 1997, Plaintiff Dickerson's training officer, Officer Tonya Longus (hereinafter "Officer Longus"), and Plaintiff Dickerson

were on a police call for service on Georgia Avenue NW, when a citizen asked to speak to a supervisor about an open fire hydrant.

821. Officer Longus summoned Lt. Foye. Upon arrival on the scene, Lt. Foye kept looking and commenting on Plaintiff Dickerson's buttocks and breasts.

822. The citizen was so appalled by the lieutenant's behavior, he sent a written complaint to the Third District Commander.

823. However, no disciplinary action was taken against Lt. Foye, and no attempt was made to protect Plaintiff Dickerson from Lt. Foye's unlawful advances.

824. On information and belief, prior to Plaintiff Dickerson's complaint against Lt. Foye, there was another claim against him for sexual harassment that was substantiated, but he was not terminated.

825. From late 1998-2001, Plaintiff Dickerson was again sexually harassed by Sgt. Jaime Anderson (hereinafter "Sgt. Anderson"), who made repeated and continual sexual advances and comments to Plaintiff Dickerson.

826. Sgt. Anderson repeatedly asked Plaintiff Dickerson out on dates, and complimented her on her lips, buttocks, and breasts.

827. Every time Sgt. Anderson prepared roll call, he would assign Plaintiff Dickerson without a partner so that he could force her to meet with him at different places within the Third District.

828. If another sergeant assigned Plaintiff Dickerson with a male partner, Sgt. Anderson would force the male partner to walk a foot beat, while forcing Plaintiff Dickerson to meet up with the Sgt. to complete her shift.

829. Plaintiff Dickerson's complaints about Sgt. Anderson's abuse of power and blatant harassment were ignored.

830.   Officer Marjorie Temple also made a sexual harassment complaint against Sgt. Anderson. During that investigation, Sgt. Anderson admitted to the investigators that he had sexually harassed Plaintiff Dickerson, but no action was taken against him.

831.   After Sgt. Anderson's targeted harassment of Plaintiff Dickerson, male officers started objecting to partnering with her because they knew Sgt. Anderson would later change their assignment.

832.   Sgt. Anderson was not fired or disciplined for his blatantly unlawful conduct, and MPD leadership failed to address a situation that was so obvious it became a common joke at MPD.

833.   After Plaintiff Dickerson's complaint, someone drew a caricature of her on the men's bathroom stall at the Third District with a special emphasis on her buttocks and breasts.  This is indicative that the message sent by MPD to its officers was that harassment and disrespect of women officers was acceptable.

834.   In 2008, while a sergeant at the Fifth District, after exercising, Plaintiff Dickerson was taking a shower in the female locker room.

835.   A male employee from D.C Government's Department of General Services entered the shower area after Plaintiff Dickerson asked him not to.

836.   Plaintiff Dickerson jumped out of the shower, put on minimal clothing, and ran out of the shower area into the general area of the police station to solicit help.

837.   She hurriedly went to the sergeant's office, visibly shaken and upset, and told Sergeant Terry Thorne (hereinafter "Sgt. Throne") what had transpired while she was in the shower.

838.   The male employee ran out of the shower area and locked himself in a boiler room.

839.   Sgt. Thorne urged the employee to exit the boiler room, and to give his account of what had transpired.

840.    The employee informed Sergeant Thorne that he heard Plaintiff Dickerson tell him not to enter the locker room, and that he had heard the water running in the shower, but decided to enter anyway because he ostensibly needed to enter to do his job.

841.    Plaintiff Dickerson complained to Commander Lamar Greene (hereinafter "Cdr. Greene") who informed his bosses, Chief Cathy Lanier (hereinafter "Chief Lanier") and Assistant Chief Diane Groomes (hereinafter "Chief Groomes), who initially took no action.

842.    After Plaintiff Dickerson's repeated complaints, an internal affairs investigation was initiated.

843.    MPD detectives arrested the male employee, however the United States Attorney's Office contacted Plaintiff Dickerson and informed her that the case would not be prosecuted because the Plaintiff Dickerson "didn't have authority to tell him not to enter the ladies' locker room."

844.    Plaintiff Dickerson continued to complain, and an internal investigation was launched by the male employee against Plaintiff Dickerson.

845.    Lieutenant Derrick McNeely (hereinafter "Lt. Neely"), Plaintiff Dickerson's immediate supervisor, informed her that ***she*** was the target of an internal investigation, and directed her to write a statement explaining her actions.

846.    After becoming visibly upset, Plaintiff Dickerson explained the entire incident. Lt. McNeely then apologized to Plaintiff Dickerson and told her that he would let her know if the statement would still be needed.

847.    Lt. McNeely later returned and informed Plaintiff Dickerson that his bosses had instructed him to move forward with the investigation to ensure that she had not violated the department's policies.

848.    The MPD initiated an investigation into Plaintiff Dickerson as an act of retaliation and an attempt to intimidate her, and to make an example out of her to others, in order to discourage the reporting of sexual harassment and misconduct.

849.    For the duration of the investigation into Plaintiff Dickerson for reporting sexual harassment and after, she was denied promotion to Lieutenant, while Chief Lanier promoted people who ranked lower than Plaintiff Dickerson on the exam to "Acting Lieutenant," over Plaintiff Dickerson, to make sure Plaintiff Dickerson didn't get promoted.

850.    By creating "Acting Lieutenants," Chief Lanier filled the Lieutenant roles thus not allowing room for Plaintiff Dickerson to be promoted on her merit.  Chief Lanier only made male officers "Acting Lieutenants.  Some of them ranked lower than Plaintiff Dickerson, and some hadn't ranked at all.

851.    Chief Lanier's actions were retaliatory in nature, and negatively affected Plaintiff Dickerson's pay and long-term earning potential.  Furthermore, Chief Lanier circumvented MPD's promotional process.

852.    In 2012, Plaintiff Dickerson attempted to resolve a situation in which Detective Lieutenant Peter Larsen, (hereinafter Det. Lt. Larsen), manager of the Fourth District's Detectives Unit, sent an email to Detective Vandra Covington, in which he used the word "cunt."

853.    Plaintiff Dickerson requested a meeting with Det. Lt. Larsen's immediate supervisor, Captain Wilfredo Manlapaz (hereinafter "Cpt. Manlapaz).  Det. Lt. Larsen and Cpt. Manlapaz were present for the meeting.  Neither agreed that the term "cunt" was offensive, or offered an apology, even after Plaintiff Dickerson expressed to both of them that she was also offended by the email.

854.   Cpt. Manlapaz told Plaintiff Dickerson that she should focus on Detective Covington's performance not a term that she viewed as offensive.

855.   Plaintiff Dickerson explained that Det. Covington was not under Plaintiff Dickerson's immediate supervision, however due to the MPD's implementation of a new technological case management system, that they should develop a training plan for the detective if they had concerns about her performance, but that using foul language was not acceptable.

856.   Lastly, Plaintiff Dickerson explained that the term "cunt" must have been used so frequently by Det. Lt. Larsen that it auto populated on his cellphone.  Plaintiff Dickerson had to show Chief Manlapaz that the MPD email system flagged the term as offensive, when Plaintiff Dickerson tried to forward Det. Lt. Larsen's email to a non-government email account.

857.   Both Chief Manlapaz and Det. Lt. Larsen continued to deflect, and refused to consider that Det. Covington was entitled to greater respect than to be called a "cunt," regardless of their opinions about her performance.  Shortly thereafter, Detective Covington, the victim of Det. Lt. Larsen's sexism and disrespect, was transferred to the Seventh District's Detectives Unit.

858.   As a result of this incident, Plaintiff Dickerson was called before Commander George Kucik (hereinafter "Cdr. Kucik," and Captain William Fitzgerald (hereinafter "Cpt. Fitzgerald"), and told that she should voluntarily transfer out of the department, which Plaintiff Dickerson interpreted as both a threat and blatant act of retaliation.

859.   Plaintiff Dickerson left the meeting dejected but did not request a transfer. Instead, she complained to Assistant Chief Peter Newsham who was Commander Kucik's boss at the time of the incident.  No action was taken against any of the males involved and Chief Newsham urged Plaintiff Dickerson not to transfer to another division.

860.    Plaintiff Dickerson continued to work directly for Det. Lt. Larsen until July of 2014.  After that incident, Det. Lt. Larsen refused to have in-person or telephone conversation with her. He only communicated with Plaintiff Dickerson by email.

861.    According to written MPD policy, referring to a woman as a "cunt," is not acceptable.

862.    Det. Larsen was never reprimanded or disciplined for his use of sexist and derogatory language to a fellow female police Detective, in blatant violation of MPD rules.

863.    In 2013, Plaintiff Dickerson took the lieutenant's promotional exam for the third time.  On both previous tests, she was ranked promotable, but was passed over.  On this third attempt, she was again ranked promotable.

864.    In July of 2014, she was promoted to Acting Lieutenant and transferred to the Second Police District, and ultimately promoted to Lieutenant in October of 2014.

865.    Another detective sergeant, who did not perform as well as she had on the exam, was also designated as an Acting Lieutenant at the same time. However, he was allowed to remain in the Criminal Investigations Division, and was not transferred.

866.    From March 30, 2018, until July 13, 2021, Plaintiff Dickerson was the only sworn female police officer on MPD's executive staff.  She was also the highest-ranking Black woman officer at MPD.

867.    Plaintiff Dickerson was assigned to Patrol Services South Bureau, which experienced the highest level of violent crimes, particularly shootings and homicides.

868.    In 2018, 2019 and 2020, and during each year's end-of-year performance evaluation, Plaintiff Dickerson asked Chief Peter Newsham to be allowed to attend weekly homicide meetings and included in strategizing sessions to reduce homicides and violent crime city-wide.

869.     Each year, Chief Newsham denied Plaintiff Dickerson's request, leaving Plaintiff Dickerson out of the loop of critical information to combat crime and to execute her duties.  There was no justification or excuse for excluding Plaintiff Dickerson from these important meetings.

870.     In February of 2019, during an executive performance briefing, Plaintiff Dickerson noticed a staggering disparity in serious discipline involving employees of color at MPD.  Plaintiff reiterated her concerns about disparities in serious discipline in February of 2020 and March of 2021.

871.     When Plaintiff Dickerson mentioned it to Chief Newsham, rather than take Plaintiff Dickerson's concerns seriously, Chief Newsham's staff stopped sending Plaintiff Dickerson calendar invitations, minutes or other information about attending disciplinary committee meetings. It is highly unlikely that the staff would make such a change without Chief Newsham's approval.

872.     Thereafter, Chief Newsham frequently refused to answer Plaintiff Dickerson's emails, text messages, and phone calls.  As her direct supervisor, his refusal to engage with her materially hampered Plaintiff Dickerson's ability to do her job.

873.     Chief Newsham's sabotage and disregard of Plaintiff Dickerson was retaliatory, designed to isolate Plaintiff Dickerson and keep her ignorant of information important to fulfilling her responsibilities.

874.     On February 14, 2019, Plaintiff Dickerson had an emergency medical procedure that left her experiencing pain, headache, brain fog, and dizziness.

875.     But instead of giving her the necessary time to recuperate, she was forced to return to work and give a presentation on or about February 21, 2019, even though she had a follow-up medical appointment for that day.

876.   Plaintiff Dickerson's colleague, Assistant Chief Lamar Greene had agreed to present Plaintiff Dickerson's information for her, but was not allowed to help her in that way.  Chief Greene and Plaintiff Dickerson were both Patrol Bureau Chiefs and had similar issues and concerns.  Both were capable of making the presentation and had done so jointly in the past.

877.   But Plaintiff Dickerson was subject to disparate and more harsh and taxing treatment than her colleague, for no discernibly legitimate reason.

878.   The pressure put on Plaintiff Dickerson to present when she was not feeling well was gratuitous and meant to send a negative message to her.

879.   In March of 2019,  Plaintiff Dickerson notified IAD Chief Manlapaz that she had evidence that Commander Morgan Kane (hereinafter "Cdr. Kane") was misclassifying or reassigning violent crimes to avoid an increase in these crimes in the First Police District.

880.   This was a serious allegation of misconduct against a direct subordinate of Plaintiff Dickerson's, grounded in evidence.

881.   In December 2019, Plaintiff Dickerson sent Assistant Chief Manlapaz a follow up email asking for an update or the outcome of the investigation.

882.   Despite compelling evidence, Plaintiff Dickerson was informed that the allegations were classified as insufficient facts or unfounded.

883.   Plaintiff Dickerson expressed her confusion and displeasure with the outcome given the evidence provided to Chiefs Newsham and Manlapaz, but Plaintiff Dickerson never received clarification or an explanation for the result.

884.   Chiefs Newsham and Manlapaz undermined Plaintiff Dickerson's authority by using their power to cover-up and excuse misconduct in Plaintiff Dickerson's department.

885.   After that incident, executive management, including Chief Newsham and Communications Director Dustin Sternbeck (hereinafter "Mr. Sternbeck") began to exclude Plaintiff Dickerson from essential meetings.  Mr. Sternbeck would exclude Plaintiff Dickerson from press conferences about events that took place in her area of responsibility.

886.   Chief Newsham denied Plaintiff Dickerson important and desirable training and development opportunities that were given to all of her colleagues.  Plaintiff Dickerson's picture was even removed from the final version of the annual calendar, even though her picture was in the draft that was disseminated.

887.   For example, in December 2018 and October 2019, Plaintiff Dickerson asked Chief Newsham and his Chief of Staff, Matthew Bromeland, if she could attend the National Counter Terrorism Seminar in Israel.

888.   This training has been attended by police executives in major city police departments across the country, and is valued because Israel is known for its strategies to combat terrorism and community resilience practices.

889.   Plaintiff Dickerson was denied the opportunity to attend.  All of Plaintiff Dickerson's male colleagues, who wanted to attend were given the opportunity to go.

890.   In the Fall of 2019, Chief Newsham sent one of Plaintiff Dickerson's male subordinates, Commander Randy Griffin (hereinafter "Cdr. Griffin") to Israel.

891.   Commander Griffin informed Plaintiff Dickerson that during his visit, all other attendees were Deputy/Assistant Chiefs or Chiefs of Police.

892.   Cdr. Griffin stressed that the training was phenomenal, and re-emphasized that he was the lowest ranking police official in attendance.

893.    There was no legitimate reason for Plaintiff Dickerson to have been denied the opportunity to attend the training in favor of a male subordinate.  The training was not even funded by MPD. Chief Newsham's denial of this important training opportunity to Plaintiff Dickerson was an act of disparate treatment, and was in retaliation for her complaints about misconduct and discrimination within the MPD.

894.    MPD executive management engaged in a pattern of negative actions and decisions against Plaintiff Dickerson in order to intimidate her and discourage her from complaining about and addressing both misconduct, and discrimination at the MPD.

895.    In July 2019, Plaintiff Dickerson attended a Strategic Crime briefing with Chief Newsham and one of her subordinates.

896.    During the briefing, her subordinate, Captain John McDonald (hereinafter "Cpt. McDonald") made a disparaging remark about young black youth, comparing them to rats.

897.    Cpt. McDonald also used the term "on the hunt" while describing the Sixth District's police efforts to reduce robberies, in a way that was dehumanizing and disrespectful of the community.

898.    Although Chief Newsham told the Cpt. McDonald that he shouldn't refer the community that way, no formal investigation was initiated, even though Plaintiff Dickerson informed Chief Newsham that she was offended by the remark, and concerned about Cpt. McDonald's attitude towards the DC Black community.

899.    Plaintiff Dickerson followed-up with Chief Newsham's Chief Operating Officer, Leeann Turner, a week after the incident, and requested that Cpt. McDonald be transferred from her bureau and a formal investigation initiated into his comments and interactions with the Black community.

900.    Plaintiff Dickerson's request was initially denied, and her concerns about Cpt. McDonald and his possible racial animus was ignored by Chief Newsham. But because of her persistence, an investigation was opened and substantiated, and Cpt. McDonald was demoted.

901.    On or about January 4, 2020, the production company for investigative journalist Soledad O'Brien (hereinafter "Soledad Productions") contacted MPD (Communications Department, PIO) to request an interview with Plaintiff Dickerson for an HBO documentary titled "Black and Missing."

902.    MPD replied that Plaintiff Dickerson no longer worked in that area but would authorize the current Commander, Ramey Kyle (hereinafter "Cdr. Kyle") (white male) to handle the interview.

903.    There were numerous emails exchanges between the executive producer and the PIO director.  Soledad Productions agreed to interview Cdr. Kyle, but stressed the importance of featuring Plaintiff Dickerson's work as a black woman in the areas of missing persons and human trafficking.

904.    On or about January 24, 2020, MPD declined to participate in the documentary because of the team's persistence to interview Plaintiff Dickerson.

905.    On or about February 3, 2020, Plaintiff Dickerson met with Chief Newsham to discuss the decision to decline the interview.

906.    He told Plaintiff Dickerson that it would be unfair to Cdr. Kyle if he allowed Plaintiff Dickerson to participate in the interview, even though Plaintiff Dickerson had a unique perspective as a Black woman police officer.

907.    Chief Newsham agreed to allow Plaintiff Dickerson to participate after the executive producer threatened to have Soledad O'Brien contact Mayor Bowser directly.

908.    During the meeting, Chief Newsham told Plaintiff Dickerson that he didn't understand why doing this interview was so important to her, and he didn't expect Plaintiff Dickerson to "make trouble" for him.

909.    Of note, Cdr. Kyle was lower ranking than Plaintiff Dickerson, and Plaintiff Dickerson was so sharp and knowledgeable about human trafficking, that Chief Newsham had previously allowed her to conduct a human trafficking presentation in his stead at the International Assoc. of Chiefs of Police on his behalf.

910.    In another example of a petty, retaliatory act, MPD refused to sign a release to allow Plaintiff Dickerson to participate in Queen Latifah's "Gloves Off" segment that featured one of Plaintiff Dickerson's subordinate officers, Tiara Brown.

911.    MPD signed releases for other officers to be in the segment that highlighted a Black female police officer (and Plaintiff Dickerson herein), but refused to allow the most senior Black woman in the Department to participate.

912.    In April 2021, Plaintiff Dickerson noticed during a crime briefing that her subordinate, Cdr. Kane was, once again, attempting to misclassify crimes.

913.    MPD's new Executive Assistant Chief, Ashan Benedict (hereinafter "EAC Benedict") was in charge of the briefing. Cdr. Kane complained to EAC Benedict because Plaintiff Dickerson, Cdr. Kane's direct supervisor, told her to correct the crime report.

914.    On or about April 21, 2021, Plaintiff Dickerson forwarded to EAC Benedict the email from Internal Affairs about the history of Cdr. Kane and crime reports.

915.    Thereafter, the dialogue between Plaintiff Dickerson and EAC Benedict changed. EAC Benedict cancelled a one-on-one meeting with Plaintiff Dickerson and has stopped engaging her directly on several key issues.

916.    Since being made Chief, Plaintiff Dickerson has been treated disparately with respect to staffing and resources than her white and male colleagues.

917.    Plaintiff Dickerson has requested EAC Benedict to authorize a sergeant and administrative assistant for her new bureau, but was told that she would have to wait to fill her vacancies.  Those vacancies were filled on or about August 16, 2021.

918.    Plaintiff Dickerson reiterated to EAC Benedict that she only had two employees on her team, and that it was difficult to achieve department goals with minimal staffing.

919.    In sharp contrast, despite issues with her reporting accuracy and candor, Cdr. Kane was promoted to Assistant Chief of Police on or about July 14, 2021, to oversee a newly created bureau for her, and was immediately given a staff assistant and sergeant.

920.    In February of 2021, Plaintiff Dickerson raised concerns about Black women officers being disciplined for recording their conversations with their supervisors and EEO.  Plaintiff Dickerson was troubled because it was clear to her that Black women officers felt the need to record conversations because they were not being treated fairly.

921.    Plaintiff Dickerson also was concerned because the Black women officers were being disciplined for something that was not a clear violation of police rules.

922.    Plaintiff Dickerson's concerns fell on deaf ears and resulted in backlash and retaliation against her.

923.    On or about July 27, 2021, there was an MPD executive retreat at the Wharf DC.

924.    During the retreat, Plaintiff Dickerson asked the group to consider whether MPD had an issue with systemic racism, real or perceived.

925.    EAC Benedict replied, in part, that people often "believe" that there is a systemic racism issue when it's actually a "performance" issue.

926.    EAC Benedict did not specify in whom the performance deficiency lay, nor did he seem particularly interested in how real or perceived racism affected the people who believed they were being harmed by such treatment.

927.    EAC Benedict did not speak or converse with Plaintiff Dickerson during the entire two-day retreat, but cordially interacted with Plaintiff Dickerson's colleagues.

928.    As Patrol Chief for three years prior to her current assignment, Plaintiff Dickerson frequently interacted with, and had a good relationship with EAC Benedict, while he was at the Bureau of Alcohol, Tobacco and Firearms.

929.    She was therefore able to sense the chill in his interaction with her when she started to raise concerns about racism at MPD.

930.    Chief Newsham often dismissed Plaintiff Dickerson's presence in rooms filled with her subordinates or community members.

931.    Chief Newsham, Commander Andre Wright, and  Plaintiff Dickerson were in front of the group offering congratulatory remarks.  On each occasion, Chief Newsham offered remarks and deferred to Commander Wright after he finished speaking.  Commander Wright immediately introduced me and allowed me to address the audience before him.  Commander Wright was following the rank structure that Chief Newsham blatantly ignored.

932.    On or about January 1, 2021, Plaintiff Dickerson was the third in command of the Metropolitan Police Department.  On or about January 2, 2021, Mayor Muriel Bowser swore in Chief Robert J. Contee III as the acting chief of police for the department.

933.    Prior to his appointment, Chief Contee was the Assistant Chief of Police of the Investigative Services Bureau (ISB).  Plaintiff Dickerson has vast knowledge and experience in supervising and managing criminal and administrative investigations.  Chief Contee promoted a

white male subordinate to Assistant Chief to oversee ISB.  Plaintiff Dickerson was not offered, or even considered for this position.

934.    In March of 2021, the second in command, Asst. Chief Greene, announced that he would be retiring from the department in May of 2021.  On April 2, 2021, Chief Contee hired EAC Benedict, a retired officer from a completely different administration, to be second in command.

935.    Despite Plaintiff Dickerson's education, knowledge, familiarity with the city and citizens of DC, and long tenure on the MPD, she was not offered, or even considered for the EAC position.

936.    On or about May 7, 2021, Plaintiff Dickerson was reassigned from being a three-star Assistant Chief to a two-star Assistant Chief, and was downgraded from third in command to eight in command, below all the male executive sworn officers.

937.    Plaintiff Dickerson was assigned to lead the Youth and Family Engagement Bureau.  She went from having an assigned seat and voice in the MPD weekly Monday & Thursday meetings, to not being included in any crime fighting strategies.

938.    Chief ContPlee informed Plaintiff Dickerson in July of 2020, (as peers) that she was the "conscience of the department," and he openly wondered what would happen to MPD when Plaintiff Dickerson left.  He further complemented Plaintiff Dickerson for having the courage to always say what needs to be said.

939.    Plaintiff asserts that her functional demotion, lack of training opportunities, lack of proper resourcing, marginalization and undermining are the result of her efforts to report police misconduct, and her efforts to oppose racism and sexism in MPD.

**Plaintiff Dickerson's Individual Causes of Action**

*Race Discrimination and Retaliation Claims*

940.    Plaintiff Dickerson incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

941.    Plaintiff Dickerson, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

942.    Plaintiff Dickerson was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

943.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

944.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

945.    The facts alleged by Plaintiff Dickerson that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

946.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Dickerson was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

947.    Plaintiff Dickerson has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

948.    Plaintiff Dickerson seeks compensatory, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

<u>*Sex Discrimination and Retaliation Claims*</u>

949.    Plaintiff Dickerson incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

950.    Plaintiff Dickerson, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

951.    Plaintiff Dickerson was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination she to which she was subjected.

952.    The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

953.    The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

954.    The facts alleged by Plaintiff Dickerson, that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

955.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Dickerson was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

956.    Plaintiff Dickerson has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

957.    Plaintiff Dickerson seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

958.    Plaintiff Dickerson incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

959.    Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

960.    Plaintiff Dickerson was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

961.    As a direct result of Plaintiff Dickerson's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff Dickerson, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

962.    As a result of Defendants' actions, Plaintiff Dickerson suffered significant economic harm in the form of loss salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

963.    Plaintiff Dickerson was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms caused her severe mental anguish.

964.    Plaintiff Dickerson has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

**965.**    Plaintiff Dickerson herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees, and all other remedies the Court deems appropriate.

**PLAINTIFF GRIER'S INDIVIDUAL CLAIMS**

**<u>Facts Relevant to Plaintiff Grier's Individual Claims</u>**

966.    Plaintiff Grier was first employed by MPD in February  of 1989. The Plaintiff Grier retired in March of 2015, and was asked to rejoin the department in November of 2017.

967.    Her first assignment upon her return to MPD, was in the Police Academy, where her duties included, preparing civilians, via her knowledge, and skills, and MPD general orders and special orders, to be the best law enforcement officers, to the best of her abilities.

968.    In her department there were two offices spaces, for instructors, one was all male officers and the other was all female officers.

969.    A civilian manager named Jessica Bress (hereinafter "Ms. Bress") (white female), who was not part of Plaintiff Grier's supervisory chain of command, was allowed to assign Plaintiff Grier to the office that only had male officers as an "experiment" or "special project."

970.    The assignment caused Plaintiff Grier to be isolated in a work environment that was male dominated and jocular, where inappropriate and disrespectful language towards women was used regularly.

971.    Moreover, the male officers in the department were managed in a way that allowed them to act as if no female officer was present.

972.    For example, one of the male officers, Bray Jones (hereinafter "Officer Jones"), would regularly undress down to his underwear in front of Plaintiff Grier, which was extremely inappropriate and done to shock Plaintiff Grier and make her feel uncomfortable.

973.    Officer Jones' provoking and inappropriate behavior happened often enough that on or about November 2020, the Plaintiff Grier, sought the intervention of the departmental Lieutenant, Arthur Davis (hereinafter "Lt. Davis").

974.    The Plaintiff Grier asked if she could speak privately with Lt. Davis about the fact that Officer Jones would undress in front of her.  Ultimately, Lt. Davis took no action whatsoever, asserting that what Officer Jones was doing by undressing in front of Plaintiff Grier when he could easily have done so privately, was tolerable and acceptable because Officer Jones "wasn't trying to be deliberately offensive."

975.    Plaintiff Grier repeatedly asked Lt. Davis and  to either be transferred out of the office space, or for another female officer to be assigned to the office to change the dynamics.

976.    Plaintiff Grier's requests were repeatedly ignored.

977.    Instead, Plaintiff Grier was forced to continue working in an office that was a bastion of "locker-room talk" and inappropriate language, and was treated as if she did not exist.

978.    In the early months of 2002, Plaintiff Grier arrested and testified against a fellow police Officer, Jay Effler (hereinafter "Officer Effler"), who was operating his police cruiser while intoxicated.

979.    Plaintiff Grier had no choice but to make the arrest because the Officer Effler was observed driving erratically by a witness who called 911.

980.    Plaintiff Grier's fellow officers were so incensed about her "snitching," that the refused to provide her back up on the job.

981.    For example, one night Plaintiff Grier was trailing a stolen vehicle.  Normally, in such cases, other officers arrive to assist without having to be called. That night, Plaintiff called several times for back up, and no officers came.

982.    The dispatcher continued to call for back up units (assistance), at which time, Plaintiff Grier's (then) spouse (Retired Detective Lowell Grier), who was the Youth Division Watch Commander for that evening, responded from his office to provide his wife back-up in a dangerous situation.

983.    For duration of the incident, no other officers arrived to provide back-up, and management did not discipline anyone for this breach of procedure and protocol. There were several other incidents in which officers failed to provide back-up to Plaintiff, which put her at risk.

984.     Plaintiff Grier went to court to testify against Officer Effler, her recruiting class colleague, which she was legally required to do.  But because it did not sit well with her colleagues, they shunned her.

985.    Officer Effler was ultimately diverted, and the case was resolved without further charges, but this outcome did ameliorate the retaliation against Plaintiff Grier. She was forced to be transferred to day shift for her own safety and wellbeing.

986.    From that point on, Plaintiff Grier was treated as a pariah, isolated and disrespected by management and by fellow officers. The Plaintiff Grier was advised by a fellow officer, to "Watch your Back!" after responding in after the incident with the intoxicated officer.

987.    MPD management was aware of what the other officers were doing to Plaintiff Grier, and chose to do nothing to change or correct their retaliatory behavior.

988.    Plaintiff Grier was discriminated against and treated more harshly than her male counterparts and fellow officers in many ways.

989.    For example, while at the Police Academy, although all of the officers were supposed to take turns doing details in the field when it was needed, Plaintiff Grier was the only officer to be assigned to every detail.

990.    Detail into the field is often viewed as less desirable duty because it requires the officer to change routine, enter into a community with which they might not be familiar, and involves more risk.

991.    Nevertheless, every officer is supposed to assist with special details,  from time to time, it assists them in remaining sharp, and to back up and augment forces when needed.

992.    Plaintiff Grier repeatedly complained to her superiors, including to the Department Commander Ralph Ennis (hereinafter "Cdr. Ennis")(white male), about the fact that she was being singled out to be assigned to every single detail, but Cdr. Ennis ignored her complaints.

993.    Worse, Cdr. Ennis was actively complicit in the disparate treatment.

994.    On more than one occasion, especially during the holidays,  he went to so far as to find a substitute instructor for Plaintiff Grier's academy class cohort so that he could send Plaintiff Grier to the field, rather than sending the substitute person to the field instead.

995.    Cdr. Ennis' confusing choice caused Plaintiff Grier's class to lose valuable training information.

996.     Cdr. Ennis chose to, unnecessarily and counter-productively, send Plaintiff Grier into the field, to make it clear to that her complaints did not matter, and would only bring upon her more unfair treatment.

997.    In 2020, during the raging COVID-19 pandemic, Plaintiff Grier was again treated differently and more harshly than her peers.

998.    All of Plaintiff Grier's colleagues were allowed to work from home and conduct business over zoom during the pandemic.

999.    Plaintiff Grier, however, was not permitted to do so.

1000.   Plaintiff Grier's colleagues worked from home for weeks without incident, while she was still required to come in to work.

1001.   As soon as Plaintiff Grier actually tried to work from home, the departmental management changed the work from home policy altogether.

1002.   This was not mere coincidence.  The Acting Sgt., Sarah Snapko (hereinafter "Ofc. Snapko")(white female) stated that by attempting to work from home as all the other officers were permitted to do, Plaintiff Grier had "messed it up for everyone."

1003.   A/Sgt. Snapko was acting under the direction of Ms. Bress and Cdr. Ennis.

1004.   Plaintiff Grier was never given an explanation as to why her working from home would be a problem, when it was fine for all the other officers.

1005.   Plaintiff Grier was so dejected from the hostile and discriminatory work environment she was exposed to, she opted to retire, rather than continue working at MPD.

1006.   When she retired in March of 2021, she asked to be made a Reserve Official (which is an unpaid position) to be able to continue assisting in the Reserve Officer program, because there was no female leadership in the Reserve Program.

1007.   Plaintiff Grier was aware of the statistical disparities in the ability to women to get through training successfully, and wanted to continue helping the next generation of female officers.

1008.   On several occasions, Plaintiff Grier received feedback that her presence was helpful to female trainees.

1009.   Plaintiff Grier was rejected for this ***volunteer*** position because several male officers did not want to work with her.

1010.   MPD, again, chose to place the sexist and discriminatory preferences, and petty desires for revenge of male officers, over the training needs of female trainees for female leadership and support in becoming police officers.

### Plaintiff Grier's Individual Causes of Action

#### *Race Discrimination and Retaliation Claims*

1011.   Plaintiff Grier incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1012.   Plaintiff Grier, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

1013. Plaintiff Grier was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

1014. The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1015. The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

1016. The facts alleged by Plaintiff Grier that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1017. As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Grier was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

1018. Plaintiff Grier has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1019. Plaintiff Grier seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

<u>*Sex Discrimination and Retaliation Claims*</u>

1020. Plaintiff Grier incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1021.   Plaintiff Grier, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

1022.   Plaintiff Grier was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination to which she was subjected.

1023.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1024.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

1025.   The facts alleged by Plaintiff Grier, that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1026.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Grier was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1027.   Plaintiff Grier has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1028.   Plaintiff Grier seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees, and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

1029.   Plaintiff Grier incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

1030.   Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

1031.   Plaintiff Grier was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

1032.   As a direct result of Plaintiff Grier protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

1033.  As a result of Defendants' actions, Plaintiff Grier suffered significant economic harm in the form of loss salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

1034.  Plaintiff Grier was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1035.  Plaintiff Grier has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1036.  Plaintiff Grier herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

## PLAINTIFF HAMPTON'S INDIVDUAL CLAIMS

### Facts Relevant to Plaintiff Hampton's Individual Claims

1037.  Plaintiff Hampton first join the MPD in December of 2003.  Her first duty assignment was as a patrol officer in the 7th District.

1038.  She remained in that role and in that District for seventeen (17) years.

1039.  Plaintiff Hampton was often detailed to Community Outreach because she was passionate about helping the community that she grew up in, and helping to bridge the gap between the community and MPD.

1040.  On Plaintiff's third day at the 7th District, she was sexually harassed by Sergeant Andre Suber (hereinafter "Sgt. Suber"), who was one of her immediate supervisors.

1041.  Sgt. Suber wanted to take Plaintiff Hampton out on a date, and since she was so new on the job she told him she was engaged rather than just rebuffing his advances.

1042.  Plaintiff Hampton was concerned about angering him.

1043. Sgt. Suber indicated that he did not care if Plaintiff Hampton was engaged, he wanted to date her anyway.

1044. He further told Plaintiff Hampton that he could make her life miserable.

1045. Despite the fact that she was new to the force, Plaintiff Hampton reported the sexual harassment to her training officer, Anthony Ruchak (hereinafter "Officer Ruchak"), who was offended on her behalf and took Plaintiff Hampton immediately to the Union Steward, Officer Christopher Bauman (hereinafter "Union Steward Bauman").

1046. Union Steward Bauman filed an internal EEO complaint on Plaintiff Hampton's behalf, but the EEO Office decided that there was insufficient evidence and said the claim was unfounded.

1047. Union Steward Bauman also filed a complaint with DC OHR. That claim was also investigated, and went to mediation.

1048. At the mediation, it was resolved that Sgt. Suber would no longer be able to supervise Plaintiff Hampton for the remainder of her MPD career.

1049. Sgt. Suber was not disciplined in any other way.

1050. Plaintiff Hampton eventually processed what happened, and was able to carry on with her career.

1051. In October of 2007, Plaintiff Hampton started to be harassed by some young men in the community, in front of her home.

1052. They singled her out for intimidation and attacked because she was a police officer living in the community, and because she was female.

1053. Plaintiff Hampton went to her MPD chain of command to seek assistance and help with the situation, but did not receive the kind of concern or response she expected.

1054.   At one point, an MPD Detective Mary Bonaccorsy (hereinafter "Det. Bonaccorsy") went to Plaintiff Hampton's house to conduct a threat assessment.

1055.   Det. Bonaccorsy concluded that the harassment was Plaintiff Hampton's fault because she should have lived in such a dangerous community.

1056.   Unfortunately, the harassment escalated, and eventually Plaintiff Hampton went to the local news to get community support in ending the harassment.

1057.   MPD leaders were unhappy with Plaintiff Hampton for taking the situation public, and rather than providing back-up or support, MPD attempted to silence her and insisted that she cease going on the news.

1058.   A few MPD officers came to Plaintiff Hampton's home to give her back-up against the harassment, but they ultimately were disciplined for doing so.

1059.   Plaintiff Hampton felt as if MPD management was doing all it could to prevent her from getting assistance with a dangerous situation, and did not have her back.

1060.   At work, the retaliation against Plaintiff Hampton escalated.   Her work was hyper-scrutinized. She was isolated and lost the camaraderie of her peers.   And word was put out that she was on management's target list.

1061.   Plaintiff Hampton filed a DOJ complaint against Asst. Chief Dianne Grooms for retaliation.

1062.   DOJ kicked the investigation back to MPD, to be handled by Chief Lanier.  Chief Lanier handed the investigation to IAD, which in turn concluded that the claim was not substantiated.

1063.   It is worth noting that virtually every officer at MPD knew that Plaintiff was disfavored by management, but somehow IAD could find no evidence to substantiate the claim.

1064.   In January of 2011, Plaintiff was called to a domestic abuse situation in which the man was beating his partner, and Plaintiff ended up having to shoot the man.

1065.   The girlfriend who was being abused was called by MPD IAD at the shooting review board, and IAD was attempting to make the case that Plaintiff Hampton was in the wrong.

1066.   However, the Union attorney, Pressler & Associates, made a request for records to the prosecutor's office, and received two witness statements that corroborated that Plaintiff was justified in the shooting.

1067.   Additionally, Plaintiff Hampton and her partner Kimberly Sillah (hereinafter "Officer Sillah") had thirteen (13) veteran officers testify on their behalf.

1068.   Even the man who was shot by Plaintiff Hampton and Offier Sillah, apologized to them.

1069.   And in fact, IAD was chastised by the tribunal for its shoddy investigation.

1070.   Both officers involved in the incident were cleared by a unanimous decision of the tribunal, and both received an apology from the tribunal for having been put through such an ordeal.

1071.   Plaintiff Hampton never received an explanation as to why IAD had not bother to obtain the critical witness statements.

1072.   In  2018, Plaintiff lost her father unexpectedly.  The loss was devastating to Plaintiff and her family.  In a moment of extreme grief, she broke down while at work.

1073.   Sgt. Delroy Burton (hereinafter "Sgt. Burton"), was considered a friend by Plaintiff Hampton, and was there when she became emotional.  He hugged her, but then used the moment to try to kiss her, which Plaintiff Hampton rebuffed.  She was both confused and hurt by his attempt sexual advance.

1074.   Plaintiff Hampton was too scared to report Sgt. Burton because he was a top leader in the Union, and powerful throughout the MPD. Nevertheless, he retaliated against her.

1075.   Although Sgt. Burton did not have the authority to discipline Plaintiff Hampton, he did have the reach and power to sully her name, and turn people against her, which he did.

1076.   In April of 2019, Plaintiff was asked and approved to participated in a recruiting event for MPD by Commander Andre Wright (hereinafter "Cdr. Wright").

1077.   However, Lieutenant Peter Larsen (hereinafter "Lt. Larsen"), who was the Watch Commander, insisted that Plaintiff Hampton prove that she was authorized to participate in the event.

1078.   Plaintiff Hampton had to forward the email from Cdr. Wright approving her participation to Lt. Larsen, and even did not satisfy him.  He demanded that the Recruiting Sergeant verbally confirm to him that Plaintiff Hampton had proper authority to be at the event.

1079.   Lt. Larsen had no reason or justification for making Plaintiff Hampton jump through those hoops.

1080.   Plaintiff Hampton had to call Cdr. Wright, who then sent out another email, essentially clarifying that he said what he said.

1081.   In June of 2019, Plaintiff Hampton was on patrol and flagged down by a resident, and simultaneously received a call on the radio to serve a protection order.

1082.   Because Plaintiff Hampton was detained speaking with the resident, she didn't immediately answer the radio call.

1083.   At which point Captain James Boteler (hereinafter "Cpt. Boteler") demanded that Plaintiff Hampton call him, and berated her for not responding to the radio fast enough.

1084.   Cpt. Boteler then sent Sergeant Jonathan Podorski (hereinafter "Sgt. Podorski") to meet Plaintiff Hampton in the field and monitor her to ensure she was responding to the radio.

1085.   When asked, Sgt. Podorski confirmed that Plaintiff Hampton was the only officer Cpt. Boteler treated in such a condescending and micromanaging fashion.

1086.   In June of 2019, Plaintiff Hampton discovered that she had been involuntarily detailed to the Teletype Unit, and that her days off would be changed to Monday and Tuesday, which was highly irregular.

1087.   The Teletype Unit Supervisor informed Plaintiff Hampton that the change in her days off was specifically directed by Cpt. Boetler.

1088.   Plaintiff Hampton felt as if she had no choice but to file and internal EEO complaint against Cpt. Boteler for targeting her for mistreatment and retaliation.

1089.   Plaintiff met with EEO Counselor Doreen Haines, who initiated an investigation, but Plaintiff Hampton's claim was unsubstantiated.

1090.   In May of 2021, Plaintiff Hampton was promoted to Sergeant.

1091.   In August of 2021, Lieutenant Michael Daee (hereinafter "Lt. Daee") intentionally undermined Plaintiff Hampton's authority when he intervened to protect a white male officer who had been blatantly disrespectful and insubordinate to Plaintiff Hampton.

1092.   The officer defied her order on the radio where all officers could hear the exchange.

1093.   When Plaintiff Hampton attempted to write up the insubordination, Lt. Daee undermined her, and made it all but impossible for Plaintiff Hampton to properly do her job.

1094.   Lt. Daee did not engage in that kind of heavy-handed intervention, with respect to other Sergeants.

1095.   Lt. Daee further undermined Plaintiff Hampton, by usurping a key authority from her, and making her obtain his approval before exercising her discretion.  Again, this was disparate treatment based on Plaintiff Hampton's race and gender.

1096.   On or about September 8, 2021, Lt. Daee targeted Plaintiff Hampton for an investigation of a shooting that took place on the shift after her shift was completed, rather the Sergeant who was on duty when the shooting occurred.

1097.   Lt. Daee didn't just unfairly target Plaintiff Hampton, but also went out of his way to involve his peers and other managers in the targeting of Plaintiff Hampton.

1098.   Lt. Daee insisted that Plaintiff Hampton attend a recertification training for the Civil Disturbance Unit, even though Plaintiff Hampton had never received the certificate in the first place, and did not have underlying knowledge or equipment for the recertification training to be of any value.

1099.   On or about September 14, 2021, Plaintiff Hampton went to the scene of a shooting, but due to a lack of available cruisers, had to get a ride with a fellow Sergeant.

1100.   The scene was somewhat volatile, and Plaintiff Hampton had to work to keep the crowd under control.

1101.   While she was doing that, the Officer who had given her a ride, Sergeant Dale Vernick (hereinafter "Sgt. Vernick") (white male), got back in the cruiser and left her on the scene.

1102.   Plaintiff Hampton had left her personal belongings in the cruiser, and had to raise Sgt. Vernick and tried to raise him on the radio three times.  He refused to respond to her.

1103.   Another sergeant (Black male) raised Sgt. Vernick on his cell phone, and he answered right away.

1104.   Sgt. Vernick returned to the station so Plaintiff Hampton could get her things.  When he got there, he refused to speak to her or acknowledge that he left her at the scene of a crime.

1105.   This was the first time in Plaintiff' Hampton's career that she was left behind by someone she was riding with.

1106.   MPD management took no disciplinary action whatsoever against Sgt. Vernick. The Lieutenant in charge at the time, Lieutenant Jonathan Fleming (hereinafter Lt. Fleming), made excuses for Sgt. Vernick's behavior, and took no action to address the risk situation in which he left Plaintiff Hampton.

1107.   This act of contempt and disrespect was noticed by all the officers that were on the scene and listening to the radio.

## Plaintiff Hampton's Individual Causes of action

### *Race Discrimination and Retaliation Claims*

1108.   Plaintiff Hampton incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1109.   Plaintiff Hampton, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

1110.   Plaintiff Hampton was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

1111.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1112.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

1113.   The facts alleged by Plaintiff Hampton, that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1114.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Hampton was humiliated, embarrassed and made to endure symptoms of severe mental anguish.

1115.   Plaintiff Hampton has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1116.   Plaintiff Hampton seeks compensatory and punitive money damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

### *Sex Discrimination and Retaliation Claims*

1117.   Plaintiff Hampton incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1118.   Plaintiff Hampton, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

1119.   Plaintiff Hampton was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination to which she was subjected.

1120.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1121.   The facts alleged above taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

1122.   The facts alleged by Plaintiff Hampton that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1123.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Hampton was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1124.   Plaintiff Hampton has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1125.   Plaintiff Hampton seeks compensatory and punitive money damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

<em>Whistleblower Retaliation Claim</em>

1126.   Plaintiff Grier incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

1127.   Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

1128.   Plaintiff Grier was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

1129.   As a direct result of Plaintiff Grier protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

1130.   As a result of Defendants' actions, Plaintiff Grier suffered significant economic harm in the form lost salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

1131.   Plaintiff Grier was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1132.   Plaintiff Grier has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1133.   Plaintiff Grier herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees, and all other remedies the Court deems appropriate.

1134.

## PLAINTIFF KNIGHT'S INDIVIDUAL CLAIMS

### Facts Relevant to Plaintiff Knight's Individual Claims

1135.   Plaintiff Knight began her employment with the MPD in 1989, when she was hired for a civilian position.  In 1 991, she transferred to a sworn officer position and was assigned to the 4th District.

1136.   While Plaintiff Knight was still a rookie and in training, Sgt. Braum Persaud (hereinafter "Sgt. Persaud") began sexually harassing her by making inappropriate and suggestive comments.

1137.   Plaintiff Knight complained of Sgt. Persaud's inappropriate, intimidating and unwanted advances to her supervisor, but nothing was done.

1138.   Eventually, Sgt. Persaud went so far to call Plaintiff Knight's grandmother's house on Plaintiff's day off. When Plaintiff Knight returned the call, which was very unusual, Sgt. Persaud asked her to meet him for a sexual assignation. When Plaintiff Knight refused, and explained that she was married, Sgt. Persaud's demeanor towards Plaintiff completely changed.

1139.   Sgt. Persaud retaliated against Plaintiff Knight for refusing his advances by giving her very undesirable assignments, such as a walking beat that was only *one block long*, and forbade other officers from helping or relieving Plaintiff Knight, making it clear to Plaintiff Knight, and to everyone else on the team that she was his target, and that no one was to help her.

1140.   At times, Sgt. Persaud's retaliation and mistreatment of Plaintiff Knight left her with no back-up or assistance in parts of the city with active gang violence, which put her personal safety at risk.

1141.   In 1993, Plaintiff Knight again informed her superior Commander Bill Sarvis (hereinafter "Cdr. Sarvis") that she was being sexually harassed and retaliated against by Sgt. Persaud. Instead

of investigating or disciplining Sgt. Persaud, Defendant made Plaintiff Knight switch Districts with another female officer, Carolyn Battle, and moved Plaintiff Knight to the First District.

1142.   On Plaintiff Knight's first day in her new district, Captain Michael Razalowski (hereinafter "Capt. Razalowski"), the leader of the First District substation called Plaintiff Knight into his office and proceeded to scream and curse at her, calling her a "trouble-maker."

1143.   From that day on, the First District Station Sergeants, Phillip Parker (hereinafter "Sgt. Parker") and Richard Gets (hereinafter "Sgt. Gets"), harassed, attacked, bullied, demeaned, isolated and undermined Plaintiff on a near-daily basis.

1144.   The systematic, and management-approved retaliation against Plaintiff continued unabated until Cpt. Razalowski was replaced by Captain Charles Fonville (hereinafter "Cpt. Fonville"). Cpt. Fonville put a stop to the harassment and retaliation, but he did not discipline the Sgts  who had engaged in it.

1145.   Plaintiff Knight received a phone call from Cpt. Fonville informing her that Sgt. Persaud made Lieutenant and was transferred to the First District sub-station, over Plaintiff Knight.  Cpt. Fonville told Plaintiff Knight not to worry, that if anything inappropriate happened, she should immediately him.  But a few months later, Cpt. Fonville was promoted and transferred, and the bullying continued.

1146.   In 1997 Plaintiff Knight became pregnant with twins.  Lt. Persaud told her that she wasn't allowed to sit in the station "looking like that" and made her sit the break room.

1147.   Per MPD policy at the time, Plaintiff Knight was required to make routine visits to the Police and Fire Clinic because she was on limited duty.  There was a steep hill between the parking lot and the clinic.  Plaintiff Knight asked Lt. Persaud if she could get a ride to the clinic to avoid

walking up the steep hill, but he refused her request, while he granted rides to other non-Black women who went to the clinic.

1148.   The combination of the stress of being bullied at work, and the strain of repeatedly walking up the steep hill while carrying twins proved to be very detrimental to Plaintiff Knight's pregnancy. She went into premature labor, and lost both of the twins.

1149.   Plaintiff Knight remained in the Fist District until 1997, when she was swapped out with another officer from the Fifth District.

1150.   In 2001, Plaintiff Knight was again transferred, this time to the training academy as an instructor.   Her direct supervisor was Mr. Larry Edwards (hereinafter "Mr. Edwards") and Sergeant Darryl Price (hereinafter "Sgt. Price").

1151.   Mr. Edwards rarely spoke to the Black officers in his sections.   He would wait until the officer walked away from their workstation and would communicate through sticky notes that he placed on their computers.

1152.   Mr. Edwards had no problem communicating with the white officers face-to-face.   Mr. Edwards would often send the white officers to trainings and conferences, while not informing Sgt. Price or the black officers.   The black officers raised the issue with Sgt. Price, and he spoke to Mr. Edwards about it, but the disparate treatment was not escalated, and no disciplinary action was taken.

1153.   Sgt. Price was transferred to the Assistant Chief's Office, and shortly thereafter, the three Black officers who worked under Mr. Edwards were involuntarily transferred to different assignments within the academy.

1154.   Plaintiff Knight was assigned to work under Mr. Byron Williams (hereinafter "Mr. Williams") and Sergeant Kimberly Butler (hereinafter "Sgt. Butler.")   During a staff meeting, Sgt.

Butler informed Plaintiff Knight that there was a rumor that she was having an affair with Mr. Williams.  Plaintiff became very upset, strenuously denying the rumor.

1155.   Nevertheless, the false rumor persisted, and when Plaintiff attempted to report Mr. Williams for grabbing her put, which he did while smiling at her, her complaint was not taken seriously because the Commander she reported the sexual assault to, assumed the rumor was true.

1156.   Although the Commander claimed she would "look into it," no action was taken, and Plaintiff never heard another thing about it.  Mr. Williams was eventually terminated.

1157.   In 2009, Plaintiff Knight was transferred to the District 5 administrative office with Sergeant Randy Griffin (hereinafter "Sgt. Griffin").

1158.   Sgt. Griffin was not happy with Plaintiff Knight being assigned under him because he felt an officer who was working well in the roll was moved out of admin to make room for Plaintiff Knight.

1159.   Sgt. Griffin was thus hostile and unprofessional towards Plaintiff Knight from the beginning of her assignment.

1160.   Sgt. Griffin wrote-up Plaintiff Knight for three separate disciplinary infractions, and rather than provide them to her in a professional manner, he placed them in her jacket.

1161.   When Plaintiff Knight discovered them, she went directly to the department Captain to address the situation.

1162.   The department Captain, Lewis Douglas, removed the disciplinary actions.  No action or discipline was taken against Sgt. Griffin for abuse of his power and fraudulent disciplinary actions.

1163.   To further retaliate against and bully Plaintiff Knight, Sgt. Griffin ordered Plaintiff Knight to report to the Police and Fire Clinic for a fitness for duty evaluation. Sgt. Griffin claimed that the

basis for the referral was that Plaintiff had informed him that she was "depressed." Plaintiff Knight had not done so.

1164.   Plaintiff Knight complained to the department commander that what Sgt. Griffin had done was wrong and retaliatory, and she was informed by Capt. Douglas to disregard the referral.

1165.   Plaintiff Knight was moved from the part of the office where she worked for Sgt. Griffin and placed under the department commander. Sgt Griffin was removed from the administrative office. Shortly thereafter Plaintiff Knight was transferred to SOD.

1166.   Plaintiff Knight served in SOD from 2009 to March of 2014.

1167.   In March of 2014, Plaintiff Knight was sent back to the Fifth District from SOD. Plaintiff was confused by the transfer because there didn't appear to be a reason for it.

1168.   Plaintiff Knight contacted Chief Lamar Green (hereinafter "Chief Green"), to find out why she had been transferred.  He investigated and informed Plaintiff that the order came from Chief Cathy Lanier (hereinafter "Chief Lanier") who was incensed about some incident that purportedly involved Plaintiff Knight.

1169.   Notably, Plaintiff Knight was punitively transferred before she was even informed or asked about the incident.

1170.   Plaintiff Knight was order to the Internal Affairs Department (hereinafter "IAD") to be interviewed by Sergeant Brad Wagner (hereinafter "Sgt. Wagner").

1171.   Plaintiff Knight attended the meeting with her husband, Fred Knight (hereinafter "Mr. Knight"). IAD told Mr. Knight he couldn't sit in on the interview because he was a potential witness.

1172.   In the interview, Plaintiff Knight was played a tape recording of a message left by a female voice that stated:  "Hey Fred your wife is not at work.  She is having an affair with Captain Shelton, and she is with him right now."

1173.   At first, Plaintiff Knight thought she was called in to IAD to be accused of having an affair with Captain Shelton, which she vehemently denied.

1174.   She soon discovered that she was being accused of having made the call to a different "Fred," the husband of Officer Janice Oliver.

1175.   Mr. Knight was taken into a separate room where IAD played him the tape to see if he could identify the voice as Plaintiff Knight's.  Essentially, IAD was trying to enlist Mr. Knight as a witness against his wife.   Mr. Knight made clear that the voice was not Plaintiff's.

1176.   Plaintiff Knight immediately offered IAD her phone records to prove that she was not the person who made the call at issue.  She also offered to take a polygraph and for a voice recognition expert to be used to prove that the voice on the recording was not hers.

1177.   Plaintiff Knight passed the polygraph exam, but Chief Lanier would not accept that she was innocent, despite the fact that Plaintiff's phone records also proved she did not make the call, and was on patrol when the call was made.

1178.   The MPD refused to pay for the voice recognition expert, so Plaintiff Knight paid for it herself to prove her innocence.  She took the voice recognition test in the presence of IAD to ensure that they could not question the validity of the test.

1179.   The voice recognition expert concluded that the voice on the message was ***not*** Plaintiff Knight's voice.

1180.   Sgt. Wager informed Chief Lanier that Plaintiff Knight was innocent, but Chief Lanier did not care.  She refused to reverse Plaintiff Knight's punitive transfer out of SOD.

1181.   Plaintiff Knight met with Chief Alfred Durham (hereinafter "Chief Durham") to complain about the unfair way she was being treated.

1182.   Chief Durham stated that Plaintiff Knight would not be reinstated to SOD despite having passed all the tests proving her innocence, because Officer Olive still "believed" that Plaintiff had made the call.

1183.   Chief Lanier chose to appease Officer Olive at Plaintiff Knight's expense because Chief Lanier and Officer Olive were close friends.

1184.   Plaintiff Knight escalated matters by reaching out to Mayor Bowser's office.  An aid in the Mayor's office informed Plaintiff that her complaint would be investigated by the Office of the Inspector General (hereinafter "OIG").

1185.   In December of 2014, nearly a *year later*, OIG called Plaintiff Knight to ascertain if she had been transferred back to SOD.  She stated that she had not.

1186.   Two weeks later, Plaintiff Knight was transferred back to SOD.

1187.   Eventually, Officer Olive was fired for making false statements about having an affair. Capitan Shelton only received a letter of prejudice after making false statements, and for going to Maryland to engage in an illicit affair while on the clock. A few months later, he was arrested for DUI. He suffered no additional disciplinary action

1188.   Chief Lanier was not disciplined for abusing of her power or for retaliating against Plaintiff Knight.

1189.   Officers in SOD were received scheduled overtime because of the staffing needs.  When Plaintiff Knight was reinstated to SOD, she was not given back pay for the overtime pay amount she had been wrongfully denied.

1190.   During Plaintiff Knight's absence from SOD, the leadership of the department had changed.  When she returned, the SOD Lieutenant was Guillermo Rivera (hereinafter "Lt. Rivera") and the Captain was Jeffrey Carroll (hereinafter "Cpt. Carroll").

1191.   Lt. Rivera immediately began to disparage and retaliate against Plaintiff Knight, subjected her to far more restrictive work rules and procedures than her colleagues, and repeatedly accused her of things she had not done, or repeated disparaging rumors about her.

1192.   Plaintiff Knight went to her supervisor Sgt. Jane Barrientos (hereinafter "Sgt. Barrientos) to complain about the way she was being treated, and asked that Sgt. Barrientos go with her to talk to Lt. Rivera about his constant disparaging comments about her.  Lt. Rivera was dismissive and disrespectful during the meeting, refusing to change his inappropriate behavior.

1193.   The incessant bullying and disparagement from Lt. Rivera and others in SOD took its toll on Plaintiff Knight, causing her extreme stress and anxiety.

1194.   When a position on the Crash Review Board (hereinafter "CRB") was posted as open, Plaintiff leapt at the opportunity.

1195.   Plaintiff Knight emailed Commander Stephen Sund (hereinafter Cdr. Sund) to inquire about the position, and was immediately told "no," without any explanation.

1196.   A few days later, Cdr. Sund emailed Plaintiff Knight indicating that he would allow her to take the assignment.

1197.   But upon her arrival, she was informed that Cpt. Carroll would not allow Plaintiff Knight to be placed in the CRB office, but would have to be moved into the Administrative Office so she "could be watched."  This was yet another instance of disparate treatment Plaintiff endured.

1198.   Plaintiff Knight complained to Cdr. Sund by email about the way she was being treated differently than others, and unfairly singled-out for supervisory scrutiny.

1199.   Eventually Cdr. Sund allowed Plaintiff to work in the CRB office she was assigned to, but made sure she was aware that it was a trial assignment, to undermine her confidence and comfort in the position.

1200.   In October of 2015, a letter from the OIG's office acknowledging receipt of Plaintiff Knight's complaint regarding the unfair and retaliatory transfer out of SOD, but that the OIG office considered the matter closed once she was transferred back to SOD.

1201.   Plaintiff Knight attempted to contact Daniel Lucas (hereinafter "Mr. Lucas") in the OIG's office to inform him that she felt she was still being retaliated against, and to seek accountability for those who had falsely accused her.

1202.   Mr. Lucas did not acknowledge or respond to either Plaintiff Knight's phone calls or her emails to him.

1203.   Four months later, in February 2016, Plaintiff Knight was informed that she was being moved from the supervisory control of Sgt. Barrientos to that of Sgt. Terry Thorne (white male), who sat in a different building.

1204.   The explanation that was given for the change was that CRB, which investigated vehicle accidents, was "somewhat like traffic," so Plaintiff Knight needed to be under the Traffic Department.

1205.   In reality, this was another act of retaliation, removing Plaintiff from the supervision of a female Sergeant whom Plaintiff Knight was comfortable working for, to a white male Sergeant who later undertook a scheme to push her out of MPD.

1206.   On information and belief, this move was orchestrated by Chief Lanier to retaliate against Plaintiff Knight going to OIG with a complaint about the unfair reassignment from SOD.

1207.  Due to some promotions in the Spring of 2016, Plaintiff Knight reported to Cpt. Robert Glover (hereinafter "Cpt. Glover").

1208.  Cpt. Glover was openly rude and hostile to Plaintiff from the beginning of her tenure working under him.

1209.  Cpt. Glover's animus towards Plaintiff is demonstrated in an incident in June of 2016 in which Plaintiff was directed by Cdr. Carroll to send an overdue car accident case list to the Professional Development Bureau (hereinafter "PDB").

1210.  Plaintiff Knight complied with the directive by sending an email to the administrative inbox of the PDB.

1211.  Lieutenant James Brown (hereinafter "Lt. Brown") called Plaintiff Knight to ask why she was inquiring about cases that were more than a year old.  She informed him that she had been directed to do so by Cdr. Carroll.

1212.  Plaintiff Knight later was informed that Lt. Brown complained to Cpt. Glover about Plaintiff Knight, and accused Plaintiff Knight of sending him a nasty and unprofessional email.

1213.  Cpt. Glover became irate at Plaintiff, without asking her anything about the exchange, and insisted that an investigation be launched into her actions.  He further asserted that Plaintiff Knight needed "to be watched."

1214.  Plaintiff Knight sent an email to her entire chain of command, attaching the email at issue, and defending her actions.  She asked the team to conduct a thorough investigation, and to hold Lt. Brown accountable if his accusation proved to be unfounded.

1215.  Cdr. Carroll ultimately concluded that Plaintiff Knight had done nothing wrong.  No disciplinary action was taken against Lt. Brown for the false accusation, or for Cdr. Glover's ill-conceived and unjustified overreaction.

1216.   In response, and as a further act of retaliation, Cdr. Glover went to the Time and Attendance and asked Officers Eric Coates and James Jaffe to hyper-scrutinize Plaintiff Knight's time entries, accusing Plaintiff Knight of "egregious" abuse and theft of paid time (a very serious offense).

1217.   Upon being informed that Cdr. Glover had, without any basis in fact, accused Plaintiff Knight of stealing time, Plaintiff Knight had to again involve Cdr. Carroll.

1218.   When Plaintiff Knight went to Cdr. Carroll's office and tried to explain how she was being targeted for personal retribution and attack by Cpt. Glover, Cdr. Carroll dismissed her concerns, and all but ignored her, responding that Plaintiff just had "a problem with everyone."

1219.   Cdr. Carroll did not take Plaintiff Knight's allegations seriously, and did not feel that it was his responsibility to address and remedy the animus, disparate treatment, and false accusations made by Cpt. Glover.

1220.   Cdr. Carroll further admonished Plaintiff Knight because her email to the PDB admin inbox embarrassed Lt. Brown, even if it was sent at Cdr. Carroll's instruction, and in no way was addressed specifically to Lt. Brown.

1221.   When Cdr. Carroll made clear that he was not going to do anything to address the unfair and disparate treatment that Plaintiff Knight was enduring, she informed him that she was going to speak to Chief Green.

1222.   When Cdr. Carroll asked Plaintiff Knight what she expected Chief Green to do, she informed him that she expected both of them to put a stop to Cpt. Glover's campaign of harassment, and false accusations.

1223.   Plaintiff Knight left the meeting with Cdr. Carroll feeling defeated, having been informed by her senior manager that he did not believe it was his obligation to ensure that Plaintiff had a fair and non-discriminatory work environment.

1224.   When she got back to her desk, Plaintiff Knight sent Cdr. Carroll the email that Cdr. Carroll had claimed "embarrassed" Lt. Brown, just to make a record of what it was that had caused to the fury and backlash.

1225.   On or about June 16, 2016, Cdr. Carroll sent a responsive email confirming that Plaintiff Knight had not done anything wrong and stated that he would speak with Cpt. Glover.

1226.   In 2017, Plaintiff Knight became an active union representative, and Cdr. Carroll was promoted to be Bureau Chief of the Homeland Security Department (hereinafter "HSB").   Cpt. Glover became the Administrative Captain for SOD, which fell under HSB, and Cpt. Rivera was promoted to Commander of SOD.

1227.   As union representative, Plaintiff Knight started to receive complaints from fellow officers about the way Cpt. Glover was treating people.   She passed on their concerns and complaints to Cdr. Rivera.

1228.   In 2018, Plaintiff Knight again became the target of a campaign of harassment and disparate treatment.   This was manifested by hyper-scrutiny of her work assignments, and changing Plaintiff Knight's assignments without informing her, to cause confusion and chaos in her work schedule.

1229.   Plaintiff Knight was so disdained by her leadership that one of them, Lt. Darian Jones (hereinafter "Lt. Jones"), took to pretending that he was mistaking Plaintiff for Sgt. Boyd, a large African American male officer with a full beard.   It was a thinly veiled attempt to denigrate and disparage Plaintiff's appearance that Lt. Jones engaged in on several occasions.

1230.   When Plaintiff Knight complained to Cdr. Rivera about the blatant animosity and disrespect from Lt. Jones, Cdr. Rivera dismissed her concern, claiming that Lt. Jones had a right to "inquire about resources."

1231.   Lt. Jones had such hostility to Plaintiff Knight that chastised a subordinate Sgt. Keith Jackson (hereinafter "Sgt. Jackson"), for giving Plaintiff Knight an overtime opportunity, and made clear that he did not want Plaintiff assigned to special events.

1232.   Sgt Jackson also received a call from Lt. Margiotta, the Lieutenant over the Events Section, demanding to know why Plaintiff Knight was working in Special Events.

1233.   Sgt. Jackson later informed Plaintiff Knight that she was "hot," a term used in MPD to refer to officers who are unwelcome and targeted for bullying and retaliation.

1234.   He told Plaintiff Knight that because Lt. Jones did not like her, he could no longer assign Plaintiff to overtime for the Special Events department, thus isolating her, retaliating against her, and making her subject to disparate treatment and a hostile work environment.

1235.   After this, and several other incidents that made clear that Plaintiff Knight was being targeted for bullying and retaliation, on or about March 23, 2019, Plaintiff Knight sent an email to Chief Newsom requesting to speak to him about her hostile work environment.

1236.   Approximately a week later, Cdr. Rivera sent an email to the entire department stating that the EEO team would be addressing the department on EEO policy.

1237.   In June of 2019, tensions with Cpt. Glover escalated again.  Plaintiff Knight was part of a team tasked with formulating a Memorial Day Schedule for 2020.

1238.   Cpt. Glover was combative and hostile during the entire meeting, and during the meeting, decided he was going to conduct a separate meeting with his "Admin" team.

1239.   Plaintiff Knight believed that she was part of the "Admin" team.

1240.   Cpt. Glover adjourned the meeting, and Plaintiff Knight left to go back to work. On her way, she ran into one of the attendees who informed Plaintiff Knight that Cpt. Glover was conducting a meeting with everyone, but Plaintiff Knight.

1241.  When Plaintiff Knight knocked on the door to enter, Cpt. Glover opened the door, told Plaintiff she wasn't invited, and slammed the door in her face.  This act was in violation of Department policy on professionalism.

1242.  Furthermore, Cpt. Glover informed the people in the meeting that they were no longer to share information with Plaintiff, and to change all the passwords and codes to all systems so that Plaintiff Knight could use them to do her job.

1243.  He also informed the team not to ask Plaintiff Knight for any assistance.

1244.  Plaintiff Knight requested a meeting with Cdr. Rivera, who immediately took Cpt. Glover's side and refused to address the blatant disrespect and inappropriate behavior of Cpt. Glover.

1245.  Eventually, Plaintiff Knight met with Chief Carroll because her management team refused to take seriously or address the daily disparate and hostile treatment that Plaintiff Knight was being subjected to.

1246.  Plaintiff Knight further informed Chief Carroll that the racism, sexism and retaliation she was being subjected to was also being visited upon other Black women officers.

1247.  Rather than address the issue with his management team, Chief Newsham asked Alphonso Lee of EEO to reach out to Plaintiff Knight to listen to her "concerns."

1248.  But instead of actually listening to, or trying to address, any of Plaintiff Knight's concerns and claims, Mr. Lee gave Plaintiff Knight information on getting EEO "counseling," and let her know that she had a right to file a complaint with the District of Columbia Office of Human Rights (hereinafter "OHR").

1249.  On or about October 1, 2019, Plaintiff Knight went to the Deputy Mayor's office and met with Daisha Winham (hereinafter "Ms. Winham") to report her concerns about discrimination withing MPD.

1250.  Plaintiff Knight informed Ms. Winham of her concerns regarding racial inequality, retaliation and unfair working conditions, provided Ms. Winham with a written summary of Plaintiff's concerns.

1251.  Plaintiff Knight was deliberate in informing Ms. Winham of Plaintiff Knight's fears and concerns about retaliation she would suffer for speaking out.

1252.  Specifically, Plaintiff Knight mentioned that she had concerns with the Chief Manlapaz of the Internal Affairs Division, who had made it known that he "intended" to retaliate against Plaintiff Knight.

1253.  Plaintiff Knight never heard anything back from the deputy Mayor's office.

1254.  Undeterred, Plaintiff Knight then went to Councilman Charles Allen's (hereinafter "Councilmember Allen") office requesting to see him.

1255.  Plaintiff Knight was instructed to send Councilmember Allen an email, which Plaintiff Knight did.

1256.  Plaintiff Knight did not receive a response from the Councilmember's Office.

1257.  On or about October 14, 2019, Plaintiff Knight spoke with Alana Sisnett (hereinafter Ms. Sisnett) from Mayors Bowsers office.

1258.  Plaintiff Knight spoke with Ms. Sisnett about racial inequality in the promotional and hiring process, the practice of some in the MPD of falsifying crime statistics, and the fact that MPD EEO appeared to be working on behalf of management, and to the detriment of, and against complainants.

1259.  Plaintiff Knight further asserted that Black women officers were not receiving fair and impartial investigations, and further informed Ms. Sisnett that IAD Chief Manlapaz was making

it known about he planned to retaliate against Plaintiff Knight for complaining outside the chain of command.

1260.   On or about October 18, 2019, Chief Manlapaz cornered union representative Hiram Rivera (hereinafter "Officer Rivera), interrogating him about Plaintiff Knight and her activities. Officer Rivera reported back to Plaintiff Knight that Chief Manlapaz was on the  warpath for her.

1261.   Later that day, Plaintiff Knight was told that she was under investigation because there were two cases that she worked on "missing" from the MPD car accident filing system.

1262.   Plaintiff Knight was given a question & answer form her commander, and told that she needed to send a spreadsheet of her cases to Chief Manlapaz.

1263.   Plaintiff Knight asserts that Chief Manlapaz was making good on his promise and threat to retaliate against Plaintiff for complaining about racial and gender discrimination at the MPD.

1264.   Plaintiff Knight later learned that certain files and hard copy and memos had disappeared from the files she worked on, for which she was disciplined, even though no evidence was presented that she was responsible for removing the missing records.

1265.   Plaintiff Knight asserts that the files were sabotaged to implicate her as part of a scheme to retaliate against her for complaining about race and gender discrimination.

1266.   During Plaintiff Knight's appeal of the discipline she received, it was discovered and noted that Cdr. Rivera had removed important information from the investigation that was favorable toward Plaintiff Knight.

1267.   Lt. Walter Flemins, who investigated the case, had requested that the case against Plaintiff Knight be dropped, but Chiefs Carrol and Manlapaz denied the request.

1268.   Plaintiff Knight asserts that Chiefs Carrol and Manlapaz denied the request to drop the investigation against Plaintiff Knight because they were seeking a reason to terminate her employment, and to retaliate against her for engaging in protected activity.

1269.   During the ordinary course of her work, Plaintiff Knight received a performance evaluation completed by her direct supervisor, Sgt. Barrientos.  That performance evaluation, written by the person who directly observed Plaintiff's performance, gave Plaintiff the highest possible rating of a five (5).

1270.   On or about November 27, 2019, Cdr. Rivera informed Sgt. Barrientos that she was no longer going to supervise Plaintiff, and Cdr. Rivera deleted Plaintiff's completed performance evaluation, substituting it with one that he wrote himself.

1271.   Cdr. Rivera dropped Plaintiff Knight's performance score from a five (5), which was consistent with Plaintiff's rating for the previous ten (10) years, to a three (3).

1272.   The purported justification for the drop in rating was the fact that Plaintiff was the subject of an investigation initiated by Chief Manlapaz. No other significant performance deficiency was identified to justify the uncharacteristically low rating.

1273.   In December of 2019, Plaintiff Knight had an interview with the OHR to discuss her concerns about racial and gender discrimination at the MPD, and the systemic culture of retaliation she had been subjected to. Plaintiff Knight met with Joy Board (hereinafter "Ms. Board").

1274.   Plaintiff Knight provided Ms. Board with a written copy of her EEOC complaint against MPD that included racial inequality, favoritism and unfair working conditions.

1275.   Ms. Board told Plaintiff Knight that MPD was past the allotted time for providing her with an Exit Letter. Plaintiff Knight responded that the Exit Letter had nothing to do with her complaint.

1276.  Ms. Board informed Plaintiff Knight that Mr. Lee knew that OHR was only going to investigate what was in the Exit Letter.

1277.  Plaintiff Knight started to get upset because once again, her serious concerns and complaints were being brushed off as irrelevant.

1278.  Ms. Board agreed to go through the process anyway, but it appeared that this was to placate.

1279.  On or about March 18, 2020, Plaintiff received a DocuSign from Ms. Board. The document addressed an overtime issue concerning Officer Wells and Cdr. Glover, but none of the racial inequality, favoritism and unfair treatment complaints raised by Plaintiff Knight.

1280.  On or about March 19, 2020, Plaintiff Knight sent an email to Ms. Board informing her the bases of her complaint were not addressed. Plaintiff Knight informed Ms. Board that the write-up, which only covered an overtime issue, did not address her concerns, and that Plaintiff Knight would therefore not sign it.

1281.  Thereafter, OHR issued a letter conveying OHR's Administrative Dismissal of the complaint, despite the fact that it failed to even acknowledge, let alone actually investigate, any of the claims Plaintiff raised in her complaint.

1282.  OHR further indicated that Plaintiff Knight's complaint was untimely and lacked any merit. Plaintiff's response was sent to OHR the day after she received their correspondence in the mail. It was in no way untimely.

1283.  On or about January 16, 2020, Plaintiff Knight testified under oath before Councilmember Allen regarding the pattern of falsification of police reports, racial inequalities, and unfair hiring and testing practices at the MPD.

1284.   Plaintiff Knight asserted to Councilmember Allen that if MPD leadership didn't do more to promote minorities within the next ten (10) years, there would be no minorities at the top levels of MPD.

1285.   Councilmember Allen specifically asked if Plaintiff Knight was being retaliated against.

1286.   Plaintiff stated that she was. She recounted to Councilmember Allen that she was being retaliated against by Chief Manlapaz of IAD.

1287.   Councilmember Allen stated that he would get back to Plaintiff Knight, but and he never did.

1288.   In furtherance of the scheme to retaliate against Plaintiff Knight, she was written up twice in February of 2020 for fabricated transgressions.

1289.   On or about April 22, 2020, Plaintiff Knight received a phone call from IAD agent Michael Ames (hereinafter "Agent Ames"), informing her that she was the target of yet another "investigation."

1290.   Plaintiff Knight immediately told Agent Ames about Chief Manlapaz informing people within the MPD that he intended to retaliate against Plaintiff, and that he was gunning for her.

1291.   Plaintiff Knight put Agent Ames on notice that there was legitimate reason to believe the investigation was contrived, and was an act of retaliation.

1292.   Agent Ames told Plaintiff Knight that the investigation was about an email she sent to OHR, and more specifically, that the Plaintiff Knight had mentioned that she had recorded Commander Rivera in that email.

1293.   Information that complainants provide to OHR is supposed to remain confidential.

1294.   Plaintiff Knight was interviewed nine (9) times about the alleged recording, but not a single time about the content and substance of her OHR complaint.

1295.  As a result of the investigation, Plaintiff Knight was informed that she was going to be suspended for twenty-eight (28) days.  At the time, there was no MPD policy against recording conversations.

1296.  It is not a violation of Washington DC law to record a conversation without the prior consent of the person recorded.

1297.  On or about April 30, 2020, Plaintiff Knight sent an email to Chief Newsham detailing the things that were happening to her.

1298.  She implored Chief Newsham to pay attention and act on the discrimination, disparate treatment, and contrived and intentional retaliation and bullying that was taking place at MPD. Plaintiff received no response from Chief Newsham.

1299.  Through her Union Steward, Officer Rosario, Plaintiff filed a grievance with respect to the suspension, and the union demanded arbitration of the suspension.  The union is not required to demand arbitration on all grievances, but it did choose to pursue this one.

1300.  On or about June 4, 2020, Plaintiff Knight informed the MPD Director of Human Resources Angela Simpson, that she was being retaliated against.

1301.  On or about July 6, 2020, Plaintiff Knight was ordered back to IAD to speak with agent was David Chumbley (hereinafter "Agent Chumbley"). She appeared at the interview with her Union Steward Rosario.

1302.  Agent Chumbley was so hostile and aggressive in the interview that Officer Rosario stepped in and stopped the interview and asked for another IAD official to intercede.

1303.  Approximately a month later, Plaintiff Knight was ordered back to IAD for another interview, but given the hostile and unproductive comportment of Agent Chumbley, Plaintiff was interviewed this time by Captain Pamela Wheeler (hereinafter "Cpt. Wheeler").

1304.   Captain Wheeler asked questions about Plaintiff's testimony before the city council. However, Captain Wheeler also tried to convince Plaintiff that she was not being retaliated against as a result of that testimony because the investigation and disciplinary action against her began before the city council testimony occurred.

1305.   Plaintiff Knight informed Captain Wheeler that the investigation and discipline was a result of multiple complaints against Chief Manlapaz and others, but escalated after the city council testimony.

1306.   On or about September 24, 2020, Plaintiff Knight received a memo from Chief Newsham in response to her appeal of the 28 days suspension, stating that Plaintiff failed to be forthright during the investigation into her recording of Cdr. Rivera.

1307.   Chief Newsham's memo did not mention any of the claims and concerns Plaintiff Knight raised to Chief Newsham, and did not address that no evidence against Plaintiff Knight was discovered in the investigation.  It further failed to state why recording Cdr. Rivera would be a violation of MPD policy.

1308.   Nevertheless, Plaintiff's suspension was rescinded, and she instead received a letter of censure.  Plaintiff Knight sought to go back to SOD, her original department.

1309.   On or about February 17, 2021, Chief Chanel Dickerson (hereinafter "Chief Dickerson") told Plaintiff Knight to complete a transfer form to go back to her assignment at SOD.

1310.   At the time, Plaintiff Knight was temporarily assigned to Chief Dickerson's office for a project, but by then, the project was complete.

1311.   Three days later, on or about February 20, 2021, Chief Dickerson called Plaintiff Knight to inform her that Chief Contee refused to allow Plaintiff Knight to go back to SOD, and that Chief Contee wasn't going to require that any other department receive Plaintiff Knight.

1312. This was a direct and intentional denial of job and promotional opportunities to Plaintiff Knight by Chief Contee, as well as act that would negatively affect Plaintiff Knight's pay.

1313. Plaintiff Knight viewed this as an act of retaliation and a negative employment action to punish her for her protected activity.

1314. Because Plaintiff Knight's only option at that point was to go back to patrol, she feared that any further retaliation would result in loss of her job because there would be nowhere else for her to go.

1315. Given that no entity in the District of Columbia was willing to take her claims and concerns seriously, and that no member of MPD leadership was willing to restrain the rampant and intentional retaliation against Plaintiff Knight, Plaintiff Knight opted to retire from the MPD on or about March 24, 2021.

## Plaintiff Knight's Individual Causes of Action

### *Race Discrimination and Retaliation Claims*

1316. Plaintiff Knight incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1317. Plaintiff Knight, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

1318. Plaintiff Knight was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination she was subjected to.

1319.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1320.   The facts alleged above taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of race.

1321.   The facts alleged by Plaintiff Knight, that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1322.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Knight was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1323.   Plaintiff Knight has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1324.   Plaintiff Knight seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Sex Discrimination and Retaliation Claims*

1325.   Plaintiff Knight incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1326.   Plaintiff Knight, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

1327.  Plaintiff Knight was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination she was subjected to.

1328.  The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1329.  The facts alleged above taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern, practice and custom of race discrimination against Black women police officers on the basis of sex.

1330.  The facts alleged by Plaintiff Knight, that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1331.  As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Knight was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1332.  Plaintiff Knight has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1333.  Plaintiff Knight seeks compensatory and punitive money damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00 plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

1334.  Plaintiff Knight incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

1335.  Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a

D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

1336.   Plaintiff Knight was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

1337.   As a direct result of Plaintiff Knight's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff Knight, including but not limited to unwarranted disciplinary actions against Plaintiff Knight, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

1338.   As a result of Defendants' actions, Plaintiff Knight suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

1339.   Plaintiff Knight was humiliated, embarrassed, and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1340.   Plaintiff Knight has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1341.   Plaintiff Knight herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees, and all other remedies the Court deems appropriate.

## PLAINTIFF LOCKERMAN'S INDIVIDUAL CLAIMS

### Facts Relevant to Plaintiff Lockerman's Individual Claims

1342.   Plaintiff Lockerman joined the DC Metropolitan Police Department in November 2003 and was first assigned to the Fourth District Station.

1343.   Plaintiff Lockerman was promoted to Sergeant June 2016 and assigned to the Sixth District, and was against promoted to Lieutenant in of June 2019, and assigned to the Seventh District.

1344.   In December 2019, Plaintiff Lockerman was transferred to the Second District, per her own request.

1345.   On March 5, 2020, Plaintiff Lockerman attended a crime briefing and private lunch with Commander Duncan Bedlion (hereinafter "Cdr. Bedlion") (white male).

1346.   While Plaintiff Lockerman believed that the luncheon was for professional reasons, Cdr. Bedlion implied that he wanted to engage in conversation of a personal nature, which made Plaintiff Lockerman uncomfortable.

1347.   The conversation was not sexual *per se*, however, Plaintiff Lockerman was alone with her boss in a social setting, and she put off by the direction of the conversation.

1348.   From that point forward, Cdr. Bedlion began to retaliate against Plaintiff Lockerman for her cool reaction to his attempt at conversation on personal and private matters.

1349.   Plaintiff Lockerman was placed on sick leave from March 26 thru April 8, 2020, however, Plaintiff Lockerman was assigned two tasks that were due during the time that she was out on sick leave.

1350.   Although Plaintiff Lockerman was away on approved sick leave, she was issued discipline at the order of Cdr. Bedlion, for not turning in the assignments on time.

1351.   It is not MPD policy that officers be disciplined for assignments they miss while they are on approved leave.

1352.   While reviewing her evaluation with Captain Edward Bernat (hereinafter "Cpt. Bernat") (now retired), Plaintiff Lockerman was informed that Cdr. Bedlion was urging Cpt. Bernat to place Plaintiff Lockerman on a Performance Improvement Plan (PIP).

1353.   Capt. Bernat refused, informing Cdr. Bedlion that Plaintiff Lockerman did not deserve to be placed on a PIP.

1354.   It was nevertheless very concerning to Plaintiff that Cdr. Bedlion was so angry at being rebuffed that he would try to attack her fitness as an officer and impede her career.

1355.   On or about October 3, 2021, Plaintiff Lockerman was issued discipline for failing to post on the Next-Door application, which is a social media platform designed to inform the community crimes in the area of public interest, or in which the MPD is seeking information from the public.

1356.   Plaintiff Lockerman explained that there was an arrest made in that situation, so there was no further danger to the public or need for information from the public, which is why Plaintiff Lockerman didn't think that it was necessary to make the post.

1357.   Nevertheless, discipline was issued.

1358.   Plaintiff Lockerman scheduled a meeting with Cdr. Bedlion and Cpt. Brian Bray (hereinafter "Cpt. Bray") to discuss the discipline for not posting on the Next-Door app.

1359.   Cdr. Bedlion spent the entire meeting berating and denigrating Plaintiff Lockerman.

1360.   During the meeting, Cdr. Bedlion stated that he didn't think favorably of employees that made requests to transfer from one district to the next (although this is common practice at MPD, and two other white Lieutenants were transferred as well).

1361.   Cdr. Bedlion also falsely accused Plaintiff Lockerman of having issues with her work performance in the Seventh District.

1362.   In fact, Plaintiff Lockerman had no major disciplinary issues and was never placed on a PIP at the Seventh District.

1363.   Cdr. Bedlion further stated to Plaintiff Lockerman that he has made other people cry that sat in the same chair that she was sitting in at the time.  Cdr. Bedlion was very proud of the fact that he made other people cry, an appeared to have made the comment to intimidate and threaten Plaintiff Lockerman.

1364.   It is MPD policy, and in accordance with COVID-19 protocols, that officers wear a face mask while on duty and in an enclosed space.

1365.   On or about , Plaintiff Lockerman directed a subordinate to put his mask on properly per that Executive Order.

1366.   The subordinate officer felt offended that he was directed to put his mask on (which should have been on anyway) and filed a complaint against Plaintiff Lockerman.

1367.   Cdr. Bedlion ordered his subordinate Captain Peter Frenzel (hereinafter "Cpt. Frenzel") to begin an administrative investigation into Plaintiff Lockerman for a "Potential Orders and Directives Violation" for giving the subordinate a lawful directive.

1368.  Plaintiff Lockerman was ultimately exonerated by Assistant Chief Lamar Green (hereinafter "Asst. Chief Green"), however Plaintiff Lockerman was made to endure long and stressful investigation for no reason.

1369.  The subordinate she directed to cover his face was out of order, putting other officers at risk, and insubordinate to a superior officer.

1370.  By treating Lt. Lockerman as if she was at fault, and as if she did not have proper authority to direct her subordinates to comply with directives, Cdr. Bedlion directly undermined Lt. Lockerman, diminished her in the eyes of her colleagues and subordinates and maligned her character.

1371.  Plaintiff Lockerman complained about her unfair treatment end excessive punishment by Cdr. Bedlion to Assistant Chief Green.  He advised Plaintiff to take her complaint to MPD EEO.

1372.  On or about February 18, 202, Plaintiff Lockerman made a complaint to EEO, outlining the pattern of retaliation she was being subjected to by Cdr. Bedlion.  She spoke with EEO Counselor Doreen Haines, and gave details of what Cdr. Bedlion was doing to her.

1373.  EEO did not sustain the complaint and directed Plaintiff Lockerman to resolve the matter with her chain of command.  Nothing further was done.

1374.  Although Plaintiff Lockerman made a post on Next Door within a few hours of the occurrence of the crime, which was fully compliant with the general order on such posts, Cdr. Bedlion nevertheless issued Plaintiff Lockerman a Letter of Prejudice for not making a post to the Next-Door app in what he unilaterally deemed to be "timely manner."

1375.  On information and belief, Cdr. Bedlion held Plaintiff to a different standard than the other Lieutenants when it came to timely posting on Next Door.

1376.   For example, on or about March 3, 2021, Lieutenant Darren Haskis (hereinafter "Lt. Haskis"), a white male officer, failed to post a social media notification for several hours after being relieved of duty.

1377.   On information and belief, Lt. Haskis was not reprimanded.

1378.   Not only is Lt. Haskis a white male, but he is perceived to be a friend of Cdr. Bedlion, and in his favor.

1379.   On or November 20, 2020, Plaintiff Lockerman contracted COVID-19, and was placed on administrative leave by human resources.

1380.   Cdr. Bedlion ordered his subordinate, Cpt. Bray to instruct the time and attendance clerk, Ms. Joann Coombs (hereinafter "Ms. Coombs"), to dock Plaintiff Lockerman's earned annual leave for her time off, which is fraud and against policy.

1381.   Ms. Coombs managed the situation, and did not dock Plaintiff for the COVID-19 time off.

1382.   On or about April 5, 2021, Cdr. Bedlion emailed Plaintiff Lockerman directing her to join the evening and midnight shift officers in meeting with the program director for the Latin American Youth Center (hereinafter "LAYC"), the management of the building that housed the LAYC, and a private citizen who was complaining about the kids at the LAYC.

1383.   Plaintiff Lockerman reached out and spoke to the LAYC Program Director, the building owner and the private citizen, and attempted to address the issues.  However, she directed her subordinate sergeant to attend the on-site meeting, because she was scheduled for her bi-annual physical on that evening, which had been scheduled for months, and which she was not allowed to reschedule.

1384.   Commander Bedlion directed Cpt. Frenzel to issue a letter of counseling regarding this because, he stated that going to the clinic did not excuse her from arranging a meeting in front of the building.

1385.   This confused Plaintiff Lockerman because it was her understanding that the meeting was to resolve the issue, which Plaintiff Lockerman was able to address through phone conversation.

1386.   To the extent that Cdr. Bedlion wanted a physical police presence in front of the building, there was no reason why Plaintiff Lockerman's Sergeant could not provide that presence and visibility.

1387.   It is important to note that Plaintiff Lockerman's physical was late in the evening and the building management and staff of the LAYC were not on-site at 10 pm, therefore the issue could not have been resolved at that time.

1388.   Because of Cdr. Bedlion's unreasonable demand, Plaintiff was put in an untenable situation.   She would have disciplined for missing the physical, and was disciplined for not following Cdr. Bedlion's exact instruction.

1389.   Nevertheless, Cdr. Bedlion ordered Cpt. Frenzel to issue to Plaintiff Lockerman a "letter of counseling," which is not a standard MPD form, but something that Cdr. Bedlion invented to use in his department.

1390.   On or about May 6, 2021, Plaintiff Lockerman became ill with a sinus infection.

1391.   She informed Cpt. Bray that she was ill, and was opting to take an optional sick leave  (a three-day period) that would have her off on the next shift.

1392.   Cdr. Bedlion found out about it, and ordered Cpt. Bray to force Plaintiff Lockerman to go to the clinic if she wanted the time off, which is in violation of the MPD rules.

1393.   Cpt. Bray left Plaintiff Lockerman a message that she was being ordered to the clinic while she was on sick leave, unless she accepted an overtime assignment on the next Saturday, which she was previously scheduled as a vacation day for Plaintiff Lockerman, and had been set months prior.

1394.   Plaintiff felt like this was retaliatory and punitive, and done simply to make her miserable, and take from her earned time off.

1395.   On or about May 19, 2021, Plaintiff Lockerman actually received the letter of counseling from Cpt. Frenzel about the LAYC incident.

1396.   On or about July 19, 2021, Plaintiff Lockerman was issued another letter of counseling for failing to respond and notify the community by emailing  the local stakeholders of a robbery/kidnapping that occurred in her assigned area.

1397.   Plaintiff Lockerman was not the Watch Commander that night.

1398.   Cpt. Bray was the watch commander that evening, and it was the responsibility of the Watch Commander to make the notifications to the community during their shift, which he did.

1399.   Had Plaintiff made the notification, it would have been duplicative.

1400.   Again, Plaintiff Lockerman was disciplined for something that was not her responsibility, and not in accordance with department rules.  And once again, the order to discipline Plaintiff Lockerman came from Cdr. Bedlion.

1401.   Plaintiff Lockerman took two weeks of annual leave from August 5 thru August 21, 2021.

1402.   During that time Ms. Coombs stated that she was approached by Cdr. Bedlion, demanding to know who authorized Plaintiff Lockerman's leave because there was a staffing shortage at the time.

1403.   Although, there were obviously several Departmental Lieutenants who were not working at that time (hence the shortage), Cdr. Bedlion only inquired about Plaintiff Lockerman.

1404.   Plaintiff Lockerman was again scheduled for annual leave for September 5 thru September 14, 2021.   The administrative Lieutenant, Michael Hamelin (hereinafter "Lt. Hamlin"), asked Plaintiff Lockerman if she could cancel leave the 5ᵗʰ of September, and Plaintiff Lockerman agreed.

1405.   Plaintiff Lockerman also requested to have the leave she had scheduled for September 12-14, 2021, cancelled.

1406.   However, her request was denied by Cdr. Bedlion.

1407.   Plaintiff Lockerman called Mr. Mark Viehmeyer (hereinafter "Mr. Viehmeyer"), Labor Relations, on or about Thursday, September 2, 2021, and left a message regarding this ongoing issue with Cdr. Bedlion.

1408.   On or about September 8, 2021, Plaintiff Lockerman went to Mr. Viehmeyer's office and spoke with him in person, because he had failed to return her call.

1409.   Plaintiff Lockerman was directed to attempt to resolve the issue with Assistant Chief Emerman (hereinafter "Asst. Chief Emerman").

1410.   On September 8, 2021, Plaintiff Lockerman briefly met with Assistant Chief Emerman, and he advised her that she could cancel her leave and return to work on September 12, 2021.

1411.   Plaintiff Lockerman had another scheduled meeting with Assistant Chief Emerman on or about September 14, 2021, wherein she reported the hostile working environment she was enduring because of Cdr. Bedlion.   Plaintiff specifically asserted that she believed she was being targeted because of her race and gender.

1412.   Asst. Chief Emerman advised that he would speak with Cdr. Bedlion regarding the situation and get back to her.

1413.   or about, September 15, 2021, Plaintiff Lockerman met with Cpt. Frenzel, wherein she was served with an official reprimand for failing to notify the community stakeholders of an incident that took place while Plaintiff was on leave.

1414.   The Watch Commander for that shift had properly notified the community stakeholders of the event.  So, there was no reason or need for Plaintiff to renotify the community, and she was scheduled to return to work until the next shift.

1415.   Plaintiff was also served with a Performance Improvement Plan (PIP), even though Cpt. Frenzle advised Plaintiff Lockerman that she would be receiving a favorable annual evaluation.

1416.   It was stated in the PIP that Plaintiff Lockerman's days off would be changed due to her "need of more supervision," although it was unclear as to what she needed supervision on.

1417.   Importantly, the change of days-off did not included Saturday night, which is the busiest night of the week, and ostensibly the night in which Plaintiff Lockerman would need the most help and supervision.

1418.   During the conference Cpt. Frenzel brought up incidents from the Seventh District. Plaintiff Lockerman transferred from the Seventh District almost two years, prior.

1419.   This indicated to her that her management team was looking for reasons to attack her. During the conference, Cpt. Frenzel mentioned that Plaintiff had late correspondence.

1420.   Plaintiff Lockerman stated that she had not had any later correspondence during the PIP period.

1421.   Cpt. Frenzel admitted that the late correspondence from more than a year ago, under a different Captain, and occurred while Plaintiff was on sick leave.

1422.   Plaintiff asked why Cpt. was bringing up a deficiency that was addressed, and really wasn't a fair criticism in the first place.

1423.   During the conference, Cpt. Frenzel mentioned Plaintiff Lockerman's relationships with her co-workers.

1424.   He later admitted that he was _only_ speaking of the subordinate officer that Plaintiff Lockerman directed to wear a mask, and a fellow Lieutenant who was only briefly assigned to the district, and with whom Plaintiff Lockerman had not worked.

1425.   By contrast, several officers have filed complaints against Cdr. Bedlion, and he has not been disciplined in any way for his relationship with his subordinates.

1426.   Plaintiff asserts that this is another example of race and gender discrimination and disparate treatment at MPD.

1427.   According to MPD policy, it is not proper to base a PIP that on deficiencies that occurred over a year prior to the rating period.  Cpt. Frenzle was basically saying that he would be rating Plaintiff Lockerman in 2022, for something that supposedly occurred in 2020.

1428.   Plaintiff herein asserts that the PIP, the discipline and the change in schedule are acts of retaliation against her for complaining of race and gender discrimination.

1429.   Plaintiff asserts herein that her EEO Complaint was not fully and fairly investigated, and that she is being victimized by unfair policies and procedures in the EEO process.

1430.   In his latest gambit to target Plaintiff Lockerman, Cdr. Bedlion has created a schedule in which all of the Watch Commander duties for the entire midnight shift land on Plaintiff Lockerman, and Captain Sharell Williams (black female), and none of those duties are shouldered by the male management officers of the Second District for that tour.

1431.   Plaintiff asserts that Cdr. Bedlion and his subordinate officers are colluding to push her out of the MPD, based on unfair, inaccurate and overly harsh discipline, and other management actions that violate MPD policy.

## Plaintiff Lockerman's Individual Causes of Action

### *Race Discrimination and Retaliation Claims*

1432.   Plaintiff Lockerman incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1433.   Plaintiff Lockerman, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866 Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

1434.   Plaintiff Lockerman was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

1435.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1436.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern, practice and custom of race discrimination against Black women police officers on the basis of race.

1437.   The facts alleged by Plaintiff Lockerman that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1438.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Lockerman was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1439.   Plaintiff Lockerman has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1440.   Plaintiff Lockerman seeks compensatory and punitive money damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

<u>*Sex Discrimination and Retaliation Claims*</u>

1441.   Plaintiff Lockerman incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1442.   Plaintiff Lockerman, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

1443.   Plaintiff Lockerman was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination to which she was subjected.

1444.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1445.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern, practice and custom of race discrimination against Black women police officers on the basis of sex.

1446.   The facts alleged by Plaintiff Lockerman that establish that she was treated disparately than her male colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1447.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Lockerman was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1448.   Plaintiff Lockerman has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1449.   Plaintiff Lockerman seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

1450.   Plaintiff Lockerman incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

1451.   Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

1452.   Plaintiff Lockerman was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC

about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

1453.  As a direct result of Plaintiff Lockerman's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

1454.  As a result of Defendants' actions, Plaintiff Lockerman suffered significant economic harm in the form of loss of salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

1455.  Plaintiff Lockerman was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1456.  Plaintiff Lockerman has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1457.  Plaintiff Lockerman herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

## PLAINTIFF MITCHELL'S INDIVIDUAL CLAIMS

### Facts Relevant to Plaintiff Mitchell's Individual Claims

1458.   Plaintiff Mitchell was first employed by MPD in September of 1985.  She retired from the MPD with 29.5 years of service, on or about March 16, 2015.

1459.   In 2017, she was asked to come out of retirement and return to the MPD as a Senior Police Officers ("SPO").

1460.   She was assigned to partner with Officer Sinobia Brinkley, whom she had partnered with for more twenty (20) years when they were both sworn officers. Officer Brinley (hereinafter "Plaintiff Brinkley") is a CRP in this matter.

1461.   At the time Plaintiff Mitchell returned to the ERT Department, Lieutenant Kevin O'Bryant (hereinafter "Sgt. O'Bryant") was still her manager, but was preparing to retire.

1462.   On her first day on the job, Sergeant Michael Boyd (hereinafter "Sgt. Boyd") asked Plaintiff Mitchell and Plaintiff Brinkley to meet him in a conference room.

1463.   When Plaintiffs Mitchell and Brinkley got there, Sgt. Boyd and Detective Elisa Brown (hereinafter "Det. Brown") gave them the insight on the new ERT, which had experienced turnover since they had retired, emphasizing whom the Plaintiffs should avoid and not to trust because there was a "New Sheriff" in town.

1464.   Plaintiffs Mitchell and Brinkley took this as a warning that then Chief of Police Cathy Lanier operated very differently than her predecessor.

1465.   Plaintiffs Mitchell and Brinkley were baffled by the meeting and the warning because they did not work directly for Sgt. Boyd or Det. Brown, and could not fathom their motivation behind this private warning.

1466.   Sgt. Boyd was responsible for issuing Plaintiffs Mitchell and Brinkley the cruiser they would be using for their day-to-day work.

1467.   When they went to the lot to retrieve their vehicles, they were surprised to see that the vehicles were two old K-9 cruisers, with the dog cages and other parts stuffed in the trunk.

1468.   The cars assigned to Plaintiffs had interiors that were covered in dog hair and dander that was getting all over their uniforms, along with numerous spiders and insects because the cars had been sitting idle for months.

1469.   Since Plaintiffs Mitchell and Brinkley had to be immediately available for all barricades and high-risk warrants, they tried to make the best of it.

1470.   Plaintiffs Mitchell and Brinkley both asked that the vehicles be sent to the MPD shop for detailing.

1471.   Plaintiff Mitchell was able to drive her car to the vehicle cleaning area, but Plaintiff Brinkley's vehicle had to be towed because the engine was dead.

1472.   A few days later, Plaintiffs Brinkley and Mitchell were informed that they needed to be on a high-risk detail.

1473.   On many of these warrant details, the officers spend a great deal of time inside their vehicles, waiting for the "go ahead" to approach a person or structure.

1474.   When Plaintiffs Mitchell and Brinkley received their vehicles back from the cleaning service, the cars were not actually cleaned, but there were several containers of the insecticide that was used to kill the spiders and other insects in the back of the vehicles.

1475.   The insecticide killed the spiders, but it did not kill the fleas, which were still clearly visible and moving around the vehicle.

1476.  At first, Plaintiffs Mitchell and Brinkley went to Sgt. Boyd to obtain different vehicles, since there were other vehicles available.  Sgt. Boyd refused to assign them different vehicles.

1477.  Perplexed by Sgt. Boyd's refusal, Plaintiffs Mitchell and Brinkley went to Sgt. Boyd's superior, Lieutenant Kenny Taylor (hereinafter "Lt. Taylor") to get assigned clean vehicles.  Lt. Taylor also denied their request.

1478.  It bears repeating that there were multiple clean, operational vehicles available for Plaintiffs Brinkley and Mitchell to use.

1479.  Plaintiffs Mitchell and Brinkley then requested a meeting with the (then) Commander Guillermo Rivera (hereinafter "Cdr. Rivera") who seemed very irritated that Plaintiffs had to come to him with such a petty issue.

1480.  He stated: "This a no-brainer," or words to that effect, and  several days later, Plaintiffs Mitchell and Brinkley were issued new suitable trucks.

1481.  Until the new vehicles arrived, Plaintiffs Mitchell and Brinkley were given permission by Lt. Taylor to use a white Suburban Truck.

1482.  When Sgt. Boyd realized that Plaintiffs Mitchell and Brinkley were using that Suburban (with Lt. Taylor's permission), he called Plaintiff Mitchell's phone and began to berate her for taking this vehicle without his permission.

1483.  Plaintiff Mitchell attempted to explain to Sgt. Boyd that Lt. Taylor had given her and her partner permission to use the vehicle.

1484.  Sgt. Boyd stated he did not care who gave Plaintiff Mitchell permission. Sgt. Boyd asserted that he didn't want Plaintiff Mitchell to drive the Suburban.  He gave no reason or explanation for his adamant and illogical position.

1485.   Sgt. Boyd was screaming at Plaintiff Mitchell in a very loud, disrespectful and condescending tone.

1486.   Plaintiff Mitchell then notified Lt. Taylor to complain about the way Sgt. Boyd spoke to her and handled the situation.

1487.   From that point forward, Sgt. Boyd had personal animus against Plaintiff Mitchell, and acted to retaliate against her.

1488.   In June of 2017, Plaintiff Mitchell was assigned to assist with a high-risk warrant, and to go on a drive-by detail with five (5) other tactical officers, as well as a Sergeant.  Plaintiff was the only female officer assigned to this detail.

1489.   The other officers were ready before Plaintiff Mitchell arrived at work, and they were waiting for her, while chatting with Sgt. Boyd.

1490.   Once Plaintiff Mitchell arrived, she noticed that Officer Eric Watson (hereinafter "Officer Watson") was carrying a unique looking bag.  When she asked what was in it, he responded that there was a drone in the bag.

1491.   Plaintiff Mitchell was pleasantly surprised, because drones were not available before she had retired from the force.  When Plaintiff Mitchell asked about using official drones, Officer Watson admitted it was his personal drone, not one issued by the MPD.

1492.   Officer Watson indicated that he brought the drone to take arial pictures of the location where the warrant was to be issued.

1493.   Apparently, neither Officer Watson nor Sgt Horos, were aware that the area in which the warrant was to be served was designated a no-fly zone for drones by the FAA.

1494.   Officer Watson sent the drone up twice, but eventually, it fell out of the air.  The tracking device in it indicated it was in the Fort Dupont Park area, so Officer Watson and Sgt. Horos decided to go to find it, rather than simply let it be.

1495.   Plaintiff Mitchell had no power in that situation to do anything but ride along.  Sgt. Horors was the supervisory employee on the team.

1496.   Plaintiff Mitchell was texting with Plaintiff Brinkley, who was back at the station and wondering what was taking the team so long.   A ride-by typically takes less than an hour.

1497.   Plaintiff Mitchell and the rest of the men on the detail were driving around for three hours, looking for the drone.

1498.   By that time, several of the male officers needed to urinate so they went in the woods.

1499.   For some reason, Sgt. Horos decided to take his penis out and urinate in the van into a bottle, instead of getting out with the other guys.

1500.   Everyone in the van could hear and smell the Sgt. Horos' urine.  This event made Plaintiff, the only female in the van, very uncomfortable.

1501.   Plaintiff Mitchell intended to report the urination incident, but she had to attend the funeral of a family member of a fellow officer shortly after the ride by was completed.

1502.   During the funeral, the officers on the ride by team were called back to the station to meet with their Captain.

1503.   Once they met with Captain  Robert Halbileb (hereinafter "Cpt. Halblieb"), Plaintiff Mitchell's police powers were suspended, along with that of the other officers, pending investigation, even though all officers admitted that she was not the one operating the drone.

1504.   As mentioned above, Plaintiff had no idea that Officer Watson planned to bring and deploy the drone, and had no idea the area at issue was a no-fly zone for the FAA.

1505.   She had just returned to MPD after retirement, and had no idea what MPD policy on the use of drones was. She relied on the fact that Sgt. Horos, who was in the van, and who fully participated in deploying the drone, knew what he was doing.

1506.   To make matters worse, Sgt. Boyd tried to accuse Plaintiff of Brinkley, who was at the station during the incident, of being the one who "snitched" on the others for use of the done.

1507.   In fact, it was Sgt. Boyd himself who saw the other officers charging the drone in the locker room before they left for the ride-by.

1508.   The only reason Sgt. Boyd could have for lying about Plaintiff Brinkley and saying that she was the one who reported the others, was to cause Plaintiff Brinkley to be shunned and retaliated against by the other officers.

1509.   Sgt. Boyd knew or should have known that the drone was illegal, and was aware that the officers who were in the locker room prior to ride by were planning on using it.

1510.   Sgt. Boyd but did not warn, or prohibit the other officers from using the drone.

1511.   When Plaintiff Mitchell left the Cpt. Hableb's office, she reported the highly inappropriate urinating incident in the van to Sgt. O'Bryant.

1512.   Sgt. O'Bryant was shocked, and he notified Lt. Taylor who requested a meeting with Plaintiff Mitchell and Sgt. Horos.

1513.   Sgt. Horos apologized for his actions, and a few weeks later, he was promoted.

1514.   On information and belief, Sgt. Horos was not disciplined in any way for his inappropriate behavior.

1515.   Despite the fact that he had participated in illegally operating the drone, on information and belief, Sgt. Horos did not suffer any serious adverse consequences for failing to lead in that situation.

1516.  By contrast, Plaintiff was taken off of regular duties and placed on no-contact duties order, able to work only in the station.

1517.  On or about February 26, 2018, Plaintiff Mitchell was told to go see Capt. Glover.

1518.  When she got to Cpt. Glover's office, Lieutenant Andrew Margiotta (hereinafter "Lt. Margiotta") was also there.

1519.  Capt. Glover asked Plaintiff if she had violated her no-contact order by being on-scene at a barricade.

1520.  Plaintiff Mitchell indicated that she had not, and that she had only assisted Plaintiff Brinkley in moving equipment into Plaintiff Brinkley's vehicle.

1521.  Nevertheless, Cpt. Glover mandated that Plaintiff Mitchell write an incident report and be investigated for violating the no-contact order.

1522.  A thorough investigation was conducted into Plaintiff Mitchell's whereabouts. Video footage from around the scene was pulled and several officers were interviewed.

1523.  Eventually, it was concluded that the officer who had reported seeing Plaintiff Mitchell at the barricade, had actually seen Plaintiff Brinkley instead.

1524.   The investigation, which took weeks of valuable police time, fully exonerated Plaintiff Mitchell.

1525.   When Plaintiff was finally able to confront the officer who had accused her, Sgt. Matthew Mahl (hereinafter "Sgt. Mahl"), and asked him why he had falsely accused her, he responded by stating "y'all look alike," or words to that effect.

1526.  Sgt. Mahl was not disciplined in any way for making a false report on a fellow officer.

1527.  On or about March 27, 2020, while in a meeting with Lt. Robinson and Sgt. John Brown regarding Plaintiff Mitchell's tour of duty with Plaintiff Brinkley, the pair of them were told to

"watch the company you keep," or words to that effect, which indicated that Plaintiff Mitchell was under close scrutiny by management.

1528.   A few weeks later Plaintiff caught the coronavirus, and was out of work for eight weeks with COVID.

1529.   On her first day back to work once she was cleared, Plaintiff attended roll call as usual.

1530.   That roll call was conducted by Sgt. Luke Foskess, who decided to single out Plaintiff Mitchell during roll call.

1531.   Sgt. Foskess took Plaintiff Mitchell's temperature and asked her if she had any symptoms, as per COVID protocols, but Plaintiff Mitchell was just coming back from sick leave and had just been cleared by a doctor.

1532.   Plaintiff Mitchell responded that she had a slight headache because she had not yet eaten anything, but otherwise was fine.

1533.   Sgt. Foskess then ordered Plaintiff Mitchell to go to the Police and Firefighters Clinic for a fitness for duty evaluation.

1534.   Rather than being allowed to drive to the clinic herself, an officer was ordered to drive Plaintiff Michell to the clinic, which made little sense if Sgt. Foskess was worried that Plaintiff Mitchell still had COVID-19.

1535.   Why Plaintiff was seen at clinic, the medical provider asked her why she was there.  When Plaintiff Mitchell explained she had not eaten lunch yet that day, and told him that she had a slight headache, he told Plaintiff to go.

1536.   Plaintiff Mitchell was humiliated by this event, where she was sent to a fitness for duty evaluation in front of her colleagues.

1537.   There was no reason for Sgt. Foskess to insist that she go for an evaluation, because she did not have a fever and had just been cleared for duty.

1538.   Not only did this incident single-out Plaintiff, but it also inconvenienced one of her peers. It also kept her from doing her job.

1539.   Thereafter Plaintiff Mitchell and Plaintiff Brinkley continued to be targeted for minor discipline and investigations.

1540.   For example, on or about August 28, 2020, Plaintiff Mitchell was working the day shift tour during the  March On Washington Detail.

1541.   When they reported for their tour, Plaintiff Mitchell and Plaintiff Brinkley were advised by Sgt. Brown to go to the SOD office and write out a form explaining why they had not been at a barricade the night before.

1542.   The reason was that they were not on duty, and there was no general order that all day officers had to be available for night duty.

1543.   Nevertheless, Plaintiff Mitchell was disciplined for a minor infraction when she had done nothing wrong.

1544.   On or about May 3, 2020, while working on the scene at a barricade at 3237 Hyatt Place NW, Plaintiff received a call that her mother had suffered a seizure and was being transported to the hospital emergency room by ambulance.

1545.   Plaintiff Mitchell's mother was admitted to the Critical Care unit of the Washington Hospital Center.

1546.   Plaintiff Mitchell was allowed to stay with her mother in the Critical Care unit to help calm and ease her mother because the seizure and other medical issues made her mother non-verbal.

1547.   Plaintiff Mitchell was granted three weeks of unpaid FMLA leave.

1548.   However, when she returned to work, she was served with a minor disciplinary action for not being on five barricades that took place while Plaintiff Mitchell was out on approved FMLA leave.

1549.   To clarify, Plaintiff was not written-up for missing work.  She was written up for missing the barricades themselves.

1550.   There is no basis in the law for disciplining someone for missing work assignments while on FMLA, and no other officers in Plaintiff Mitchell's unit were disciplined for missing barricades while on FMLA leave.

1551.   Plaintiff Mitchell herein asserts that the discipline she received for missing barricades was retaliation for taking FMLA leave, and part of a greater scheme to retaliate against her for opposing Sgt. Horors' misconduct.

1552.   Plaintiff Mitchell filed a grievance on the discipline that was issued to her for missing barricades while she was on approved FMLA leave to take care of her very sick mother.

1553.   A few weeks after Plaintiff Mitchell returned to work, she was accidentally stung by a bee while on duty.   She had a severe reaction to the sting and went to the clinic to be seen by a health care provider.

1554.   At the clinic, Plaintiff was prescribed an antibiotic and antihistamine.

1555.   Plaintiff had a serious systemic reaction to the medication, and had to be off of work for two weeks to recover.

1556.   She was placed on paid FMLA leave while she recuperated.

1557.   Again, while she was on FMLA leave, Plaintiff Mitchell was disciplined for not making it to the barricades that had taken place while she was out.

1558.   Sgt. Brown went to Plaintiff Mitchell's home to serve her notification of another form of discipline, while she was still recuperating from her ordeal with the medication.

1559.   Plaintiff had to call her Union Steward, Hiram Rosario, and place him on speaker phone in order to have Union representation (which she was entitled to) during this meeting.

1560.   Sgt. Brown stated he did not agree with the discipline, however he was *directed by his superiors* to handle it.

1561.   It bears repeating that Plaintiff was on approved medical leave when she missed the barricades that were the subject of her discipline.

1562.   On information and belief, no other officers in SOD have been written up for missing barricades or other assignments while on approved FMLA leave.

1563.   On or around January 17, 2021,  during the days leading up to the inauguration of President Biden, Plaintiff Mitchell was detailed to a joint operations center in Herndon, VA, which is more than an hour and a half drive, each way, for Plaintiff Mitchell.

1564.   At the time, Plaintiff Mitchell's supervisors were well aware that she was the sole caregiver for her mother, who had suffered a stroke, and had had several seizures.

1565.   In order to have the time to care for her mother, ensure that her mother was fed during the day and that she was comfortable, Plaintiff requested 4 hours of intermitted leave each day of the 12-hour shift (6am -6pm), so she could have time to drive back and forth to Herndon and still care for her mother.

1566.   Plaintiff Mitchell's request was denied.  The reason she was given was because a different agency was paying for her time.

1567.   Luckily, Officer Wendell Cunningham (hereinafter "Officer Cunningham") volunteered to work the extra 4 hours to cover for Plaintiff so she could care for her mother.

1568.  While this may seem like an innocuous incident, Plaintiff Mitchell had very few options when it came to caring for her ailing mother because her mother is non-verbal, and cannot communicate well with hired caregivers.

1569.  The anxiety and stress that Plaintiff Mitchell endured in trying to work out how she could fulfill her duties and still care for her mother was all-consuming.

1570.  Had she not been assisted by Officer Cunningham, Plaintiff Mitchell would have likely quit her job, rather than allow her mother to go without care.

1571.  There was no reason for Plaintiff Mitchell to have been put through that sort of stress, because the joint operations role Plaintiff Mitchell was fulfilling was actually designated for a management-level officer, as explained in the emails from Captain Caron and Lt. Robinson.

1572.  This incident was another example of the disregard and disparate treatment that Plaintiff Mitchell endures on the job.

1573.  Plaintiff Mitchell has endured so many small incidents of unfairness and negative treatment that she has opted to retire from MPD, rather than continue in such a toxic environment.

1574.  Her last day on the job will be September 24, 2021.

## Plaintiff Mitchell's Individual Causes of Action

### Race Discrimination and Retaliation Claims

1575.  Plaintiff Mitchell incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1576.  Plaintiff Mitchell, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*;  the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the Civil Rights Act of 1866

Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983.

1577.   Plaintiff Mitchell was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the race discrimination to which she was subjected.

1578.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1579.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern, practice and custom of race discrimination against Black women police officers on the basis of race.

1580.   The facts alleged by Plaintiff Mitchell that establish that she was treated disparately than her non-Black-female colleagues, are typical of, and consistent with, the claims of the other nine (9) CRPs.

1581.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Mitchell was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1582.   Plaintiff Mitchell has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1583.   Plaintiff Mitchell seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

### *Sex Discrimination and Retaliation Claims*

1584.   Plaintiff Mitchell incorporates and restates all of the previous factual allegations contained in this Complaint as if fully restated herein.

1585.   Plaintiff Mitchell, on her own behalf, asserts herein claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*

1586.   Plaintiff Mitchell was treated disparately, subjected to a hostile work environment and retaliated against for complaining about and opposing the gender discrimination she was subjected to.

1587.   The facts alleged above, if proven, constitute discrimination, and systematic retaliation severe and pervasive enough to be compensable.

1588.   The facts alleged above, taken in conjunction with the facts alleged by the other nine (9) CRPs, establish that Defendant maintained a pattern and practice of race discrimination against Black women police officers on the basis of sex.

1589.   The facts alleged by Plaintiff Mitchell that establish that she was treated disparately than her male colleagues are typical of, and consistent with, the claims of the other nine (9) CRPs.

1590.   As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff Mitchell was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that caused her severe mental anguish.

1591.   Plaintiff Mitchell has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

1592.   Plaintiff Mitchell seeks compensatory damages, and damages for mental pain and suffering, above and beyond recovery as a member of the class, of not less than $250,000.00, plus interest, costs, fees and all other remedies the Court deems appropriate.

*Whistleblower Retaliation Claim*

1593.   Plaintiff Mitchell incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

1594.   Pursuant to the District of Columbia Whistleblower Protection Act D.C. Code § 1-615-51 *et seq.,* Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

1595.   Plaintiff Mitchell was an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, the EEO Department of the MPD, Assistant Chief Caron, Chief Newsham, the District of Columbia City Council, the Office of the Mayor and the EEOC about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

1596.   As a direct result of Plaintiff Mitchell's protected disclosures, Defendants systematically and continuously retaliated against Plaintiff, including but not limited to unwarranted disciplinary

actions against Plaintiff Mitchell, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation and ultimately termination.

1597.  As a result of Defendants' actions, Plaintiff Mitchell suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

1598.  Plaintiff Mitchell was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

1599.  Plaintiff Mitchell has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

**1600.**  Plaintiff Mitchell herein seeks compensatory damages, and damages for mental pain and suffering of not less than $500,000.00, plus interest, costs, fees, and all other remedies the Court deems appropriate.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs individually respectfully pray that this Honorable Court ORDER that Defendant:

    a.  Award EACH Plaintiff compensatory damages in an amount not less than $250,000.00;

    b.  Provide Plaintiffs with all necessary health care connected to injuries and or mental and emotional harms related to their claims;

    c.  Reinstate those Plaintiffs who have been terminated or forced to retire with back pay;

    d.  Pay Plaintiffs with applicable backpay, benefits and interest;

e.  Provide Plaintiffs with a clean record of any adverse/negative personnel actions/records, including all adverse/negative performance appraisals, disciplinary records, and substitute accurate agency records on the Plaintiffs;

f.  Reimburse Plaintiffs for all sick leave and other benefits which  they were forced to use due to the Defendant's discrimination and retaliation;

g.  Award Plaintiffs future pecuniary and nonpecuniary compensatory damages in a proven amount not to exceed lawful amounts provided by law.

h.  Award Plaintiffs reasonable attorney's fees and costs;

i.  Award such other and further injunctive and declaratory relief  as this Honorable Court deems just and proper.

j.  And any such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Donald M. Temple*
Donald M. Temple
Pamela M. Keith
Temple Law Offices
1310 L St. NW
Suite 750
Washington, DC 20005
Dtemplelaw@gmail.com
pamkeithtemplelaw@gmail.com
202-628-1101 (o)
202-302-0383 (m)
*Counsel for Class Representative*
*Plaintiffs and Putative Class*