# EXHBIT 1

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SINOBIA N. BRINKLEY,            )
*et al.,*                       )
                                )
    *Plaintiffs,*            )
                                )    Civil Action No. 1:21-CV-01537 (RBW)
DISTRICT OF COLUMBIA,           )
                                )
    *Defendant.*             )
_____ )

## <u>SWORN AFFIDAVIT OF ROSE MARIE LUCERO</u>

I, ***Rosemarie Lucero***, being of sound mind and over the age of eighteen (18), do hereby assert that the following facts are personally known to me, and that I would testify to the same if called upon to do so in this matter:

1.    I have been employed as an EEO Investigator/Counselor with the Metropolitan Police Department (hereinafter "MPD") since March of 2017.

2.    I received my undergraduate degree in Political Science from the University of New Mexico in 1982. I received a Masters' Degree in Counseling Services from Webster University in 1987, and a Masters of Business Administration from Marymount University in 1996.

3.    I began my career in 1987, in the Management Service office of the Library of Congress as a management analyst.

4.    From 1989-90, I was an EEO Specialist at the federal Department of Education.

5.    From 1990-93, I worked for D.C. Metro as an EEO Specialist.

6.    From 1993-2008, I worked for the Board of Governors of the Federal Reserve System, first as an EEO Specialist, and then as a Supervisory Consumer Analyst.

7.     From 2008-2017, I was self-employed as a mediator in Virginia, certified by the Supreme Court of Virginia to mediate Juvenile and Domestic Relations District Court cases and General District Court cases.

8.     I applied to the MPD in 2017 because I wanted to return to the EEO work which I had done earlier in my career, and because I believed my skill and experience in mediating disputes would be an asset to an organization like MPD.

9.     From the very beginning of my tenure at MPD, working under EEO Director Alphonso Lee (hereinafter "Mr. Lee"), I have observed and complained about Mr. Lee's participation and assistance in creating and maintaining a systematic pattern and practice of discrimination and retaliation, and his creation of a hostile work environment for women, in particular.

10.    On numerous occasions, several persons have expressed to me Mr. Lee's disdain for women generally, and for female police officers.   Mr. Lee has repeatedly expressed to me that women police officers are liars, conniving, deceptive and will do whatever to get what they want.

11.    Mr. Lee is vocal and blatant in his disregard of women.  Mr. Lee does not fear being disciplined for his sexism because he has stated that he is protected by Assistant Chief of the Internal Affairs Department (hereinafter "IAD") Wilfredo Manlapaz (hereinafter "A/C Manlapaz"), and by the executive management of the MPD.

12.    Mr. Lee stated to me that because of the way *"he"* operates EEO, management is very approving and favors him highly, and he will do what he must do to not let anyone take this management favored status away from him.

13.    Mr. Lee operates EEO as if it is a *fiefdom* he controls.

14.    Mr. Lee (on several occasions) has directed/demanded that myself, and my fellow EEO Counselors conduct our work in a way that favors management.

15.    Opposing Mr. Lee's discriminatory practices, opposing discrimination, is not an option without severe ramifications.  It is death to one's MPD career and leads to a barrage of retaliation to contest with.

16.    As a D.C. certified EEO Counselor, my job is to counsel workplace disputes, with the goal to try to resolve EEO complaints and charges wherever possible.

17.    My first step is supposed to engage in an informal process that allows me to ascertain if certain concerns of the complainant can be remedied at the lowest level, in which I would be using my mediation and negotiating skills.

18.    Contrary to D.C. OHR EEO program policy and practices and guidance from the EEOC, Mr. Lee does not permit EEO Counselors to engage informally with complainants in trying to resolve complaints.

19.    I have not been involved in resolving any EEO case.

20.    Many times, Mr. Lee stated to me only he will deal with and/or interview management regarding resolution requests.

21.    Contrary to D.C. OHR EEO program and policy, an EEO Officer is not an EEO counselor, and Mr. Lee is the EEO Officer.

22.    According to OHR, EEO officers do not conduct EEO counseling; however, Mr. Lee will conduct counseling as he deems necessary in order to ensure the outcome is favorable to management.

23.    Mr. Lee required that my fellow EEO Counselors and I audio record all interviews with complainants.

24.    Mr. Lee would often tell me to listen to the recording and report anything that could be used to discredit the complainant.

25.   Mr. Lee directs every step of the EEO counseling and investigation process so extensively that my colleagues have described his approach as similarly to being suffocated.

26.   It is my belief that Mr. Lee wants to ensure that the final investigative reports will show that the complainant has no creditability, and their allegations have no merit.

27.   To ensure that my investigations always concluded what he wished, Mr. Lee would restrict me to interview management.

28.   He would interview management and then tell me what information I should include in my report; or he would speak to management before I could.

29.   Regardless of which ever method applied, Mr. Lee always contacted management, or on many occasions, I learned that Mr. Lee had already discussed with management the complainant's issues and made a determination before the complainant even filed an EEO complaint.

30.   As soon as I interviewed a complainant or a complainant's witness, Mr. Lee would call and demand that I tell him everything the complainant and the witnesses said.

31.   Complainants have told me that they believe that Mr. Lee tells their management about their complaints, so they have no trust in the EEO process because they were extremely concerned about retaliation.

32.   Several police officers expressed to me that they believed that Mr. Lee breached confidentiality in the EEO process which made them weary or unwilling to report or complain about misconduct or discrimination.

33.   It is my firm belief that Mr. Lee engages in a pattern and practice of distorting investigative report write-up that result in the painting of complainants in the worst possible light, that can be characterized as maligning and ruining the reputation of the person filing the complaint.

34.     On several occasions, I experienced Mr. Lee altering investigative reports and exit letters to attack the reputations of officers, with the purpose to sabotage them if they sought redress from external offices available to the complainant, such as DC Office of Human Rights (hereinafter "OHR"), the District of Columbia Inspector General's Office (hereinafter "OIG") or the District of Columbia Attorney General's Office (hereinafter "AG's Office").

35.     Although OHR has provided training to me and my colleagues that as EEO Counselors, our  purpose is to seek resolution at the lowest possible level; not to investigate, Mr. Lee stated to me that MPD is "different" than any other part of the DC Government, and that federal EEO laws and guidelines do not apply to MPD.

36.     Mr. Lee went so far as to assert that there was a separate and distinct set of EEO policies that applied exclusively to MPD, but since working for Mr. Lee, he has never produced those policies, or any reference to them.

37.     A policy that Mr. Lee created and directed that I and my colleagues follow, was to extend the scope of witnesses in order to find a person of similar demographics as a particular complainant, and interview them to establish that they did not have the same concern as the complainant.

38.     According to Mr. Lee's rule, when we found a person of similar demographics (i.e., Black, female, disabled) who would state that they had not been discriminated against, we were to use that statement to invalidate and discredit the complainant's assertion they were discriminated against.

39.     I was required to engage in this "sleuthing for the purpose of discrediting" activity on several occasions throughout my time at MPD as directed by Mr. Lee, especially to make the complainant look like a liar and void of any credibility, for the purpose of defending the agency.

40. Without exception, although working in EEO, I am treated in the same manner because I have complained about Mr. Lee's discriminatory actions, and I believe he operates the EEO program in opposition to EEO laws and DC OHR policies.

41. If I resisted or contradicted Mr. Lee, he would place me on a Performance Improvement Plan (hereinafter "PIP"), which had negative consequences on my job security, and pay.

42. During my tenure, Mr. Lee has placed me on a PIP three times.

43. The first time Mr. Lee, placed me PIP was after I complained about Mr. Lee's discrimination, abuse, and creation of a hostile work environment.

44. At this time, Mr. Lee told me that he would place everyone on a PIP, so no one would be able to claim discrimination against him.

45. The second time, Mr. Lee did not tell me he placed me on a PIP, but it was after I filed my EEOC claim.

46. The third time, Mr. Lee placed me on a PIP because Mr. Lee disagreed with my report findings, because he concluded that management's conduct was non-discriminatory.

47. In addition to using the PIP process to bully and intimidate the EEO counselors, Mr. Lee habitually threatened me and my colleagues with "investigation," by IAD.

48. Mr. Lee constantly waved his close personal relationship with A/C Chief Manlapaz of IAD to the EEO counselor, and constantly reminded us that if we did not do what he demanded, he could make A/C Chief Manlapaz open an investigation into any one of us.

49. I informed A/C Manlapaz about Mr. Lee's discrimination, bullying, intimidation, and threats of opening an investigation.

50. A/C Manlapaz confirmed that he supported Mr. Lee's assertion that IAD would open an investigation on me or anyone of us.

51.     When I complained about Mr. Lee to A/C Manlapaz, the only redress A/C provided is that Mr. Lee will "never notice me," and that I should find another job.

52.     I believed Mr. Lee freely makes these threats because of the way they (Mr. Lee and A/C Manlapaz) back each other up.

53.     If an allegation was made against A/C Manlapaz, Mr. Lee (himself) would investigate it.

54.     Also, if a complaint was leveled against Mr. Lee, Mr. Lee (himself) would investigate it and A/C Manlapaz would confirm the investigation results.

55.     Not surprising, Mr. Lee's investigation of himself, cleared himself of any wrong-doing or discriminatory behavior.

56.     The Fox guarding the Hen House, is not only an idiom, but also the exact and true portrayal of Mr. Lee's work conduct.

57.     I believe Mr. Lee proudly brandished his EEO Directorship as a tool to ruin or terminate careers.

58.     Worse yet, in 2018, I filed an internal complaint attesting that Mr. Lee discriminated against me.

59.     I firmly believe that because of my ethnicity, and Mr. Lee's disdain for women, Mr. Lee singled me out to scream and humiliate me in front of my colleagues on several occasions.

60.     Mr. Lee repeatedly yelled at me with so much force that it overwhelmed and discomfited my colleagues.

61.     A/C Manlapaz knew about Mr. Lee's abusive and discriminatory behavior, and did not intervene or do anything about allegations, or about the inappropriateness and conflict of interest in Mr. Lee investigating a complaint against himself.

62.    On several occasions I have heard Mr. Lee state that he believed all persons who availed themselves of the EEO process were trying to get something, and that they will regret doing so because they will be discredited and humiliated for using the EEO system.

63.    Since my employment at MPD, I am aware that of the five (5) EEO Counselors who have worked for Mr. Lee, all (5) have complained about Mr. Lee for discrimination and retaliation, internally, externally to the EEOC, or both.

64.    Regarding the five (5) counselors that complained, MPD has never addressed Mr. Lee discriminatory, retaliatory, and abusive actions/behavior.

65.    MPD hired Harry Carter, a former EEO Director with the Department of Defense with over 30 years' experience.

66.    Mr. Carter was very helpful in sharing his expertise on disability programs, and when Mr. Lee found out that I conversed with Mr. Carter about EEO and disability issues, Mr. Lee became so livid that when he screamed at me it was so loud and intense that Mr. Lee showed that he had no boundaries.

67.    Mr. Lee directed me not to speak to Mr. Carter about EEO and I was to get advice from him only (Mr. Lee).

68.    In May 2021, a new EEO Counselor, David Simmons, joined the EEO office.

69.    To the best of my knowledge, Mr. Simmons is the only EEO Counselor in the last five years who has not filed a complaint against Mr. Lee.


And further, Affiant sayeth not.

I, **_Rosemarie Lucero_**, do hereby swear or affirm, under the penalties of perjury, that the foregoing is true and accurate to the best of my knowledge.

9.16.2021

_____
Date

_Rosemarie Lucero_ _(signature)_

_____
Rosemarie Lucero

# EXHBIT 2

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SINOBIA N. BRINKLEY,          )
*et al.,*                     )
                             )
    *Plaintiffs,*       )
                             )    Civil Action No. 1:21-CV-01537 (RBW)
DISTRICT OF COLUMBIA,         )
                             )
    *Defendant.*        )
_____)

## SWORN AFFIDAVIT OF HARRY L. CARTER, JR.

I, *Harry Lee Carter, Jr.*, being of sound mind and over the age of eighteen (18), do hereby assert that the following facts are personally known to me, and that I would testify to the same if called upon to do so in this matter:

1.     I received an undergraduate degree from Bowie State University in business administration in 1976.

2.     I began my career as a Human Resources Specialist in 1974, at the United States Department of Defense, in the Consolidated Civilian Personnel Office in Washington, DC.

3.     I was continuously employed in that position as a generalist in Human Resources for approximately seven (7) years.

4.     In 1982, I transitioned to the Equal Employment Opportunity office (hereinafter "EEO"), also in the Consolidated Civilian Personnel, to serve as an EEO Counselor.

5.     As an EEO Counselor, my responsibilities my responsibilities were broken down into an informal and formal process. In the informal process, my job was to speak to employees that had EEO concerns, and to intercede to mediate, or negotiate informal resolution of disputes.

1

6.      The formal dispute resolution component of my duties involved impartially investigating claims of discrimination and retaliation, preparing reports of findings, and at times, participating in disciplinary actions against those who had engaged in discriminatory or retaliatory conduct.

7.      I held the position as an EEO Counselor in the Consolidated Civilian Personnel Office for approximately one year.

8.      In 1983, I applied for and was hired as the EEO Complaints Manager for the Naval Air Systems Command (hereinafter "NAVAIR"). In that capacity, I supervised 2 EEO Counselors. I held that job for approximately two years.

9.      In 1985, I was promoted to Director of EEO Programs for NAVAIR.  In that capacity I had eight (8) executive staff who were my direct reports, and twenty-seven (27) EEO Directors across the country, who reported to me.

10.     In that role I set EEO policies and procedures for the NAVAIR EEO Office, oversaw diversity initiatives, designed and implemented disability accommodation procedures, and was intimately involved in disciplinary decisions.

11.     I held the position as Director of EEO Programs for approximately twelve (12) years.

12.     In 1997 I moved to an even larger responsibility as the Director of EEO Programs for the Joint Defense Information Systems Agency in Washington DC.   This Command contained component personnel from all of the armed services.

13.     In that role, I had nine (9) Senior Executives who directly reported to me and  thirty-one (31) EEO Directors who were indirect reports to me nationwide.

14.     I retired from this position in 2015.

15.     In February of 2020, I decided to re-enter the work force, principally because I still had a passion for EEO work, and the retired lifestyle was too slow-paced for me.

2

16.     I was further interested in re-entering the work force because I could earn a second retirement with only five (5) years of service for Washington, DC government.

17.     I applied for a position as an EEO Counselor for the MPD because of my deep and abiding respect for those who put their lives on the line in service to their community, and because I believed that the culture of a police department would be similar to the culture of a military department which I had served my whole 37-year federal career.

18.     I began my employment with MPD on or about February 18, 2020.

19.     My direct supervisor, Alphonso Lee (hereinafter "Mr. Lee"), was out of the office during the first few days I was on the job. So, my first interactions were with Mr. Lee's direct reports.

20.     At the time I was hired, the MPD EEO office was staffed by Mr. Lee and two EEO Counselors, Doreen Haines (hereinafter "Ms. Haines"), and Rose Marie Lucero (hereinafter "Ms. Lucero"). I was hired to be the third EEO Counselor.

21.     On my second day on the job, I received an anonymous phone call about Mr. Lee, alleging that Mr. Lee was corrupt and working to protect management. The caller accused Mr. Lee of manipulating investigations and working to discredit complainants.

22.     I was shocked to receive the call, inasmuch as I was so new to the job, I wasn't sure how anyone had even obtained my number. To this day, I do not know who the made the anonymous call.

23.     As would be expected, I asked my new co-workers, Ms. Lucero and Ms. Haines about the call and the accusations leveled against Mr. Lee.

24.     Ms. Haines' response to me was: "they [weren't] lying," or words to that effect.

25.     Ms. Lucero's answer was: "that has been my total experience," or words to that effect.

3

26.     Ms. Lucero informed me that Mr. Lee intentionally discriminates against women, treats them "like dogs," and repeatedly calls women police officers "lazy," and "liars."

27.     Ms. Lucero informed me that she had actually filed a complaint against Mr. Lee in 2018, and that Mr. Lee decided to conduct the investigation of the claim *himself*.

28.     As I was new to the office, I did not know what to make of Ms. Lucero's allegations, but as an EEO professional with thirty-three (33) years of experience, I was certain that it would have been completely inappropriate and unacceptable for an EEO Director to investigate an allegation leveled against himself.  Such a claim should always be referred to a neutral third party for investigation.

29.     When Mr. Lee returned to the office in late February of 2020, I had my first in-person meeting with him.

30.     During that meeting, Mr. Lee informed me of the special relationship he had with Assistant Chief Wilfredo Manlapaz (hereinafter "Asst. Chief Manlapaz"), the Director of Internal Affairs Division (hereinafter "IAD").

31.     The role of IAD is similar to the role of an Inspector General in a military department, which is to investigate internal misconduct, unethical or unlawful behavior, or fraud, waste or abuse.

32.     Mr. Lee informed me that Asst. Chief Manlapaz and himself had an agreement and understanding such that Mr. Lee would ensure that allegations that came through the EEO office would not harm or implicate MPD management, and that Asst. Chief Manlapaz, in turn, would protect Mr. Lee from any claims against him.

33.     Mr. Lee's specific words to me were: "those people can file all the complaints against me they want, because [Asst. Chief Manlapaz] and I have a deal, he's in my pocket," or words to that effect.

34.     In all of my years as an EEO professional, I have never heard an EEO Director make a comment like that.

35.     Somehow, Mr. Lee had discovered that Ms. Lucero had asked me to go to lunch with her during my first week.  Mr. Lee finished the meeting by telling me to stay away from Ms. Lucero because "all she does is file complaints," or words to that effect.

36.     By my second week on the job, I learned that Ms. Lucero and Ms. Haines knew very little about EEO best practices because they were not given access to training through well-respected entities like the Society for Human Resources Management (hereinafter "SHRM"), or other industry-leading entities.

37.     I further learned that Mr. Lee ran the department completely differently than any EEO office I had ever worked in, stating to me on multiple occasions that the MPD EEO Department did not have to adhere to or consider EEOC guidance on any issue.

38.     Basically, Mr. Lee made up his own rules, and insisted that Ms. Lucero, Ms. Haines and I abide by his edicts, no matter how contrary to EEOC principles they may be.

39.     Mr. Lee enforced his rules by using the performance improvement plan system to bully and intimidate Ms. Lucero and Ms. Haines.

40.     Not only were both on a performance improvement plan, but both had been repeatedly placed on performance improvement plans to dissuade them from displeasing Mr. Lee in any way.

41.     A week later, Mr. Lee informed me that he was getting me a tape recorder to tape all of my interviews.

42.     Again, this shocked me.  It is not standard in any way to record all EEO interviews.

43.     To the contrary, the first part of the EEO counselor's job is informal interview and counseling of employees to resolve issues that arise in the workplace without the need for formal intervention.

44.     When I raised this fact to Mr. Lee, he again informed me that the MPD does not do things by EEOC Standards.

45.     In March of 2020, Ms. Lucero had a case that dealt with reasonable accommodation of individual with a disability.  She came to me to ask for assistance because I had more experience in that area, and I offered to help her find EEOC guidance on the topic.

46.     The next day, during a conversation between Ms. Lucero and Mr. Lee, Ms. Lucero mentioned that she had sought assistance from me on the reasonable accommodation issue.

47.     Mr. Lee went off on an explosive, expletive-laden rant on Ms. Lucero, which I could easily hear from my office because Mr. Lee had not bothered to shut the door.

48.     For more than 10 minutes, Mr. Lee yelled at the top of his lungs at Ms. Lucero, telling her she was not to share information about MPD with me.

49.     Mr. Lee's behavior was so volatile and disturbing, the woman who was cleaning the office became visibly shaken and started crying.

50.     I was so alarmed by the incident that I wrote an affidavit outlining what happened, a copy of which is attached hereto at ATTACHMENT A.

51.     Later that day, Ms. Lucero called me and warned me that I should be cautious around Mr. Lee because Mr. Lee was jealous of my experience, and did not like that I was willing to discuss EEO best practices with Ms. Lucero and Ms. Haines.

52.     Contrary to standard EEO practices, per Mr. Lee's mandates, the EEO Counselors were to act as investigators whenever an officer or employee came to see them, and were supposed to make a formal determination to dismiss and deny the allegation.

53.     Mr. Lee directed all the Counselors to record all interviews, and mandated that we save all recordings on a drive.

54.     My concerns about Mr. Lee's methods escalated when he began to tell me what management's response was going to be to an allegation before I had even interviewed the complainant.

55.     When I asked Mr. Lee how he knew what management's response would be before I even interviewed the complainant, he responded that it was based on his "experience," and that he knew what management would want done.

56.     When I questioned the legitimacy of Mr. Lee's intercession and tried to assert that his process was contrary to how EEO is supposed to work, Mr. Lee reminded me that I was just a counselor, and that he had the right to set all the procedures and make all the decisions.

57.     An example of Mr. Lee's process came up in April of 2020. In that case, a female officer made an allegation of sexual harassment, in which she sought to be moved to a different department.

58.     Based on my conversation with the complainant, and with the departmental Lieutenant, there was a simple resolution of the issue because there was an officer that wanted to be transferred into the department. It was an easy win-win solution. It should be noted that the

7

complainant had already successfully negotiated a reassignment with said Lieutenant to another division.

59.     Mr. Lee intervened.  He demanded that an investigative report be written denying the complainant's allegation of sexual harassment. He further interceded to prevent the transfer, thus forcing the complainant to continue being subjected to the alleged harassment.

60.     A few weeks later, in April of 2020, Mr. Lee came to my office to discuss a case I was investigating involving claims of gender and race discrimination by three of the plaintiffs in this case, Officer Tabatha Knight, Officer Sinobia Brinkley, and Officer Karen Carr.

61.     I had just begun working on the matter when Mr. Lee informed me that he believed that all of the complaints were liars, and that he believed the MPD would be better off if EEO could find a way to move them out of their employment.

62.     I felt extremely uncomfortable with Mr. Lee's comments and believed them to be a sign of inappropriate bias.

63.     I attempted to investigate the allegation of unfair and disparate discipline against Black women officers made by Officers Knight, Brinkley and Carr.

64.     Although my preliminary analysis of the statistics available to me did not show a disparity, Mr. Lee prohibited me from obtaining access to the disciplinary files to ascertain whether Black women were being subjected to appropriate discipline or harsher discipline than was appropriate.

65.     All EEO Counselors were supposed to have access to such files to be able to execute our duties, which included looking at past disciplinary actions to help ensure fair and consistent treatment.

66.     In October of 2020 a Black female officer came to EEO alleging harassment against two management officials (Sergeant Pringle and Lieutenant Hodge.) The Lieutenant retired abruptly.

67.     In mid-October, I interviewed Sergeant Pringle. After the interview, Mr. Lee told me what to put in the counselor's report, but it was something contradictory to what the Sgt. had said. Mr. Lee also instructed me to put comments in the report designed to attack and undermine the credibility of the complainant and all of her witnesses who had collaborated the alleged discriminatory actions.

68.     One of the ways that Mr. Lee systematically discredited complainants was to instruct the EEO Counselors to find one person of a similar demographic (i.e., female, Black, Latino) that had not been treated in the same manner, or had not made a complaint, and use the existence of that person as a basis to deny that discrimination had occurred.

69.     This was a pattern and practice in the EEO office and rule that Mr. Lee forced all the EEO Counselors to abide by. We were all required to find and interview persons of a similar demographic for the express purpose of invalidating the allegations of a complainant.

70.     An example of this common practice occurred when Ms. Lucero had a case involving age discrimination in promotions from Detective Level 2 to Detective Level 1.

71.     Mr. Lee made Ms. Lucero find the one person over age forty out of dozens of applicants who was promoted to Detective Level 1, and then required her to conclude that the allegation of age discrimination in promotion was without merit. I became aware of the situation because Ms. Lucero and I discussed it as it was occurring.

72.     During the entire time I was employed at the MPD EEO office, Mr. Lee did not allow a single claim of discrimination or retaliation to be substantiated. The other two EEO Counselors

(Haines and Lucero) informed me that such had also been their experience during their four years working for Mr. Lee.

73.     During the course of my tenure, it became clear to me that Mr. Lee was speaking to management about complainants and coordinating responses with them to dismiss the allegations, regardless of their merit.

74.     It also became clear to me that Mr. Lee was speaking to both management and non-management employees about what complainants were saying in their interviews with EEO Counselors.

75.     On several occasions, Mr. Lee asked me to report to him what a complainant said in an interview, and I later learned that those very comments were brought-up to the complainant by a colleague or by the person they had accused.

76.     Several complainants I had spoken to later stated to me that they felt there was no confidentiality in the EEO process and that they were being retaliated against because they came forward to make a complaint to EEO.

77.     On several occasions -- so frequently, in fact, that it was almost a mantra -- Mr. Lee stated to me that people who used the EEO process are all liars who seek to get something they want, or to get an advantage, and that they are all disgruntled people trying to harm good management officers.

78.     In June of 2020, an IAD investigation was opened into Mr. Lee's management style. Cdr. Manlapaz interviewed both Ms. Lucero and Ms. Haines, but he did not interview me.

79.     Soon thereafter, Mr. Lee called me into his office to discuss the investigation into his management style.

10

80.     Mr. Lee informed me that Asst. Chief Manlapaz was not going to do nothing to him, because there were no secrets between them.

81.     I interpreted this comment as a warning that anything that I said to Asst. Manlapaz during the investigation was going to get back to Mr. Lee, and that Mr. Lee would not hesitate to retaliate against me if I were to be truthful in the investigation.

82.     Mr. Lee had two more incidents of yelling at the top of his lungs at Ms. Lucero in the month of June, before someone from IAD eventually contacted me.

83.     In late June, I was asked for a written account of the three incidents in which I witnessed Mr. Lee screaming at and berating Mr. Lucero.

84.     Despite Mr. Lee's thinly veiled threat to me, I provided the written account, a copy of which is attached hereto as ATTACHMENT B.

85.     Until I tendered that written statement, I had received nothing but glowing performance reviews.  I was not on any kind of Performance Improvement Plan, and had received no counseling whatsoever about any deficiencies in my performance.

86.     For two weeks after I submitted the written statement, Mr. Lee refused to speak to me.  I suspected that Mr. Lee's silent hostility towards me was the result of having been informed that I provided a written statement against him.

87.     In November of 2020, Ms. Lucero filed another complaint against Mr. Lee because he used the PIP, threats of retaliatory investigations into her, and threats about losing her employment to bully her into compliance.

88.     I wrote to Asst. Chief Manlapaz regarding my grave concerns about how the EEO staff was being treated and managed, and the policies that were being put forth by Mr. Lee.  I further

11

expressed my concerns about how Mr. Lee's actions were having a negative impact on the MPD. A copy of that email is attached hereto as ATTACHMENT C.

89.    Asst. Chief Manlapaz never responded to my email.

90.    One week after I sent that email to Asst. Chief Manlapaz, Mr. Lee called me and asked if I had looked at my performance appraisal, which had been posted online.

91.    I was confused by Mr. Lee's inquiry because it was not the time of year for performance evaluations, and Mr. Lee had been so complimentary about my performance up to that point, that he had recommended me for a EEO Director's job at the Metropolitan Fire Department.

92.    When I went to look at the performance evaluation, Mr. Lee had rated me as not recommended for retention.

93.    Mr. Lee was not required to produce documentation to support his appraisal of me, and as a probationary employee still within the first year of employment, I had no recourse other than the EEOC process.

94.    I was terminated from my employment with MPD on or about December 2, 2020.

95.    On or about March 1, 2021, I filed an EEOC charge alleging retaliatory discharge for my participation in the investigation into Mr. Lee.  The EEOC has not yet issued a determination or Notice of Right to Sue Letter on my case.


And further, Affiant sayeth not.


    I, Harry L. Carter, Jr., do hereby swear or affirm, under the penalties of perjury, that the foregoing is true and accurate to the best of my knowledge.

13

_____
Harry L. Carter, Jr.

_____
Date
9-19-2021

# ATTACHMENT A

# DECLARATION OF HARRY CARTER
## REGARDING THE OPERATION OF THE DISTRICT OF COLUMBIA METROPOLITAN POLICE DEPARTMENT'S EQUAL EMPLOYMENT OPPORTUNITY PROGRAM AND OFFICE

1.      I, Harry Carter, was formerly employed as an EEO Counselor in the EEO Office of the DC Metropolitan Police Department (MPD) from February 18, 2020 until December 2nd, 2020. Prior to working in the District of Columbia Government, I have close to 30-years of experience working in the EEO field. Mention should be made that I am a retired federal employee (within the Department of Defense). Again, relative to my approximately 30-years in the EEO field, I have spent 22-years as an EEO Director in some of the largest DoD activities that exist worldwide.

2.      My immediate supervisor in the DC MPD was EEO Director, Alphonso Lee. Being an EEO Director for 22 years myself, I can unequivocally state that Mr. Lee is the absolute worst EEO Director of the dozens I have met over my long career.  It was my observation/experience that Mr. Lee used his position as Director to unfairly represent management's point of view in 99 percent of the cases.  In other words, because of his involvement (helping management establish their rebuttals) and directing assigned Counselors to include such in the corresponding Counselor's report, there is really **no neutrality** and definitely **unfair biases'** within MPD's EEO program. Given the preceding, I estimate that 75-90% of the complainants using the EEO process within MPD are not getting a fair investigation, and some are actually having their civil rights violated by the very person (Lee) that's supposed to be entrusted with/getting paid to ensure such doesn't happen.

In an effort to express the frustration of illegal/procedural incorrect EEO practices I noticed Lee

implementing while working in Lee's shop for 10 months, the following is offered:

The first abnormal thing that transpired occurred after only two weeks on the job.  I received an anonymous call on my new desk phone from a person (lady) warning me about Lee.  She shared the following:

- He was the worst manager she ever worked for;
- He creates a hostile working environment for his EEO Subordinates
- He eventually puts everyone on a PIP
- He interferes with cases, and is definitely PRO-MANAGEMENT
- He will lie about anything and to anyone in a hummingbird heartbeat
- He does not abide by any federal regulations and often develop policies "on the fly"
- He has no respect for the men/women of MPD unless you're upper management
- He does not like to be questioned

1

- If I really know what EEO is supposed to be and desire to do things correctly, I wouldn't make it out of my probationary period.

I'm sure Mr. Lee will probably say that I'm only saying this now because he terminated me and will accuse me of being a disgruntled employee. However, I shared the contents of the above anonymous conversation with both of my co-workers (Rosemarie Lucero and Doreen Haines) within days of the conversation. Let me make this point perfectly clear...while I listened to the caller and kept mental notes, I never initially passed any judgement on Mr. Lee. I wanted to give him a complete chance and gave him every benefit of the doubt to prove the above referenced anonymous caller wrong. Additionally, given my love and knowledge for/in this field, I could not envision an EEO Director resembling what I was warned was Mr. Lee's method of operation. I remembered when I first shared the conversation with Ms. Lucero (co-worker), she immediately stated that it had been her experience that all I was told was 100% true. Then I began to notice certain things about how our (MPD's program under Lee's direction) processes were so much different than directed by the Equal Employment Opportunity Commissions l regulations. **Some**, not all, of said differences are referenced immediately below:

- There are no recordings allowed per federal regulations in the Counseling process. The preceding is completely prohibited. When told by Mr. Lee we did such in MPD, I inquired why and cited the applicable federal EEO regulations to which Mr. Lee angrily responded that he requires such because often **complainants** lie that they didn't say what they actually said and in those cases we will have proof to show they lied. It was obvious that he didn't like my "why are we doing this" questions. Because of the pandemic, I was never able to take the OHR counselors course but both my counter-parts informed me that they (OHR) does not endorse the taping either and have voiced such repeatedly in their training.

- The whole purpose of counseling per EEOC regulations is to obtain a resolution between complainants and applicable management officials whenever possible/practical. I was told by Mr. Lee on my first assigned counseling case, the preceding was not my job....that my job was to determine if the complainant's case had merit or not and write why. The preceding is totally opposite than the federal regulations dictate/require...per federal regulations, there are no determinations made in the counseling process regarding the **merits** of the case; **such is strictly prohibited.**

- Being an EEO Director for 22 years myself, I can unequivocally state that Mr. Lee uses his position as Director to unfairly represent management's point of view in 99 percent of the cases. In other words, because of his involvement (helping management establish their rebuttals) and directing assigned Counselors to include such in the corresponding Counselor's report, there is really **no neutrality** and definitely **unfair biases'** within MPD's EEO program. I know of at least 7 cases I was assigned whereas Mr. Lee was supplying me with managements responses prior to me even interviewing the

2

complainant to ascertain or clarify his/her issue.  The preceding has just not happened to me but also the other two EEO Counselors as well.  When someone (other than a management official) comes to speak to Mr. Lee privately, their concerns are snitched (by Lee) back to their respective management officials before they even get back to the office.  If a survey is conducted of Mr. Lee's office visitors, I guarantee that 90% or even more of such will attest to the preceding.   Such high numbers cannot be wrong!  As stated, I have served as an EEO Director for 22-years (with a much larger staff than Lee's) and while I may have been the final reviewer for their work products, I never was directly or so intimately involved and/or interfered with their actual counseling as Mr. Lee does repeatedly.

- Mr. Lee has established certain criterion that **violates employees' civil rights**.  An example of such he directs Counselors to find "no discrimination" in EEO cases whereas one other like person has not raised an issue.  We recently had a case whereas a lot of officers felt a detective-1 test was age discriminatory.  According to Mr. Lee, because only **one** person over 40 passed the test, there cannot be discrimination.  The preceding conclusion not only passes an EEOC properly articulated legal challenge but also lacks complete logic/common sense.  Can you imagine if MPD was recruiting for 1000 officers and hired only one Hispanic out of 500 Hispanic applicants?  How can anyone make the argument that if the other 499 Hispanics filed an EEO complaint we could have no findings on each because one Hispanic applicant was hired…yet, several instances counselors have been directed by Lee to conclude/include such on their respective reports.

- MPD Counselors are not allowed to provide Complainants final interviews as applicable regulations state.  A final interview, per applicable regulations exists to inform Complainants to not only what was found during the counseling process but why such was found.  We just consistency send out case notification papers stating a complainant's claim is without finding.  I only know of one instance whereas there was a finding and that involved one officer who sent another officer graphic sexual texts and therefore could not deny such.  The preceding case was an officer against another officer.  I am convinced that if the wrong doing individual would have been a management official, Mr. Lee would have found one of his backward logic ways to exonerate said manager.  Think about it…how can all these complainants be wrong…time after time…after time…after time…after time?

- In MPD's program, when a person comes into an office to voice a concern yet does not express to file a complaint, Mr. Lee requires all Counselors to write a Counselor's report as if he/she did actually filed a complaint.  When such happened under my watch (as an EEO director) we would definitely conduct a limited inquiry and prepare a memo for the

3

record with applicable findings but we would never force anyone to enter the complaint process without them expressing a desire to do such. The reason why Mr. Lee's approach is wrong is because not only is it contradictory to federal guidelines outlining the do's and don'ts of the complaint process, but it also sets up a possible adversarial relationship with the person who visited the office. I have noticed on several occasions whereas someone contacts one of our Counselors asking how they could possibly receive an exit letter when they made it clear they never officially entered the process. The preceding is another reason that employees are discouraged from visiting the MPD EEO Office.

- **Some of his (Lee's) recent transgressions involved cases where Tabatha Knight was a complaining official. This was the one of the first cases I counseled. Mr. Lee told me not to trust Officer Knight because was a liar and taking up for some black female officers at SOD who were also liars and that MPD would be better if they figured out how to fire officers like Brinkley, Carr, and Knight because all they did was file complaints. I was shocked at his comment and he stated such while Rose was in my office and witnessed such. I was told to also not to trust Officer Rosario (who served as the union rep for the prementioned African-American female officers) because all he did was "lie on management also and they all would lie on me, so be careful in my dealings with any of them."**

- When Mr. Lee left, EEO Counselor Rose informed me that Director Lee has told her that all MPD officers do is lie on management, that none of them should ever be trusted. The preceding attitude is the last type of attitude an EEO Director should have. Even when we finished the interview addressed above, Mr. Lee came down to my office and asked "how did it go"; I informed him that Officer Rosario was a great example of a representative and he was clearly agitated because I did not agree with him regarding her and so he replied when he (Rosario) and "those women" throw me under the bus by lying, don't say he didn't warn me.

- On another one of my most recent cases Officer Karen Carr in which union representative (Roserio) served as her representative, I received a written reprimand for sharing all the allegations alleged about Carr ( she was named as the target by Sgt. Boyd). Never mind the EEO regulations clearly state that a Target has the right to respond to ALL charges. Mr. Lee was actually angry that I gave Officer Carr an opportunity to defend herself of all charges. It should also be noted that Lee has violated the confidentiality clause to a much greater degree than he makes up on subordinates. Less than three–weeks later, he (Lee) directed me to inform a complainant who had requested to remain anonymous that the target has a right to know both, the charges and the person making the charge.

4

- Reasonable accommodation case Rose was working on..........Because he hadn't, I advised Rose she needed to check to determine if management had properly engaged in the  interactive process the regulations require...Lee was furious at Rose for obtaining the information and informed her management hadn't done anything wrong ( while she was just starting the investigation)...told her seeking information from anyone but him could cause her her job;  Called her stupid; told her not to discuss any work with me and not to share any information with me; and just write what he told her to write.  Because Rose's office was situated next to mine and he was screaming at her so loud, I could hear every word.  Even the cleaning lady who was in my office teared up just listening to the manner he was screaming at Rose.

- Officer Caesar's case...Lee gave me management's response that she abused leave and her witnesses did also even before I started my inquiry.  Although I found during the investigation management was indeed guilty of harassing Officer Caesar, Lee firmly directed me not to include such findings in my report.

- Hispanic complaints in District-7............had Newsome (on his language staff) write things were fine and their complaint had no merit.  Complaint was initially assigned to Rose and I however when we discovered through our collective interviews, management had made many mistakes that were discriminatory in nature, Lee took the case from us and completed himself with a finding of no discrimination in spite of the information Rose and I provided him to the contrary.

- Detective Thomas's Case – reprisal regarding Age complaint case for Detective 1 exam..........I was not allowed to interview complainant nor target...was given management's (commander Haines') response by Lee was also instructed by Lee I could not interview a Commander and the questions I was going to ask were too hard.  It should be noted when Lee became aware in October, 2020 that Thomas had recorded a conversation with Captain Branch, Lee made another unprofessional statement, he stated that he was going to convince management to go after Thomas regarding the tape and that would force Thomas to drop his complaint.  This is another case Lee took from me when he discovered management may have not done everything exactly like they said....it is a case he finished but should have never been involved with because he called Thomas a liar and trouble maker from the start.

- Another case whereas the complainant who negotiated her reassignment in a sexual harassment case and Lee said HE wasn't approving such,  according to applicable regulations, the decision is definitely not his to make.

5

- SOD cases where Lee said the department should find a way to fire the black female officers because they were just troublemakers and liars

As stated above, the preceding above is but a few examples of Mr. Lee's mismanagement of the MPD EEO Program and I fully believe his upper management does not care because Mr. Lee's mismanagement gives the impression that MPD is a discrimination-free workplace (addressed in more detail later in this paper).

I can remember one particular case Rose was working on whereas she wanted my advice. I provided her the exact regulatory EEOC and ADA instruction location she was seeking and discussed the instruction's directive relative to what Rose needed. Rose made the mistake of informing Mr. Lee of such while he was in her office and he began to scream at her so loud I could hear every word while sitting in my office next door. The screaming went on for 12-15 minutes. I felt so bad for her. Soon after the preceding occurred, my co-workers were directed by Mr. Lee to not share any information with me regarding how things are done at MPD... "that since I was so smart, let me sink or swim on my own." I was never trained on MPD's way of doing business ... all I know such is what the federal regulations instruct agencies to do... I have supervised a staff of 17 EEO Specialists and have taught EEO sessions (especially pertaining to EEO Counseling) at conferences nation-wide and I have never seen an EEO shop run like MPDs.

In June of 2020, someone must have filed a complaint against Mr. Lee because Asst. Chief Manlapaz contacted Rose and Doreen regarding how they felt about Lee's management style. Both expressed to him about Lee's abuse and pro-management style and Rose informed Asst. Chief Manlapaz that she was filing a complaint against Lee for race discrimination and I had witnessed Mr. Lee scream at her for a prolonged period of time on three separate occasions. It should be noted that Asst. Chief Manlapaz never contacted me personally to get any of my input. It should also be noted that toward the end of June, I was contacted by a member of internal affairs and asked to submit a 119 regarding Mr. Lee's actions towards Rose. I remember informing the agent I would do so but I believed telling the truth would cost me my job...the agent verbally assured me such definitely would not happen. Attachment (1) is the narrative I sent to the agent and I believe is the major reason (besides me questioning Lee's practices) that I was not converted. Mention should be made that prior to me submitting the 119, Mr. Lee was saying I was a great addition...he even asked me if I would approve him sending my resume to the DC fire department for a position equivalent to his because he said my talents deserved such.

Some of his (Lee's) recent transgressions involved cases you were involved with...the first case I counseled that you served as a representative, he told me not to trust you because you were a liar and taking up for some black officers at female officers at SOD who were also liars and that MPD would be better if they figured out how to fire officers like Brinkley, Carr, and Knight because all they did was file complaints. I was shocked at his comment and he stated such while Rose was in my office and witnessed such. When he left Rose informed me that he has told her that all MPD officers do is lie on management. The preceding attitude is the last type of attitude an EEO Director should have. Even when we finished the interview addressed above, Mr. Lee came down to my office and asked "how did it go"; I informed him you were a great example of

a representative and he was clearly agitated because I did not agree with him regarding you and so he replied when you and your client throw me under the bus I'll see the light then. On another one of my most recent cases (Carr) in which you served as a rep, I received a written reprimand for sharing all the allegations alleged about her (remember she was named as the target by Sgt. Boyd). Never mind the regulations clearly state that a Target has the right to respond to ALL charges. He was actually mad that I gave Officer Carr an opportunity to defend herself of all charges. Additionally, please keep in mind than less than three–weeks later, he (Lee) directed me to inform a complainant who had requested to remain anonymous that the target has a right to know both, the charges and the person making the charge.

As alluded to earlier, I was working on a case (Detective George Thomas) upon my termination last December whereas Mr. Lee was emailing me management's rebuttal even before I interviewed the complainant (Thomas). While I agree that Lee has never told any Counselor (to my knowledge) to find for management, he has his ways (through his actions/interference) of ensuring such should/will happen. I tried to request a meeting with Chief Manlapaz to discuss all of the above but he never responded to my emails. Even in Lee's training to MPD, he instructs management officials they must take action when informed of a possible EEO infraction yet Manlapaz has done nothing after hearing from two of three Counselors and refusing to respond to the third. I have nothing but respect for the fine men and women who wear that police uniform and they deserve so much better than they get when they come to MPD's EEO office. From what I experienced, it is my strong belief that a hot-dog vendor off the streets could run the MPD EEO shop better than Mr. Lee…no offense to hot-dog vendors.

If you need any clarification or any additional information from me, please do hesitate to ask for such. MPD personnel deserve so much more from MPD's EEO office than what is being provided under Mr. Lee's abusive dictatorship way of conducting business.

   a. I was never counseled that I was performing unsuccessful
   b. I was never counseled period
   c. I was never placed on a PIP by the king of PIPs
   d. Did just as much as everyone else although I was junior in rank
   e. He corrected everyone else as much or more than he corrected me
   f. Never, ever provided any training
   g. Things started in June, 2020….got worse until December (because of Rose complaint against wherein I was named as a Primary Witness)
   h. Given my performance appraisal on a Monday….terminated on Tuesday
   i. Tried to talk to Manlapaz to discuss but he never acknowledged my emails regarding such
   j. I have initiated my own EEOC complaint against MPD  and then I plan to sue Lee along with Manlapaz personally in federal court for violating my civil rights

I declare under penalty of perjury that the above statement is true and correct to the best of my knowledge information and belief.

7

# ATTACHMENT B

My 119

Again, while I will comply with the request of truthfully answering subject 119, such is at the very minimum worrisome as I have expressed to you I am a probationary employee who really likes his job and the MPD and therefore, do not want to have such jeopardized by participating in any manner in a complaint against my supervisor. However, since I conduct investigations for a living, I also know the importance of truthfulness when answering these type questions. You requested that I submit this document if I have heard Director Lee either yell at or verbally degrade any employee on the EEO staff. Truth is, I have witnessed such on three different occasions, all directed at the same person (Rose Lucero), each of which are described below:

- 1st incident -  I started my position within MPD EEO on February 18th, 2020.  My first week on the job, Director Lee was on leave.  My office is located directly beside Ms. Lucero's, however, they are very big offices whereas private conversations can be had/conducted with optimum privacy being obtained with minimum effort. During the first part of March, while sitting in my office, I heard Director Lee raising his voice at Ms. Lucero regarding a case she was working on. I remember him asking her why did she do something a certain way and apparently he didn't like the answer she provided because his voice began to get louder.  He was telling her that maybe he made a mistake by hiring her because obviously she did not know her job and had problems following directions.  Because I was still brand new in the office I didn't think I should be overhearing such things about a co-worker so I got up to go shut my office door thinking a closed door would lessen the hearing of what should have been a private conversation.  As I was walking to my door I heard Director Lee inform Ms. Lucero that failure to follow his directives could possibly "land her on a PIP (Performance Improvement Plan)."  Upon shutting my door and returning to my seat, I could still hear Director Lee raise his voice at Ms. Lucero for at least five minutes although my door being shut prevented me from articulating exactly what he was saying which was alright with me because it was none of my business anyway.  It should be noted if Ms. Lucero was responding, I never heard anything she said.  Upon Director Lee finishing his high pitched conversation with Ms. Lucero and walking down the hall to his office, there was a knock on my door.  Upon inviting the knocker in, Ms. Lucero entered, literally shaking; she asked me did I hear the conversation. I answered that I heard part of it and she stated he yells at her like that often. I remember feeling sorry for her because I knew she had to be embarrassed by the entire incident.  I remember skipping lunch that day and not leaving my office because I did not want her to think about me overhearing the incident and becoming embarrassed all over again.  I remember thinking to myself that I do not know how I would respond if such ever happened to me.  I served as the Director of EEO Programs within Department of Defense for 22 years (have been in the EEO field for 28) and I was always taught (and believed) that one praises subordinates in public and discipline in private and that model I was accustomed to did not happen on that day.

- The second incident occurred approximately one month later -  it will take a little background information to understand this incident so I will start with that….Ms. Lucero was assigned a case

regarding disability Reasonable Accommodation (RA). She came into my office and expressed she didn't know a lot regarding RA, especially the interactive process. She asked me if I had an understanding of such. I informed her that I had taught the RA requirements at different major EEO Conferences, e.g., the Army Corps of Engineers, DOD, EEOC, and Federal Disputed Resolution FDR). I also informed her that I had taught Sexual Harassment Classes at the same major conferences. I answered the questions she had and showed her the applicable supportable regulations so she could use as a tool in processing her case. I shared such so she would know that the advice I was providing wasn't what I thought but what the actual applicable regulations stated regarding such situations. A couple days later, I heard Director Lee in Ms. Lucero's office inquiring about the status of the RA case she was working. When I heard his voice raise and tell her she is only supposed to get directions from him, I immediately went to shut my door. As I was doing such, I heard Director Lee tell her that she was not following his directions and she obviously didn't know her job so I shut my door to not hear clearly the rest of their conversation. Again, with my door shut I could hear Director Lee's voice in a loud pitch however with my door shut I could not make out exactly what was being said. The preceding went on for approximately another 10 minutes and when their conversation was over, Ms. Lucero phoned me and informed me that Director Lee had given her a direction not to have any more contact with me. Ms. Lucero additionally informed me that Director Lee instructed her to not share with me any more MPD's policies and that I better not ask any staff member any questions pertaining to MPD's ways of business. It was obvious Ms. Lucero was crying on the phone and what I should have done was forgo my lunch again to avoid seeing her in the hallway. However, I walked down to the kitchen area approximately 15 minutes later to get a sandwich and upon my return to my office, I bumped into Ms. Lucero in the hallway. I immediately noticed her eyes were bloodshot red so I asked her if she was alright. She replied she had a migraine headache and was dizzy. I advised her to ask Director Lee if she could leave for the day but she responded she was "terrified" to have another conversation with him. The very next day, when I first saw Ms. Lucero I inquired as to how she was doing; she replied she had a rough night and almost called in sick that morning. She also stated she was struggling with the RA case she was working. I asked her if she wanted me to ask Director Lee if I could provide her assistance. She answered yes but when I initially asked Director Lee, he stated no because I had not taken MPD's counseling class yet and because the complainant had an attorney for a representative, me being involved could possibly cause problems for the department. I thought the answer was strange because I had already counseled several cases since coming onboard. Mention should be made that upon Ms. Lucero going on leave, I was assigned said case and completed such without any problem.

- 3rd incident – I believe this incident took place in mid-late April, 2020. Upon reporting to the office in February, I had been informed that one of the department's officers had committed suicide after her EEO complaint had concluded (I was informed such by both EEO Investigators), I received a call from a very distraught complainant in late April (I believe) desiring to speak to Ms. Lucero regarding a complaint she (Lucero) was counseling for her. It should be noted that everyone in the division knew Ms. Lucero was having problems with her office phone and had a ticket in for the fixing of such. The lady on the phone informed me that she thought she was going to have a nervous

breakdown regarding her discrimination complaint and needed to speak with Ms. Lucero immediately regarding such. Mention should be made that during this time we (our office) was under a social distance mandate because of the pandemic. Inasmuch, thinking about the officer who had committed suicide (so I'm told), I asked the caller if she would mind holding on while I went next door to ask Ms. Lucero to receive her call in my office. When the caller said she really would appreciate such, I took disinfectant wipes and cleaned my phone, went next door to Ms. Lucero's office, stood in the doorway (so that I could be in the six foot distance mandate), explained the situation to Ms. Lucero who immediately came to my office to take the call. Ms. Lucero wiped down the phone again with another wipe and while she conversed with the lady on the phone I stood in the doorway to maintain the instructed recommended distance. Upon completion of her call, Ms. Lucero asked me if she could get some candy on a table that I keep approximately 8-10 ft. from my desk. I answered her in the affirmative and while she was getting the candy I returned to my desk ensuring we kept the recommended social distance from each other. As I was sitting down, Director Lee walked pass my office and harshly told us we were breaking directives. We both tried to explain what actually happened but apparently our explanation did not meet his approval. Ms. Lucero was again shaken and returned to his office whereas Director Lee visited her about 20 minutes later. It was during that time that I heard him raise his voice to almost yelling telling her she should not have been in my office for any reason and that we both had broken protocol by violating the rules. Ms. Lucero attempted to explain what actually transpired but Director Lee was not satisfied. He continued to loudly proclaim we had violated instructions. Approximately ½ hour after he left her office, Ms. Lucero forwarded me an email of reprimand given her by Director Lee for subject incident. Although I know that neither of us did anything wrong and simply desired to provide good customer service in a very safe manner, I felt really bad because it was I that orchestrated the whole ordeal.

The above three situational examples are what I have personally witnessed. As I stated during our phone conversation other people in the office and outside have told me they have witnessed other examples of such behavior. I have been warned that everyone that is on the EEO staff job has been threatened; that individuals have been put on PIPs for insufficient reasons; that staff closeness is a "no-no"; and to "watch-out" for constantly changing directions/guidance. Maybe I just come from a different area of supervisory. As a supervisor, I always cherished a close-nit staff. I found the closer the staff, the more the mission prospers because everyone has everyone's back. I believe it is good to give the "whats", but also the "whys" and the "hows". I also believe that if a subordinate does 100 things and 99 of them are great and one is wrong, a supervisor should address the 99 first and the 1 wrong thing as a teaching experience and not a threatening experience. As the "new kid on the block" I think our office has tremendous untapped potential but operating in fear will never capture such.

In closing, let me repeat where I started…I really love my job in the MPD's EEO Division. I also have grown (in a short period of time) to appreciate/respect each of my co-workers. I believe Director Lee has a tremendous passion for the field and it is his desire to make ours, a top-notch organization. However, after witnessing some examples of employee treatment, I can understand the other side also; how the majority of the staff believe they are subjected to a hostile work environment on an ongoing

basis.  I truly hope the above discussion does not come back at me negatively in any matter.  I do everything I can to demonstrate that I can be a valuable asset to MPD's EEO Division and answering your questions truthfully should not interfere with my continued employment.  I trust it will not.  Have a good day.

Harry Carter

March_____,2021

# ATTACHMENT C

My attempted communication with chief manlapaz although he never responded and did not investigate the complaint filed against Mr. Lee in June of 2020.  If you have any questions, please do not hesitate to contact me

---------- Forwarded message ---------
From: **Carter, Jr, Harry (MPD)** <harry.carterjr@dc.gov>
Date: Mon, Nov 30, 2020 at 4:56 PM
Subject: FW: EEO Concerns
To: harry.l.carter44@gmail.com <harry.l.carter44@gmail.com>

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Carter, Jr, Harry (MPD)" <harry.carterjr@dc.gov>
Date: 11/30/20 8:54 AM (GMT-05:00)
To: "Manlapaz, Wilfredo (MPD)" <wilfredo.manlapaz@dc.gov>
Cc: "Newsham, Peter (MPD)" <peter.newsham@dc.gov>
Subject: EEO Concerns

Sir,

I tried to get on your calendar a couple weeks ago to discuss some concerns i had about working within the EEO division.  You never responded.  Just wanted you to know (and I'm sure you already do) that my supervisor is now not recommending me for conversion.  I am not going to take this without a huge fight-back.  I even requested to be reassigned but I never received a response.  I'm writing this email out of professional courtesy but you can't keep turning your back on the EEO Staff…I could see if I was the only one who has had problems with Mr. Lee but the entire EEO staff feels the same way and has expressed such to you.  As I stated earlier, I'm not just going to take this without a fight…there has got to be another placement for me in MPD.

Harry L. Carter

EEO Investigator

Internal Affairs/EEO

Metropolitan Police Department

Harry.carterjr@dcgov.com

WE ARE HERE TO HELP

For the latest information on the District Government's response to COVID-19 (Coronavirus), please visit coronavirus.dc.gov.

EXHBIT 3

**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SINOBIA N. BRINKLEY,                        )
*et al.,*                                   )
                                            )
         *Plaintiffs,*                      )
                                            )        Civil Action No. 1:21-CV-01537 (RBW)
DISTRICT OF COLUMBIA,                       )
                                            )
         *Defendant.*                       )
_____)

## <u>SWORN AFFIDAVIT OF RENAE LEE</u>

I, ***Renae Lee***, being of sound mind and over the age of eighteen (18), do hereby assert that

the following facts are personally known to me, and that I would testify to the same if called upon

to do so in this matter:

1.      I joined MPD in 2017, hired at the GS-12 grade.

2.      I received a Bachelors' Degree from Bowie State in 1999 in Political Science.  I received

a Masters' Degree in Human Resources Development from Bowie State in 2002.

3.      I worked as an HR Specialist Employee Relations in HR Department at the University of

the District of Columbia for twelve (12) years, and also worked at United Planning Organization

for eighteen (18) months, before taking the position at MPD.

4.      Throughout my career in HR, at various times I had EEO investigative responsibilities, so

I had approximately fifteen (15) years of EEO investigative background before coming to MPD.

5.      I worked for Alphonso Lee (hereinafter "Mr. Lee") in the EEO Office of MPD for

approximately two years, before taking my current position as an EEO Officer with the

Washington Metropolitan Area Transit Authority (hereinafter "WMATA").

1

6.      Given that the position I had applied for was posted as having promotional opportunity to the GS-13 grade, when I first met with Mr. Lee, I asked about the performance requirements and expectations to move to the GS-13 grade.

7.      Mr. Lee appeared to be unhappy with my inquiry, and our relationship began on a rocky footing.

8.      Given my past experience, and the wording of the job posting, I did not believe my question was impertinent, but Mr. Lee may have believed it was.

9.      Luckily, I developed a strong mentoring relationship with a member of management, who gave me some good feedback and suggestions on how to improve my communications and rapport with Mr. Lee.

10.     I was advised that Mr. Lee might be resentful of my experience and not appreciate my suggestions on how to improve EEO Office processes and procedures.

11.     It was suggested to me that I would benefit from showing compliance with his directives first, before suggesting changes.

12.     After that feedback, my relationship with Mr. Lee improved.  I also believe that my being placed in the Policing for Tomorrow Program, and  having a supportive mentor in management made a difference as well.

13.     When I became more familiarized with the MPD EEO, I found it challenging that the EEO Department was subordinate to and reported directly to the Internal Investigations Bureau.  My reason was the worry for how comfortable a law enforcement complainant would be filing a complaint, and the confidentiality related to retaliation under the laws of discrimination.

2

14.     At my previous employer, and in my current position at WMATA, EEO is separate from and co-equal to, the head of an agency, which allows for our investigations to remain confidential and impartial until a recommendation is made.

15.     Recommendations are made to management officials who oversee discipline.  Under the provisions of discrimination laws, it only requires that an agency act when policy violations occur.

16.     As an EEO professional my role is to determine whether the policy governing EEO has been violated.

17.     In my current position, the only persons who can see EEO investigative files are the EEO Director, the EEO Manager, the three EEO officers, and the EEO coordinator.

18.     This WMATA practice of keeping EEO interviews and investigations limited to a very small number of people helps greatly in keeping the process confidential and building trust in the process with employees.

19.     At MPD the Bureau Chief of IAD, Assistant Chief Wilfredo Manlapaz (hereinafter "Asst. Chief Manlapaz") and his subordinates have access to EEO investigative files while investigations are ongoing.

20.     When I first began in my position at MPD, I was told that I was I could record my interviews and that it was a practice in the department. I was provided the work tool of a recorder.

21.     At my current agency WMATA, which is a public transportation agency, we are not allowed to record EEO interviews and investigations; however, as an investigator I am permitted to use a recorder for self-notes after an interview.

22.     I initially thought that the only person who had access to my recordings was Mr. Lee.  I later found out that Asst. Chief Manlapaz could also listen to recordings of complainants.

3

23.     I was very uncomfortable with this MPD EEO Office practice.  I had believed that the purpose of the recordings was to help EEO Counselors remember details from complainant or witness interviews.

24.     Another practice at the MPD EEO Office was Mr. Lee's directive that he be the only person to interview persons above the rank of Captain.

25.     In my previous positions, EEO counselors were free to interview anybody deemed relevant to an investigation.  Such is also the case in my current position.

26.     Mr. Lee did not give his staff such latitude.  Not only was Mr. Lee the only person allowed to speak to more senior management employees, but Mr. Lee also forbade us from doing interviews in the field without his pre-clearance.

27.     We were required to ask Mr. Lee to schedule any field interviews.  He would identify a contact person for us and schedule the field interviews.

28.     In my opinion, this practice negatively impacted our filed interviews because it removed any spontaneity from our interactions with witnesses.

29.     At MPD, all of our investigative reports had to go through Mr. Lee.

30.     Mr. Lee would frequently return investigative reports to the EEO Counselors and direct them to include other information.

31.     It is my opinion that both Asst. Chief Manlapaz and Mr. Lee treat EEO Counselors as if they are law enforcement detectives.

32.     I further believe that the MPD EEO Office practices and procedures impeded impartiality in investigations.

33.     During my tenure at MPD, my office was next to the office of EEO Counselor Rose Marie Lucero (hereinafter "Ms. Lucero").

4

34.     On several occasions I heard Mr. Lee yelling and screaming at Ms. Lucero in a way that made me very uncomfortable.  While I could easily hear Mr. Lee's screaming, I did not hear Ms. Lucero respond to him in an elevated voice.

35.     Based on my observations of the interactions between Mr. Lee and Ms. Lucero, I believe he created a hostile work environment for Ms. Lucero.

36.     I also believe that Mr. Lee created a hostile work environment for Doreen Haines (herein "Ms. Haines"), one of the other EEO Counselors.

37.     I am aware that on one occasion, Ms. Lucero filed an EEO complaint against me and another colleague and Mr. Lee investigated himself.

38.     I know Ms. Lucero filed a complaint against Mr. Lee with Asst. Chief Manlapaz.

39.     No one from IAD reached out to me in conjunction with an investigation into Ms. Lucero's complaint, which I found very strange because my office was next door to hers.  I was a witness to many of the interactions she complained of.

40.     I believe, and would testify, that Mr. Lee regularly used exhibited bullying behavior that threaten and intimidated them.

I, Renae Lee, do hereby swear or affirm, under the penalties of perjury, that the foregoing is true and accurate to the best of my knowledge.

_9/20/21_
Date

_____
Renae Lee

5

EXHBIT 4

 

**METROPOLITAN POLICE DEPARTMENT**
PROFESSIONAL DEVELOPMENT BUREAU
EEO DIVISION

### SECURITY AGREEMENT

I, _____, understand that by virtue of my duties with the EEO Division, I am the recipient of or have access to confidential information, sources and methods, and that the unauthorized disclosure of such information, knowledge, sources and methods to other law enforcement officers, news media, or members of the general public is a violation of the rules and regulations promulgated for the conduct and operation of the EEO Division and the Metropolitan Police Department.

I understand that the duty of non-disclosure also includes the non-revelation of information as to content or the existence of records, files, raw data, compact discs, flash drives, emails, recordings on phones and recorders or other source material or documentation.

I am aware of my responsibility to notify the Director of the EEO Division promptly in the event I am called upon by properly constituted authorities to testify or provide such confidential information that I am not authorized to disclose, and I will advise said authorities that my obligation to testify or provide information must be established before I am required to do so.

Nothing in this understanding is to be taken as imposing any restrictions upon the normal conduct or operation of the business and affairs of the EEO Division, but a reaffirmation of the responsibility to conduct such affairs only in conformity with appropriate guidelines.

_____

Signature of Person Making Statement    Element    Date

_____

Signature of Witness    Print Name    Element    Date