# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINOBIA N. BRINKLEY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> *Defendant*. | Civil Action No. 1:21-cv-1537 (RBW) |

## DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Defendant District of Columbia (the District) respectfully submits this motion to partially dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6), or, in the alternative, for partial summary judgment under Fed. R. Civ. P. 56(c).

In support of this motion, the District submits (1) a statement of material facts as to which there is no genuine issue, (2) a memorandum of points and authorities, and (3) a proposed order.

Dated: July 22, 2022

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Christina Okereke*
CHRISTINA OKEREKE [219272]
Chief, Civil Litigation Division Section II

*/s/ Burth G. López*
BURTH G. LOPEZ [976981]

RYAN MARTINI [888241893]
Assistant Attorneys General
400 6th Street, N.W.
Washington, D.C. 20001
(202) 716-6658
Burth.Lopez@dc.gov

*Counsel for Defendant District of Columbia*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SINOBIA N. BRINKLEY, *et al.*,

           *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA,

           *Defendant*.

Civil Action No. 1:21-cv-1537 (RBW)

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Under Fed. R. Civ. P. 56(c) and LCvR 7(h)(1), Defendants submit the following statement of material facts as to which there is no genuine issue.[1]

1. On or about December 23, 2020, Plaintiff Sinobia Brinkley filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).  *See* Ex. 1, Brinkley EEOC Complaint.

2. On or about January 1, 2021, Plaintiff Leslie Clark filed a Charge of Discrimination with the EEOC.  *See* Ex. 2, Clark EEOC Complaint.

3. On or about May 20, 2021, Plaintiff Tabatha Knight filed a Charge of Discrimination with the D.C. Office of Human Rights.  *See* Ex. 3, Knight EEOC Complaint.

4. On or about July 26, 2021, Plaintiff Karen Carr filed a Charge of Discrimination with the EEOC.  *See* Ex. 4, Carr EEOC Complaint.

---

[1] Defendants identify the following material facts as not being in dispute for the purposes of this motion only.  Defendants reserve the right to dispute these facts should this case proceed to discovery and should Defendants uncover evidence disputing these facts.

5.      On or about August 2, 2021, Plaintiff Regenna Grier filed a Charge of Discrimination with the EEOC.  *See* Ex. 5, Grier EEOC Complaint.

6.      On or about August 4, 2021, Plaintiff Chanel Dickerson filed a Charge of Discrimination with the EEOC.  *See* Ex. 6, Dickerson EEOC Complaint.

7.      On or about August 4, 2021, Plaintiff Kia Mitchell filed a Charge of Discrimination with the EEOC.  *See* Ex. 7, Mitchell EEOC Complaint.


Dated: July 22, 2022                              Respectfully submitted,

                                                  KARL A. RACINE
                                                  Attorney General for the District of Columbia

                                                  CHAD COPELAND
                                                  Deputy Attorney General
                                                  Civil Litigation Division

                                                  */s/ Christina Okereke*
                                                  CHRISTINA OKEREKE [219272]
                                                  Chief, Civil Litigation Division Section II

                                                  */s/ Burth G. López*
                                                  BURTH G. LOPEZ [976981]
                                                  RYAN MARTINI [888241893]
                                                  Assistant Attorneys General
                                                  400 6th Street, N.W.
                                                  Washington, D.C. 20001
                                                  (202) 716-6658
                                                  Burth.Lopez@dc.gov

                                                  *Counsel for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................**Error! Bookmark not defined.**

INTRODUCTION ................................................................................................ 1

FACTS .................................................................................................................... 2

   Sinobia Brinkley.............................................................................................. 2

   Tiara Brown ..................................................................................................... 4

   Karen Carr ........................................................................................................ 6

   Leslie Clark ...................................................................................................... 7

   Chanel Dickerson ............................................................................................ 9

   Regenna Grier ............................................................................................... 11

   Tamika Hampton ........................................................................................... 13

   Lashaun Lockerman ....................................................................................... 15

   Tabatha Knight ............................................................................................... 18

   Kia Mitchell.................................................................................................... 19

STANDARD OF REVIEW ................................................................................. 20

I.    Failure to State a Claim ............................................................................ 20

II.   Summary Judgment .................................................................................. 21

ARGUMENT ....................................................................................................... 22

I.    Plaintiffs Have Failed to Exhaust Title VII and ADEA Claims by Failing to Bring Appropriate EEOC Charges.................................................................... 22

II.   Most of Plaintiffs' Claims Are Untimely. ............................................... 24

   A.   Many of Plaintiffs' Title VII, ADEA, and ADA Claims Are Over 300 Days Old and Are Thus Time-Barred. ................................................................... 24

   B.   DCHRA Claims ....................................................................................... 27

   C.   DCWPA Claims ....................................................................................... 28

III.   Plaintiffs' Title VII, DCHRA, and ADEA Claims Fail to State a Claim for Relief on Any Alleged Adverse Action.................................................................... 28

   A.   Sinobia Brinkley ...................................................................................... 29

   B.   Kia Mitchell ............................................................................................. 30

   C.   Karen Carr................................................................................................ 31

   D.   Tiara Brown ............................................................................................. 31

   E.   Regenna Grier .......................................................................................... 32

F.   Tamika Hampton ................................................................................... 33

G.   Lashuan Lockerman ............................................................................... 33

IV.   Plaintiffs Have Failed to State a Claim for a Hostile Work Environment. ......................... 34

V.   Plaintiffs Fail to State Retaliation Under Title VII, the DCHRA, or the DCWPA. .............. 40

VI.   Plaintiffs' Section 1981 and 1983 Claims Fail to State a Claim ........................................ 46

VII.   Plaintiff's Negligent Training and Supervision Claim Fails ............................................ 48

VIII.   Plaintiffs Brinkley and Clark's ADEA Claims Are Meritless. .......................................... 49

IX.   Plaintiff Brinkley's ADA Claim Fails ............................................................................... 50

TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 20, 21, 49, 50
*Ashraf-Hassan v. Embassy of France in U.S.*,
  878 F. Supp. 2d 164 (D.D.C. 2012) ............................................................................ 21
*Badwal v. Bd. of Trustees of Univ. of Dist. of Columbia.*,
  139 F. Supp. 3d 295 (D.D.C. 2015) ............................................................................ 51
*Bailey v. Verizon Comm., Inc.*,
  544 F. Supp. 2d 33 (D.D.C. 2008) .............................................................................. 22
*Baird v. Gotbaum*,
  792 F.3d 166 (D.C. Cir. 2015) .................................................................................... 35
*Baird v. PiGotbaum*,
  662 F.3d 1246 (D.C. Cir. 2011) ............................................................................ 34, 38
*Baker v. District of Columbia*,
  326 F.3d, 1302 (D.C. Cir. 2003) ................................................................................. 47
*Baloch v. Kempthorne*,
  550 F.3d 1191 (D.C. Cir. 2008) .................................................................................. 28
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 554 (2007) .............................................................................................. 20, 21
*Bias v. Advance Int'l, Inc.*,
  905 F.2d 1558 (D.C. Cir. 1990) .................................................................................. 22
*Booth v. District of Columbia*,
  701 F. Supp. 2d 73 (D.D.C. 2010) ........................................................................ 41, 43
*Brooks v. Grundmann*,
  851 F. Supp. 2d 1, D.D.C. 2012), aff'd, 748 F.3d 1273 (D.C. Cir. 2014)) ......................... 36, 37
*Brooks v. Grundmann*,
  748 F.3d 1273 (D.C. Cir. 2014) .................................................................................. 35
*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998) .............................................................................................. 28, 29
*Burlington Northern & Santa Fe R. Co. v. White*,
  548 U.S. 53 (2006) ............................................................................................... 40, 43
*Burrell v. Shepard*,
  321 F. Supp. 3d 1 (D.D.C. 2018) ................................................................................ 35
*Byrd v. District of Columbia*,
  297 F. Supp. 2d 136 (D.D.C. 2003) ....................................................................... 46, 47
*Canton v. Ohio*,
  489 U.S. 378 (1989) .................................................................................................... 47
*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .............................................................................................. 21, 22
*Chisholm v. U.S. Postal Serv.*,
  665 F.2d 482 (4th Cir. 1981) ...................................................................................... 22
*Coleman v. District of Columbia*,
  794 F.3d 49 (D.C. Cir. 2015) ...................................................................................... 42

*Congress v. District of Columbia*,
    277 F. Supp. 3d 82 (D.D.C. 2017)......................................................... 24
*Cuddy v. Carmen*,
    694 F.2d 853 (D.C. Cir. 1982) ............................................................. 49
*Czekalski v. Peters*,
    475 F.3d 360 (D.C. Cir. 2007).............................................................. 28
*Daskalea v. District of Columbia*,
    227 F.3d 433 (D.C. Cir. 2000).............................................................. 46
*Doe v. Gates*,
    981 F.2d 1316 (D.C. Cir. 1993)............................................................ 22
*Douglas v. Donovan*,
    559 F.3d 549 (D.C. Cir. 2009)................................................... 28, 29, 30
*Dudley v. Wash. Metro. Area Trans. Auth.*,
    924 F. Supp. 2d 141 (D.D.C. 2013)....................................................... 35
*Dyson v. District of Columbia*,
    808 F. Supp. 2d 84 (D.D.C. 2011)......................................................... 24
*Faragher v. Boca Raton*,
    524 U.S. 775 (1998) ................................................................... Passim
*Giles v. Shell Corp.*,
    487 A.2d 610 (D.C. 1985) .................................................................. 48
*Greer v. Bd. of Trustees of Univ. of D.C.*,
    113 F. Supp. 3d 297 (D.D.C. 2015)....................................................... 42
*Hamilton v. Geithner*,
    666 F.3d 1344 (D.C. Cir. 2012)............................................................ 40
*Harris v. Dist. of Columbia Water and Sewer Auth.*,
    791 F.3d 65 (D.C. Cir. 2015)............................................................... 40
*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17, 21, (1993) ................................................................ 34, 38
*Hatter v. Washington Metro. Area Transit Auth.*,
    105 F. Supp. 3d 7 (D.D.C. 2015).......................................................... 27
*Hodges v. District of Columbia*,
    959 F. Supp. 2d 148 (D.D.C. 2013)....................................................... 51
*Jianqing Wu v. Special Counsel, Inc.*,
    54 F. Supp. 3d 48 (D.D.C. 2014).......................................................... 28
*Jianqing Wu v. Special Counsel*,
    2015 WL 10761295 (D.C. Cir. Dec. 22, 2015) ....................................... 28
*Johnson v. District of Columbia*,
    935 A.2d (D.C. 2007) ...................................................................... 41
*Jones v. Bernanke*,
    493 F. Supp. 2d 18 (D.D.C. 2007)......................................................... 49
*Kelly v. Mills*,
    677 F. Supp. 2d 206 (D.D.C. 2010)....................................................... 34
*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994).............................................................. 21
*Laffey v. Northwest Airlines, Inc.*,
    567 F.2d 429 (D.C. Cir. 1976) (abrogated on other grounds ....................... 23

*Laughlin v. Holder*,
    923 F. Supp. 2d 204 (D.D.C. 2013)..................................................................36
*Lurensky v. Wellinghoff*,
    167 F. Supp. 3d 1 (D.D.C. 2016)......................................................................29
*Marshall v. Potter*,
    634 F. Supp. 2d 66 (D.D.C. 2009).....................................................................40
*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574 (1986) ..........................................................................................22
*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*,
    611 F.3d 1 (D.C. Cir. 2010)...............................................................................28
*McNair v. District of Columbia*,
    213 F. Supp. 3d 81 (D.D.C. 2016)......................................................................50
*McNair v. District of Columbia*,
    359 F. Supp. 3d 1 (D.D.C. 2019)........................................................................32
*Merchants Home Delivery, Inc.*,
    892 A.2d 415 (D.C. 2006) .................................................................................48
*Monell v. Department of Social Services*,
    436 U.S. 658 (1978) ..........................................................................................46
*Montgomery v. Omnisec Int'l Sec. Servs., Inc.*,
    961 F. Supp. 2d 178 (D.D.C. 2013)....................................................................50
*Motley-Ivey v. District of Columbia*,
    923 F. Supp. 2d 222 (D.D.C. 2013)..............................................................47, 48
*Mungin v. Katten Muchin & Zavis*,
    116 F.3d 1549 (D.C. Cir. 1997)..........................................................................29
*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101, (2002) .....................................................................................35, 38
*Ndondji v. InterPark Inc.*,
    768 F. Supp. 2d 263 (D.D.C. 2011)....................................................................22
*Nurriddin v. Bolden*,
    674 F. Supp. 2d 64 (D.D.C. 2009) (dismissing ..................................................36
*Outlaw v. Johnson*,
    49 F. Supp. 3d 88 (D.D.C. 2014)........................................................................35
*Park v. Howard Univ.*,
    71 F.3d 904 (D.C. Cir. 1995).........................................................................22, 23
*Peters v. District of Columbia*,
    873 F. Supp. 2d 158 (D.D.C. 2012)....................................................................38
*Peterson v. Linear Controls, Inc.*,
    757 F. App'x 370 (5th Cir. 2019)........................................................................32
*Phelan v. City of Mount Rainier*,
    805 A.2d 930 (D.C. 2002) .................................................................................49
*Porter v. Shah*,
    606 F.3d 809 (D.C. Cir. 2010).............................................................................34
*Rawlings v. District of Columbia*,
    820 F. Supp. 2d 92 (D.D.C. 2011)......................................................................49
*Redmon v. U.S. Capitol Police*,
    80 F. Supp. 3d 79 (D.D.C. 2015)........................................................................32

*Robinson v. Dist. of Columbia*,
   403 F. Supp. 2d 39 (D.D.C. 2005)......................................................... 46
*Russell v. Principi*,
   257 F.3d 815 (D.C. Cir. 2001)....................................................... 29, 33
*Search v. Uber Techs. Inc.*,
   128 F. Supp. 3d 222 (D.D.C. 2015)........................................................ 48
*Singleton v. Potter*,
   402 F. Supp. 2d 12 (D.D.C. 2005)................................................... 49, 50
*Slate v. Pub. Def. Serv. for the Dist. of Columbia*,
   31 F. Supp. 3d 277 (D.D.C. 2014)........................................................ 24
*Sledge v. District of Columbia*,
   63 F. Supp. 3d 1 (D.D.C. 2014)......................................................... 42
*Taylor v. Small*,
   350 F.3d 1286 (D.C. Cir. 2003)..................................................... 29, 31
*Taylor v. Solis*,
   571 F.3d 1313 (D.C. Cir. 2009)......................................................... 40
*Tressler v. Amtrak*,
   No. 09-2027, 2012 WL 5990035 (D.D.C. Nov. 30, 2012)............................... 40
*White v. Department of the Air Force*,
   391 F.3d 1377 (Fed. Cir. 2004)........................................................ 41
*Williams v. District of Columbia*,
   317 F. Supp. 3d 195 (D.D.C. 2018)..................................................... 35

Statutes

29 U.S.C. § 621............................................................................. 1
29 U.S.C. § 623(a)(1)...................................................................... 49
42 U.S.C. § 2000e.......................................................................... 1
42 U.S.C. § 2000e–5(e)(1)................................................................. 24
42 U.S.C. § 12101.......................................................................... 1
42 U.S.C. §§ 1981 and 1983............................................................. 1, 2
D.C. Code § 1-615-51....................................................................... 1
D.C.Code § 1–615.52(6)(A)–(E)............................................................ 41
D.C. Code § 1–615.52(a)(6)(D)............................................................ 45
D.C. Code § 1-615.53(a)................................................................... 41
D.C. Code § 1-615.54 (a)(2).............................................................. 28
D.C. Code § 2-1401.01...................................................................... 1
D.C. Code § 2–1403.16.................................................................... 27

Rules

Fed. R. Civ. P. 12(b)(6)............................................................... 1, 20
Fed. R. Civ. P. 56(a)..................................................................... 21
Fed. R. Civ. P. 56(c)...................................................................... 1

Other Authorities

LCvR 7(h)(1) ................................................................................................................. 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SINOBIA N. BRINKLEY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:21-cv-1537 (RBW) |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs, ten former and current Metropolitan Police Department (MPD) officers, bring myriad employment discrimination claims against Defendant District of Columbia (the District) in this putative class action lawsuit. All Plaintiffs bring disparate treatment, hostile work environment, and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.* (DCHRA). All Plaintiffs also bring claims under the District of Columbia Whistleblower Protection Act, D.C. Code § 1-615-51 *et seq.* (DCWPA), and all Plaintiffs bring discrimination claims under 42 U.S.C. §§ 1981 and 1983. Additionally, Plaintiffs Sinobia Brinkley and Leslie Clark bring claims for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA). Finally, Plaintiff Brinkley alone brings a claim under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq.* (ADA) for disability discrimination.

The Amended Complaint—a collection of allegations spanning decades and ranging from alleged harassment to perceived slights—mostly falls far short of making out any viable claim for discrimination and retaliation.  *First*, the Court should dismiss most of Plaintiffs' claims because they failed to exhaust their Title VII and ADEA claims by failing to bring appropriate EEOC charges.  *Second*, many of the Plaintiffs' disparate treatment claims are untimely.  *Third*, many Plaintiffs have failed to allege an adverse employment action, and their Title VII and DCHRA disparate treatment claims thus fail.  *Fourth*, all Plaintiffs fail to state a hostile work environment claim.  *Fifth*, all Plaintiffs fail to state a claim for retaliation under Title VII, the DCHRA, and the DCWPA.  *Sixth*, Plaintiffs' claims under 42 U.S.C. §§ 1981 and 1983 fail to state a claim.  *Seventh*, Plaintiffs' negligent training and negligent supervision claim fails. *Eighth,* Plaintiffs Brinkley and Clark's ADEA claims are meritless.  *Lastly*, Plaintiff Brinkley's ADA claim should be dismissed because Plaintiff Brinkley fails to allege the necessary elements of her disability discrimination claim.

## FACTS

### A.   <u>Sinobia Brinkley</u>

Plaintiff Brinkley was a Senior Police Officer (SPO) in the Metropolitan Police Department's (MPD) Special Operations Division (SOD), Emergency Response Team (ERT). Second Am. Compl. ¶ 5.  Plaintiff served under a one-year contract, renewable annually if she remained able to meet physical and other requirements.  *Id.*  ¶ 291.  Plaintiff Brinkley first complains that in May 2017, Sergeant Michael Boyd assigned Plaintiff and her partner, Plaintiff Kia Mitchell, to flea-infested vehicles previously used by the K-9 unit.  *Id.* ¶ 299.  Despite several requests and having other options, Sergeant Boyd "refused to assign Plaintiff and her partner different vehicles."  *Id.* ¶¶ 300-02.  After she complained, Brinkley alleges that "for months thereafter, Sergeant Boyd undertook a campaign to retaliate" against her.  *Id.* ¶ 307.

2

Plaintiff Brinkley alleges that after the sudden loss of her husband she began to experience depression and experienced a depression-related episode at work in September 2019. *Id.* ¶ 308-13.  Plaintiff alleges that after she was taken away in an ambulance, Lieutenant Darnell Robison publicly made derogatory comments about her extreme grief, depression, and anxiety and threatened to send her for a fitness for duty evaluation.  *Id.* ¶ 314.

Plaintiff Brinkley complains that during one roll call meeting in February 2020, Officer Harrison shouted in response to a question from another officer "He can suck my dick" without reprimand.  *Id.* ¶¶ 323-24, 325, 327.  When management did not respond to her complaint, she filed a complaint with the MPD EEO Office.  *Id.*  ¶¶ 330-31.  However, Plaintiff alleges that her EEO complaint was not taken seriously, was leaked to Sergeant Boyd, and that she became the target of a retaliatory campaign after making her EEO complaint.  *Id.* ¶¶ 333-36.

Plaintiff Brinkley alleges several specific acts of retaliation.  Plaintiff alleges that EEO Director Alphonso Lee told other EEO officials that MPD would be better off without officers like Plaintiff Brinkley because "all [she] did was file complaints." *Id.* ¶ 337.  Plaintiff also alleges that she was told by her superiors that she was "being watched" and to "watch the company [she] kept," *id.* ¶¶ 343-44, and was separated from Plaintiff Mitchell, her long-term partner.  *Id.*  Plaintiff alleges that she was reprimanded for a series of minor infractions including arriving at work too early, *id.* ¶ 349, and failing to submit to Covid-19 related health assessments, *id.* ¶¶ 368-72.  Plaintiff also alleges that she was reprimanded for missing a call-out meeting a barricade, among other reprimands for minor infractions.  *Id.* ¶ 392.

Plaintiff next complains that on or about July 17, 2020, Officer Anthony Campanale accosted her and accused her of secretly recording that day's roll-call meeting.  *Id.* ¶¶ 374-75.  Officer Campanale "continued to aggressively question and move into Plaintiff's personal space

3

and had to be restrained by other officers in the room." *Id*.  When she reported the incident to

her union representatives and the chain of command, MPD disciplined her for "raising her tone"

and "conduct unbecoming an officer." *Id.* ¶¶ 389-91.  On or about November 10, 2020, Plaintiff

received her performance evaluation, which detailed several violations that she contends "were

trumped-up, fabricated, unjust, disparate or exaggerated charges, that formulated a basis for the

Department to terminate her employment." *Id.* ¶ 405.

Plaintiff alleges that she made at least two formal complaints to EEO agencies about her

experience at MPD.  On or about April 21, 2020, Plaintiff filed a complaint with the District of

Columbia Office of Human Rights (OHR), alleging discrimination and retaliation for her

concerns about the treatment of Black women officers in the MPD.  *Id.* ¶ 352.  Plaintiff also

alleges that on or about December 23, 2020, she filed a formal charge with the U.S. Equal

Employment Opportunity Commission (EEOC), alleging race, age, gender, and disability

discrimination, retaliation, and disparate treatment.  *Id.* ¶ 422; *see* Ex. 1, Brinkley EEOC Charge

of Discrimination.  Plaintiff also alleges a series of complaints that she made to District officials

including Mayor Bowser, *id.* ¶ 339; Chief of Police Peter Newsham and Assistant Chief Jeffrey

Carroll, *id.* ¶ 401; and the City Council, *id*. ¶¶ 426, 431.

Brinkley was terminated from her employment on April 30, 2021.  *Id.* ¶¶ 444-45.

**B.     Tiara Brown**

Plaintiff Tiara Brown became a sworn police officer with the MPD in 2015.  Second Am.

Compl. ¶ 7.  Sometime in 2016, she was appointed to Community Patrol Officer in Fairfax

Village.  *Id*. ¶ 509.  Several fellow officers supposedly resented Brown for receiving such a

desirable assignment and began "harassing, denigrating, undermining, and bullying her," and

Brown's direct supervisors "tried to impede her from patrolling by bike, saying she had to 'earn

the right.'" *Id*. ¶¶ 514-15.  Brown told Sergeant Drummond and Sergeant Weathersby that she

was qualified to patrol by bicycle and was personally requested by the community, but the

sergeants told her she was still subject to their power and discretion.  *Id*. ¶ 517.  Brown claims

that she brought her "concerns about being bullied and denied the benefit of a positive

assignment" to Lieutenant Jonathan Munk, who "attempted to intercede."  *Id*. ¶¶ 519.

Sometime in 2018, Brown alleges that Sergeant Michael Grey took her radio and hid it

for an entire shift, telling her that she should not have left it unattended and unsecured.  *Id*. ¶ 521.

Brown also claims that she was "bull[ied] through small acts of micro-aggressions" by other

officers, such as having her lunch repeatedly taken.  *Id*. ¶ 524.  Brown alleges that her

supervisors "permitted and encouraged" the "unprofessional conduct" of other officers.  *Id*. ¶

525.  Brown claims that "for years" she was "cyber-bull[ied]" on a Facebook page called "MPD

Forum" where she was called a fake police officer and a "part-time" cop.  *Id*. ¶¶ 536-38.

Brown alleges that "bullying from her fellow officers escalated" after she was honored as

Officer of the Year in 2019.  *Id*. ¶¶ 540-41.  Commander Darriya Habbebulah told Brown's

supervisors that she wanted Brown to spend as much time in the Fairfax Village community as

possible, having a bike rack placed on her car so she can ride around the neighborhoods.  *Id*. ¶¶

547-548.  Brown claims that Commander Habbebulah's orders were disregarded without

consequences, and Brown was later involuntarily moved from Fairfax Village.  *Id*. ¶¶ 549-50.

Brown alleges that she reported online bullying in the MPD Forum to Plaintiff Chanel

Dickerson, Assistant Chief, who initiated an investigation that ultimately resulted in MPD Forum

being shut down.  *Id*. ¶¶ 553-55.  Afterwards, Brown's department received a complaint about

her through a fictitious name and email address; the "gravamen" of the complaint was that

Brown "wasn't making enough arrests and getting enough weapons off the street." *Id*. ¶¶ 556-59. The complaint was investigated and Brown was cleared of any wrongdoing. *Id*. ¶¶ 560-61.

Brown alleges—without providing a date—that she attempted to report an illegal stop-and-frisk to Lt. Preston. *Id*. ¶¶ 562-565. Brown claims that Lieutenant Preston asked her if she would write a written complaint, and then told her the officers involved would be notified of who reported them. *Id*. ¶¶ 565-66. Brown interpreted this as a warning to keep silent and therefore did not pursue the complaint. *Id*. ¶ 566.

Brown recounts—again without providing a date—an incident in which she was deployed to the Seventh District Police Station after a shooting had occurred in the Seventh District. *Id*. ¶¶ 546-47. An angry crowd attempted to break through the station while Brown and fellow officers created a protective barricade around the building for hours. *Id*. ¶¶ 568-77. Brown claims that the incident was "the final straw" for her, and she resigned from the MPD in December 2020. *Id*. ¶¶ 7, 578.

Brown does not allege that she ever filed any complaint with the EEOC.

**C.**     <u>**Karen Carr**</u>

Plaintiff Karen Carr makes a variety of claims regarding retaliation and hostile work environment occurring from 1998 to 2016. *See generally* Second Am. Compl.

In 2019, she alleges that she made a complaint to MPD's EEO office alleging unfair treatment, disparate terms and conditions of employment, and hostile work environment. *Id*. ¶ 664. Plaintiff Carr alleges that her complaint was leaked by MPD's EEO office to her colleagues who escalated their retaliation campaign against her. *Id*. ¶ 665-66.

In February 2020 Plaintiff Carr claims that she was suspended for 25 days after presenting evidence to management that one of her colleagues lied during an Internal Affairs

investigation. *Id.* ¶¶ 684-86. Plaintiff Carr further complains that management reneged on a deal to rescind her suspension if she voluntarily transferred from SOD by suspending her after she completed her transfer. *Id.* ¶¶ 691-94.

In August 2020, Plaintiff Carr became involved in a confrontation with Sergeant Boyd during roll call. *Id.* ¶ 675. Sergeant Boyd filed an EEO complaint against her and she was immediately threatened with a 30-day suspension. *Id.* ¶¶ 678-79. Plaintiff alleges that Sergeant Boyd's EEO complaint against her was an act of retaliation. *Id.* ¶ 678.

Plaintiff Carr filed an EEOC charge on May 2, 2021. Ex. 4, Carr EEOC Charge of Discrimination.

### D.   <u>Leslie Clark</u>

Plaintiff Clark became a sworn police officer with MPD in May 1989, and she was assigned to the Seventh District. Second Am. Compl. ¶¶ 8, 726. Clark retired from MPD in May 2014, but in February 2017, MPD asked her to return as a Senior Police Officer (SPO) in the Special Operations Division (SOD). *Id.* ¶¶ 739-41.

Clark claims that on February 18, 2017, Lieutenant Margiotta informed her that he was permanently assigning her to the evening shift, but, according to Clark, this schedule presented hardships for her because of family obligations. *Id.* ¶¶ 742-43. Several days later, Clark asked Margiotta if she could replace another SPO on the day shift, but Margiotta refused her request. *Id.* ¶ 744. In March 2017, Clark requested to work a modified shift, but Margiotta denied the request. *Id.* ¶¶ 746. Shortly thereafter, Clark spoke with Captain Glover, who told her that she would not be allowed to work a day schedule and that he would not allow a modified shift until there are new hires. *Id.* ¶ 750-51. On some unidentified date, Clark spoke to her union representative, who spoke to Margiotta on Clark's behalf about switching her to a day schedule.

*Id.* ¶¶ 762-63.  Margiotta allegedly said that Clark could file any paperwork she desired, but he would never change her schedule from the evening shift.  *Id.* ¶¶ 765.

In September 2019, Clark allegedly asked for a temporary schedule change to help care for her granddaughter.  *Id.* ¶ 767.  There was allegedly an opening on the day shift when another officer switched schedules, but Margiotta moved two other officers to day schedules instead of Clark.  *Id.* ¶¶ 768-69.  On May 21, 2020, Clark requested to change one of her days off to attend her niece's graduation, but Margiotta refused the request.  *Id.* ¶¶ 771-72.  That same month, Clark learned of a vacancy on the Crash Review Board and asked Captain Glover to be transferred to the position, but Glover supposedly tried to "force" another officer to take the job. *Id.* ¶¶ 783-84.

By July 2020, Clark was on limited duty.  On July 24, 2020, Margiotta "wrote [her] up . . . because she came to work on limited duty on the day shift schedule, and worked the entire week . . . on the day shift."  *Id.* ¶ 788.  MPD's Internal Affairs Division (IAD) initiated an investigation, but Captain Glover eventually cancelled it.  *Id.* ¶ 796.  The next month, Clark sought a transfer to the Time and Attendance Department, but Commander Rivera denied her request.  *Id.* ¶¶ 778-79.  On August 29, 2020, Clark allegedly requested a day schedule to accommodate family needs, *id.* ¶¶ 780-81, but Rivera allegedly denied her request "because, according to him, it would generate too many complaints from other (non-Black female) officers."  *Id.* ¶ 781.[2]  Clark also asked if she could be moved to a different division in SOD, but Rivera refused to answer the question.  *Id.* ¶ 782.  Finally, in October 2020, although her supervisory sergeant gave Clark and everyone in the sergeant's squad a #4 rating, Commander

---

[2]     Clark does not specify whether Rivera expressly stated that "non-Black female officers" would complain or whether he mentioned other officers, who are not Black or female, who he believed would complain, without referencing race or gender.

Rivera downgraded Clark to a #3 without explanation while approving a #4 rating for the other squad members.  *Id*. ¶¶ 797-98.  A union representative requested that Clark's rating be changed back to a #4 but MPD refused.  *Id*. ¶ 799.

Clark filed an EEOC charge on January 1, 2021.  Ex. 2, Clark EEOC Charge of Discrimination.

### E.    Chanel Dickerson

In 1988, Plaintiff Chanel Dickerson joined MPD as a police cadet, Second Am. Compl. ¶ 839, and she became a sworn officer in 1990, *id*. ¶ 9.  She alleges that in 1988 during the new-hire orientation for her cadet class, pregnant cadets could not continue in the cadet program.  *Id*. ¶ 840.  In 1989 she became pregnant and was told that she would not be allowed to remain in the program while pregnant.  *Id.* ¶ 840.  As a result, Plaintiff Dickerson terminated her pregnancy, which she alleges caused severe and enduring emotional distress.  *Id.* ¶ 842.

She alleges that in 1990 a lieutenant and a detective offered her money, clothes, and a car in exchange for sexual favors.  *Id*. ¶¶ 843-44.  Dickerson did not welcome or accept these advances and instead asked to be transferred.  *Id*. ¶ 845.  She later resigned from MPD in 1991. *Id*. ¶ 846.  But Dickerson returned to MPD as a civilian employee in 1994 and became a sworn officer again in 1997.  *Id*. ¶¶ 9, 847.  She alleges various instances of sexual harassment that allegedly occurred from 1995 to 2012 and claims that various MPD officials took no action.  *See generally id*. ¶¶ 847-96.

Dickerson alleges that she was the only sworn female police officer on MPD's executive staff from March 30, 2018, to July 13, 2021.  *Id*. ¶ 904.  She alleges various slights against her from 2018 to January 2020:  then-Chief Peter Newsham denied her requests to attend homicide meetings that related to Dickerson's then-assignment to the Patrol Services South Bureau, *id*. ¶

906; she stopped receiving calendar invitations, minutes, or other information regarding disciplinary committee meetings, and Newsham stopped responding to her emails, texts, and phone calls after she complained in February 2019 during an executive performance briefing about a "staggering disparity in serious discipline involving employees of color at MPD," *id*. ¶¶ 908-10; she was forced to return to work to give a presentation in February 2019 despite having had an emergency medical procedure, *id.* ¶¶ 912-13; in March 2019, she complained to IAD that Commander Morgan Kane was misclassifying or reassigning violent crimes to avoid an increase in the First District's statistics, but MPD deemed the allegations as "insufficient facts or unfounded" to "cover up and excuse misconduct" in the Department, *id.* ¶¶ 917, 920, 922; in July 2019, Dickerson requested an investigation of a captain for making disparaging comments about Black youth, which was initially denied, but an investigation was eventually opened and the captain was demoted as a result, *id.* ¶¶ 933-38; her request in October 2019 to attend a counterterrorism seminar in Israel was denied, *id.* ¶¶ 925-27; and in January 2020, MPD refused to allow her to participate in two documentaries, although she was eventually allowed to participate in one of them, *id.* ¶¶ 939-49.

In January 2021, Dickerson claims that then-Acting Chief Robert J. Contee III promoted a white male subordinate to Assistant Chief of the Investigative Services Bureau without "offer[ing] or even consider[ing]" Dickerson. *Id.* ¶ 970. In February 2021, Dickerson allegedly "raised concerns" about Black women officers being disciplined for recording conversations with supervisors and EEO, *id.* ¶ 958, and claims that her concerns "fell on deaf ears and result[ed] in backlash and retaliation against her," *id.* ¶ 960.

In April 2021, Dickerson claims that she noticed Commander Kane attempting to misclassify crimes during a crime briefing, and she told Kane to correct the crime report. *Id.* ¶¶

950-51.  Kane complained to EAC Benedict.  *Id.* ¶ 951.  On April 21, 2021, Dickerson forwarded to Executive Assistant Chief Ashan Benedict an email from IAD about Kane and crime reports, and "[t]hereafter," Benedict cancelled a one-on-one meeting with Dickerson and stopped engaging with her directly on "several key issues."  *Id.* ¶¶ 952-53.

In May 2021, Dickerson was reassigned from being a three-star Assistant Chief to a two-star Assistant Chief and was downgraded from third in command to eighth in command.  *Id.* ¶ 973.  She was also assigned to lead the Youth and Family Engagement Bureau and went from "having an assigned seat and voice in the MPD weekly Monday & Thursday meetings to not being included in any crime fighting strategies." *Id.* at ¶ 974.  In July 2021, Chief Contee told Dickerson that she is the "conscience of the department" and "openly wondered what would happen to MPD when [she] left." *Id.* ¶ 975.  The same month, Kane was promoted to Assistant Chief to oversee a newly created bureau and was given a staff assistant and sergeant. *Id.* ¶ 957.  Dickerson also describes an incident in July 2021 at an MPD executive retreat at the Wharf DC where she asked colleagues to consider if MPD has an issue with systematic racism.  *Id.* ¶¶ 961-62.  Benedict allegedly replied that "people often 'believe' that there is a system racism issue when it's actually a 'performance' issue."  *Id.* ¶ 962.  Dickerson claims that Benedict did not speak with her for the rest of the two-day retreat.  *Id.* ¶ 964.

Dickerson filed an EEOC charge on August 4, 2021.  Ex. 6, Dickerson EEOC Charge of Discrimination.

**F.**    <u>**Regenna Grier**</u>

Plaintiff Regenna Grier was first employed by MPD as an officer in February of 1989.  Second Am. Compl. ¶ 1007.  She complains that in 2002, she arrested and testified against a fellow police officer, Officer Jay Effler, for operating his police cruiser while intoxicated.  *Id.* ¶¶

1018-19.  As a result of her cooperation, Plaintiff Grier alleges that her colleagues "shunned," "isolated," and "disrespected" her.  *Id.* ¶¶ 1024-26.  She further alleges that she complained to Commander Ralph Ennis about her treatment but was ignored.  *Id.* ¶¶ 1032-34.  Plaintiff Grier retired in March of 2015 and was asked to rejoin the department as an SPO in November 2017. *Id.* ¶ 10, 1040.

Upon her return to MPD, Plaintiff Grier was assigned to work in the Police Academy.  *Id.* ¶ 10.  Plaintiff Grier alleges that a civilian manager, Jessica Bress, assigned her to an all-male workspace where officers discussed and treated women disrespectfully.  *Id.* ¶ 1010-12.  Plaintiff Grier alleges that the Police Academy also had an all-female workspace that she was not assigned to as an experiment.  *Id.* ¶¶ 1010-12.  While working out of the all-male workspace, Plaintiff alleges that a male officer, Officer Bray Jones, regularly undressed down to his underwear in her presence to shock her.  *Id.* ¶ 1013.  Plaintiff claims to have reported Officer Jones' conduct to Lieutenant Arthur Davis, who allegedly defended Officer Jones' behavior.  *Id.* ¶¶ 1015-16.

Having allegedly been denied requests to transfer to another workspace, Plaintiff Grier continued to work at the Police Academy.  *Id.* ¶¶ 1016-17.  At an unspecified point in 2020, Plaintiff Grier alleges that she was required to work in person while all her colleagues were allowed to work from home due to the COVID-19 pandemic.  *Id.* ¶¶ 1035-38.  Dissatisfied with her instruction to work in person, Plaintiff Grier allegedly tried to work from home, at which point MPD updated its work-from-home policy.  *Id.* ¶¶ 1036-37.  Plaintiff Grier fails to allege how the telework policy changed.  *See id.* ¶¶ 1035-38.  Approximately a year later, Plaintiff Grier retired and asked to convert to an unpaid Reserve Official position but was denied. *Id.* ¶ 1039-40.

###### G. <u>Tamika Hampton</u>

Plaintiff Tamika Hampton began her career with MPD as a patrol officer in 2003.  *Id.* ¶ 1074.  On her third day with MPD, Plaintiff Hampton alleges that Sergeant Andre Stuber asked her out on a date and stated that he could make her life miserable if she rejected him.  *Id.* ¶¶ 1076-78.  Plaintiff Hampton alleges reporting her concerns regarding Sergeant Stuber to the Union Steward, Officer Christopher Bauman, who in turn filed an internal EEO complaint and Office of Human Rights (OHR) complaint on Plaintiff Hampton's behalf.  *Id.* ¶¶ 1079-81.  According to Plaintiff Hampton, OHR facilitated an informal resolution of her complaint under which Sergeant Stuber no longer supervised her.  *Id.* ¶ 1082.

Plaintiff Hampton alleges that in October 2007, young men in her community began harassing her in front of her home for being a female police officer.  *Id.* ¶¶ 1084-85.  She claims to have reported her concerns to her chain of command at MPD, who dispatched Detective Mary Bonnacorsey to conduct a threat assessment.  *Id.* ¶¶ 1086-87.  Dissatisfied with MPD's response to her concerns, Plaintiff Hampton took her story to a local news outlet.  *Id.* ¶ 1089.  Supposedly, MPD leaders were unhappy with Plaintiff Hampton for going to the local news with her story.  *Id.* ¶ 1090.  Plaintiff Hampton alleges that MPD began targeting her by hyper-scrutinizing her work.  *Id.* ¶ 1093.  Seeking relief from perceived retaliation, Plaintiff Hampton filed a complaint with the U.S. Department of Justice (DOJ) against Assistant Chief Dianne Grooms.  *Id.* ¶ 1094.  DOJ allegedly returned the investigation to MPD for Chief Lanier to handle, but Chief Lanier assigned the matter to IAD, which concluded that Plaintiff Hampton's allegations were unsubstantiated.  *Id.* ¶ 1095.

Approximately five years later, Plaintiff Hampton responded to a call involving domestic abuse wherein she shot an alleged domestic abuser.  *Id.* ¶ 1097.  IAD investigated the matter and

a Disciplinary Review Division (DRD) trial board determined the charges against Plaintiff Hampton were unsubstantiated. *Id.* ¶¶ 1098-1102. Roughly seven trouble-free years after the conclusion of the routine IAD investigation, Plaintiff Hampton alleges that her colleague, Sergeant Delroy Burton, tried to kiss her. *Id.* ¶ 1104. Plaintiff Hampton rebuffed his advance but was too afraid of potential retaliation to report him. *Id.* ¶¶ 1104-05. Nonetheless, Sergeant Burton allegedly sullied her good name and turned people against her. *Id.* ¶ 1106. Plaintiff Hampton fails to allege how and when Sergeant Burton took such action. *Id.*

In April 2019, Plaintiff Hampton alleges that Commander Andre Wright asked her to participate in an MPD recruiting event, but later was ordered by Lieutenant Peter Larsen, the Watch Commander, to substantiate her authorization to participate in the event. *Id.* ¶¶ 1107-08. Plaintiff Hampton complains that Lieutenant Larsen required her to arrange for verbal and written verification of her participation from Commander Wright. *Id.* ¶¶ 1109-11.

Approximately two months later, while on patrol, Plaintiff Hampton claims to have been flagged down by a resident when a radio call to serve a protective order went out. *Id.* ¶ 1112. Having failed to promptly respond to the radio call, Plaintiff Hampton claims to have been reprimanded by Captain James Boteler, who subsequently assigned Sergeant Jonathan Podorski to monitor her radio responsiveness in the field. *Id.* ¶¶ 1113-14. According to Plaintiff Hampton, Sergeant Podorski agreed with her assertion that Captain Boteler only micromanaged and condescended against her. *Id.* ¶ 1115. Also in June 2019, Captain Boteler detailed Hampton to the Teletype Unit with only Mondays and Tuesdays off duty. *Id.* ¶¶ 1116-17. Plaintiff Hampton filed an internal EEO complaint against Boteler that was investigated and dismissed as unsubstantiated. *Id.* ¶¶1118-19.

Two years later, Plaintiff Hampton was promoted to Sergeant. *Id.* ¶ 1120. In August

2021, Plaintiff Hampton alleges that a white male officer defied her orders over the radio.  *Id.* ¶ 1121.  Plaintiff Hampton claims to have attempted to initiate discipline against the disrespectful officer but was stopped by Lieutenant Michael Daee.  *Id.* ¶¶ 1122-24. According to Plaintiff Hampton, Daee did not exercise this type of oversight over other sergeants, and only did so to Plaintiff Hampton because of her race and gender.  *Id.* ¶¶ 1123-24.  Daee allegedly went on to initiate an investigation into Plaintiff Hampton based on a shooting that occurred during the shift after hers on September 8, 2021.  *Id.* ¶ 1125-26.  Plaintiff Hampton claims that Daee insisted that she attend a training for the Civil Disturbance Unit despite her strong feeling that she would not benefit from such training.  *Id.* ¶ 1127.

Days later, Plaintiff Hampton travelled to the scene of a shooting with Sergeant Dale Vernick, who left her at the scene after driving off with the personal possessions she left in his cruiser.  *Id.* ¶¶ 1129-1132.  Vernick did not respond to Plaintiff Hampton's radio calls, but did answer a cell phone call from another sergeant.  *Id.* ¶¶ 1132-33.  Vernick offered Plaintiff Hampton no apology for the inconvenience and received no discipline for his conduct.  *Id.* ¶¶ 1134-36.

### H.    Lashaun Lockerman

Plaintiff Lashaun Lockerman began working for MPD as an officer in 2003.  *Id.* ¶ 1368. Throughout her time with MPD, Plaintiff Lockerman was consistently promoted, reaching the ranks of Sergeant in June 2016 and Lieutenant in June 2019.  *Id.* ¶¶ 1369.  In December 2019, Plaintiff Lockerman initiated a transfer from the Seventh District to the Second District.  *Id.* ¶ 1370.  On March 5, 2020, Plaintiff Lockerman attended lunch with Commander Duncan Bedlion.  *Id.* ¶ 1371.  Plaintiff Lockerman expected to discuss professional matters during lunch and was surprised when Bedlion allegedly steered the conversation towards personal topics.  *Id.*

¶ 1372.

Following her cool reaction to Bedlion's attempt to converse on personal matters,
Plaintiff Lockerman alleges that she began experiencing what she believed to be retaliation.  *Id.* ¶
1374.  First, while out on approved sick leave, Plaintiff Lockerman was allegedly disciplined for
failing to complete assignments issued while she was on leave.  *Id.* ¶¶ 1375-76.  Plaintiff
Lockerman claims Bedlion ordered the issuance of this discipline.  *Id.* ¶ 1376.  Next, Plaintiff
Lockerman alleges that Bedlion urged Captain Edward Bernat to place her on a Performance
Improvement Plan (PIP), but that Captain Bernat refused.  *Id.* ¶¶ 1378-79.  Then, on October 3,
2020, Plaintiff Lockerman was allegedly disciplined for failing to post on the Next-Door
application, a social media platform MPD uses to seek information from the public.  *Id.* ¶ 1381.
Plaintiff Lockerman claimed that she did not post because an arrest had already been made,
obviating the need for further information gathering.  *Id.* ¶ 1382.  Plaintiff Lockerman alleges
that a white male, Lieutenant Darren Haskis, was late in posting to the Next-Door application but
was not reprimanded. *Id.* ¶ 1399.

Upset with her most recent discipline, Plaintiff Lockerman arranged a meeting with
Commander Bedlion and Captain Brian Bray.  *Id.* ¶ 1383.  Bedlion allegedly shared his
unfavorable opinion of MPD employees that transfer districts, his belief that Plaintiff Lockerman
had performance issues in the Seventh District, and that he had previously made people cry in
meetings of this nature.  *Id.* ¶¶ 1384-86.

Next, Plaintiff Lockerman complains that she directed a subordinate to properly wear a
face mask in accordance with COVID-19 protocols.  *Id.* ¶¶ 1387-88.  The subordinate officer
allegedly filed a complaint against Plaintiff Lockerman for issuing the directive.  *Id.* ¶ 1389.
Bedlion allegedly initiated an investigation into Plaintiff Lockerman for a "Potential Orders and

Directives Violation," but she was ultimately cleared of wrongdoing.  *Id.* ¶¶ 1390-91.  Plaintiff

Lockerman complained to Assistant Chief Lamar Green about Bedlion's investigation and was

allegedly told to file an EEO complaint.  *Id.* ¶ 1394.  Plaintiff Lockerman claims to have filed an

EEO complaint against Bedlion on February 18, 2021, but the charges were not sustained.  *Id.* ¶¶

1395-96.

Plaintiff Lockerman next complains that she contracted COVID-19 and was placed on

administrative leave on November 20, 2020.  *Id.* ¶ 1401.  According to Plaintiff Lockerman,

Bedlion instructed Captain Bray to direct the time and attendance clerk, Joann Coombs, to draw

from Plaintiff Lockerman's annual leave balance, but Coombs did not follow the alleged

direction.  *Id.* ¶ 1402.

On or about April 5, 2021, Bedlion allegedly directed Plaintiff Lockerman to meet with

the program director for the Latin American Youth Center (LAYC) to address complaints.  *Id.* ¶

1404.  Plaintiff Lockerman contacted the LAYC Director, but sent a subordinate sergeant to the

on-site meeting.  *Id.* ¶ 1405.  Having disobeyed an order, Plaintiff Lockerman was issued a letter

of counseling on or about May 19, 2021.  *Id.* ¶ 1416.  MPD does not officially issue letters of

counseling; rather, according to Plaintiff Lockerman, Bedlion  invented them.  *Id.* ¶ 1411.

Approximately two months later, Plaintiff Lockerman was allegedly issued another letter

of counseling for failing to notify the community by emailing local stakeholders of a

robbery/kidnapping that occurred in her assigned area.  *Id.* ¶ 1417.  Plaintiff Lockerman claims

she was not responsible for making such posts that evening.  *Id.* ¶¶ 1417-18.  The letter of

counseling was followed by an official reprimand issued on September 15, 2021, along with a

PIP and a schedule change designed to increase supervision over Plaintiff Lockerman.  *Id.* ¶

1431, 1433. The next month, while Plaintiff Lockerman was using annual leave to go on

vacation, Cdr. Bedlion allegedly asked Coombs who authorized Plaintiff Lockerman's leave. *Id.*
¶¶ 1420-21.  Then, on September 5, 2021, Plaintiff Lockerman requested to cancel annual leave
scheduled for September but Bedlion allegedly denied the request. *Id.* ¶ 1423-34.  Plaintiff
Lockerman contacted Assistant Chief Emerman, who approved the cancellation of her leave on
September 8, 2021. *Id.* ¶ 1428.  Plaintiff Lockerman and Chief Emerman met again September
14, 2021, when Plaintiff Lockerman reported a hostile work environment caused by Bedlion.
*Id.* ¶ 1429.

Finally, Plaintiff Lockerman alleges that Bedlion created a schedule wherein  Plaintiff
and another black female are responsible for all of the Watch Commander duties for the
midnight shift. *Id.* ¶ 1446.

## I.      Tabatha Knight

In 1989, Plaintiff Knight began working for the MPD as a civilian employee. *Id*. ¶¶ 12,
1167.  In 1991, she became a sworn officer and was assigned to the Fourth District. *Id.* ¶ 1167.
Plaintiff Knight describes a litany of incidents of alleged harassment and retaliation dating back
to her rookie training in the early 1990s. *See generally Id.* ¶¶ 1167-1337.  More recently, Knight
claims that in February 2020, she was "written up twice . . . for fabricated transgressions." *Id*. ¶
1310.  In April 2020, Knight learned that she was being investigated by IAD for secretly
recording Commander Rivera. *Id*. ¶¶ 1311-15.  The charges against her were sustained, and
Knight was issued a 28-day suspension. *Id*. ¶ 1316.  A union representative filed a grievance and
requested arbitration on Knight' behalf. *Id*. ¶ 1320.  In September 2020, then-Chief Newsham
sent Knight a memo stating that she had "failed to be forthright" during the IAD investigation,
but he ultimately rescinded her suspension and instead issued a letter of censure. *Id*. ¶¶ 1327-29.

In February 2021, Knight sought a transfer back to SOD, but her request was denied.  *Id.* ¶¶ 1329-32.

On March 24, 2021, Knight retired, citing the notion that "no entity in the District of Columbia was willing to take her claims and concerns seriously, and that no member of MPD leadership was willing to restrain the rampant and intentional retaliation against" her.  *Id.* ¶ 1336. Knight filed an EEOC charge on May 20, 2021.  Ex. 3, Knight EEOC Charge of Discrimination.

**J.      Kia Mitchell**

Plaintiff Mitchell was an SPO in the SOD's Emergency Response Team (ERT) and was initially assigned to partner with Plaintiff Brinkley.  *Id.* ¶¶ 14, 1479-80.  Like Plaintiff Brinkley, Plaintiff Mitchell complains that in or about May 2017 she was assigned an insect-infested vehicle by Sergeant Boyd despite the availability of other vehicles.  *Id.* ¶¶ 1486-88; 1494-97. Plaintiff's complaints about the vehicle and management's reaction to her request for a new vehicle prompted an alleged campaign of retaliation by Sergeant Boyd against Plaintiff Mitchell. *Id.* ¶¶ 1501--06.

Plaintiff Mitchell also complains that she was suspended pending investigation after another officer on one of her details deployed an unauthorized aerial drone even though she was not involved in its deployment.  *Id.* ¶ 1509-14 1521.  She also complains that during the detail with the drone, one of her superior officers urinated in a bottle in her presence.  *Id.* ¶¶ 1516-19. The officer who urinated in her presence was not punished for his actions and was promoted shortly thereafter.  *Id.* ¶¶ 1531-33.

Plaintiff Mitchell further complains that in February 2018, she was investigated for being present at a barricade while on a no-contact order.  *Id.* ¶¶ 1534-35.  She was ultimately cleared of any wrongdoing, but the officer who accused her of violating the no-contact order was not

punished for wrongly accusing her of violating the order.  *Id.* ¶¶ 1540-42.

Like Plaintiff Brinkley, Plaintiff Mitchell complains that she was admonished by management to "watch the company [she] kept."  *Id*. ¶ 1543.   Plaintiff Mitchell alleges that on two separate occasions in May and June 2020, she was disciplined for missing a call-out at a barricade even though she was on Family Medical Leave Act (FMLA) leave.  *Id*. ¶¶ 1561-65, 1571.

Plaintiff Mitchell alleges that in August 2020, she was disciplined for missing a nighttime detail even though she was scheduled to work during the day and there was no general order that all day officers be available for nighttime activities.  *Id.* ¶¶ 1557-59.  In January 2021, Plaintiff Mitchell was denied intermittent leave to care for her sick mother until another officer volunteered to cover for her.  *Id.* ¶¶ 1577-81.

On August 4, 2021, Plaintiff Mitchell filed an EEOC charge.  *See* Ex. 7, Mitchell EEOC Charge of Discrimination.  Plaintiff Mitchell retired from the MPD on September 24, 2021.

## STANDARD OF REVIEW

### I.   <u>Failure to State a Claim</u>

To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court set forth a "two-pronged approach" for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  556 U.S. at 679. While a court generally must consider a plaintiff's factual allegations as true, the court must first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they

must be supported by factual allegations." *Id.*  Thus, the basic pleading standards "demand[]

more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing

*Twombly*, 550 U.S. at 555).  If the court determines that the plaintiff has asserted "well-pleaded

factual allegations," it "should assume their veracity and then determine whether they plausibly

give rise to an entitlement to relief." *Id*. at 679.  But the court need not draw inferences in favor

of the non-movant "if such inferences are unsupported by the facts set out in the complaint."

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

"In ruling upon a motion to dismiss, a court may ordinarily consider only the facts

alleged in the Complaint, documents attached as exhibits or incorporated by reference in the

Complaint, and matters about which the Court may take judicial notice.  Generally, where

matters outside the pleadings are presented to and not excluded by the court, the motion to

dismiss must be treated as one for summary judgment under Rule 56." *Ashraf-Hassan v.

Embassy of France in U.S.*, 878 F. Supp. 2d 164, 169 (D.D.C. 2012).  However, "a court may

consider an EEOC complaint and Notice of Charge without converting a motion to dismiss into a

motion for summary judgment because such records are public documents of which a court may

take judicial notice." *Id*.

## II.  <u>Summary Judgment</u>

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of identifying

evidence that shows that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986)  Once a movant has made this initial showing, the burden shifts to the

opposing party to "come forward with specific facts showing that there is a genuine issue for

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).  In other words, "once the movant has supported a summary judgment motion by evidence of particular events, the court may properly look to the nonmovant for rebuttal evidence either 'from persons familiar with the events,'" or require "the nonmovant to 'otherwise cast more than metaphysical doubt on the credibility of the testimony.'"  *Doe v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (quoting *Bias v. Advance Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990)).  A trial court should enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.

## ARGUMENT

### I.    Plaintiffs Failed to Exhaust Their Title VII and ADEA Claims by Failing to Bring Appropriate EEOC Charges.

Under Title VII and the ADEA, a plaintiff must timely exhaust her administrative remedies before bringing an action in federal court.  *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 276 (D.D.C. 2011).  Only those claims that are contained in the administrative complaint or that are "like or reasonably related" to the allegations of the administrative complaint can be raised in a Title VII lawsuit.  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995); *see also Bailey v. Verizon Comm., Inc.*, 544 F. Supp. 2d 33, 37–38 (D.D.C. 2008) ("If a plaintiff's EEOC charge makes a class of allegation altogether different from that which she later alleges when seeking relief in federal district court, she will have failed to exhaust administrative remedies.").  Such claims "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Park*, 71 F.3d at 907 (quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)).  The exhaustion requirement provides the EEOC the opportunity to investigate and "serves the important purpose of giving the charged

party notice of the claim and 'narrow[ing] the issue for prompt adjudication and decision." *Id.* (quoting *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 n.325 (D.C. Cir. 1976) (abrogated on other grounds)).

Here, Plaintiffs Brown, Hampton, and Lockerman did not file EEOC charges, and thus the Court should dismiss their Title VII claims for failure to exhaust their administrative remedies.  And many of the other Plaintiffs have asserted numerous discrete acts of discrimination and retaliation—spanning decades—that are not reasonably related to allegations brought in their EEOC charges.  First, Plaintiff Brinkley's EEOC charge alleges that the discrimination took place beginning December 8, 2020, and so no earlier allegations of discrimination may form the basis of her complaint.  *See* Ex. 1, Brinkley EEOC Charge of Discrimination.  Similarly, Plaintiff Carr's EEOC charge alleges that the discrimination took place beginning in May 2020, and thus no earlier allegations of discrimination may form the basis of her Complaint.  *See* Ex. 4, Carr EEOC Charge of Discrimination.  And Plaintiff Knight filed an EEOC charge citing a single incident of discrimination/retaliation on June 12, 2020, but she does not raise this incident in the Amended Complaint.  *See* Ex. 3, Knight EEOC Charge of Discrimination.  Thus, the Court should dismiss Knight's Title VII claims.

Next, Plaintiff Dickerson's lengthy EEOC charge alleges several discrete discriminatory acts, the most recent of which appears to have occurred in December 2019.  *See* Ex. 6, Dickerson EEOC Charge of Discrimination.  But in the Amended Complaint, Dickerson asserts several more recent incidents of discrete discrimination and retaliation.  The Court should thus dismiss Dickerson's Title VII claims to the extent that they are premised on those more recent allegations that Dickerson failed to mention in her EEOC charge.  Finally, Plaintiff Clark filed an EEOC charge on January 1, 2021, but the charge does not include several of the discrete acts of

discrimination and retaliation that she alleges in the Amended Complaint.  Ex. 2, Clark EEOC

Charge of Discrimination.  Accordingly, the Court should dismiss these claims subject to

administrative exhaustion as to these Plaintiffs.

## II.    Most of Plaintiffs' Claims Are Untimely.

Plaintiffs have asserted numerous untimely claims.  Specifically, Plaintiffs' Title VII,

ADEA, and ADA claims based on events that occurred more than 300 days before the filing of

their respective EEOC charges are untimely.  Additionally, Plaintiffs' DCHRA claims premised

on events that occurred more than one year before the filing of the Amended Complaint or any

charge of discrimination are untimely.  Finally, Plaintiffs' DCWPA claims based on events that

occurred more than one year before the Amended Complaint's filing are untimely.

### A.    Many of Plaintiffs' Title VII, ADEA, and ADA Claims Are Over 300 Days Old and Are Thus Time-Barred.

Under Title VII, a charge of discrimination must be filed with the EEOC within 180 days

after the alleged unlawful employment practice occurred." *Dyson v. District of Columbia*, 808 F.

Supp. 2d 84, 87 (D.D.C. 2011) (citing 42 U.S.C. § 2000e–5(e)(1)).  "But if a complainant

initially institutes proceedings with a state or local agency with authority to grant or seek relief

from the unlawful employment practice, the charge must be filed within 300 days after the

alleged unlawful employment practice occurred." *Id*.  "A 'work-sharing' arrangement between

the EEOC and the District of Columbia Office of Human Rights [(OHR)] deems timely-

filed EEO charges as cross-filed with [OHR], making the deadline for filing EEO charges in

the District of Columbia under Title VII 300 days from the date of the alleged discrimination."

*Slate v. Pub. Def. Serv. for the Dist. of Columbia*, 31 F. Supp. 3d 277, 294–95 (D.D.C. 2014).

This exhaustion requirement is identical for claims brought under the ADA and the ADEA.

*Congress v. District of Columbia*, 277 F. Supp. 3d 82, 87 (D.D.C. 2017).

Here, as shown below, most of the claims in the Amended Complaint are well beyond the 300-day limit.

**Sinobia Brinkley**:  Plaintiff Brinkley did not bring an EEOC charge until December 23, 2020.  As a result, the Court should dismiss her Title VII, ADA, and ADEA claims based on race, sex, and retaliation as they relate to the following alleged events, all of which occurred more than 300 days before she filed her EEOC charge:

- Beginning in 2017, Sergeant Boyd assigned Plaintiff a "vehicle[] that had been used by the K-9 unit and had been infested with fleas " and prohibited her from using a clean vehicle based on her race and sex., Second Am. Compl. ¶¶ 298-306;

- In September 2019, Lieutenant Robinson made "derogatory comments about her extreme grief, had publicly denigrated her for exhibiting symptoms of depression and anxiety, and had threatened to send Plaintiff for a fitness for duty evaluation," *id.* ¶ 314; and

- On or about February 4, 2020, Officer Harrison used offensive language during a roll call by responding to a superior's request that he work with another officer by stating "he can suck my dick." *Id.* ¶¶ 323-26, 328.

**Kia Mitchell**:  Plaintiff Mitchell filed her EEOC charge on August 4, 2021, *see* Ex. 7, Mitchell EEOC Charge, and thus the following alleged events that happened more than 300 days earlier cannot form the basis for any federal discrimination or retaliation claim:

- In May 2017, Plaintiff Mitchell was assigned a vehicle that was dirty and insect-infested, Second Am. Compl. ¶¶ 1486-88, and her superiors refused to assign her a clean vehicle until she complained to her Commander, *id.* ¶¶ 1496-500;

- While she was assigned to assist with a high-risk warrant and drive-by detail in June 2017, one of her male superiors in the same van as her took out his penis and urinated into a bottle, *id.* ¶¶ 1516-18;

- In February 2018, she was wrongfully accused of violating a no-contact order by being on-scene at a barricade, *id.* ¶¶ 1534-37, and after being cleared by an investigation, no discipline issued against the officer who falsely accused Plaintiff Mitchell of violating the no-contact order, *id.* ¶¶ 1540-42;

- In March 2020, she was admonished to "watch the company you" keep, *id.* ¶ 1543;

- In or about May and June 2020, she was disciplined for missing barricade call-outs while she was out on FMLA leave, *id.* ¶¶ 1561-65, 1571; and

- In August 2020, she was disciplined for not showing up at a barricade despite the fact she had not been on duty and there was no general order that officers be available for night duty.  *Id.* ¶¶ 1557-59.

**Karen Carr**:  Plaintiff Carr filed her EEOC charge on May 2, 2021.  *See* Ex. 4, Carr EEOC Charge.  Accordingly, her charge is untimely as to any event that occurred before July 6, 2020.  Accordingly, all of Plaintiff Carr's claims are untimely except her complaint of an incident in August 2020 when she became involved in a confrontation with ERT Sergeant Boyd during roll call and was threatened with a 30-day suspension.  *Id*. ¶¶ 675-76, 678-79.

**Chanel Dickerson**:  Plaintiff Dickerson filed an EEOC charge on August 4, 2021. Accordingly, her charge is untimely as to any event that occurred prior to October 8, 2020.  The Court should therefore dismiss Dickerson's Title VII claims to the extent that they are premised on discrete acts of discrimination and retaliation that occurred before October 8, 2020.  *See* Second Am. Compl. ¶¶ 840-949 (asserting acts of discrimination and retaliation prior to October 8, 2020).

**Leslie Clark**:  Plaintiff Clark filed an EEOC charge on January 1, 2021.  As a result, her charge is untimely as to any event that occurred prior to March 7, 2020.  The Court should thus dismiss her Title VII and ADEA claims to the extent that they are premised on discrete acts of discrimination and retaliation that occurred prior to March 7, 2020.  *See id.* ¶¶ 727-70 (asserting acts of discrimination and retaliation prior to March 7, 2020).

**Tabatha Knight**:  Plaintiff Knight filed an EEOC charge on May 20, 2021, so her claims are only timely as to those events that occurred before July 24, 2020.  The Court should thus

dismiss her Title VII claims to the extent that they are premised on discrete acts of discrimination and retaliation that occurred prior to July 24, 2020.  *See id.* ¶¶ 1168-1326 (asserting acts of discrimination and retaliation prior to July 24, 2020).

*Regenna Grier*:  Finally, Plaintiff Grier filed an EEOC charge on August 2, 2021.  This charge can only timely raise unlawful employment practices that occurred on or before October 6, 2020.  But nearly all the conduct Grier complains of took place after February 3, 2021.  *See id.* ¶¶ 1007-39.  Grier's untimely Title VII complaints include her allegations that (1) she was shunned following her 2002 arrest of Officer Jay Effler, *id.* ¶¶ 1018-26, and (2) she was assigned to the male-dominated Police Academy workspace in 2015, *id.* ¶¶ 1007-17.  Her only timely allegations are that she was denied the opportunities to work from home during the rise of COVID-19 when "all of her colleagues were permitted to do so," and to volunteer as a Reserve Official.  *Id.* ¶¶ 1035-38, 1042.

## B.     Plaintiffs Brown, Hampton, and Lockerman's DCHRA Claims Are Untimely.

"The DCHRA requires plaintiffs to bring a lawsuit 'within one year of the unlawful discriminatory act,' and also provides that 'the timely filing of a complaint with the D.C. Office of Human Rights, or under the administrative procedures established by the Mayor pursuant to § 2–1403.03, shall toll the running of the statute of limitations while the complaint is pending.'" *Hatter v. Washington Metro. Area Transit Auth.*, 105 F. Supp. 3d 7, 10 (D.D.C. 2015) (quoting D.C. Code § 2–1403.16).  Here, all DCHRA claims based on events that occurred more than one year before the filing of any EEOC charge are time-barred.  As a result, in the case of Plaintiffs Brown, Hampton, and Lockerman—who each filed no EEOC charge—their DCHRA claims based on events that occurred before September 22, 2020, are time-barred.

### C.   DCWPA Claims Are Time-Barred.

The DCWPA has a one-year statute of limitations.  *See* D.C. Code § 1-615.54 (a)(2).

Therefore, for Plaintiff Brinkley, her DCWPA claim based on alleged retaliation that occurred

before June 8, 2020—one year before she filed the original complaint—is time-barred.  For all

other Plaintiffs, all claims based on alleged retaliation that occurred before September 22,

2020—one year before the Amended Complaint was filed—are time-barred.

### III.   Plaintiffs' Title VII, DCHRA, and ADEA Discrimination Claims Fail to State a Claim for Relief on Any Alleged Adverse Action.

"[U]nder Title VII [and] the ADEA, . . .the two essential elements of a discrimination

claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the

plaintiff's [protected status]."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

The same analytical framework governs discrimination claims under the DCHRA.  *See*

*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 3, 6 (D.C. Cir. 2010).  As a

result, Plaintiffs must present facts that "'give rise to an inference of discrimination'" to survive

dismissal.  *Jianqing Wu v. Special Counsel, Inc.*, 54 F. Supp. 3d 48, 52 (D.D.C. 2014) (quoting

*Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007)), *aff'd sub nom. Jianqing Wu v. Special*

*Counsel*, No. 14-7159, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015).

An adverse employment action is "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 761 (1998).  An adverse employment action must "materially . . .affect[] . . . the terms,

conditions, or privileges of employment . . . such that a reasonable trier of fact could find

objectively tangible harm."  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citations

and internal quotation marks omitted).  An adverse employment action must be "significant,"

otherwise courts would be embroiled in "judicial micromanagement of business practices" and "frivolous suits over insignificant slights." *Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, 15-16 (D.D.C. 2016) (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997), and *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)).

As shown below, Plaintiffs' allegations do not rise to the level of adverse employment action because they do not constitute "a significant change in employment status." *Burlington Indus., Inc.*, 524 U.S. at 761.

### A. <u>Sinobia Brinkley</u>

Plaintiffs Brinkley's Title VII, DCHRA, and ADEA claims fail to state a claim for relief on any alleged adverse action other than her termination.   First, Plaintiff complains about her vehicle assignment, Second Am. Compl. ¶¶ 298-306; separation from her partner, *id.* ¶¶ 343-47; and the use of profane language in the workplace and management's refusal to correct it, *id.* ¶¶ 323-37.   Yet none of these allegations rise to the level of adverse employment action because there is no allegation that they "materially . . . affect[] . . . the terms, conditions, or privileges of employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Douglas*, 559 F.3d at 552.   Likewise, Brinkley's allegations involving her violation of internal rules do not pass muster:   being called out by her supervisor for failing to attend roll call with her protective vest, Second Am. Compl. ¶ 387; being charged with misconduct for failing to submit to health assessments, *id.* ¶¶ 368-71, and for conduct unbecoming an officer, *id.* ¶¶ 391; receiving discipline for missing call-out at a barricade, *id.* ¶ 392; and receiving a poor performance evaluation, *id.* ¶ 405.   Formal or informal criticism and negative performance evaluations that do not result in financial harm are not adverse employment actions.   *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("[F]ormal criticism or poor performance

evaluations are not necessarily adverse actions and they should not be considered such if they did

not affect the employee's grade or salary.") (alterations, citation, and internal quotation marks

omitted); *Douglas* 559 F.3d at 552 ("[P]erformance evaluations ordinarily are not actionable

under Title VII . . . .").  It is well settled that "a tangible employment action in most cases

inflicts *direct* economic harm," and "[t]hus, not everything that makes an employee unhappy is

an actionable adverse action."  *Id.* (alterations, citations, and internal quotation marks omitted).

### B.  <u>Kia Mitchell</u>

    None of the claims made by Plaintiff Mitchell allege an adverse employment action.

Indeed, many of her allegations show how her initial complaints were favorably resolved.

According to Mitchell, MPD assigned her a bug-infested vehicle, Second Am. Compl. ¶¶ 1486-

88, and her complaints and effort to secure a clean vehicle triggered retaliation from Sergeant

Boyd, *id.* ¶¶ 1501-04.  But she admits she was assigned a clean vehicle.  *Id.* ¶¶ 1498-1500.

Plaintiff further alleges that her police powers were suspended for her proximity to the use of an

unauthorized drone, despite other officers' insistence that she was not involved in the drone

incident.  *Id.* ¶ 1521.  However, Plaintiff's powers were returned after she was cleared through

investigation.

    And Michell's allegation that she was wrongfully accused of violating a no-contact order

ultimately resolved in her favor as she was cleared of any wrongdoing.  *Id.* ¶¶ 1534-35.  Her

complaint seems to be not that she suffered any harm, but that no one was disciplined for causing

her to be investigated.  *See id.*  MPD's alleged admonishment to Micthell to "watch the company

you keep" is alleged to have come with nothing more than a warning and did not cause a

significant change in employment status.  *Id.* ¶ 1543.  The District's assignment of Plaintiff

Mitchell to a detail in Herdon, Virginia, and refusal to grant her intermittent leave was not a

"significant change in employment status" because fellow officer Wendell Cunningham covered for Plaintiff Mitchell.  *Id.* ¶¶ 1577-81.  Similarly, Mitchell's allegations of discipline for missing call-outs at a barricade also fail to show how her terms of employment were materially affected and allege nothing more than formal criticism that did not affect Plaintiff Mitchell's grade or salary.  *See id.* ¶¶ 1557-60, 1564-76; *Taylor*, 350 F.3d 1286 at 1293.

### C. <u>Karen Carr</u>

None of Plaintiff Carr's allegations demonstrate a significant change in employment status and are therefore not actionable under Title VII.  Plaintiff Carr complains about the 2019 revocation of her "expected tardiness privilege," Second Am. Compl. ¶ 669, without identifying how this change affected her employment status.  She also complains about being suspended for recording her colleague Lieutenant Margiotta, *id.* ¶ 686, and that management rescinded its promise to revoke the disciplinary suspension if she transferred out of SOD, *id.* ¶¶ 691-94.  But, again, "[f]ormal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered such if they did not affect the employee's grade or salary." *Taylor*, 350 F.3d at 1293 (alterations, citation, and internal quotation marks omitted).  Finally, Plaintiff Carr complains that after an altercation with Sergeant Boyd, he initiated an EEO complaint against her, and she was threatened with a 30-day suspension.  But the result of this investigation was a finding of fault for Sergeant Boyd, and thus no adverse employment action followed this event as there was no significant change in Carr's employment status.  Second Am. Compl. ¶¶ 679-80.

### D. <u>Tiara Brown</u>

Plaintiff Brown fails to allege that she suffered any adverse employment action.  Instead, her allegations are simply a laundry list of disjointed workplace grievances, none of which

evince illegal discrimination or retaliation.  Brown voluntarily resigned from MPD in December

2020, and she admits that she did so because she apparently disagreed with the behavior of

certain officers towards protestors at the Seventh District Station in 2019.  *Id.* ¶¶ 6, 578.  Because

Brown has not alleged that she suffered any adverse employment action, the Court should

dismiss her Title VII and DCHRA claims.

### E.  <u>Regenna Grier</u>

Plaintiffs Grier's Title VII and DCHRA claims fail to state a claim for relief on any

alleged adverse action other than her non-hire for the Reserve Official position.  Grier complains

about her assignment to a primarily male workspace, *id.* ¶¶ 1011-12; the alleged denial of her

request to transfer workspaces, *id.* ¶¶ 1016-17; and the alleged denial of her request to work from

home, *id.* ¶¶ 1036-37.  But MPD's alleged failures to approve transfer or telework requests are

not adverse actions.  *See Redmon v. U.S. Capitol Police*, 80 F. Supp. 3d 79, 87 (D.D.C. 2015)

("The Court agrees with the cited opinions that a denial of a request to telework, without more,

does not rise to the level of an adverse employment action, as it does not involve 'hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision

causing significant change in benefits' ") (collecting cases); *McNair v. District of Columbia*, 359

F. Supp. 3d 1, 10 (D.D.C. 2019) ("[T]he denial of a request to work from home, in and of itself,

is not an adverse action.").  In addition, these are not ultimate employment decisions.  Rather,

these alleged failures merely assert concerns about working conditions that cannot serve as a

basis for discrimination claim.  *See Peterson v. Linear Controls, Inc.*, 757 F. App'x 370, 373-74

(5th Cir. 2019) (claims that employee was subjected to discriminatory remarks and supervisor's

racial slur and denied leave and that Black employees were subject to harsher working conditions

than white employees did not address ultimate employment decisions), *cert. dismissed*, 140 S.

Ct. 2841 (2020).  And Grier does not allege that these denials affected her salary, job

responsibilities, or future employment opportunities in any way.  Thus, she was not subjected to

adverse employment actions based on these alleged events.

### F.   Tamika Hampton

None of Plaintiff Hampton's complaints allege adverse employment actions.  She alleges

that (1) young men in her community harassed her, Second Am. Compl. ¶¶ 1084-85; (2) MPD

failed to satisfactorily assist her with this personal issue, *id.* ¶¶ 1086-88; (3) MPD heavily

scrutinized her work, *id.* ¶ 1093; (4) MPD investigated her use of force, *id.* ¶¶ 1096-102; (5)

MPD requested verification that she was authorized to participate in a recruiting event, *id.* ¶¶

1109-11; (6) she was temporarily subject to additional supervision after failing to respond to a

radio call, *id.* ¶¶ 1112-14; (7) she was temporarily detailed to the teletype unit, *id.* ¶¶ 1116-17;

(8) she was unable to unilaterally discipline a subordinate, *id.* ¶¶ 1121-24; (9) MPD investigated

her following a shooting in her district, *id.* ¶¶ 1124-26; and (10) there was a delay in returning

personal possessions she left in a colleague's cruiser, *id.* ¶¶ 1132-34.  As this Circuit has

recognized, "not everything that makes an employee unhappy is an actionable adverse

action."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (citation and internal quotation

marks omitted).  Plaintiff Hampton offers nothing more here.  Accordingly, Plaintiff Hampton's

claims under Title VII and the DCHRA fail.

### G.  Lashuan Lockerman

Lastly, none of Plaintiff Lockerman's complaints allege adverse employment actions.

She alleges that she:  (1) was disciplined for failing to complete assignments, Second Am.

Compl. ¶¶ 1375-76; (2) was considered for placement on a PIP, *id.* ¶¶ 1378; (3) was disciplined

for failing to post on Next-Door, *id.* ¶ 1381; (4) was prevented from unilaterally disciplining a

subordinate, *id.* ¶¶ 1387-93; (5) almost had her leave changed from administrative to annual, *id.*
¶¶ 1401-02; (6) was issued an unofficial letter of counseling for disobeying an order to meet with
the LAYC director, *id.* ¶¶ 1404-06, 1416; (7) was placed on a PIP for that conduct, *id.* ¶¶ 1401-
02; (8) experienced a temporary delay in cancelling approved annual leave, *id.* ¶¶ 1423-34; and
(9) was trusted with the critical role of Watch Commander during the midnight shift, *id.* ¶ 1446.

Plaintiff Lockerman alleges that she was "disciplined" but fails to explain how she was
disciplined. The Second Amended Complaint reveals that she was issued two unofficial letters
of counseling and a single official reprimand, both of which are essentially nonpunitive warnings
that do not constitute adverse employment actions. *See id.* ¶¶ 1416-17, 1431. As for the
September 15, 2021 PIP, placing an employee on a PIP without more does not constitute an
adverse employment action. *Kelly v. Mills,* 677 F. Supp. 2d 206, 222 (D.D.C. 2010) ("The PIP
placement itself had no effect on the terms or conditions of [plaintiff's] employment and thus
was not 'materially adverse' because it did not cause a 'significant change in employment
status.'"). And Plaintiff Lockerman does not plead direct economic harm associated with her
PIP placement. *Cf. Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010). Accordingly, the PIP
placement cannot serve as the basis for a Title VII or DCHRA claim.

## IV.   Plaintiffs Have Failed to State a Claim for a Hostile Work Environment.

To state a hostile work environment claim under Title VII and the DCHRA, Plaintiffs
must show that their "workplace [was] permeated with discriminatory intimidation, ridicule, and
insult" and that this conduct was "sufficiently severe or pervasive to alter the conditions of
[their] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc*.,
510  U.S. 17, 21 (1993) (citation and internal quotation marks omitted); *see also Baird v.
PiGotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (Title VII hostile work environment);

*Williams v. District of Columbia*, 317 F. Supp. 3d 195, 201 (D.D.C. 2018) (applying same test to hostile work environment claim under DCHRA).  In determining whether a work environment is hostile enough to be actionable, a court should consider:  (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, (2002); *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998); *see also Baird v. Gotbaum (Baird II)*, 792 F.3d 166, 169 (D.C. Cir. 2015).  This standard is a demanding one, as Title VII is not a "'general civility code' that regulates the 'ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"  *Burrell v. Shepard*, 321 F. Supp. 3d 1, 12 (D.D.C. 2018) (quoting *Faragher*, 524 U.S. at 788); *see also Faragher*, 524 U.S. at 788 (explaining that "the conduct must be extreme to amount to a change in the terms and conditions of employment").

A plaintiff cannot transform alleged discrete acts of discrimination and retaliation, without more, into a hostile work environment claim.  *See Dudley v. Wash. Metro. Area Trans. Auth.*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013) ("[A]s a general matter, courts in this Circuit frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim" and are "reluctant to transform mere reference to alleged disparate acts of discrimination against plaintiff into a hostile work environment claim.").  Although a court may consider allegations of "discrete acts that the plaintiff claims . . . are actionable on their own" in evaluating a plaintiff's hostile work environment allegations, *Brooks*, 748 F.3d at 1278, a plaintiff must still meet her burden of pleading severe or pervasive harassment; pleading such discrete acts is not enough.  *See Outlaw v. Johnson*, 49 F. Supp. 3d

88, 92 (D.D.C. 2014); *see also Laughlin v. Holder*, 923 F. Supp. 2d 204, 221 (D.D.C. 2013) (dismissing hostile work environment claim because non-promotions and other performance-based actions, including manipulating performance evaluations, denying bonuses, and repeatedly pressuring plaintiff to retire, did not rise to the level of an actionable hostile work environment); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing hostile work environment claim alleging, among other things, opposition to career advancement, removal of important assignments, and lowered performance evaluations).

Because Plaintiffs merely seek to bootstrap numerous discrete acts and do not show any severe or pervasive harassment, their hostile work environment claims fail:

***Plaintiff Brinkley*** alleges that MPD created a hostile work environment through a series of alleged "micro-aggressive" slights, including:  (1) assigning her a vehicle used by the K-9 unit that "had been infested with fleas," Second Am. Compl. ¶ 299; (2) refusing to address the use of sexually charged profanity during roll call, *id.* ¶¶ 324-30; (3) leaking her EEO complaint about the use of profanity in the workplace to her colleagues, *id.* ¶¶ 334-35; (4) separating her from her longtime partner SPO Mitchell, *id.* ¶ 343-44; and (5) disciplining her for the allegedly minor infractions of failing to submit to COVID-19 related assessments, using an inappropriate tone with a fellow officer, failing to wear her protective vest during roll call, and missing call-out at a barricade, *id.* ¶¶ 368-72, 389-90, 392, among other alleged slights.  But these are only "ordinary tribulations of the workplace."  *Faragher*, 524 U.S. at 788.   Additionally, as for her discipline for various infractions, "[c]ourts have generally rejected hostile work environment claims that are based on work-related actions by supervisors."  *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 7 (D.D.C. 2012) (citation and internal quotation marks omitted), *aff'd*, 748 F.3d 1273 (D.C. Cir. 2014).  And "a Title VII plaintiff must show far more than criticisms and snubs or perceived

slights to establish a hostile work environment." *Id.* (brackets, citation, and quotation marks omitted). Brinkley's hostile work environment claims fail because they offer nothing more.

**Plaintiff Mitchell** also alleges a series of slights that do not rise to a hostile work environment: (1) she was assigned a dirty, insect infested vehicle, Second Am. Compl. ¶¶ 1486-88; (2) a male superior urinated into a bottle in her presence, *id.* ¶¶ 1516-19; (3) she was wrongfully accused of violating a no-contact order before being exonerated after an investigation, *id.* ¶¶ 1535-39; (4) she was admonished to "watch the company you keep," *id.* ¶ 1543; and (5) she was denied the opportunity to take four hours of intermittent leave so that she could care for her mother, *id.* ¶¶ 1579-80. But these are again only "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788. Mitchell's hostile work environment claims thus fail.

**Plaintiff Carr** also alleges a series of slights that do not suffice: (1) revocation of her tardiness privilege, Second Am. Compl. ¶ 669; (2) suspension for recording Lieutenant Margiotta, *id.* ¶ 686; and (3) being subjected to an EEO investigation for allegations by Sergeant Boyd, for which she was exonerated, *id.* ¶¶ 678-80. Again, these are no more than "snubs" that do not establish a hostile work environment." *Faragaher*, 524 U.S. at 788.

**Plaintiff Grier** alleges mere perceived slights and fails to plead the requisite specificity to sustain a claim. In essence, Grier complains that she worked amongst more men than she would have preferred. She claims that she was assigned to an all-male workspace where Officer Jones "regularly" undressed down to his underwear to shock her. Second Am. Compl. ¶¶ 1010, 1013. Grier fails to allege anything other than these generalized allegations and does not specify when Officer Jones began this practice, when it ended, or what she means by "regularly." *Id.* ¶ 1013. She further fails to state the basis for her allegation that Officer Jones engaged in this behavior to shock her. *Id.* Plaintiff Grier fails to allege any other specific instances of conduct that created

the hostile culture she complains of.  *See id.* ¶ 1011.  Without specific allegations, Grier does not

demonstrate the requisite severity or pervasiveness needed to state a hostile work environment

claim.  *Harris*, 510 U.S. at 21.  Additionally, Grier fails to allege that "that the conduct at issue

was not merely tinged with offensive connotations, but actually constituted discrimination

because of [her] protected status."  *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188–89

(D.D.C. 2012) (citation omitted).

     ***Plaintiff Hampton*** alleges no more than a series of unrelated perceived slights and minor

annoyances.  For allegations to qualify as "part of the same actionable hostile work environment

claim," they must be "adequately linked into a coherent hostile environment claim" by

"involv[ing] the same type of employment actions, occurr[ing] relatively frequently, and [being]

perpetrated by the same managers."  *Baird*, 662 F.3d at 1251.  Hampton's complaints are highly

varied and cannot be viewed as part of the same hostile work environment claim.  As discussed

above, she complains of micromanagement, Second Am. Comp. ¶ 1093, condescension, *id.*, and

generally of operating within a publicly accountable bureaucracy, *id.* ¶¶ 1080-82, 1084-89, 1094-

95.  Her complaints are merely the "ordinary tribulations of the workplace" one would

reasonably expect to encounter through the course of a nearly 20-year career.  *Faragher*, 524

U.S. at 788.

     ***Plaintiff Lockerman*** seeks to use the consequences of her isolated performance issues as

the basis for a hostile work environment claim.  After failing to meet her supervisor's

performance standards, Lockerman was issued two unofficial letters of counseling and an official

reprimand and was placed on a PIP.  Second Am. Compl. ¶¶ 1416, 1417, 1433.  None of these

actions could reasonably be described as pervasive because there were only four occurrences

over a nearly two-year period.  *See Morgan*, 536 U.S. at 116.  Moreover, the contested actions

imposed no physical threat and were designed to improve Lockerman's performance, not to interfere with it.

*Plaintiff Dickerson's* allegations of discriminatory and retaliatory conduct date back to 1990, and they range from alleged sexual harassment to petty workplace slights. *See generally* Second Am. Compl. ¶¶ 843-977. There is no consistency in either the type of conduct or the perpetrators, underscored by the fact that Dickerson alleges she has been discriminated and retaliated against by every Chief of Police dating back to Chief Cathy Lanier. *See generally id*. Thus, her allegations fail to meet the demanding standard to state a claim for hostile work environment.

Like Dickerson, *Plaintiff Knight's* allegations of discriminatory and retaliatory conduct span three decades, and they similarly range from sexual harassment to petty workplace slights. *See* id. ¶¶ 1167-1337. There is no consistency in either the type of conduct or the perpetrators, and Knight makes allegations about how countless individuals—from MPD management, to the City Council, to the Mayor—either were out to get her or were not taking her seriously. *See generally id*. Thus, Knight's allegations fail to meet the demanding standard to state a claim for hostile work environment.

*Plaintiff Brown* cobbles together various allegations of what she describes as "harassing, denigrating, undermining, and bullying" behavior targeting her over the span of approximately three years. *See id.* ¶¶ 513-61. But Brown fails to allege any consistent perpetrators of the so-called bullying. Moreover, she seems to suggest that the treatment grew out of her assignment to patrol the Fairfax Village community, not any protected class or activity. *See id.* ¶¶ 514-15. Thus, Brown's allegations fail to state a claim for hostile work environment.

Finally, **Plaintiff Clark** alleges various instances—over the course of four years—when her requests for transfers, shift changes, and days off were denied. *See id.* ¶¶ 742-72. She alleges that at least three different supervisors were responsible for these disparate acts. *See id.* Clark's allegations amount to mere "ordinary tribulations of the workplace" and thus fail to support a claim for hostile work environment. *Faragher*, 524 U.S. at 788.

## V.   Plaintiffs Fail to State Retaliation Under Title VII, the DCHRA, or the DCWPA.

The Court should dismiss several of Plaintiffs' Title VII, DCHRA, and DCWPA retaliation claims, primarily because they fail to allege a causal connection between alleged protected activity and any materially adverse employment action. To show retaliation, Plaintiffs must establish that an employer took a materially adverse action "because" they opposed an unlawful practice. *Harris v. Dist. of Columbia Water and Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015). An action is materially adverse if it would dissuade a reasonable employee from making a charge of discrimination. *Burlington Northern & Santa Fe R. Co. v. White*, 548 U.S. 53, 70 (2006). The causation element may be established if the plaintiff alleges "that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter." *Marshall v. Potter*, 634 F. Supp. 2d 66, 73 (D.D.C. 2009). Although "neither the Supreme Court nor the [D.C. Circuit] has established a bright-line three-month rule," *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), courts in this Circuit have generally ruled that a three-month gap between the protected activity and the adverse employment action is too attenuated to prove causation. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting interval of two and a half months as establishing temporal proximity and citing with approval cases that did not find temporal proximity when two to three months elapsed between protected activity and adverse employment action); *see also Tressler v. Amtrak*, No. 09-2027,

40

2012 WL 5990035, at *10–11 (D.D.C. Nov. 30, 2012) (five- or ten-month gap was too long to establish necessary temporal proximity).

The DCWPA prohibits supervisors from "tak[ing], or threaten[ing] to take, a prohibited personnel action or otherwise retaliate[ing] against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  D.C. Code § 1-615.53(a).  To allege a prima facie claim, a plaintiff must first show that she made a protected disclosure and that her employer had knowledge of the protected activity.  A "protected disclosure" under the DCWPA is one that the employee "reasonably believes" evidences one or more of the circumstances delineated in D.C.Code § 1–615.52(6)(A)–(E).  For there to be a protected disclosure, "an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people."  *White v. Department of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004).  Courts in this District have applied the temporal proximity analysis to DCWPA claims.  *See Booth v. District of Columbia*, 701 F. Supp. 2d 73, 81 (D.D.C. 2010) ("[C]laims premised on alleged retaliatory acts over four months after plaintiffs' protected activity do not permit an inference of causation."); *Johnson v. District of Columbia*, 935 A.2d 113, 1120 (D.C. 2007) ("[W]e reject the four-month lapse of time as proof of a causal connection between the protected disclosures and the adverse actions.").

Plaintiffs' retaliation claims falter for failure to allege facts stating a claim, as follows:

*Sinobia Brinkley*:  Here, the latest protected activity that Plaintiff Brinkley claims to have engaged in was on December 23, 2020, when she filed her EEOC charge of discrimination, but she was not terminated until April 29, 2021, over four months later.  Second Am. Compl. ¶¶ 444-45.  And even if Brinkley relies on emails or letters written to the Chief and Assistant Chief of MPD, those communications occurred on January 9, 2021, still more than three months before

her termination.  *Id.* ¶ 426.  Finally, there is no allegation showing that MPD was aware of her February 19, 2021 letter to the City Council.  *See id.* ¶ 431.  Accordingly, Plaintiff cannot show causation between that letter and her termination.  *See Coleman v. District of Columbia*, 794 F.3d 49, 64 (D.C. Cir. 2015) (requiring defendant to have actual knowledge of protected activity for DCWPA claim); *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 19 (D.D.C. 2014) (same requirement for Title VII).  Because the temporal proximity between Plaintiff's alleged protected activity and the District's alleged retaliation is too remote to support an inference of causation and no other facts support such inference, the Court should dismiss Plaintiff Brinkley's retaliation claims.  *See Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 312 (D.D.C. 2015) (dismissing retaliation claim where there was no temporal proximity between alleged protected activity and retaliation and no other events or factors are alleged giving rise to an inference of causation).  Regarding her DCWPA claim, Brinkley generically states that she made "disclosures to her supervisors . . . about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it,"[3] Second Am. Compl. ¶ 469, which is insufficient to show that she made any timely protected disclosure or the requisite causation between any such disclosure and a prohibited personnel action.

**Kia Mitchell**:  Plaintiff Mitchell fails to allege any protected activity under Title VII that preceded any materially adverse action.  She did not file an EEOC charge until August 4, 2021. *See* Ex. 7, Mitchell EEOC Charge.  She alleges no materially adverse action between filing her EEOC charge and her scheduled retirement in September 2021.  *See* Second Am. Compl. ¶ 1587.

---

[3]      This boilerplate allegation is repeated verbatim as to Plaintiffs Clark (Second Am. Compl. ¶ 824), Dickerson (*id.* ¶ 1000), Grier (*id.* ¶ 1067), Knight (*id.* ¶ 1360), and Lockerman (*id.* ¶ 1471).

Accordingly, her retaliation claims fail.  Similarly, she alleges no protected disclosure under the DCWPA, so that claim also does not pass muster.

**Karen Carr**:  Plaintiff Carr alleges no materially adverse action that happened after her May 2, 2021 EEOC charge.  Thus, any Title VII claim based on her protected activity in filing her EEOC charge fails for both want of adverse action and causation.

**Regenna Grier**:  Plaintiff Grier fails to allege a prima facie case of retaliation.  Even if her participation in Officer Effler's arrest and prosecution in 2002 constituted protected activity, far too much time has passed since her alleged protected activity to establish any causal connection to the events she complained of in the late 2010's forward.  Additionally, Plaintiff Grier retired from MPD in 2015 before returning in 2017.  Second Am. Compl. ¶¶ 10, 1007.  The roughly 15 years that passed between her actions in 2002 and her assignment to an all-male workspace in 2017 render her claim of retaliation untenable.  *See Booth*, 701 F. Supp. 81.  Additionally, this assignment is not materially adverse in that it would not dissuade a reasonable worker from making a charge of discrimination.  *Burlington Northern*, 548 U.S. at 70.  Likewise, Plaintiff Grier's internal complaints about Officer Jones, her workspace, and MPD's teleworking policy lack temporal proximity to any materially adverse action.

**Tamika Hampton**:  Plaintiff Hampton's retaliation claims cannot stand.  She alleges several complaints of discrimination:  (1) a 2003 internal and OHR complaint against Sergeant Suber, Second Am. Compl. ¶¶ 1080-81; (2) a 2007 DOJ complaint against Chief Grooms, *id.* ¶ 1094; and (3) a 2019 internal complaint against Captain Boteler, *id.* ¶¶ 1118-19.  Even if the 2012 IAD investigation into Plaintiff Hampton's use of force constitutes a materially adverse employment action, approximately *five years* had passed since Hampton's last complaint of discrimination.  *Id.* ¶¶ 1097-1102.  Similarly, two years had passed—during which Hampton was

43

promoted to Sergeant—between the 2019 complaint against Captain Boteler and Hampton's supposedly undue scrutiny, with even more time passing until she was left at the scene of a shooting. *Id.* ¶¶ 1120-23, 1129-35.  Simply too much time had elapsed between any of the events that could reasonably be construed as protected activity and those that could be framed as materially adverse actions.  The Court should dismiss Hampton's retaliation claims.

***Lashaun Lockerman***:  Plaintiff Lockerman fails to allege any protected activity under Title VII that preceded any materially adverse action.  She never filed an EEOC charge or even brought an internal complaint of discrimination.  Her retaliation claims thus fail.  Similarly, as she alleges no protected disclosure under the DCWPA, her DCWPA claim also falters.

***Chanel Dickerson***:  Plaintiff Dickerson fails to allege facts giving rise to any claim of retaliation.  Dickerson filed an EEOC charge on August 4, 2021, but she does not allege that she suffered any materially adverse action after that point in time.  As for her DCWPA claim, Dickerson generically states that she made "disclosures to her supervisors . . . about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it . . . . "  Second Am. Compl. ¶ 1000.  Dickerson's vague description does not match any of her specific factual allegations, nor does she make any effort to tie any purported disclosure to any adverse action against her.  Thus, Dickerson has failed to state any claim for retaliation.

***Tabatha Knight***:  Plaintiff Knight essentially alleges that she was retaliated against throughout her entire career at MPD.  *See generally* Second Am. Compl. ¶¶ 1167-1337.  But Knight filed an EEOC charge in May 2021, two months *after* she retired from MPD.  Thus, she does not—and cannot—claim that she was retaliated against for filing the charge.  What is more, as with most of the other Plaintiffs, Knight merely generically alleges that she made "disclosures

44

to her supervisors . . . about the systemic discrimination in the MPD, and the complicity of the

MPD EEO Department in perpetuating it and protecting those who engage in it . . . ." *Id.* ¶ 1360.

Knight does not link any specific disclosures she supposedly made to any adverse action she

allegedly suffered.  Thus, she has failed to state any claim for retaliation.

      *Tiara Brown*:  Plaintiff Brown does not describe any actions that suggest retaliation

under Title VII, the DCHRA, or the DCWPA.  *See generally* Second Am. Compl. ¶¶ 507-79.

Brown did not file an EEOC charge, and thus cannot claim that she was retaliated against for

doing so.  Unlike most of the other Plaintiffs, Brown bases her DCWPA claim on specific

alleged disclosures:  her alleged disclosure to Lieutenant Preston reporting what Brown describes

as an illegal stop-and-frisk, and her disclosure of "race and gender harassment" to Plaintiff

Dickerson.  *Id.* ¶ 602.  Both complaints happened in 2019, and thus they are time-barred.  *See id.*

¶¶ 556-562, 602-04.  But even if they were timely, Brown still has failed to state a claim for

DCWPA retaliation.  Regarding her supposed disclosure to Dickerson, Brown concedes that she

reported "bullying," not "race and gender harassment," and she thus did not report any violation

of law.  *See* D.C. Code § 1–615.52(a)(6)(D).  As for her discussion with Preston, Brown makes

no allegation that Preston—or anyone else for that matter—took any adverse action against after

she made that disclosure.  Brown has failed to state any claim for retaliation.

      *Leslie Clark*:  Last, Plaintiff Clark does not allege any facts that would give rise to a

claim for retaliation.  *See generally* Second Am. Compl. ¶¶ 726-801.  On the contrary, based on

her allegations, the supposed adverse treatment that she received (*i.e.*, denials of requests for

transfers, shift changes, and days off) apparently existed from the moment she returned to MPD

as an SPO.  *See generally id.*  Clark filed an EEOC charge on January 1, 2021, but she does not

allege any adverse treatment occurring after that date.  As most of the other Plaintiffs do, Clark

generically and vaguely alleges that she made "disclosures to her supervisors . . . about the systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it . . . ."  *Id.* ¶ 824.  But Clark asserts no factual allegations consistent with this description.  Thus, Clark has failed to state retaliation.

**VI.**   **Plaintiffs' Section 1981 and 1983 Claims Fail to State a Claim.**

Plaintiffs attempt to hold the District liable for constitutional violations allegedly committed by members of the MPD.  Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a city may be held liable under § 1983 for the deprivation of constitutional rights, not under principles of *respondeat superior*, but instead only where its own "policy or custom. . . inflicts the injury.  *Id.* at 694.  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy."  *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 139 (D.D.C. 2003), *aff'd sub nom. Byrd v. Gainer*, No. 03-7196, 2004 WL 885228 (D.C. Cir. Apr. 26, 2004) (internal citations and quotations omitted).  "The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Robinson v. Dist. of Columbia*, 403 F. Supp. 2d 39, 53–54 (D.D.C. 2005) (citing *Monell* 436 U.S. at 694).  Accordingly, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Id.*

"The failure to train, supervise, or discipline city employees can constitute such a policy or custom if it amounts to 'deliberate indifference' towards the constitutional rights of persons in its domain."  *Byrd*, 297 F. Supp. 2d at 139 (quoting *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000)).  Deliberate indifference is an objective analysis conducted by

"analyzing whether the municipality knew or should have known the risk of constitutional violations, and yet failed to respond as necessary." *Id.* (quoting *Baker v. District of Columbia*, 326 F.3d, 1302, 1307 (D.C. Cir. 2003). Plaintiffs must show more than simple or heightened negligence in order to prevail; the District's indifference must be conscious or at least reckless. *Id.* (citing *Canton v. Ohio*, 489 U.S. 378, 389 (1989)).

Plaintiffs' § 1983 claims fail for several reasons. *First*, their allegations are conclusory and thus do not state a plausible claim. Like the plaintiff in *Motley-Ivey v. District of Columbia*, 923 F. Supp. 2d 222 (D.D.C. 2013), Plaintiffs allege "in purely conclusory fashion, that [their] supervisors' allegedly discriminatory actions had become so widespread and embedded that [the] Chief [of Police] must have known and sanctioned it . . . ." 923 F. Supp. 2d at 239 (internal quotation marks omitted); *see* Second Am. Compl. at 2; ¶¶ 248-60. This does not suffice.

*Second*, although Plaintiffs allege that the Chief of Police was notified of general discrimination involving some Plaintiffs, Plaintiffs fail to allege deliberate indifference on the part of the Chief of Police. *See e.g.*, *id.* ¶ 401 (Plaintiff Brinkley's email to Chief of Police detailing "systemic and sustained disparate treatment and discriminatory actions against Black female officers in the MPD); ¶ 824 (Plaintiff Clark's alleged disclosure to Chief Newsham about discrimination at MPD); ¶ 1611 (Plaintiff Mitchell's alleged disclosure about systemic discrimination at MPD); ¶¶ 908-10 (Plaintiff Dickerson's alleged complaint during an executive performance briefing about a "staggering disparity in serious discipline involving employees of color at MPD"). Indeed, Plaintiffs Grier, Lockerman, and Hampton fail to allege that the Chief of Police was ever notified of general discrimination involving them. Plaintiffs' general warnings about "systemic discrimination" are insufficient to put MPD on notice of the specific discrimination Plaintiffs allegedly experienced. *See Motley-Ivey*, 923 F. Supp. 2d at 239

47

(dismissing § 1983 claim for lack of showing that alleged conduct toward female police officer was driven by an official policy or custom).

*Third*, Plaintiffs' attempt to connect the Chief of Police to the allegedly discriminatory actions of lower-level supervisors by alleging "that the Chief of Police maintains a degree of supervision over the Department's various managers and its Equal Employment Office," Second Am. Compl. ¶ 19, does not advance their cause as it alleges only *respondeat superior* liability. *See Motley-Ivey*, 923 F. Supp. 2d at 239 (dismissing § 1983 claim for lack of showing that alleged conduct toward female police officer was driven by an official policy or custom).

*Lastly*, any § 1983 claim that relies on notice to the Chief of Police that occurred before June 8, 2018, for Plaintiff Brinkley, and September 22, 2018, for the remaining Plaintiffs is barred by the three-year statute of limitations. Accordingly, except Brinkley's alleged email notice to Chief Newsham, which occurred on October 31, 2020, no other allegations of notice to the Chief of Police were made within the statute of limitations.

## VII.   Plaintiffs' Negligent Training and Supervision Claim Fails.

In the District of Columbia, "employers operating public businesses are generally 'bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee.'" *Search v. Uber Techs. Inc*., 128 F. Supp. 3d 222, 229 (D.D.C. 2015) (citing *Merchants Home Delivery, Inc.*, 892 A.2d 415, 431 (D.C. 2006). To properly state a negligent retention and supervision claim, a plaintiff must allege that the "employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Corp*., 487 A.2d 610, 612 (D.C. 1985). A plaintiff must allege that "the employer breached a duty to plaintiff to use

reasonable care in the supervision or retention of an employee which proximately caused harm to the plaintiff." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002).  The breach must be a "substantial factor" in causing the plaintiff's injury.  *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 114 (D.D.C. 2011) (quotations and citation omitted).

Here, Plaintiffs have not plausibly alleged that MPD knew or should have known that its various supervisory officers behaved in a dangerous or otherwise incompetent manner, and that MPD, armed with actual or constructive knowledge, hired the various supervisory officers or failed to adequately train or supervise them.  Instead, Plaintiffs allege in a conclusory manner that MPD "fosters a culture and environment where such [civil rights] violations were not only allowed to occur, but were encouraged and fully tolerated."  Second Am. Compl. ¶ 249.  The Second Amended Complaint pleads only facts that are "merely consistent with" the District's liability, and amount to no more than "unadorned, the defendant-unlawfully-harmed-me accusations," which are not sufficient to satisfy the pleading requirements.  *Iqbal*, 556 U.S. at 678.  Accordingly, Plaintiffs' negligent hiring, training, and supervision claim cannot survive.

## VIII.   Plaintiffs Brinkley and Clark's ADEA Claims Are Meritless.

"The ADEA makes it 'unlawful for an employer . . . to fail or refuse to hire or discharge . . . or discriminate against any individual who is at least forty (40) years old . . . because of such individual's age.'"  *Singleton v. Potter*, 402 F. Supp. 2d 12, 25 (D.D.C. 2005) (quoting 29 U.S.C. § 623(a)(1)).  "To establish a *prima facie* case of age discrimination under the ADEA, the plaintiff must demonstrate 'facts sufficient to create a reasonable inference that age discrimination was a determining factor in the employment decision.'"  *Jones v. Bernanke*, 493 F. Supp. 2d 18, 27 (D.D.C. 2007) (quoting *Cuddy v. Carmen,* 694 F.2d 853, 856-57 (D.C. Cir. 1982)).  Such an inference is created if the plaintiff shows that: "(1) she was a member of the

ADEA's protected class of persons over forty (40) years of age; (2) she was qualified for her position and was performing her job well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action despite her qualifications and performance; and (4) she was disadvantaged in favor of similarly situated younger employees." *Singleton*, 402 F. Supp. 2d at 26 (citations omitted).[4]

Here, the Amended Complaint lacks any factual allegations that show an inference of age discrimination. Neither Brinkley nor Clark allege any facts demonstrating that MPD mistreated them because of their age. Instead, they make the conclusory statements that they were "terminated"[5] and "denied sick leave, weekend days off, duty assignments, training, and health assessments" because of their ages. Second Am. Compl. ¶¶ 479, 480, 484, 833, which is nothing more than a threadbare recital of the cause of action, *Iqbal*, 556 U.S. at 678; *see McNair v. District of Columbia*, 213 F. Supp. 3d 81, 87-88 (D.D.C. 2016) (dismissing gender discrimination claim because plaintiff failed to allege any connection between her gender and the allegedly different treatment that she received). The Court should dismiss Brinkley's and Clark's ADEA claims.

## IX.   **Plaintiff Brinkley's ADA Claim Fails**

"To state a claim for intentional discrimination [under the ADA], a plaintiff must allege facts sufficient to show that he or she (1) had a disability within the meaning of the statute, (2) was qualified for the position with or without a reasonable accommodation, and (3) suffered an

---

[4]     Although a plaintiff need not plead facts establishing a *prima facie* case, she "must nevertheless plead sufficient facts to show a plausible entitlement to relief." *Montgomery v. Omnisec Int'l Sec. Servs., Inc.*, 961 F. Supp. 2d 178, 183 (D.D.C. 2013) (citation and internal quotation marks omitted).

[5]     Despite mentioning termination in her ADEA claim, Clark does not allege that she was terminated in her recitation of factual allegations. In fact, she appears to allege that she is still employed with MPD. *See* Second Am. Compl. ¶ 8.

adverse employment action because of his or her disability." *Badwal v. Bd. of Trustees of Univ. of Dist. of Columbia.*, 139 F. Supp. 3d 295, 308 (D.D.C. 2015) (citing *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 154 (D.D.C. 2013)).  Plaintiff Brinkley fails to meet the second and third requirements.

First, Plaintiff's ADA claim fails for the simple reason that she does not allege anywhere in her complaint that she can perform the job of SPO with or without a reasonable accommodation.  *See generally* Second Am. Compl.  This pleading failure is fatal to her ADA claim and Count XI should be dismissed for this reason.  *See Badwal*, 139 F. Supp. 3d at 310 (dismissing ADA claim for failure to allege that plaintiff could perform his duties with or without reasonable accommodation).  And none of the actions Brinkley allegedly suffered because of her alleged disability constitute adverse employment action.  *See* Second Am. Compl. ¶¶ 493-503.  She alleges that her superiors asked inappropriate questions and made negative comments about her disability, threatened to send her to a fitness for duty evaluation, disciplined her for failing to submit to a health assessment, and disclosed her personal and confidential information concerning her mental health condition to her colleagues.  *Id.*  For the reasons explained in Section III above, these allegations do not rise to the level of an adverse employment action because they do not allege objectively tangible harm.  Plaintiff thus fails to state a claim under the ADA.  Accordingly, the Court should dismiss Plaintiff Brinkley's ADA claim.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion for partial dismissal, or, in the alternative, for partial summary judgment.

Dated: July 22, 2022                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Christina Okereke*
CHRISTINA OKEREKE [219272]
Chief, Civil Litigation Division Section II

*/s/ Burth G. López*
BURTH G. LOPEZ [976981]
RYAN MARTINI [888241893]
Assistant Attorneys General
400 6th Street, N.W.
Washington, D.C. 20001
(202) 716-6658
Burth.Lopez@dc.gov

*Counsel for Defendant District of Columbia*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SINOBIA N. BRINKLEY, *et al.*,

        *Plaintiffs*,

     v.

DISTRICT OF COLUMBIA, *et al.*,

        *Defendants*.

Civil Action No. 1:21-cv-1537 (RBW)

**ORDER**

Upon consideration of Defendants' Motion to Partially Dismiss the Complaint, any opposition and reply thereto, and the entire record herein, it is by the Court this _____ day of _____, 2022, hereby

**ORDERED** that Defendants' Motion is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' race discrimination under Title VII in Count I of the Second Amended Complaint are **DISMISSED WITH PREJUDICE** as to Plaintiffs Kia Mitchell, Karen Carr, Chanel Dickerson, Leslie Clark, Tabatha Knight, Regenna Carter, Tiara Brown, and Tamika Hampton; and as to Plaintiff Sinobia Brinkley except as to her termination; and it is further

**ORDERED** that Plaintiffs' Title VII hostile work environment claims in Count I are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' Title VII retaliation claims in Count I are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs race discrimination claims under the DCHRA in Count II are **DISMISSED WITH PREJUDICE** as to Plaintiffs Kia Mitchell, Karen Carr, Chanel Dickerson,

Leslie Clark, Tabatha Knight, Regenna Carter, Tiara Brown, and Tamika Hampton, and as to Plaintiff Sinobia Brinkley except as to her termination; and it is further

**ORDERED** that Plaintiffs' DCHRA hostile work environment claims in Count II are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' DCHRA retaliation claims in Count II are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Count III (Plaintiffs' claims under 42 U.S.C. § 1981) is **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' Title VII sex discrimination claims in Count IV are **DISMISSED WITH PREJUDICE** as to Plaintiffs Kia Mitchell, Karen Carr, Chanel Dickerson, Leslie Clark, Tabatha Knight, Regenna Carter, Tiara Brown, and Tamika Hampton, and as to Plaintiff Sinobia Brinkley except as to her termination; and it is further

**ORDERED** that Plaintiffs' Title VII hostile work environment claims in Count IV are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' Title VII retaliation claims in Count IV are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' DCHRA sex discrimination claims in Count V are **DISMISSED WITH PREJUDICE** as to Plaintiffs Kia Mitchell, Karen Carr, Chanel Dickerson, Leslie Clark, Tabatha Knight, Regenna Carter, Tiara Brown, and Tamika Hampton, and as to Plaintiff Sinobia Brinkley except as to her termination; and it is further

**ORDERED** that Plaintiffs' DCHRA hostile work environment claims in Count V are **DISMISSED WITH PREJUDICE** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' DCHRA retaliation claims in Count V are **DISMISSED WITH**

**PREJUDICE** as to all Plaintiffs; and it is further

ORDERED that Count VI (Plaintiffs' DCWPA claims) is **DISMISSED WITH**

**PREJUDICE** as to all Plaintiffs; and it is further

ORDERED that Count VII is **DISMISSED WITH PREJUDICE** as to all Plaintiffs;

it is further

ORDERED that Plaintiffs' Brinkley and Clark's Age Discrimination in Employment Act

claims are **DISMISSED WITH PREJUDICE**; and it is further

ORDERED that Plaintiff Brinkley's Americans with Disabilities Act claim is **DISMISSED**

**WITH PREJUDICE**.

SO ORDERED.

_____
REGGIE B. WALTON
United States District Judge