**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SINOBIA N. BRINKLEY, <u>et al.</u>,<br><br>    Plaintiffs,<br><br>  v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 21-1537 (RBW)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>**MEMORANDUM OPINION**</u>

The plaintiffs—Sinobia N. Brinkley ("Plaintiff Brinkley"), Tiara Brown ("Plaintiff Brown"), Karen Carr ("Plaintiff Carr"), Leslie Clark ("Plaintiff Clark"), Chanel Dickerson ("Plaintiff Dickerson"), Regenna Grier ("Plaintiff Grier"), Tamika Hampton ("Plaintiff Hampton"), Tabatha Knight ("Plaintiff Knight"), LaShaun Lockerman ("Plaintiff Lockerman"), and Kia Mitchell ("Plaintiff Mitchell")—bring this civil action against the defendant, the District of Columbia, alleging various forms of discrimination, retaliation, and other statutory violations. The plaintiffs, ten current and former Black female Metropolitan Police Department ("MPD") officers, allege that the defendant violated Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2; the District of Columbia Human Rights Act ("D.C. Human Rights Act" or "DCHRA"), D.C. Code § 2-1402.11; "the Civil Rights Act of 1866 . . . [,] 42 U.S.C. § 1981(a) by way of, through and via 42 U.S.C. § 1983[;]" the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34; the Americans with Disabilities Act of 1967 ("ADA"), 42 U.S.C. § 12112; the District of Columbia Whistleblower Protection Act ("DCWPA"), District of Columbia Code § 1-615.53; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C.

§ 2615; and the District of Columbia Family and Medical Leave Act ("DCFMLA"), D.C. Code § 32-507. See Plaintiffs' Third Amended Complaint for Injunctive and Compensatory Relief ("3d Am. Compl.") at 1–5, ECF No. 42.

Currently pending before the Court is the defendant's partial motion to dismiss, or, in the alternative, for partial summary judgment. See Defendant's Motion for Partial Dismissal of the Third Amended Complaint, or, in the Alternative, for Partial Summary Judgment ("Def.'s Mot.") at 23, ECF No. 48. Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant in part and deny in part the defendant's motion.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff Brinkley filed the initial complaint in this matter on June 7, 2021. See Complaint ("Compl.") at 1, ECF No. 1. On September 22, 2021, the plaintiffs filed their first collective Amended Complaint, consolidating the cases of all the plaintiffs identified above. See Plaintiffs Sinobia Brinkley, Tabatha Knight and Karen Carr's First Amended and Consolidated Complaint, and Plaintiffs' Tiara Brown, Leslie Clark, Chanel Dickerson, Regenna Grier, Tamika Hampton, Laushaun Lockerman and Kia Mitchell's First Consolidated Complaint for Declaratory, Injunctive and Compensatory Relief ("Am. Compl.") at 3, ECF No. 9. The plaintiffs filed their Second Amended Complaint on June 13, 2022, see Plaintiffs' Amended Complaint for Declaratory, Injunctive and Compensatory Relief at 1, ECF No. 28, which the Court sua sponte dismissed on March 27, 2024, because "the plaintiffs framed their claims, in

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Partial Dismissal or in the Alternative, Motion for Partial Summary Judgment ("Opposition" or "Pls.' Opp'n"), ECF No. 52; and (2) the Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Partial Dismissal or, in the Alternative, for Partial Summary Judgment ("Def.'s Reply"), ECF No. 54.

part, as a class action lawsuit . . . [but] never moved to certify their lawsuit as a class action," see Order at 2 (Mar. 27, 2024), ECF No. 39.  After dismissing the Second Amended Complaint, the Court ordered the plaintiffs to file a Third Amended Complaint limited to the named plaintiffs' individual claims.  See id. at 5–6.  The plaintiffs filed their Third Amended Complaint on June 7, 2024.  See 3d Am. Compl. at 1.[2]

## 1.  The Third Amended Complaint

The Third Amended Complaint contains 23 counts[3] encompassing 187 pages.  Some of the counts apply to all ten plaintiffs while some apply only to an individual plaintiff.  The claims can be divided into the following several general categories.

### a.    Race Discrimination Claims

Count I alleges "race discrimination" by all ten plaintiffs in violation of Title VII on four distinct theories: disparate treatment; disparate impact; hostile work environment; and retaliation. Count II alleges "race discrimination" by all ten plaintiffs in violation of the DCHRA on the same four theories.  Count III alleges a violation of the Civil Rights Act of 1866 by all ten plaintiffs for "Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. § 1981(a) by way of, through, and via, 42 U.S.C. § 1983, Disparate Treatment, Hostile

---

[2] In the Third Amended Complaint, the plaintiffs "fully incorporate the allegations in Karen Ervin, et al. v. District of Columbia . . . in which three African American women MPD employees, two sworn officers, and one civilian employee, allege that they were sexually harassed at MPD and that they were victimized because of MPD's [Equal Employment Opportunity ('EEO'] policies."  3d Am. Compl. ¶ 208.  However, "[t]he Court does not consider allegations from other complaints that are incorporated merely by reference[,]" therefore only the allegations in the plaintiffs' Third Amended Complaint are considered as applicable in this case.  Thomas v. District of Columbia, No. 23-cv-01378 (AHA), 2025 WL 1279362, at *11 n.2 (D.D.C. May 2, 2025) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1326 (4th ed. 2008) ("Although [Federal Rule of Civil Procedure] 10(c) is not expressly limited to pleadings in the same action, it has been held that allegations in pleadings in another action, even if between the same parties, cannot be incorporated by reference." (collecting cases)).

[3] The Third Amended Complaint does not include a Count XXI, but it does repeat "COUNT XXII & XXIII" for Plaintiff Mitchell's Whistleblower Protection Act claim and for Plaintiff Mitchell's FMLA and DC FMLA claims. The Court will refer to the claims in the order in which they appear in the Third Amended Complaint and will therefore consider Plaintiff Mitchell's Whistleblower Protection Act claim Count XXI.

Work Environment[,] and Retaliation based on Race." The plaintiffs also seem to assert as a basis for these race discrimination claims that the defendant was negligent in its training and supervision of its employees. See 3d Am. Compl. ¶¶ 236–42. The Court will consider this negligence claim, which it interprets as being alleged by all ten plaintiffs, separate from their Title VII and DCHRA race discrimination claims.

### b.    Gender Discrimination Claims

Count IV alleges "gender discrimination" by all ten plaintiffs in violation of Title VII on four distinct theories: disparate treatment; disparate impact; hostile work environment; and retaliation. Count V alleges "gender discrimination" by all ten plaintiffs, in violation of the DCHRA on the same four theories.

### c.    Whistleblower Protection Act Claims

Counts VI, XI, XII, XIII, XVI, XVII, XVIII, XIX, XX, and XXI are each individual plaintiff's Whistleblower Protection Act Claim. Each of these counts alleges the creation of a retaliatory hostile work environment.

### d.    Age Discrimination Claims

Count VII alleges that the defendant discriminated against Plaintiff Brinkley because of her age in violation of the ADEA based on disparate treatment and retaliation. Count VIII alleges that the defendant discriminated against Plaintiff Brinkley based on her age in violation of the DCHRA because of disparate treatment and retaliation. Count XIV alleges that the defendant discriminated against Plaintiff Clark because of her age in violation of the ADEA, resulting from disparate treatment and retaliation. Count XV alleges the defendant discriminated against Plaintiff Clark because of her age in violation of the DCHRA, based on disparate treatment and retaliation.

**e.      Disability Discrimination Claims**

Count IX alleges that the defendant discriminated against Plaintiff Brinkley because of her disability in violation of the ADA, resulting from disparate treatment and retaliation.  Count X alleges that the defendant discriminated against Plaintiff Brinkley based on her disability in violation of the DCHRA, resulting from disparate treatment and retaliation.

**f.      Family Medical Leave Act Claims**

Count XXII alleges that the defendant interfered with Plaintiff Mitchell's rights under the FMLA.  Count XXIII alleges that the defendant interfered with Plaintiff Mitchell's rights under the DCFMLA.

**2.  The Partial Motion to Dismiss and Subsequent Filings**

On July 26, 2024, the defendant filed a partial motion to dismiss the Third Amended Complaint, or, in the alternative, for summary judgment, see Def.'s Mot. at 1.  The defendant moves to dismiss various claims on both procedural and substantive grounds, arguing that (1) most of the plaintiffs' Title VII and ADEA claims are unexhausted or otherwise untimely; and that (2) the plaintiffs' hostile work environment, retaliation, 42 U.S.C. §§ 1981 and 1982, negligent training and supervision, age discrimination, and disability discrimination allegations all fail to state a claim.  Id.  The defendant's partial motion to dismiss does not challenge (1) the plaintiffs' disparate impact claims; (2) the plaintiffs' timely disparate treatment claims; and (3) the plaintiffs' FMLA and DCFMLA claims.

The plaintiffs filed their opposition to the defendant's motion on October 4, 2024, see Pls.' Opp'n at 1, and on November 1, 2024, the defendant filed its reply to the plaintiffs' opposition, see Def.'s Reply at 1.

B.    Factual Background

The plaintiffs are a group of Black female police officers currently or formerly employed by the MPD.  See 3d Am. Compl. at 1–2.  They devote approximately 25 pages of the Third Amended Complaint to allegations "relevant to all plaintiffs," which describe cultures, patterns, and practices within the MPD that allegedly promote discriminatory actions.  See generally id. at 5–34.  In brief, the plaintiffs allege that the MPD has a "culture of allowing and encouraging supervisory abuse of power", id. at 8; a "dysfunctional and chilling EEO Office", id. at 10; a "pattern and practice of retaliatory [Internal Affairs Division] investigations of Black women police officers who complain about race or gender discrimination, or retaliation," id. at 19; a "pattern, practice and/or custom of retaliating against Black women complainants by way of involuntary transfers," id. at 21; a pattern and practice of coordinated disciplinary campaigns against Black women officers, id. at 23; a "pattern and practice of intentionally denying promotions to Black women officers," id. at 26; a "pattern and practice, and/or custom of enforcing disparate disciplinary standards which favor white male officers," id. at 29; a "pattern, practice, and custom of condoning sexual harassment, sex-based discrimination and misconduct, and rewarding and protecting male officers who engage in sexually inappropriate conduct or speech," id. at 31; and a "pattern, practice and custom of withholding resources from Black women police officers and undermining their authority and ability to execute their duties," id. at 33.

In a class action lawsuit, "a class of plaintiffs may submit 'proof of the pattern or practice' of discrimination that 'supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made pursuant to that policy.'"  Marcus v. Geithner, 813 F. Supp. 2d 11, 20 (D.D.C. 2011) (quoting Int'l Bhd. of

6

Teamsters v. United States, 431 U.S. 324, 362 (1977)).  But this is not a class action lawsuit, see Order at 2 (Mar. 27, 2024), ECF No. 39 (dismissing sua sponte the Second Amended Complaint for failure to comply with class action procedural rules and ordering a Third Amended Complaint limited to the named plaintiffs' individual claims) and "myriad rulings from members of this court and elsewhere have unanimously affirmed the proposition that [ ] individual plaintiff[s] may not bring a standalone 'pattern or practice' claim outside the context of a class action."  Id.  Thus, although the Third Amended Complaint portrays an overarching atmosphere hostile to all Black female police officers, the claims in this case are individual claims and must be analyzed accordingly.

In addition to the common "pattern and practice" allegations, the Third Amended Complaint includes approximately 140 pages of facts specific to each individual plaintiff.  The Court will attempt to summarize the most pertinent allegations.[4]

## 1. Specific Facts Related to Plaintiff Brinkley

### a. Allegations in the Third Amended Complaint

"Plaintiff Brinkley began her employment with [the] MPD in October 1988."  3d. Am. Compl.  ¶ 253.  Plaintiff Brinkley retired in November 2016, id. ¶ 261, but resumed her employment with the MPD in March 2017, id. ¶ 262.

Plaintiff Brinkley alleges that, upon her return to the MPD, a supervisor, Sergeant Boyd, treated her "more harshly and negatively than any other officers in the unit, and more harshly than other non-Black female officers[.]"  Id. ¶ 272.  For example, in May 2017, Sergeant Boyd "assigned Plaintiff Brinkley and [Plaintiff] Mitchell vehicles that . . . had been infested with

---

[4] Because the parties disagree about whether the plaintiffs have exhausted their administrative remedies by filing charges with the EEOC, and about whether those EEOC charges that were administratively exhausted were timely, the Court will indicate when they were filed and summarize the content of each plaintiff's EEOC charges.

fleas . . . [even though] there were other vehicles available[.]" Id. ¶¶ 273, 275.  When they complained about the condition of the vehicle, "[Sergeant] Boyd undertook a campaign to retaliate against, undermine, isolate, spread false claims against and harass Plaintiff Brinkley and [Special Police Officer] Mitchell[.]" Id. ¶ 281.  In September 2019, after losing her husband, Plaintiff Brinkley was allegedly informed that a different supervisor, Lieutenant Darnell Robinson, "made derogatory comments about her extreme grief, had publicly denigrated her for exhibiting symptoms of depression and anxiety, and had threatened to send Plaintiff Brinkley for a fitness for duty evaluation[.]" Id. ¶ 288.

Plaintiff Brinkley further alleges that around June 2019, Sergeant John Brown, another supervisor, after assuming his leadership position over Plaintiff Brinkley, "was far more permissive and tolerant of unprofessional and inappropriate comments [as compared to the previous sergeant], most especially by male officers towards female officers." Id. ¶ 293. According to Plaintiff Brinkley, "it became a common occurrence for officers . . . to use foul language and make inappropriate sexual comments" and concerns she raised about the conduct were ignored. Id. ¶ 294.  Plaintiff Brinkley alleges that on February 4, 2020, she was the only female officer in a roll call meeting and "[w]hen [Sergeant] Brown told Officer Eric Harrison . . . to work with another officer, Officer Harrison responded by shouting 'he can suck my dick.'" Id. ¶¶ 297–98.  Sergeant Brown allegedly "refused to do anything to stop such comments[.]" Id. ¶ 301.

As a result of what she had experienced, around February 5, 2020, Plaintiff Brinkley made a complaint to MPD EEO Director, Mr. Lee, id. ¶ 305, who she claims "leaked" information about her complaints to other officers and "[f]rom that point on, Plaintiff Brinkley became the target of a concerted, intentional, and systematic retaliatory campaign to drum her

out of the MPD[,]" id. ¶ 310.  Plaintiff Brinkley alleges that she wrote to Assistant Chief Jeffrey

Carol, Chief Robert Contee, and Mayor Muriel Bowser "to report what was going on."  Id.

¶ 313.  Plaintiff Brinkley alleges that she had a meeting with Lieutenant Robinson, Sergeant

Brown, and her partner, Plaintiff Mitchell, around March 25, 2020, during which she asked about

the status of her EEO complaint and was told "that such investigations 'take time.'"  Id. ¶ 316.

She further alleges that, "towards the end of the meeting, [Lieutenant] Robinson indicated that he

would be separating Plaintiff Brinkley and her long-time partner [Plaintiff] Mitchell, because

there were 'red flags,' with regards to them and [told them] that 'they were being watched[.]'"

Id. ¶ 317.

Additionally, Plaintiff Brinkley claims that around the time of the March 25, 2020

meeting, "[Lieutenant] Robinson chose to discipline Plaintiff Brinkley for arriving at work too

early, . . . [which] Plaintiff [Brinkley] had never seen another officer disciplined for."  Id. ¶ 323

(emphasis in original).  On August 14, 2020, "[Sergeant] Boyd ordered Plaintiff [Brinkley] to put

her cell phone away at roll call, even though he kept both of his cell phones visible on the table

in front of him, and he allowed other male tactical officers to keep their cell phones out and

visible."  Id. ¶ 358.  Plaintiff Brinkley also alleges another incident in which Officer Anthony

Campanale, a white male, "shouted at" Plaintiff Brinkley and was aggressive to her during roll

call, id. ¶ 349, and "[a]lthough Officer Campanale physically charged and threatened [her], and

had to be physically restrained from harming her, the Department decided to punish [her] for

'raising her tone[,]'" id. ¶ 365.  Plaintiff Brinkley alleges that she was "charged with conduct

unbecoming an officer" for this incident, but Officer Campanale was not disciplined.  Id. ¶ 366.

Sometime around November 10, 2020, Plaintiff Brinkley received her "job performance

documentation" and alleges that it included "several supposed 'violations' that were basically

trumped-up, fabricated, unjust, disparate or exaggerated charges, that formulated a basis for the Department to terminate her employment." Id. ¶ 380.  Plaintiff Brinkley's MPD employment was terminated on April 30, 2021. Id. ¶ 420.

### b.    Plaintiff Brinkley's EEOC Charges

Plaintiff Brinkley filed her first EEOC Charge of Discrimination on December 23, 2020. Pls.' Opp'n, Exhibit ("Ex.") 1 (Plaintiff Brinkley's First EEOC Charge) at 2,[5] ECF No. 52-2.[6]  In her EEOC Charge, she alleged that she was discriminated against between May 8, 2017 and December 8, 2020.[7] Id.  Specifically, Plaintiff Brinkley alleged to the EEOC that:

1.) She "was treated in a discriminatory manner and not given impartial and fair [MPD] EEO interviews and investigations because the conversations with the EEO counselors were electronically recorded and [she] was made to sign a confidentiality agreement document that failed to disclose that the interview was recorded and the information was shared." Id.

2.) She "received retaliation and reprisal for having participat[ed] in prior EEO activity on the basis of [her] race, gender, age, disability, and because of [her] reporting of inappropriate and threatening behavior from management and other officers." Id.

3.) She "was treated in a disparate manner and discriminated against on the basis of [her] physical and mental disability, gender, age, and race when [she] was informed by

---

[5] The page numbering in the plaintiffs' exhibits is inconsistent.  The court will therefore cite to the page number in the ECF Header of the Plaintiff's Opposition Exhibits, ECF No. 52-2, when referencing the plaintiffs' EEOC charges.

[6] Although the plaintiffs' EEOC charges were not included with the Third Amended Complaint, "such records are 'public document[s] of which a court may take judicial notice.'" Ndondji v. InterPark Inc., 768 F. Supp. 2d 263, 272 (D.D.C.2011) (alteration in original) (quoting Ahuja v. Detica Inc., 742 F. Supp. 2d 96, 101–102 (D.D.C. 2010)).

[7] On the EEO form itself, Plaintiff Brinkley entered "Dec 8, 2020" in the box asking for the earliest date that the alleged discrimination took place and "05/8/2017" in the box asking for the latest date that the alleged discrimination took place. Id.  Read in context, it is clear to the Court that Plaintiff Brinkley alleged to the EEOC that the discrimination began on May 8, 2017 and lasted until December 8, 2020.

several of [her] co-workers that [her] professional background information, physical health, and mental health were shared in the presence of officials and employees." Id.

4.) She "was consistently discriminated, retaliated, harassed and treated in a discriminatory manner as the official continued to impose unfair, untruthful disciplinary actions against [her] because of [her] reporting of wrongdoing by several officers and officials." Id.

5.) She "was given unfavorable assignments and left without direction and separated from the only other female officer assigned within the same unit." Id.

6.) She was "treated in a discriminatory manner when an official stated in the presence of a union representative that 'other officials do not like nor want to deal with me.'" Id.

7.) She was "treated in a discriminatory manner and retaliated, harassed and disciplined when [she] reported the discontinuance of the standard roll call and the mandatory health assessment for the Coronavirus." Id. at 3.

8.) She was "discriminated against and treated in a disparate manner, retaliated and harassed because [she] was a witness regarding a female officer who was mistreated and harassed by an Emergency Response team official and [she] was requested to provide a statement which did not corroborate with the other male officers and officials untruthful versions of the actual incident." Id.

9.) She was "discriminated, harassed, retaliated against because [she] had knowledge and was a witness of several incidents and complaints of disparate treatment, retaliatory actions against several female officers within the Special Operations Division." Id.

11

On March 8, 2021, after reviewing Plaintiff Brinkley's charge, the EEOC determined that it would not proceed further with its investigation and notified her of her right sue the defendant within 90 days of her receipt of their notice.[8]  Id. at 4.

Plaintiff Brinkley filed a second EEOC Charge on June 17, 2021.  Pls.' Opp'n, Ex. 2 (Plaintiff Brinkley's Second EEOC Charge) at 6, ECF No. 52-2.  That EEOC charge, which was filed after Plaintiff Brinkley's first Complaint in this case was filed, alleges that she was terminated on April 30, 2021, in retaliation for engaging in protected activity and makes various "class claim[s]" of discrimination against Black female police officers.  Id. at 6–9.

### 2.  Specific Facts Related to Plaintiff Brown

#### a.  Plaintiff Brown's Allegations in the Third Amended Complaint

"Plaintiff Brown began her employment with [the] MPD in 2015."  3d Am. Compl. ¶ 467.  She alleges that her colleagues "resented that [she] was given . . . a desirable assignment [as a bicycle officer in the Fairfax Village neighborhood], and responded by harassing, denigrating, undermining and bullying her on the job," id. ¶ 474; that "[her] direct supervisors constantly tried to impede her from patrolling the community by bike, . . . [telling] her that she needed to 'earn the right' to patrol . . . by bicycle," id. ¶ 475; and that "[her] supervising [s]ergeants retaliated against her for going up the chain of command by escalating the harassment and bullying[,]" id. ¶ 480.  In 2018, a sergeant allegedly "took Plaintiff Brown's radio . . . and hid it for an entire shift . . . [and] did not take anyone's radio except Plaintiff Brown's."  Id. ¶¶ 481, 483.  Plaintiff Brown "considered going to EEO to complain, but was

---

[8] Plaintiff Brinkley's first Complaint was filed on June 7, 2021, 91 days after the signature date on the notice of her right to sue within 90 days.  It is unclear based on available evidence when Plaintiff Brinkley actually received the EEOC's notice of her right to sue and "[a] court presumes a party receives a right-to-sue letter within three days of the letter's issuance."  Olatunji v. District of Columbia, 958 F. Supp. 2d 27, 30 (D.D.C. 2013).  "Thus, in the typical case a party has 93 days from the date the EEOC issues a letter to file suit in federal court."  Id.  The defendant has not argued that Plaintiff Brinkley's lawsuit is untimely because it was filed outside of the 90-day window.

intimidated out of doing [so] because she had heard that others who went to EEO were retaliated against." Id. ¶ 487.

Plaintiff Brown further alleges that she was "cyber-bull[ied] . . . [on an Internet forum by] white male police officers . . . [and] Black male officers[,]" id. ¶ 498, which "escalated" when she was selected in 2019 as "MPD Officer of the Year for the previous year," id. ¶¶ 500–01. Plaintiff Brown reached out to Assistant Chief Chanel Dickerson in 2019 about the cyber-bullying and Assistant Chief Dickerson "initiated an investigation into the [cyber-bullying] forum . . . . [which] was ultimately shut down." Id. ¶¶ 513, 515. "[S]hortly after the MPD Forum was investigated," Plaintiff Brown "became the subject of an investigation [stemming from an anonymous complaint]." Id. ¶¶ 517–18.

Plaintiff Brown also alleges that in November 2020, when she reported an incident of "illegal stop and frisk activity" to Lieutenant Preston, id. ¶ 522, "[Lieutenant] Preston told Plaintiff [Brown] that the officers involved were going to be told who reported them, and then asked Plaintiff Brown again, if she wanted to bother with a formal report[] . . . [which she] interpreted [ ] as a warning to keep silent, and [she] therefore kept silent." Id. ¶ 526. Plaintiff Brown resigned after she "observed several white officers taunting [Black Lives Matter protesters]." Id. ¶ 535.

### b.    Plaintiff Brown's EEOC Charges

Plaintiff Brown filed her first EEOC Charge on September 3, 2021. Pls.' Opp'n, Ex. 3 (Plaintiff Brown's EEOC Charge) at 12, ECF No. 52-2. In her EEOC Charge, she alleges that she was discriminated against from January 1, 2016, until the day she filed her EEOC Charge. Id. She asserts that she was "subjected to disparate treatment, harassment, a hostile work

environment and retaliation because [she] opposed racism, and because [she is] an African American woman." Id. at 13. Specifically, Plaintiff Brown alleged to the EEOC that:

1.) She was "bullied and harassed by other Officers[,]" who would take her lunch and hide her police gear, resulting in Plaintiff Brown being disciplined for not having her police gear, and when "[she] notified [her] superiors about what was being done to [her], [her] concerns were dismissed." Id. at 12.

2.) She was "bull[ied] on social media . . . [and she] believe[s] [she] was targeted and bullied because [she is] a woman, and African American, and because [she] was an easy target because [her] superiors would not intervene to protect her." Id.

3.) She was "retaliated against because [she is] a woman and African American, and because [she] opposed misconduct by other police officers" and was "silenced from telling the truth with fear of retaliation from other Officers." Id. at 13.

4.) She was "outcast [after she became the first African American female to win the Officer of the Year Award] by many of [her] peers who felt [she] didn't deserve the award." Id.

5.) She "witnessed several Officers violate citizens['] rights, and every time [she] opposed it, [she] would be outcast by [her] peers, retaliated against, isolated and bullied [and] put at risk" while "other officers who did not oppose racism and misconduct in the MPD were not treated as [she] was." Id.

6.) She "had no choice but to resign from the department to maintain [her] well being and remain true to her values [and] morals, which did not align with what [she] saw at [the] MPD" and because "the race and gender bullying, and retaliation and harassment got so bad." Id.

14

Plaintiff Brown also included the same "class claim[s]" of discrimination against Black female police officers that Plaintiff Brinkley made in her second EEOC Charge.  Id. at 14–15. On September 30, 2021, the EEOC determined it was closing its file on Plaintiff Brown's Charge because Plaintiff Brown had "filed a claim in court."[9]  Id. at 16.

### 3.  Specific Facts Related to Plaintiff Carr

#### a.  Plaintiff Carr's Allegations in the Third Amended Complaint

Plaintiff Carr began her employment with MPD in April 1998.  3d Am. Compl. ¶ 550. She alleges that early in her career, her Commander made it "very challenging to get the time off that she needed" to "ser[ve] in the Army Reserve," even though "several male MPD officers were also military reservists, and were given both the time off, and all reasonable accommodation[s] needed to fulfill their reserve [obligations] without difficulty."  Id. ¶¶ 557–60. Plaintiff Carr also claims that around 2001 to 2002, "she was denied a [desirable permanent reassignment]," and "[i]nstead, a male officer was assigned [that position.]"  Id. ¶¶ 625–27.  She further complains that "she was selected to take the [Explosive Ordnance Disposal] K-9 training test, but . . . Commander William Dandrige intentionally sabotaged her from getting the notification of the test in order to take from her the opportunity[.]"  Id. ¶¶ 634–35.  When Plaintiff Carr was able to take and pass the test, she was "[prevented] from being transferred to the Patrol K-9 unit[,]" because Sergeant Duane Beuthe allegedly believed that the "work of the Patrol K-9 Unit was too rigorous [for Plaintiff Carr]" and instead transferred Plaintiff Carr to "the EOD K-9 unit because it did 'less work.'"  Id. ¶¶ 639–42.

 In 2006, Plaintiff Carr filed a complaint with the MPD's Office of Human Resources ("OHR") alleging gender discrimination, which she claims was "dismissed without thorough

---

[9] Plaintiff Brown is named as a plaintiff for the first time in the First Amended Complaint, which was filed on September 22, 2021, see Am. Compl., ECF No. 9, nine days before the EEOC issued its finding on her Charge.

investigation." Id. ¶¶ 652–53.  Plaintiff Carr further alleges that thereafter she was "subjected to systematic and repetitive retaliation" for speaking out against gender bias.  Id. ¶ 646.

Plaintiff Carr additionally alleges that in 2014, she was transferred to the Administrative Department and "Captain Robert Glover began taking steps to force [her] out of the . . . [Department] and replace her with a [college-educated] white male officer," even though "[a] college degree was never required [to work in the Administrative Department.]"  Id. ¶¶ 660, 662. In December 2019, Plaintiff Carr filed an EEO complaint alleging unfair treatment, disparate terms and conditions of employment, and a hostile work environment.  Id. ¶ 664.  As a result of Mr. Lee's alleged "practice of leaking what complainants said in EEO interviews," Plaintiff Carr's accusations against her superiors "made it immediately back to them," id. ¶ 665, and thereafter those supervisors "routinely withheld vital information from her, gave her undesirable assignments that they would not give to others, issued discipline for small mistakes that were not subject to discipline when other officers made the same mistakes, and unfairly and harshly evaluated [her] performance[,]" id. ¶ 668.  For example, she alleges that Sergeant James Rogers "unilaterally revoked [her] 'excepted tardiness privilege'" even though she had not been tardy. Id. ¶ 669–70.

Plaintiff Carr also alleges that in August 2019, she got into a confrontation with Sergent Michael Boyd during roll call and that Sergeant Boyd then filed an EEO Complaint against her for creating a hostile work environment.  Id. ¶ 675–76.  Plaintiff Carr claims that Sergeant Boyd's filing of the EEO Complaint against her was "an act of aggression and retaliation" and, unlike her EEO Complaints, Sergeant Boyd's EEO Complaint was immediately investigated.  Id. ¶ 678–79.  Subsequently, Plaintiff Carr got into a confrontation with Lieutenant Andrew Margiotta, id. ¶ 684, and, in February 2020, presented Commander Guillermo Riveria with a

16

recording of the confrontation, apparently to show him that Lieutenant Margiotta was the aggressor and that he lied during a subsequent investigation by the IAD, id. ¶ 684–86. Commander Riveria purportedly refused to listen to the recording and Plaintiff Carr was suspended for twenty-five days for having recorded Lieutenant Margiotta.  Id.

### b.        Plaintiff Carr's EEOC Charges

Plaintiff Carr filed an EEOC charge on May 2, 2021.  Pls.' Opp'n, Ex. 4 (Plaintiff Carr's First EEOC Charge) at 18, ECF No. 52-2.  In her EEOC Charge, she alleged that she was continuously discriminated against from May 5, 2020 to August 19, 2020.  Id.  Specifically, Plaintiff Carr alleged to the EEOC that:

1.) She has been "subjected to different terms and conditions of employment by [the MPD], for example, [three] white male officers were given preferential treatment in regard to schedule changes and days off by Lt. Andrew Margiotta . . . [while she] was denied a schedule change and [she had] more seniority on the department and within the unit."  Id.

2.) She was "denied a change of squad" after she requested to be transferred because of racial and gender discrimination.  Id.

3.) She was "scored [ ] a 4 during the 2018-2019 evaluations [by a Black male lieutenant], however[,] Lt. Margiotta[, a white male lieutenant,] deleted that and scored [her] as a 3."  Id. at 19.

4.) Her "stress related sick leave was ruled as non[-]performance of duty by the director of the Police and Fire Clinic, Mr. Matthew Miranda[,]" id., who then violated her HIPAA rights by discussing her "personal medical information" with Mr. Alphonso Lee, id.

17

5.) She was made aware "that Officer Steven Hebron . . . made false accusations against [her]" and that confidentiality regarding her complaints was breached resulting in "male co[-]workers start[ing] to distance themselves from [her.]"  Id.

6.)  "On August 19[,] 2020, [Sergeant] Michael Boyd was loud, rude, disrespectful, and unprofessional when he ordered [her] to leave the special events roll call room. [Sergeant] Boyd later filed an EEO complaint against [her] for hostile work environment and gender discrimination."  Id.

7.) She "was experiencing severe gastrointestinal issues . . . [and] was subsequently harassed by management which created a hostile work environment for [her] based on [her] disability . . . [resulting in] lower scores on [her] performance evaluations."  Id.

On May 5, 2021, after reviewing Plaintiff Carr's Charge, the EEOC determined that it would not proceed further with its investigation and notified her of her right to sue the defendant within 90 days of her receipt of its notice.[10]  Id. at 21.  Plaintiff Carr filed a second EEOC Charge on July 26, 2021.  Pls.' Opp'n, Ex. 5 (Plaintiff Carr's Second EEOC Charge) at 23, ECF No. 52-5. That EEOC charge makes various "class claim[s]" of discrimination against Black female police officers.  See id.

### 4.  Specific Facts Related to Plaintiff Clark

#### a.  Allegations in the Third Amended Complaint

Plaintiff Clark began her employment with the MPD in May of 1989.  3d Am. Compl. ¶ 665.  Plaintiff Clark alleges that around July 11, 2012, "Officer Christopher Picciano, a white male, told Plaintiff Clark that he wanted to kill First Lady Michelle Obama . . . [and after she

---

[10] Plaintiff Carr first filed a lawsuit involving these allegations on August 6, 2021.  See Carr v. District of Columbia, 21-cv-2116 (RBW), Complaint, ECF No. 1, at 1 (D.D.C. 2021).  That Complaint, which was eventually consolidated into this action, was filed 93 days after the signature date on Plaintiff Carr's notice of her right to sue within 90 days.  It is unclear based on available evidence when Plaintiff Carr actually received the EEOC's notice of her right to sue, and the defendant has not argued that her lawsuit was filed beyond the 90-day window.

reported that comment to IAD], all the white officers and several white MPD officials started treating Plaintiff Clark in a hostile manner." Id. ¶¶ 667–72. After reporting Officer Picciano's statement, Plaintiff Clark contends that she was "isolated and shunned by her peers, and consistently given dangerous and undesirable assignments[.]" Id. ¶ 673. According to Plaintiff Clark, the "EEO did not take her claims seriously[,]" and she retired "on or about May 31, 2014[,]" id. ¶¶ 677–78, but she resumed her position with the MPD around February 6, 2017, id. ¶ 680. Plaintiff Clark further claims that her requests to make changes to her work schedule were denied, but her male counterparts' requests were granted. Id. ¶¶ 684–87. While she was assigned to the "Vice-Presidential escort detail[,]" she alleges that she was given "the least secure vehicle in the fleet" and her requests for a different vehicle were denied "[f]or no apparent reason[.]" Id. ¶¶ 692–93, 697.

In December 2018, Plaintiff Clark fell and "severely sprained her ankle [while] on duty[,]" resulting in her absence from work "from December 7 to April 9, 2019, which was a total of 77 days[.]" Id. ¶ 706. However, according to Plaintiff Clark, she was threatened with being fired for being "less than full duty for 120 days" because "weekends and holidays [were improperly counted against her as a legitimate basis for her termination.]" Id. ¶ 707–08. In September 2019, Plaintiff Clark asked for a temporary schedule change to help take care of her granddaughter, but "two white male officers [were allegedly moved instead] to [the available day shift to which she was seeking to be assigned.]" Id. ¶¶ 711–13. Plaintiff Clark alleges that "[i]nstead of allowing [her] to work the day shift while she was [on] limited duty, when there was work to be done, [Lieutenant] Margiota forced Plaintiff [Clark] to [work the] evening shift, when there was nothing to do." Id. ¶ 736. In May 2020, Plaintiff Clark was passed over for an administrative position in favor of Officer Charles Culver, who purportedly "had no

19

administrative experience and did not want the job." Id. ¶¶ 727–28. And in October 2020, Plaintiff Clark alleges that "[Commander] Rivera approved everyone in the department getting a #4 rating on their performance evaluation, except Plaintiff Clark, who was given a #3 rating[.]" Id. ¶ 742.

### b.      Plaintiff Clark's EEOC Charges

Plaintiff Clark filed an EEOC Charge on January 1, 2021. Pls.' Opp'n, Ex. 6 (Plaintiff Clark's First EEOC Charge) at 28, ECF No. 52-2. In her EEOC charge, Plaintiff Clark alleges that she was discriminated against between February 6, 2017, and December 4, 2020.[11] Id. Specifically, she alleged that:

1.) She was "treated in a discriminatory manner and not given impartial and fair MPDC EO interviews and investigations because the conversations with the EEO counselors were electronically recorded and [she] was made to sign a confidentiality agreement document that failed to disclose that the interview was recorded and the information was shared." Id.

2.) She was "treated in a disparate manner and discriminated against when [she] was denied a favorable performance evaluation given to [her] from [her] immediate supervisor." Id.

3.) She was "treated in a disparate manner and discriminated against when [she] was written up when [she] reported to work early although the lieutenant had knowledge that [she] was working and on limited duty." Id.

---

[11] On the EEO form itself, Plaintiff Clark entered "Dec 4, 2020" in the box asking for the earliest date that the alleged discrimination took place and "Feb 6, 2017" in the box asking for the latest date that the alleged discrimination took place. Id. Read in context, it is clear to the Court that Plaintiff Clark alleged to the EEOC that the discrimination began on February 6, 2017 and lasted until December 4, 2020.

20

4.) She was "treated in a disparate manner and discriminated against when [she] was denied a temporary change of duty to assist with the care for [her] granddaughter who suffered second degree burns on her body." Id.

5.) She was "retaliated against when [she] was forced to sign a bargaining agreement after being accused of alleged allegation[s] that were untruthful and [being told that] if [she] did not agree to the signing of the document [she] . . . would be terminated." Id.

On July 19, 2021, after reviewing Plaintiff Clark's Charge, the EEOC determined that it would not proceed further with its investigation and notified her of her right to sue the defendant within 90 days of her receipt of their notice.[12] Id. at 29. Plaintiff Clark filed a second EEOC Charge on July 26, 2021. Pls.' Opp'n, Ex. 7 (Plaintiff Clark's Second EEOC Charge) at 31, ECF No. 52-2. That EEOC charge makes various "class claim[s]" of discrimination against Black female police officers. See id.

### 5. Specific Facts Related to Plaintiff Dickerson

#### a. Allegations in the Third Amended Complaint

Plaintiff Dickerson joined the MPD in 1988. 3d Am. Compl. ¶ 770. Around 1990, she was allegedly told by Lieutenant Roberts and Detective Askew that "she needed to agree to intimate dates and sex acts with them in order to be promoted and get good assignments." Id. ¶ 776. She resigned her position with the MPD in 1991, id. ¶ 778, but returned in 1994, id. ¶ 779. Plaintiff Dickerson claims that in 1995 she "started being sexually harassed by Lieutenant Benjamin Preston, who made continued, unwanted sexual advances on Plaintiff Dickerson." Id.

---

[12] Plaintiff Clark was first named as a plaintiff in the First Amended Complaint, which was filed on September 22, 2021, 65 days after the signature date on the notice of her right to sue within 90 days.

¶ 780.  Plaintiff Dickerson alleges that when she complained, Lieutenant Preston was not disciplined and "immediately began to retaliate against her for reporting his behavior." Id. ¶ 782. Specifically, her lunch break was allegedly shortened, and she "had to sign in and out every time she left the office, including for restroom breaks, when no one else was required to do so." Id. ¶¶ 783–84.  In 1997, Lieutenant Ronnie Foye allegedly "made continued sexual advances and comments to Plaintiff Dickerson" and "often comment[ed] on [her] physical attributes and described the sexual acts that he would perform on her." Id. ¶¶ 786–87.

From late 1998 to 2001, Plaintiff Dickerson alleges that she was sexually harassed by Sergeant Jaime Anderson, who she claims made repeated and continual sexual advances and comments to her, id. ¶ 793, and, according to Plaintiff Dickerson, her "complaints . . . were ignored[,]" id. ¶ 797.  "After Plaintiff Dickerson's complaint, someone drew a caricature of her on the men's bathroom stall at the Third District with a special emphasis on her buttocks and breasts." Id. ¶ 801.  Plaintiff Dickerson also alleges that the MPD "initiated an investigation into [her] as an act of retaliation and an attempt to intimidate her . . . [and] discourage the reporting of sexual harassment and misconduct." Id. ¶ 816.  Plaintiff Dickerson alleges that she was denied a promotion to lieutenant while this investigation was ongoing and "people who ranked lower than Plaintiff Dickerson on the [lieutenant advancement] exam" were instead promoted to "Acting Lieutenant," purportedly "to make sure Plaintiff Dickerson was not promoted." Id. ¶ 817.

In 2012, Plaintiff Dickerson allegedly "attempted to resolve a situation in which Detective Lieutenant Peter Larsen . . . sent an email to Detective Vandra Covington[] in which he used the word 'cunt.'" Id. ¶ 820.  According to Plaintiff Dickerson, Captain Manlapaz told her that "[she] should focus on Detective Covington's performance, not a term that she viewed as offensive." Id. ¶ 822.  In July 2014, Plaintiff Dickerson was promoted to the rank of Acting

22

Lieutenant and transferred to a different district, but "[a]nother detective, who did not perform as well [on the promotion exam] . . . was not transferred[.]" Id. ¶¶ 833–34. From March 30, 2018 until July 13, 2021, Plaintiff Dickerson was "the only sworn female police officer on [the] MPD's executive staff" and "was assigned to [the area] which experienced the highest level of violent crimes," id. ¶ 836–37. However, from 2018 to 2020, she alleges that she was left out of weekly homicide meetings. See id. ¶ 838. Plaintiff Dickerson also alleges that in February 2019 she had an emergency medical procedure but, "instead of giving her the necessary time to recuperate, she was forced to return to work and give a presentation." Id. ¶ 845. She also alleges that in March 2019, she notified IAD Chief Manlapaz that she had evidence that Commander Morgan Kane was "misclassifying or reassigning violent crimes to avoid the appearance of an increase in these crimes," id. ¶ 849, but "Chiefs Newsham and Manlapaz undermined [her] authority by using their power to cover-up and excuse [the] misconduct," id. ¶854. She also claims that her "picture was even removed from the final version of the annual calendar, even though her picture was in the draft that was disseminated." Id. ¶ 856.

Plaintiff Dickerson further alleges that in December 2018 and October 2019, she asked about attending a terrorism seminar but was denied the opportunity to do so, even though all of her male colleagues were permitted to attend. See id. ¶¶ 857–59. In July 2019, Plaintiff Dickerson reported Captain McDonald for allegedly making a "disparaging remark about young black youth," id. ¶¶ 865–66, and Captain McDonald was demoted, see id. ¶ 870. "In February of 2021, Plaintiff Dickerson raised concerns about Black women officers being disciplined for recording their conversations with their supervisors and EEO . . . [but the] concerns fell on deaf ears and resulted in backlash and retaliation[.]" Id. ¶¶ 890, 892. Plaintiff Dickerson alleges that in April 2021, she again noticed that Commander Kane was "attempting to misclassify crimes"

23

but her concerns were not addressed.  Id. ¶¶ 882–85.  According to Plaintiff Dickerson, "[o]n or about May 7, 2021, [she] was reassigned from being a three-star Assistant Chief to a two-star Assistant Chief, and was downgraded and demoted from third in command to eighth in command, below all the male executive sworn officers."  Id. ¶ 906.

b.      **Plaintiff Dickerson's EEOC Charge**

Plaintiff Dickerson filed her EEOC Charge on August 4, 2021.  Pls.' Opp'n, Ex. 8 (Plaintiff Dickerson's EEOC Charge of Discrimination) at 35, ECF No. 52-2.  In her EEOC charge, she alleged that she "suffered discrimination, sexual harassment, retaliation and a hostile work environment because of [her] race (African American) and gender (female)" as early as 1990.  Id.  Specifically, Plaintiff Dickerson alleged that:

1.) In 1990, "L[t.] William Roberts and Det. Roosevelt Askey [told her] that [she] needed to agree to intimate dates and sex acts with them in order to be promoted and get good assignments."  Id.

2.) In 1995, "Lieutenant Benjamin Preston [made] continued sexual advances on [her]" and reduced her lunch period by thirty minutes when she rejected his advances.  Id.

3.) In 2008–2009, she was "the victim of a concerted campaign of retaliation because [she] complained about a male civilian employee . . . who walked into the bathroom in which [she] was taking a shower," id. at 36, but "then [she] was made the subject of an investigation for reporting and complaining about the incident," id.

4.) She was "denied [a] promotion to [lieutenant], and Chief Lanier made people who ranked lower than [she] did on the exam 'Acting Lieutnants' over [her] to make sure [she] didn't get promoted."  Id.

5.) In 2012, Captain Wilfredo Manlapaz "criticized [her] for trying to enforce department standards and oppos[ing] the use of sexist and offensive language." Id.  She was "called before Commander George Kucik and Captain William Fitzgerald, and told that [she] should consider transferring out of the Department, which was meant to be a threat and attack on [her]." Id.

6.)  She asked in 2018, 2019, and 2020 "to attend weekly homicide meetings [in order] to be included in the strategizing around reducing homicides and violent crime [but] [e]ach year Chief Newsham denied [her] request, leaving [her] out of the loop of critical information to combat crime." Id.

7.) She "noticed a staggering disparity in serious discipline involving employees of color" in February 2019, but when she "mentioned it, [she] was no longer invited to attend disciplinary committee meetings." Id.

8.) "In 2019, [she] had received credible and substantial evidence that a subordinate . . . was falsifying records and reducing characterization of crimes to make it look like crime was reducing [and] brought this issue to Chief Wilfredo Manlapaz . . . [who with] Chief Newsham concluded there was insufficient evidence [to support the allegation]." Id. at 37.  From that point on, she was "exclude[d] [ ] from essential meetings, [and] den[ied] [ ] important and desirable training and development opportunities that were given to all of [her] colleagues." Id.

9.) She "heard MPD management use disparaging remarks about African American youth . . . [and her] concerns fell on deaf ears and resulted in backlash and retaliation against [her]." Id.

25

Plaintiff Dickerson's EEOC Charge also makes various "class claim[s]" of discrimination against Black female police officers.  See id. at 38–39.  After reviewing her Charge, on September 30, 2021, the EEOC determined it was closing its file on Plaintiff Dickerson's Charge because Plaintiff Dickerson had "filed a claim in court."[13]  Id. at 40.

### 6.  Specific Facts Related to Plaintiff Grier

#### a.  Allegations in the Third Amended Complaint

Plaintiff Grier began working for the MPD in February of 1989.  3d Am. Compl. ¶ 933. She retired in March 2015 and then rejoined the department in November 2017.  Id.  When she returned to the MPD, she was placed in a department with two offices, one office occupied by all male officers and the other occupied by all female officers.  Id. ¶ 935.  She alleges that "[a] civilian manager named Jessica Bress . . . , who was not part of Plaintiff Grier's supervisory chain of command, was allowed to assign Plaintiff Grier to the office that only had male officers as an 'experiment' or 'special project[,]'" id. ¶ 936, "caus[ing] Plaintiff Grier to be isolated in a work environment that was male dominated and jocular, where inappropriate and disrespectful language towards women was used regularly[,]" id. ¶ 937.  One of the male officers, Bray Jones, "would [allegedly] regularly undress down to his underwear in front of Plaintiff Grier[.]"  Id. ¶ 939.  When Plaintiff Grier sought Lieutenant Arthus Davis's intervention in November 2020 for Officer Jones' repeated inappropriate behavior, he purportedly "took no action whatsoever . . . because Officer Jones 'wasn't trying to be deliberately offensive.'"  Id. ¶¶ 940–41.  Plaintiff Grier alleges that her requests to transfer out of the office space "were repeatedly ignored."  Id. ¶ 942.

---

[13] Plaintiff Dickerson is named as a plaintiff for the first time in the First Amended Complaint, which was filed on September 22, 2021, see Am. Compl., ECF No. 9, eight days before the EEOC issued its finding on her Charge.

In 2002, before Plaintiff Grier retired then subsequently re-joined the MPD, see id. ¶ 933, she "arrested and testified against a fellow police Officer, Jay Effler, who was operating his police cruiser while intoxicated[,]" id. ¶ 944, and afterwards "[her] fellow officers . . . refused to provide her back up," id. ¶ 946. "From that point on, Plaintiff Grier was treated as a pariah, isolated and disrespected by management and by fellow officers." Id. ¶ 952. Plaintiff Grier also complains that "[t]here were several other incidents in which officers failed to provide back-up to [her], which put her at risk." Id. ¶ 949. According to Plaintiff Grier, "MPD management was aware of what the other officers were doing to [her], and chose to do nothing to change or correct their retaliatory behavior." Id. ¶ 953.

Plaintiff Grier further alleges that, while she was assigned to the Police Academy in 2017, she was "treated more harshly than her male counterparts and fellow officers," see id. ¶ 954, by "[being] the only officer to be assigned to every detail . . . [which] is often viewed as [a] less desirable duty . . . and involves more risk[,]" id. ¶¶ 955–56. However, her complaints about her treatment were allegedly ignored. Id. ¶ 958. "On more than one occasion, especially during the holidays, [Commander] Ennis went so far as to find a substitute instructor for Plaintiff Grier's academy class cohort so that he could send Plaintiff Grier to the field, rather than sending the substitute person to the field instead." Id. ¶ 959. And in 2020, according to Plaintiff Grier, "[a]ll of [her] colleagues were allowed to work from home and conduct business over Zoom during the pandemic [except for her]." Id. ¶ 962. "As soon as Plaintiff Grier actually tried to work from home, the departmental management [allegedly] changed the work-from-home policy altogether." Id. ¶ 963. Finally, Plaintiff Grier alleges that "[w]hen she retired in March of 2021 [and] asked to be made a Reserve Official . . . , [her request] was rejected for th[e] volunteer position because several male officers did not want to work with her." Id. ¶¶ 966, 968.

**b.**   **Plaintiff Grier's EEOC Charge**

Plaintiff Grier filed an EEOC Charge on August 2, 2021.  Pls.' Opp'n, Ex. 9 (Plaintiff

Grier's EEOC Charge of Discrimination) at 42, ECF No. 52-2.  She alleged she "was

discriminated against and subject to disparate terms and conditions of employment based on

[her] race and gender (Black woman), and was subject to a hostile work environment and

continuous and frequent retaliation for complaining about the hostile and disparate treatment

[she] was subject to" between November 1, 2017 and March 22, 2021, and that the treatment was

continuous.  Id.  Specifically, Plaintiff Dickerson alleged to the EEOC that:

1.) "A [w]hite [f]emale civilian manager named Jessica Brass, who was not even in [her]

  [ ] chain of command, was allowed to assign [her] to the office that only had men as

  an 'experiment' or 'special project,' which caused [her] to be isolated in a work

  environment that was hostile and inappropriate.  For example, one of the male

  officers named Bray Jones would regularly undress down to his underwear in front of

  [her], which [she] believed to be extremely inappropriate and made [her]

  uncomfortable."  Id.  She "repeatedly asked to be transferred out or another woman

  officer to be transferred to [her] office, but [her] requests were ignored."  Id.

2.) "[A]ll of the officers were supposed to take turns doing details in the field when it

  was needed [but she] was the only officer assigned to EVERY detail."  Id. at 43.  She

  "repeatedly complained to [her] own chain of command . . . but [they] ignored [her]

  complaints]."  Id.

3.) She was "treated differently than [her] peers" during the COVID-19 pandemic

  because she "wasn't allowed to work from home and over [Z]oom as her colleagues

were . . . [and] the first time that [she] tried to work from home, the work from home policy was immediately changed." Id.

4.) She was "black-balled and singled out for retaliation because in 2006 [she] arrested and testified against a fellow police officer who was operating his police cruiser while intoxicated." Id. She was "immediately retaliated against by [her] fellow officers and management [and] had to be moved off of night shift because the other officers would not respond to [her] calls for back-up." Id.

5.) When she retired in March 2021, she "asked to be made a Reserve Official (which is an unpaid position) . . . , because there was no female leadership in the Reserve Program . . . [but her request] was rejected for this volunteer position because male officers did not want to work with [her]." Id.

Plaintiff Grier's EEOC Charge also makes various "class claim[s]" of discrimination against Black female police officers. See id. at 44–45. Following the review of her Charge, on September 30, 2021, the EEOC determined it was closing its file on Plaintiff Grier Charge because she had "filed a claim in court."[14] Id. at 46.

**7. Specific Facts Related to Plaintiff Hampton**

**a. Allegations in the Third Amended Complaint**

Plaintiff Hampton "first joined the MPD in December of 2003 . . . [and alleges that she] was sexually harassed" by an "immediate supervisor[,]" Sergeant Andre Suber, on the "third day [of her employment]." 3d Am. Compl. ¶¶ 983, 985. She claims that after Sergeant Suber told

---

[14] Plaintiff Grier is named as a plaintiff for the first time in the First Amended Complaint, which was filed on September 22, 2021, see Am. Compl., ECF No. 9, eight days before the EEOC issued its finding in response to her Charge. In its Reply to the plaintiffs' opposition to the partial motion to dismiss, the defendant claims for the first time that Plaintiff Grier's "rush to court before exhausting her administrative remedies forecloses her claims." Def.'s Reply at 5. Because the defendant did not assert this argument in its motion, the Court will not consider it now.

29

her that "he could make her life miserable," id. ¶ 987, Union Steward Officer Christopher Bauman filed an EEO complaint on her behalf, "but the EEO Office decided that there was insufficient evidence and [that] the claim was [therefore] unfounded." Id. ¶¶ 988–89. According to Plaintiff Hampton, Officer Bauman "also filed a complaint with DC [Office of Human Resources] . . . [, which] went to mediation[,]" id. ¶ 990, where "it was resolved that [Sergeant] Suber would no longer be able to supervise Plaintiff Hampton for the remainder of her MPD career, but [Sergeant] Suber was not disciplined in any other way[,]" id. ¶ 991.

Plaintiff Hampton further alleges that in October 2007, she was "harassed by some young men in the community, in front of her home[,]" id. ¶ 993, and Detective Mary Bonaccorsy "concluded that the harassment was Plaintiff Hampton's fault because she should not have lived in such a dangerous community[,]" id. ¶¶ 996–97. When Plaintiff Hampton "went to the local news to get community support [to] end [ ] the harassment[, the] MPD attempted to silence her and insisted that she cease going to the [media]." Id. ¶¶ 998–99. According to Plaintiff Hamilton, "[a] few MPD officers came to [her] home to give her back-up against the harassment, but they ultimately were disciplined for doing so." Id. ¶ 1000. She also alleges that after this incident she faced additional retaliation at work, that "[h]er work was hyperscrutinized[,]" that she "was isolated and lost the camaraderie of her peers[,]" and that "word was put out that she was on management's target list." Id. ¶ 1002. Plaintiff Hampton further alleges that "[i]n January of 2011, [she] was called to a domestic abuse situation in which [a] man was beating his partner, and [she] ended up having to shoot the man . . . [and the Internal Affairs Division] attempted to make the case that Plaintiff Hampton was in the wrong[,] . . . [even though] two witness statements . . . corroborated that Plaintiff [Hampton] was justified in [committing] the shooting." Id. ¶¶ 1006–08.

30

In 2018, Plaintiff Hampton "lost her father unexpectedly . . . [and Sergeant] Delroy Burton, [who] was considered a friend by Plaintiff [Hampton] . . . hugged her, but then used the moment to try to kiss her, which Plaintiff Hampton rebuffed." Id. ¶¶ 1012–13. Plaintiff Hampton claims that she was "too scared to report [Sergeant] Burton because he was a top leader in the Union, and powerful throughout the MPD." Id. ¶ 1014. She alleges that "[n]evertheless, he retaliated against her," id., by "sully[ing] her name, and turn[ing] people against her[,]" id. ¶ 1015.

Plaintiff Hampton further alleges that "[i]n April of 2019, [she] was asked and approved to participate[] in a recruiting event for MPD by Commander Andre Wright[,] . . . [but Lieutenant Peter Larsen] demanded that the Recruiting Sergeant verbally confirm to him that Plaintiff Hampton had proper authority to be at the event," id. ¶¶ 1016–18, "[unjustifiably] making Plaintiff Hampton jump through hoops[,]" id. ¶ 1019.

In June 2019, "Plaintiff Hampton was on patrol . . .[, was] flagged down by a resident, and simultaneously received a call on the radio to serve a protection order. Because Plaintiff Hampton was detained speaking with the resident, she didn't immediately answer the radio call[, which purportedly resulted in] Captain Hames Boteler [ ]. . .berat[ing] her for not responding to the radio[call] fast enough." Id. ¶¶ 1021–22. "[Sergeant] Podorski [allegedly] confirmed that Plaintiff Hampton was the only officer [Captain] Boteler treated in such a condescending and micromanaging fashion." Id. ¶ 1024.

Plaintiff Hampton also claims that "[i]n June of 2019, [she] discovered that she had been involuntarily detailed to the Teletype Unit, and that her days off would be changed to Monday and Tuesday, which was highly irregular." Id. ¶ 1025. "The Teletype Unit Supervisor informed Plaintiff Hampton that the change in her days off was specifically directed by [Captain] Boetler,

which" Plaintiff Hampton alleges "revealed his punitive intent." Id. ¶ 1026.  Consequently, she met with an EEO counselor who initiated an investigation into her claim, which was found to be "unsubstantiated, and no further action was taken." Id. ¶ 1028.

Plaintiff Hampton further alleges that "[i]n May of 2021, [she] was promoted to Sergeant [and] [i]n August of 2021, Lieutenant Michael Daee intentionally undermined [her] authority when he intervened to protect a white male officer who had been blatantly disrespectful and insubordinate to Plaintiff Hampton." Id. ¶¶ 1029–30.  Plaintiff Hampton also alleges that "[o]n or about September 8, 2021, [Lieutenant] Daee targeted Plaintiff Hampton for an investigation of a shooting that took place on the shift after her shift was completed, rather than investigating the Sergeant who was on duty when the shooting occurred[,]" id. ¶ 1034, and that "[Lieutenant] Daee insisted that Plaintiff Hampton attend a recertification training for the Civil Disturbance Unit, even though Plaintiff Hampton had never received the certificate in the first place, and did not have underlying knowledge or equipment for the recertification training to be of any value[,]" id. ¶ 1036.

Plaintiff Hampton also alleges that "[o]n or about September 14, 2021, [she] went to the scene of a shooting, but due to a lack of available cruisers, had to get a ride [to the scene] with [Sergeant Vernick, a white male,] . . . [who] left her on the scene." Id. ¶¶ 1038, 1040.  "Plaintiff Hampton had left her personal belongings in the cruiser, and attempted to call [Sergeant] Vernick over the radio three times to get him to return [to the scene, but h]e refused to respond to her [calls]." Id. ¶ 1041.  "Another [Black male] sergeant . . . [allegedly] raised [Sergeant] Vernick on his cell phone, and [Sergeant] Vernick answered right away," which according to Plaintiff Hampton, "prov[es] that he was intentionally ignoring Plaintiff Hampton." Id. ¶ 1042.

**b.    Plaintiff Hampton's EEOC Charge**

Plaintiff Hampton filed her EEOC Charge on September 17, 2021.  Pls.' Opp'n, Ex. 10 (Plaintiff Hampton's EEOC Charge) at 48, ECF No. 52-2.  She alleged that she was "discriminated against on the basis of [her] race and gender, and [that she was] being retaliated against because [she] oppose[d] discrimination" against her between December 2003 and the day she filed her EEOC Charge.  Id.  Specifically, Plaintiff Hampton alleged to the EEOC that:

1.) Her "immediate supervisor, Lt. Michael Daee[,] is engaging in a continuous effort to undermine [her] and usurp [her] authority and ability to do [her] job."  Id.  Lt. Daee took away her authority to "allow officers to take the last few hours of their shift off when that is appropriate . . . [, but] every similarly situated Sergeant has that authority."  Id.

2.) In 2018, "[Sergeant] Burton moved in to try and kiss [her] . . . [and] immediately thereafter, he began retaliating against [her] . . . [by giving her] an assignment that was traditionally given to new officers and rookies, and that made [her] work harder."  Id. at 49.

3.) On another occasion, Sergeant Burton "got on the radio and denied [her] request for backup . . . [and] it is unheard of for a Sergeant to deny an officer in the field back up when requested.  [Sergeant] Burton continued his campaign against [her] until he retired."  Id.

Plaintiff Hampton's EEOC Charge also makes various "class claim[s]" of discrimination against Black female police officers.  See id. at 51–52.  After reviewing her Charge, on

33

September 30, 2021, the EEOC determined it was closing its file on Plaintiff Hampton's Charge because Plaintiff Hampton had "filed a claim in court."[15]  Id. at 53.

### 8. Specific Facts Related to Plaintiff Knight

#### a. Allegations in the Third Amended Complaint

"Plaintiff Knight began her employment with the MPD in 1989, when she was hired for a civilian position," but "[i]n 1991, she transferred to a sworn officer position and was assigned to the [Fourth] District."  3d Am. Compl. ¶ 1056.  Plaintiff Knight alleges that "[w]hile [she] was still a rookie and in training, [Sergeant] Braum Persaud began sexually harassing her by making inappropriate and suggestive comments[,]" id. ¶ 1057, and even though she "complained of [Sergeant] Persaud's inappropriate, intimidating and unwanted advances to her supervisor, [ ] nothing was done[,]" id. ¶ 1058.  According to Plaintiff Hampton, "[e]ventually, [Sergeant] Persaud went so far [as] to call Plaintiff Knight's grandmother's house on [her] day off . . . [and] asked her to meet him for a sexual assignation."  Id. ¶ 1059.  Plaintiff Knight alleges that after she refused Sergeant Persaud's advances, "[Sergeant] Persaud retaliated against Plaintiff Knight for refusing his advances by giving her very undesirable assignments . . . and forbade other officers from helping or relieving [her.]"  Id. ¶¶ 1059–60.

Plaintiff Knight alleges that in 1993 she reported to Commander Bill Sarvis that "she was being sexually harassed and retaliated against by [Sergeant] Persaud[,]" but "[i]nstead of investigating or disciplining [Sergeant] Persaud, [the d]efendant made Plaintiff Knight switch Districts with another female officer, Carolyn Battle, and moved Plaintiff Knight to the First

---

[15] Plaintiff Hampton is identified as a plaintiff for the first time in the First Amended Complaint, which was filed on September 22, 2021, see Am. Compl., ECF No. 9, eight days before the EEOC issued its finding on her Charge. In its Reply, the defendant claims for the first time that because Plaintiff Hampton "rushed to court roughly three months before filing her charge of discrimination[,] [h]er failure to exhaust her administrative remedies before filing suit forecloses her claims.  Def.'s Reply at 7.  Because the defendant did not make this argument in its motion, the Court will not consider it now.

District." Id. ¶ 1062.  Plaintiff Knight claims that on her "first day in her new district, Captain Michael Razalowski, the leader of the First District substation[,] called Plaintiff Knight into his office and proceeded to scream and curse at her, calling her a 'trouble-maker.'" Id. ¶ 1063. "From that day on, the First District Station Sergeants . . . [allegedly] harassed, attacked, bullied, demeaned, isolated and undermined Plaintiff Knight on a near-daily basis." Id. ¶ 1064.

Plaintiff Knight also contends that "[i]n 1997[,] [she] became pregnant with twins [and] [Lieutenant] Persaud told her that she wasn't allowed to sit in the station 'looking like that' and made her sit in the break room, which was humiliating to her." Id. ¶ 1067.  According to Plaintiff Knight, MPD policy in effect at the time "required [her] to make routine visits to the Police and Fire Clinic because she was on limited duty" and, because the clinic was atop a steep hill, "Plaintiff Knight asked [Lieutenant] Persaud if she could get a ride to the clinic to avoid walking up the steep hill, but he [purportedly] refused her request, while he granted rides to other non-Black women who went to the clinic." Id. ¶ 1068.

Plaintiff Knight further alleges that in 2001 she was transferred to the training academy as an instructor and that her supervisor, Mr. Larry Edwards, "rarely spoke to the Black officers in his section" but would rather "[allegedly] wait until the officer walked away from their workstation and would communicate through sticky notes that he placed on their computers." Id. ¶¶ 1071–73.  Plaintiff Knight complains that "Mr. Edwards had no problem communicating with the white officers face-to-face [and] would often send the white officers to training and conferences, while not informing [Sergeant] Price or the black officers [of these events]." Id. ¶ 1073.  When "[t]he black officers raised the issue with [Sergeant] Price, . . . no disciplinary action was taken." Id.  Plaintiff Knight also alleges that "[she] was [later] assigned to work under Mr. Byron Williams and Sergeant Kimberly Butler [and] [d]uring a staff meeting,

35

[Sergeant] Butler informed Plaintiff Knight that there was a rumor that she was having an affair with Mr. Williams." Id. ¶ 1075.  Plaintiff Knight denied the rumor, id., but "[n]evertheless [it] persisted, and when Plaintiff Knight attempted to report Mr. Williams for [allegedly] grabbing her butt, . . . her complaint was not taken seriously because the Commander she reported the sexual assault to assumed the rumor was true[,]" id. ¶ 1076.

Plaintiff Knight further alleges that in 2009, she "was transferred to the District 5 administrative office with Sergeant Randy Griffin[,]" id. ¶ 1078, who she claims "was not happy with [her] being assigned under him because he felt a male officer [who he] preferred, was moved out of admin to make room for Plaintiff Knight[,]" id. ¶ 1079.  As a result, Sergeant Griffin was allegedly "hostile and unprofessional and retaliatory towards Plaintiff Knight from the beginning of her assignment," id. ¶ 1080, and "wrote-up Plaintiff Knight for three separate disciplinary infractions, and rather than provide them to her in a professional manner, he placed them in her jacket[,]" id. ¶ 1081.  According to Plaintiff Knight, "[t]he department Captain, Lewis Douglas, removed the disciplinary actions, but no action or discipline was taken against [Sergeant] Griffin for abuse of his power and fraudulent disciplinary actions." Id. ¶ 1083. Plaintiff Knight alleges that, "[t]o further retaliate against and bully [her], [Sergeant] Griffin ordered Plaintiff Knight to report to the Police and Fire Clinic for a fitness for duty evaluation, which can be a first step towards termination." Id. ¶ 1084.  According to Plaintiff Knight, "[Sergeant] Griffin claimed that the basis for the referral was that Plaintiff Knight had informed him that she was 'depressed,' which [Plaintiff Knight alleges] was completely false." Id.

Plaintiff Knight further alleges that she was accused of making a call to Officer Janice Oliver's husband, telling him that his wife was having an affair with Captain Shelton and even though she apparently "passed [a] polygraph exam, . . . Chief Lanier would not accept that she

was innocent, despite the fact that [her] phone records proved she did not make the call, and was on patrol when the call was made." Id. ¶¶ 1091–96.  Plaintiff Knight also purportedly personally paid for a "voice recognition expert," which proved that "the message was not Plaintiff Knight's voice." Id. ¶¶ 1097–98.  Nevertheless, "[Chief Lanier] refused to reverse Plaintiff Knight's punitive transfer out of [the Special Operations Division ('SOD')]." Id. ¶ 1099.  "Plaintiff Knight escalated matters by reaching out to Mayor Bowser's office [and] [a]n aid[e] in the Mayor's office informed Plaintiff [Knight] that her complaint would be investigated by the Office of the Inspector General." Id. ¶ 1103.  "In December of 2014, nearly a year later, [the] OIG called Plaintiff Knight to ascertain if she had been transferred back to [the] SOD," to which "[s]he stated that she had not [and] [t]wo weeks after that, Plaintiff Knight was transferred back to SOD." Id. ¶ 1104.

Plaintiff Knight further alleges that "[o]fficers in [the] SOD received scheduled overtime because of the staffing needs [but] [w]hen [she] was reinstated to [the] SOD, she was not given back pay for the overtime pay amount she had been wrongfully denied." Id. ¶ 1107. Additionally, she was allegedly "subject[ed] . . . to far more restrictive work rules and procedures than her colleagues, and [Lt. Rivera] repeatedly accused her of things she had not done[.]" Id. ¶ 1109.  For example, "[w]hen a position on the Crash Review Board ('CRB') was posted as open, Plaintiff Knight leapt at the opportunity . . . [but] was immediately told 'no,' without any explanation." Id. ¶ 1113–14.  "A few days later, [Commander] Sund emailed Plaintiff Knight indicating that he would allow her to take the assignment," id. ¶ 1115, but "[u]pon her arrival [to do so], she was informed that [Captain] Carroll would not allow [her] to be placed in the CRB office, and that she would have to be moved into the Administrative Office so she 'could be watched[,]'" id. ¶ 1116.

Plaintiff Knight further alleges that "in February 2016, [she] was informed that she was being moved from the supervisory control of [Sergeant] Barrientos to that of [Sergeant] Terry Thorne[,] [a] white male[], who [worked] in a different building." Id. ¶ 1122.  Plaintiff Knight alleges that "this move was orchestrated by Chief Lanier to retaliate against [her] for going to [the Office of the Inspector General] with a complaint about the unfair reassignment from [the] SOD." Id. ¶ 1125.

In the Spring of 2016, Plaintiff Knight was assigned to work under Captain Robert Glover, who "was openly rude and hostile to [her] from the beginning of her tenure working under him." Id. ¶¶ 1126–27.  For example, Plaintiff Knight alleges that after a lieutenant accused her of sending a "nasty and unprofessional" email, Captain Glover "became irate . . . without asking her anything about the exchange," id. ¶¶ 1131–32, and separately accused her of time card fraud, id. ¶ 1135.  Plaintiff Knight further alleges that "[i]n 2018, [she] again became the target of a campaign of harassment and disparate treatment[,] [which] was manifested by hyper-scrutiny of her work assignments, and changing [her] assignments without informing her, to cause confusion and chaos in her work schedule." Id. ¶ 1147.  One of the lieutenants at the time, Lieutenant Jones, purportedly "had such hostility to Plaintiff Knight, that he chastised a subordinate, Sergeant Keith Jackson, for giving Plaintiff Knight an overtime opportunity, and made clear that he did not want Plaintiff Knight assigned to [the] Special Events Department for plum assignments." Id. ¶¶ 1150, 1152.  Lieutenant Jones also allegedly "took to pretending that he was mistaking Plaintiff Knight for [Sergeant] Boyd, a large African American male officer with a full beard." Id. ¶ 1148.  Plaintiff Knight alleges that this was "a thinly veiled attempt to denigrate and disparage [her] appearance." Id.

38

Plaintiff Knight further claims that in June 2019, "[Captain] Glover [conducted] a meeting with everyone but [her]," id. ¶ 1158, and that "[Captain] Glover informed the people in the meeting that they were no longer to share information with Plaintiff Knight, and to change all the passwords and codes to all systems so that Plaintiff Knight could not use them to do her job." Id. ¶ 1160.  "He also informed the team not to ask Plaintiff Knight for any assistance."  Id.  And, according to Plaintiff Knight, around October 2019, she was "placed under investigation because two cases she worked on were 'missing' from the MPD car accident filing system."  Id. ¶ 1175. She claims that she later "learned that certain files and hard copy and memos had disappeared from the files she worked on, for which she was disciplined, even though no evidence was presented that she was responsible for removing the missing records."  Id. ¶ 1178.  "During Plaintiff Knight's appeal of the discipline she received, it was discovered . . . that [Commander] Rivera had removed important information from the investigation that was favorable toward Plaintiff Knight."  Id. ¶ 1180.  "[Lieutenant] Walter Flemins, who investigated the case, had [supposedly] requested that the case against Plaintiff Knight be dropped, but Chiefs Carrol and Manlapaz [purportedly] denied the request."  Id. ¶ 1181.  "Plaintiff Knight asserts that Chiefs Carrol and Manlapaz denied the request to drop the investigation against Plaintiff Knight because they were seeking a reason to terminate her employment, and to retaliate against her for engaging in protected activity."  Id. ¶ 1182.

Around November 2019, Plaintiff Knight's direct supervisor "gave [her] the highest possible [performance] rating of a five."  Id. ¶ 1183.  But Plaintiff Knight claims that Commander Rivera "dropped Plaintiff Knight's performance score from a five [ ], which was consistent with Plaintiff's rating for the previous ten [ ] years, to a three[.]"  Id. ¶ 1185. According to Plaintiff Knight "[t]he purported justification for the drop in rating was the fact that

39

Plaintiff [Knight] was the subject of an investigation initiated by Chief Manlapaz." Id. ¶ 1186. She claims that "[n]o other significant performance deficiency was identified to justify the uncharacteristically low rating." Id.

In April 2020, Plaintiff Knight learned that she was the target of an investigation "about an email she sent to [the] OHR, and more specifically, that Plaintiff Knight had mentioned that she had recorded Commander Rivera in that email [even though i]nformation that complainants provide to [the] OHR is supposed to remain confidential." Id. ¶ 1204. "As a result of the investigation, Plaintiff Knight was informed that she was going to be suspended for twenty-eight [ ] days," even though she claims that "[a]t the time, there was no MPD policy against recording conversations." Id. ¶ 1206. Plaintiff Knight filed a grievance and her suspension was eventually reduced to a letter of censure. Id. ¶ 1210–19.

"On or about February 17, 2021, Chief Chanel Dickerson told Plaintiff Knight to complete a transfer form to go back to her assignment at [the] SOD." Id. ¶ 1220. Then, "[t]hree days later, on or about February 20, 2021, Chief Dickerson called Plaintiff Knight to inform her that Chief Contee refused to allow Plaintiff Knight to go back to [the] SOD, and that Chief Contee wasn't going to require that any other department receive Plaintiff Knight[,]" id. ¶ 1222, which Plaintiff Knight viewed as "a direct and intentional denial of job and promotional activities . . . [and] an act of retaliation and an adverse employment action to punish her for her protected activity[,]" id. ¶ 1223. Plaintiff Knight alleges that she was constructively forced to retire from the MPD in March 2021 because "no entity in the District of Columbia was willing to take her claims and concerns seriously, and [because] no member of [the] MPD leadership was willing to restrain the rampant and intentional retaliation against Plaintiff Knight[.]" Id. ¶ 1226.

**b.**      **Plaintiff Knight's EEOC Charge**

Plaintiff Knight filed an EEOC Charge on May 20, 2021.  Pls.' Opp'n, Ex. 11 (Plaintiff

Knight's First EEOC Charge) at 55, ECF No. 52-2.  She alleged she was discriminated against

on June 12, 2020.  Id.  Specifically, Plaintiff Knight alleged to the EEOC that:

1.) She received a "62E written-form discipline on June 12, 2020, after having reported

sex-based and race-based discrimination on several instances to [her] supervisors."

Id.

On May 24, 2021, after reviewing her Charge, the EEOC decided to close its file on Plaintiff

Knight's Charge without further investigation.  Id. at 57.  Plaintiff Knight filed a second EEOC

Charge on July 23, 2021, alleging various "class claim[s]" of discrimination against Black

female police officers.  See Pls.' Opp'n, Ex. 12 (Plaintiff Knight's Second EEOC Charge of

Discrimination) at 59, ECF No. 52-2.  On September 16, 2021, the EEOC determined it was

closing its file on Plaintiff Knight's Second EEOC Charge because Plaintiff Knight had "filed a

claim in court."[16]  Id. at 62.

**9.  Specific Facts Related to Plaintiff Lockerman**

   **a.  Allegations in the Third Amended Complaint**

Plaintiff Lockerman joined the MPD in November 2003.  3d Am. Compl. ¶ 1237.  On

March 5, 2020, Plaintiff Lockerman allegedly attended a crime briefing and private lunch with

Commander Duncan Bedlion[, a] white male[]."  Id. ¶ 1240.  "While Plaintiff Lockerman

believed that the luncheon was for professional reasons, [Commander] Bedlion implied that he

wanted to engage in conversation of a personal nature," which Plaintiff Lockerman claims made

---

[16] Plaintiff Knight first filed her lawsuit related to her allegations on August 24, 2021.  See Knight v. Dist. Of Columbia, 21-cv-2249 (RBW), Complaint, ECF No. 1, at 1 (D.D.C. 2021).  That Complaint, which was eventually consolidated as part of this action, was filed 92 days after the signature date on Plaintiff Knight's notice of her right to sue within 90 days.  It is unclear based on available evidence when Plaintiff Knight actually received the EEOC's notice of her right to sue, and the defendant has not argued that her lawsuit was filed outside of the 90-day window.

her "uncomfortable." Id. ¶¶ 1241. According to Plaintiff Lockerman, "[f]rom that point forward, [Commander] Bedlion began to retaliate against [her] for her cool reaction to his attempt at conversation on personal and private matters." Id. ¶ 1243.

Plaintiff Lockerman claims that she was on sick leave from March 26, 2020 until April 8, 2020, and while she was on leave, she "was assigned two tasks that were due during the time that she was out on sick leave." Id. ¶ 1244. Upon her return to work, she was allegedly "issued discipline at the order of [Commander] Bedlion, for not turning in the assignments on time." Id. ¶ 1245. She further alleges that "[w]hile reviewing her evaluation with Captain Edward Bernat (now retired), Plaintiff Lockerman was informed that [Commander] Bedlion was urging [Captain] Bernat to place Plaintiff Lockerman on a Performance Improvement Plan [ ('PIP').]" Id. ¶ 1247.

On October 3, 2020, "Plaintiff Lockerman was issued discipline for failing to post on the Next[]Door application, which is a social media platform designed to inform the community of crimes in the area of public interest," even though she claims that "an arrest [was already] made in th[e] situation [that was the subject of the failed post]." Id. ¶ 1250–51. Plaintiff Lockerman scheduled a meeting with Commander Bedlion and Captain Brian Bray to "discuss the discipline for not posting on the Next[]Door app" and "[Commander] Bedlion spent the entire meeting berating and denigrating Plaintiff Lockerman." Id. ¶ 1252. Plaintiff Lockerman believes that "[Commander] Bedlion held [her] to a different standard than the other lieutenants when it came to timely posting on Next[]Door." Id. ¶ 1267. In support of that belief, she claims that "on or about March 3, 2021, Lieutenant Darren Haskis, a white male officer, failed to post a social media notification for several hours after being relieved of duty . . . [and Plaintiff Lockerman believes that Lieutenant] Haskis was not reprimanded." Id. ¶ 1268.

42

According to Plaintiff Lockerman, "[Commander] Bedlion also falsely accused [her] of having issues with her work performance in the Seventh District[] [even though she purportedly] had no major disciplinary issues and was never placed on a [ PIP] at the Seventh District." Id. ¶ 1254.  Commander Bedlion allegedly told Plaintiff Lockerman that he "took pride in having made other people cry who had sat in the same chair that she was sitting in, in the past." Id. ¶ 1255.  "[Commander] Bedlion was [purportedly] boastful of the fact that he made other people cry, and appeared to have made the comment to intimidate and threaten Plaintiff Lockerman." Id.

Plaintiff Lockerman further alleges that during the COVID-19 pandemic in late 2020, she "directed a subordinate to put his mask on properly," id. ¶ 1257, and in what Plaintiff Lockerman characterizes as an act of retaliation, Commander Bedlion then ordered an administrative investigation into her for a "Potential Orders and Directives Violation" for giving the subordinate an order to wear a mask, id. ¶¶ 1258–59.  In February 2021, Plaintiff Lockerman made an EEO complaint about the pattern of retaliation she was allegedly receiving from Commander Bedlion, id. ¶ 1264, but the "EEO did not sustain the complaint and directed Plaintiff Lockerman to resolve the matter with her chain of command[] [and n]othing further was done[,]" id. ¶ 1265.

In November 2020, Plaintiff Lockerman contracted COVID-19 and was placed on administrative leave. Id. ¶ 1270.  According to Plaintiff Lockerman, "[Commander] Bedlion ordered his subordinate, [Captain] Bray[,] to instruct the time and attendance clerk, Ms. Joann Coombs, to dock Plaintiff Lockerman's earned annual leave for her time off," which she claims "is fraud and against policy." Id. ¶ 1271.  On April 5, 2021, "[Commander] Bedlion emailed Plaintiff Lockerman, directing her to join the evening and midnight shift officers in [a]

43

meeting[.]" Id. ¶ 1273. Plaintiff Lockerman directed her subordinate sergeant to attend the meeting on her behalf "because she was scheduled for her bi-annual physical on that [same] evening, which had been scheduled for months, and which she was not allowed to reschedule." Id. ¶ 1274. According to Plaintiff Lockerman, "Commander Bedlion directed [Captain] Frenzel to issue a letter of counseling [to Plaintiff Lockerman] regarding this because, in his opinion, going to the clinic for a mandatory physical did not excuse her from arranging a meeting in front of the building." Id. ¶ 1275.

On July 19, 2021, Plaintiff Lockerman was "issued another letter of counseling for failing to respond and notify the community by emailing the local stakeholders of a robbery/kidnapping that occurred in her assigned area[] [even though she] claims that she was not the Watch Commander on the night of the incident." Id. ¶ 1286. She also alleges that in September 2021, Captain Frenzel "served [her] with an official reprimand for failing to notify the community stakeholders of an incident that took place while [she] was on leave." Id. ¶ 1300. "Plaintiff Lockerman was also served with a [PIP], even though [Captain] Frenzel [allegedly] advised Plaintiff Lockerman that she would be receiving a favorable annual evaluation." Id. ¶ 1302. "[Captain] Frenzel [purportedly] brought up old incidents from Plaintiff Lockerman's tenure in the Seventh District[,]" which, according to Plaintiff Lockerman, "was indicative of the management team's concerted effort to look for reasons to attack [her]." Id. ¶ 1305.

Plaintiff Lockerman also alleges that "[Commander] Bedlion created a schedule in which all of the Watch Commander duties for the entire midnight shift landed on Plaintiff Lockerman[] and Captain Sharell Williams (black female), and none of those duties were assigned to the male management officers of the Second District for that tour." Id. ¶ 1315. Plaintiff Lockerman claims that "the retaliation against [her] did not end" when Commander Bedlion was no longer

44

her manager because "MPD blocked her out of a promotion for which she was next in line, by allowing someone to remain in an 'acting' Captain role, when that person did not take, let alone score well enough on the captains exam to be promoted." Id. ¶ 1319.

>   **b.**      **Plaintiff Lockerman's EEOC Charge**

Plaintiff Lockerman filed an EEOC charge on September 18, 2021. Pls.' Opp'n, Ex. 13 (Plaintiff Lockerman's EEOC Charge of Discrimination) at 64, ECF No. 52-2. She alleged that she was continuously discriminated against from January 1, 2011 to the day she filed her Charge. Id. Specifically, Plaintiff Lockerman alleged to the EEOC that:

1.) She was "targeted and unlawfully retaliated against by [her s]uperior, based on [her] gender and race, and because [she] did not respon[d] as he wished after having taken [her] to lunch." Id. After her supervisor treated her to lunch, he "found every opportunity to discipline [her] for minor offenses when he does not do the same thing for the other lieutenants assigned to the Second District." Id.

2.) On May 6, 2021, she was told she had to report to the clinic while on sick leave and that her Commander "was attempting to force [her] to work." Id.

3.) In September 2021, Lieutenant Hamelin asked her to cancel some of her planned leave due to a staffing shortage and she agreed. Id. at 65. Her commander denied her request and told her that "she had to take [all] of her leave or none of it." Id.

4.) On September 15, 2021, she met with Captain Peter Frenzel and Captain Williams and was issued a PIP and was "given an Official Reprimand for failing to notify stakeholders of a Part I offense that occurred when [she] was on leave." Id.

5.) Her superiors "ensure that [she does] not get promoted." Id.

6.) "As a Black woman . . . [she] feel[s] like [she is] isolated and treated very harshly[,] especially in relation to [her] white and male counterparts." Id.

Plaintiff Lockerman's EEOC Charge also makes various "class claim[s]" of discrimination against Black female police officers. See id. After reviewing her Charge, on September 30, 2021, the EEOC determined it was closing its file on Plaintiff Lockerman's Charge because she had "filed a claim in court."[17] Id. at 68.

**10. Specific Facts Related to Plaintiff Mitchell**

**a.  Allegations in the Third Amended Complaint**

Plaintiff Mitchell worked for the MPD from September of 1985 until she retired in March 2015. 3d Am. Compl. ¶ 1335. In 2017, she was allegedly asked to come out of retirement and return to the MPD as a Senior Police Officer. Id. ¶ 1336. She agreed and, upon her return, "was assigned to partner with [Plaintiff] Brinkley, whom she had partnered with for more twenty [ ] years when they were both sworn officers." Id. ¶ 1337. Plaintiff Mitchell alleges that Sergeant Boyd issued Plaintiff Mitchell and Plaintiff Brinkley K-9 Unit cruisers with "interiors that were covered in dog hair and dander that was getting all over their uniforms, along with numerous spiders and insects because the cars had been sitting idle for months." Id. ¶ 1345. When they complained, Sergeant Boyd purportedly refused to assign them different vehicles, so "Plaintiffs Mitchell and Brinkley went to [Sergeant] Boyd's superior, Lieutenant Kenny Taylor[,] to get assigned clean vehicles[] [but he] also denied their request," id. ¶ 1354, even though, according to Plaintiff Mitchell, "there were multiple clean, operational vehicles available for Plaintiffs Brinkley and Mitchell to use[,]" id. ¶ 1355.

---

[17] Plaintiff Lockerman was named for the first time as a plaintiff in the First Amended Complaint, which was filed on September 22, 2021, see Am. Compl., ECF No. 9, eight days before the EEOC issued its finding on her Charge.

Plaintiff Mitchell claims that she and Plaintiff Brinkley were ultimately issued new vehicles after having a meeting with Commander Guillermo Rivera and were "given permission . . . to use a white Suburban truck [until the new vehicles were available]," id. ¶¶ 1356, 1358, but "[Sergeant] Boyd [allegedly told them that] he did not care who gave Plaintiff Mitchell permission . . . [and] asserted that he didn't want Plaintiff Mitchell to drive the Suburban[,] [ ] [giving] no reason or explanation[,]" id. ¶ 1361.  Plaintiff Mitchell then complained to Lieutenant Taylor "about the way [Sergeant] Boyd spoke to her and handled the situation[,]" id. ¶ 1363, and Plaintiff Mitchell claims that "[f]rom that point forward, [Sergeant] Boyd had personal animus against Plaintiff Mitchell, and acted to retaliate against her," id. ¶ 1364.

In June 2017, Plaintiff Mitchell was assigned to assist with the execution of a high-risk warrant by going on a "drive-by" detail inside a van with five male officers.  Id. ¶ 1365.  During the detail, Sergeant Andrew Horos allegedly "decided to take his penis out and urinate in the van into a bottle . . . [which] made Plaintiff [Mitchell], the only female in the van, very uncomfortable."  Id. ¶¶ 1375–76.  During the same detail, another officer used his personal drone to take aerial pictures of the area where the warrant was to be served, despite it being in a Federal Aviation Administration "no-fly zone."  Id. ¶¶ 1369–70.  When MPD leadership found out about the unauthorized drone use, "Plaintiff Mitchell's police powers were suspended, along with that of the other officers, pending investigation, even though all officers admitted that she was not the one operating the drone." id. ¶ 1379.

While Plaintiff Mitchell's police powers were suspended, another officer reported her for "being on-scene at a barricade."  Id. ¶ 1393.  She claims that an investigation determined that a different Black female officer was the one at the scene and, when Plaintiff Mitchell confronted

47

the officer to learn why he reported seeing her there, he allegedly responded, "y'all look alike." Id. ¶ 1399.  Plaintiff Mitchell alleges that this "false report . . . appeared to be out of spite and potentially racially motivated."  Id. ¶ 1400.

Plaintiff Mitchell further alleges that she "continued to be targeted for minor discipline and investigations,[]" id. ¶ 1414, including an allegation that around August 28, 2020, she was "working the day shift" and was written up for "not [being] at a barricade the night before" even though she alleges that she was "not on duty[,]" id. ¶¶ 1415–17.  And around May 2020, she claims that "she was served with a minor disciplinary action for not being on five barricades that took place while [she was] out on approved FMLA leave."  Id. ¶ 1422.  "Plaintiff Mitchell [ ] asserts that the discipline she received for [not being at] barricades was retaliation for taking FMLA leave, and part of a greater scheme to retaliate against her for opposing [Sergeant] Horos' misconduct."  Id. ¶ 1425.  On January 17, 2021, Plaintiff Mitchell was detailed to a joint operations center in Herndon, Virginia, and requested four hours of intermittent FMLA leave to care for her mother, who had Alzheimer's disease, but her request was purportedly denied.  Id. ¶¶ 1435–38.  According to Plaintiff Mitchell, all the foregoing "incidents of unfairness and negative treatment . . . constructively forced [her] to retire from MPD" on September 24, 2021. Id. ¶ 1445.

      **b.**      **Plaintiff Mitchell's EEOC Charge**

Plaintiff Mitchell filed an EEOC Charge on August 2, 2021.  Pls.' Opp'n, Ex. 14 (Plaintiff Mitchell's EEOC Charge) at 70, ECF No. 52-2.  She alleged that she was discriminated against from January 2017 to the day she filed her Charge and that the discrimination was continuous.  Id.  Specifically, Plaintiff Mitchell alleged to the EEOC that:

1.) She had "been disciplined for things that were not [her] fault, such as being discipline[d] for an air horn blasting inappropriately when [she] was not the officer who did that, and being disciplined for inappropriate use of a drone when [she] was not the officer who brought or operated the drone." Id.

2.) She had "been given less desirable equipment to do [her] job because [she is] African American and female. [She] and [her] partner were assigned a flea-infested K-9 unit vehicle by Sgt. Boyd, who targeted us because [they] are female and he did not like [them]." Id. "When [she] attempted to get a better vehicle, Sgt. Boyd blocked [her] efforts and started to create a hostile work environment." Id.

3.) On one occasion, she was "on detail with five other male police officers when one of them took out his penis and urinated in a bottle." Id. at 71. When she complained about this officer's behavior, she "was ignored, dismissed, trivialized, and eventually retaliated against because the officer involved was on the cusp of a promotion." Id.

4.) She has been "subjected to harsh and unfair discipline because [she] complained about MPD being a hostile work environment for Black women officers." Id.

5.) Her "management is always riding [her] and harassing [her] for little things, for the express purpose of wearing [her] down." Id.

6.) She was disciplined while on FMLA leave "for not responding to a call out" and has "been treated more harshly than [her] peers who have FMLA needs and who take leave to care for their families because of [her] race and gender." Id.

7.) She has "observed and been the victim of a workplace that favors male officers and white officers, and permits male officers to use sexist and derogatory language without any response from management." Id.

8.) She has been "given harsh and unfair performance evaluations, been subject to a never-ending cascade of minor disciplinary actions and made the subject of a systemic effort to bully and isolate [her], because [she] opposed racism[,] and sexist and inappropriate behavior in the workplace." Id.

Plaintiff Mitchell's EEOC Charge also makes various "class claim[s]" of discrimination against Black female police officers. See at 72–74. After reviewing her Charge, on September 30, 2021, the EEOC determined it was closing its file on Plaintiff Mitchell's Charge because Plaintiff Mitchell "filed a claim in court."[18] Id. at 75.

## II.   STANDARD OF REVIEW

### A.   Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff[s] plead factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff[s], who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). While the Court must "assume [the] veracity" of any "well-pleaded factual

---

[18] Plaintiff Mitchell appears for the first time as a plaintiff in the First Amended Complaint, which was filed on September 22, 2021, see Am. Compl., ECF No. 9, eight days before the EEOC issued its finding on her Charge.

allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff[s] if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. Finally, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

The parties have attached the plaintiffs' EEOC Charges of Discrimination to their filings. See Def.'s Mot., Exs. 1–7; Pls.' Opp'n Exs. 1–14. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation omitted). And among the documents "subject to judicial notice on a motion to dismiss" are "public records." Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004). Thus, "[a] court may consider an EEOC complaint and Notice of Charge without converting a motion to dismiss into a motion for summary judgment because such records are 'public document[s] of which a court may take judicial notice.'" Ndondji, 768 F. Supp. 2d at 272 (alteration in original) (quoting Ahuja, 742 F. Supp. 2d 96, at 101–102). Therefore, although the defendant requested summary judgment as an alternate form of relief, the Court will consider the EEOC Charges of Discrimination along with the facts in the Third Amended Complaint without converting the motion to dismiss into a motion for summary judgment.

### III.   ANALYSIS

The Court will first determine whether the plaintiffs have exhausted their administrative remedies for their Title VII, DCHRA, ADEA, and ADA claims.  Then, the Court will determine whether, for each plaintiff, the claims that have been properly exhausted were timely initiated.  The timeliness analysis is different for discrete employment acts on one hand and hostile work environment claims on the other, so the Court will conduct those analyses separately.  Because the Court ultimately finds that many of the plaintiffs' claims are untimely, the Court will then proceed to the merits of only the plaintiffs' timely Title VII and DCHRA claims.  The Court will then determine whether the plaintiffs' remaining DCWPA, ADEA, and ADA allegations state a claim upon which relief can be granted before finally assessing the plaintiffs' Section 1981 and Section 1983 claims.

### A.   Whether Each Plaintiff Has Exhausted Her Administrative Remedies Under Title VII, the DCHRA, the ADEA, and the ADA

"Before suing under . . . Title VII, an aggrieved party must exhaust [her] administrative remedies by filing a charge of discrimination with the EEOC[.]"  Washington v. Wash. Metro. Area Transit Auth., 160 F.3d 750, 752 (D.C. Cir. 1998).[19]  "Exhaustion serves the important function of 'giving the charged party notice of the claim.'"  Alberti v. District of Columbia, No. 24-cv-2319 (JEB), (D.D.C. Feb. 10, 2026) (quoting Park v. Howard Univ., 71 F. 3d 904, 907 (D.C. Cir. 1995).  Although exhaustion is an "essential element" of a Title VII claim, Poole v.

---

[19] The defendant does not argue that the plaintiffs failed to exhaust their administrative remedies under the DCHRA. The Court notes that "[w]hile the DCHRA generally does not require exhaustion of administrative remedies, there is a statutory exhaustion requirement for employees of the District of Columbia government." Fowler v. District of Columbia, 122 F. Supp. 2d 37, 40 (D.D.C. 2000).  Nonetheless, a work-sharing agreement between the D.C. Office of Human Rights ("OHR") and the EEOC provides that plaintiffs who file with the EEOC are relieved of their burden of exhausting remedies with the OHR and, therefore, the plaintiffs who properly exhausted their remedies for their Title VII claims also properly exhausted their remedies for their DCHRA claims. See id. at 42–43.

U.S. Gov't. Publ'g Off., 258 F. Supp. 3d 193, 199 (D.D.C. 2017) (quotation marks omitted), "a complainant need not describe every factual detail of her claim to satisfy the exhaustion requirement," Craig v. District of Columbia, 74 F. Supp. 3d 349, 365 (D.D.C. 2014).  Rather, the charge must "provide the EEOC and [the] defendants with sufficient notice to begin the investigative process." Seed v. Pruitt, 246 F. Supp. 3d 251, 255 (D.D.C 2017).  "The exhaustion requirements for Title VII of the Civil Rights Act govern administrative exhaustion under the ADA." Congress v. District of Columbia, 277 F. Supp. 3d 82, 87 (D.D.C. 2017) (citing 42 U.S.C. § 12117(a)).  Title VII's exhaustion requirement also "applies to claims brought under the Age Discrimination in Employment Act." Montgomery v. Omnisec Int'l Sec. Servs., Inc. 961 F. Supp. 2d 178, 181 (D.D.C. 2013).

The defendant argues that "[the plaintiffs] have asserted numerous discrete acts of discrimination and retaliation—spanning decades—that are not reasonably related to allegations brought in their EEOC charges." Def.'s Mot. at 23.  As detailed above, all ten individual plaintiffs filed lengthy and broad claims of discrimination with the EEOC.  Given the breadth of most of the EEOC charges, the Court finds that the Title VII, DCHRA, ADEA, and ADA claims in the Third Amended Complaint, with one exception, were properly exhausted.

The one exception is Plaintiff Knight.  Although she alleges in her EEOC charge that "during [her] employment with the Metropolitan Police Department, [she] faced discrimination based on race, color, and sex," Pls.' Opp'n, Ex. 11 (Plaintiff Knight's First EEOC Charge) at 10, the only discrimination she describes in her EEOC Charge is from a discrete incident that occurred on June 12, 2020, in which she "received a 62E written-form discipline . . . after having reported sex-based and race-based discrimination on several instances to [her] supervisors[,]" id. This single incident is not mentioned in the Third Amended Complaint.  The lengthy history of

53

alleged discrimination Plaintiff Knight describes in the Third Amended Complaint cannot be said to have been administratively exhausted because none of it is mentioned in her EEOC Charge and "[a] vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims it does not fairly embrace." Marshall v. Fed. Express Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997). Because her EEOC Charge is limited to one incident, and that incident is not included in the Third Amended Complaint, Plaintiff Knight's Title VII and DCHRA claims must be dismissed.

**B.      Whether Each Plaintiff's Title VII Disparate Treatment, Disparate Impact, and Retaliation Claims Are Timely**

Even where plaintiffs have exhausted their administrative remedies by first filing with the EEOC, the Court can only consider claims that were timely filed. "In the District of Columbia, [ ] an EEOC charge must be filed within 300 days of the date of the allegedly discriminatory/retaliatory act." Duberry v. Inter-Con Sec. Sys., Inc., 898 F. Supp. 2d 294, 298 (D.D.C. 2012); see 42 U.S.C. § 2000e-5(e)(1); see also Craig, 74 F. Supp. 3d at 361 ("Ordinarily, . . . a plaintiff alleging a violation of Title VII must file an EEOC charge within 180 days of the date that the allegedly discriminatory act occurred[; however,] [i]n the District of Columbia . . . a 'worksharing agreement' between the EEOC and the [OHR] results in the automatic cross-filing of an EEOC complaint with the [OHR], thereby extending the filing deadline for plaintiffs in the District to 300 days.") (citing 42 U.S.C. § 2000e-5(e)(1); Carter v. George Wash. Univ., 387 F.3d 872, 879 (D.C. Cir. 2004)).

Moreover, "[e]ach incident of discrimination [or retaliation] . . . constitutes a separate actionable 'unlawful employment practice[,]'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002), and "starts a new clock for filing charges alleging that act[,]" id. at 113. Thus,

"[t]o be actionable, a discrete act—an event that takes place at a particular point in time—must occur within the filing period," Dickens v. Dep't of Consumer & Regul. Affs., 298 F. App'x 2, 3 (D.C. Cir. 2008) (internal quotation marks omitted), and "discrete discriminatory [or retaliatory] acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," Morgan, 536 U.S. at 113.

The defendant argues that many of the plaintiffs' claims are time-barred because they are based on events that occurred more than 300 days before the filing of their respective EEOC charges. See Def.'s Mot. at 24. The plaintiffs respond that their claims are timely because this is a "'pattern and practice' case [which] is not subject to the same statute of limitations of a discrete claim of discrimination," Pls.' Opp'n at 20, and "the Court must examine the Third Amended Complaint under the guidance established for continuing violation cases," id. at 13.[20]

"Administrative exhaustion applies differently to 'continuing violations' than to 'discrete' violations." Guerrero v. Vilsack, 134 F. Supp. 3d 411, 429 (D.D.C. 2015). A "continuing violation" in the Title VII context is one where "the alleged acts constitute one similar pattern or practice and at least one illegal act took place within the filing period[.]" Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 368 (D.C. Cir. 2007). This doctrine "stems from judicial recognition that certain events cannot 'be made the subject of a lawsuit when [they] first occur[] typically because it is only [their] cumulative impact that reveals [their] illegality.'" In re Navy Chaplaincy, 69 F. Supp. 3d 249, 258 (D.D.C. 2014) (alterations in original) (quoting Earle v. District of Columbia, 707 F.3d 299, 306 (D.C. Cir.

---

[20] The plaintiffs argue that "the proper analytical framework for understanding and evaluating [their] claims derives from the continuing violation/pattern and practice case law," Pls.' Opp'n at 20, but they conflate the distinct concepts of a continuing violation in the Title VII context and pattern and practice discrimination claims in the class action context. As already discussed, "individual plaintiff[s] may not bring a standalone 'pattern or practice' claim outside the context of a class action," Marcus, 813 F. Supp. 2d at 20, so the Court finds that any of the plaintiffs' citations to rulings in class action decisions are inapposite to their claims in this case.

2012)).  The continuing violation doctrine "is almost exclusively applied to hostile work environment claims under Title VII," id., and is implicated by conduct

> that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period, typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality.

Earle, 707 F.3d at 306 (citing Taylor v. Fed. Deposit Ins. Co., 132 F.3d 753, 765 (D.C. Cir. 1997)).  "This application of the continuing violation doctrine thus applies if the fact of the violation becomes apparent only by dint of the cumulative effect of repeated conduct."  Id.  However, even where it does apply, the continuing violation doctrine is subject to "two crucial limiting principles."  Id.  First, it does not validate untimely "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" because "[e]ach incident of discrimination and each retaliatory adverse employment action constitutes a separate actionable 'unlawful employment practice.'"  Id. (quoting Morgan, 536 U.S. at 114).  Second, it also does not apply unless "at least one 'act contributing to the claim occur[red] within the filing period.'"  Id. (quoting Morgan, 536 U.S. at 117).

The plaintiffs focus their argument on this second principle, alleging that their claims are timely because they all contain at least one adverse action that took place within the 300-day filing period.  Pls.' Opp'n at 20.  The plaintiffs believe that "[t]he question for the Court is whether each [p]laintiff alleged that an act occurred within 300 days of her EEOC charge [ ] that was part and parcel of the pattern they allege."  Id. at 21.  Although that may be the appropriate inquiry for their substantive and retaliatory hostile work environment claims, discussed more below, that is not the question here.  Based on their own descriptions of the discrete discriminatory acts they allege they experienced, each violation was independently apparent and

56

not "only by dint of the cumulative effect of repeated conduct." See Earle, 707 F.3d at 306.

Accordingly, the continuing violation doctrine does not apply to the plaintiffs' discrete

allegations of discrimination.[21]  The Court therefore finds that the only timely discrete

allegations identified by the plaintiffs are those that occurred within 300 days before they filed

their first EEOC Charge.

**C.      Whether Each Plaintiff's DCHRA Disparate Treatment, Disparate Impact, and
Retaliation Claims Are Timely**

The Third Amended Complaint charges that the alleged violations of Title VII are also

alleged violations of the DCHRA.  See 3d Am. Compl. at 34.  Although, as discussed above, the

administrative exhaustion requirements are identical under Title VII and the DCHRA, the

defendant argues the plaintiff's "DCHRA claims premised on events that occurred more than one

year before the filing of the original Complaint or any charge of discrimination are untimely"

under the DCHRA's one-year statute of limitations.  Def.'s Mot. at 24.  The plaintiffs respond

that their DCHRA claims are subject to the same pattern and practice analysis as their Title VII

claims and that the continuing violation theory "has been explicitly applied to claims under the

DCHRA."  Pls.' Opp'n at 30.  The plaintiff's response confuses the requirement to

administratively exhaust claims before filing suit with the statute of limitations.

"The DCHRA requires plaintiffs to bring a lawsuit 'within one year of the unlawful

discriminatory act[.]'"  Hatter v. Wash. Metro. Area Transit Auth., 105 F. Supp. 3d 7, 10 (D.D.C.

2015) (quoting D.C. Code. § 2–1403.16).  Plaintiff Brinkley first filed her lawsuit on June 7,

---

[21] All plaintiffs either filed a second EEOC Charge with various "class claims" or included those "class claims" in their only EEOC Charge.  See generally Pls.' Opp'n, Exs. 1–14.  Because these "class claims" do not include any specific instances of discrimination or any dates on which discrimination is alleged to have occurred, the Court cannot rely on them in making this assessment.

2021, see Compl. at 1; Plaintiff Carr first filed her lawsuit on August 6, 2021, see Carr v. District of Columbia, 21-cv-2116 (RBW), Complaint, ECF No. 1, at 1 (D.D.C. 2021); Plaintiff Knight first filed her lawsuit on August 24, 2021, see Knight v. District of Columbia, 21-cv-2249 (RBW), Complaint, ECF No. 1, at 1 (D.D.C. 2021); and all other plaintiffs first filed their lawsuits on September 22, 2021, see 3d. Am Compl. at 1.  Thus, under a plain reading of the DCHRA, Plaintiff Brinkley's DCHRA claims from before June 7, 2020; Plaintiff Carr's DCHRA claims from before August 6, 2020; Plaintiff Knight's DCHRA claims from before August 24, 2020; and the remaining plaintiffs' DCHRA claims from before September 22, 2020 are beyond the DCHRA's statute of limitations.  Although "[f]iling a charge with the EEOC suffices to toll the one-year statute of limitations for DCHRA claims" while the EEOC investigation is ongoing, Hatter 105 F. Supp. 3d at 10 (quoting Craig, 74 F. Supp. 3d at 366), the plaintiffs do not argue that any of their time-barred claims avoid dismissal because their EEOC charges tolled the statute of limitations.

Based on the foregoing analysis, the Court finds that the following allegations are timely for purposes of the plaintiffs' disparate treatment, disparate impact, and retaliation claims in Count I, Count II, Count IV, and Count V:

- The discriminatory acts alleged by Plaintiff Brinkley since February 27, 2020 (Title VII) and June 7, 2020 (DCHRA)

- The discriminatory acts alleged by Plaintiff Brown since September 22, 2020 (DCHRA) and November 7, 2020 (Title VII)

- The discriminatory acts alleged by Plaintiff Carr since July 6, 2020 (Title VII) and August 6, 2020 (DCHRA)

58

- The discriminatory acts alleged by Plaintiff Clark since July 6, 2020 (Title VII) and September 22, 2020 (DCHRA)

- The discriminatory acts alleged by Plaintiff Dickerson since September 22, 2020 (DCHRA) and October 8, 2020 (Title VII)

- The discriminatory acts alleged by Plaintiff Grier since September 22, 2020 (DCHRA) and October 6, 2020 (Title VII)

- The discriminatory acts alleged by Plaintiff Hampton since September 22, 2020 (DCHRA) and November 21, 2020 (Title VII)

- The discriminatory acts alleged by Plaintiff Lockerman since September 22, 2020 (DCHRA) and November 22, 2020 (Title VII)

- The discriminatory acts alleged by Plaintiff Mitchell since September 22, 2020 (DCHRA) and October 8, 2020 (Title VII)

The Court finds that all other allegations in the Third Amended Complaint are untimely for purposes of the disparate treatment, disparate impact, and retaliation claims in Count I, Count II, Count IV, and Count V. In its partial motion to dismiss, the defendant did not ask the Court to dismiss the timely disparate treatment claims. Indeed, the defendant did not conduct any analysis whatsoever regarding whether those timely disparate treatment allegations satisfy the pleading requirements for disparate treatment claims. Similarly, the defendant's partial motion to dismiss does not even mention "disparate impact." Accordingly, the Court is compelled to conclude that the defendant is not moving to dismiss the plaintiffs' timely disparate treatment or disparate impact claims.

**D.      Whether Each Plaintiff's Allegations State Race-based or Gender-based Hostile Work Environment Claims Under Title VII and the DCHRA**

All ten plaintiffs allege that the defendant created gender-based and race-based hostile work environments.  In regards to both Title VII and DCHRA hostile work environment claims, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability."  Morgan, 536 U.S. at 117.  "However, both incidents barred by the statute of limitations and ones not barred can qualify as part of the same actionable hostile environment claim only if they are adequately linked into a coherent hostile environment claim," which can occur "if they involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers."  Robinson v. District of Columbia, No. 23-cv-3823 (APM), 2024 WL 4722157, at *4 (D.D.C. Nov. 8, 2024) (internal quotations omitted).  Because each plaintiff claims that all of her allegations contributed to a hostile work environment, and at least one allegation per plaintiff appears to have occurred within the 300-day filing period for each plaintiff, the Court will not dismiss the Title VII and DCHRA hostile work environment claims on timeliness grounds.  See Elzeiny v. District of Columbia,125 F. Supp. 3d 18, 36 (D.D.C. 2015).

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  Morgan, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)).  "To prevail on [a hostile work environment] claim, a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir.

2008) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  "Courts look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 23).  Thus, as already noted, a claim with "several individual acts" may "become actionable due to their 'cumulative effect,'" if they are "'adequately linked' such that they form 'a coherent hostile environment claim.'"  Baird v. Gotbaum, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011)).  Courts consider the frequency of individual acts and whether they involve the same managers and the same kind of employment action to determine whether individual acts are adequately linked.  Shanks v. Int'l Union of Bricklayers & Allied Craftworkers, 134 F.4th 585, 597–98 (D.C. Cir. 2025).

However, to reiterate, Title VII is not a "general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  Thus, "[c]ourts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."  Na'im v. Clinton, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) (collecting cases); see Kelley v. Billington, 370 F. Supp. 2d 151, 157 (D.D.C. 2005) ("Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.").  "Although a plaintiff need not plead a prima facie case of hostile work environment in the complaint, the 'alleged facts must support such a claim.'"  McKeithan v. Boarman, 803 F. Supp. 2d 63, 69 (D.D.C. 2011) (quoting Middlebrooks v. Godwin Corp., 722 F. Supp. 2d 82, 90–91 & n.6 (D.D.C. 2010)).  "'[T]he legal standard for establishing discrimination under the DCHRA is

substantively the same as under Title VII,' so these claims rise and fall together." Robinson,

2024 WL 4722157, at *3 (quoting Motley-Ivey v. District of Columbia, 923 F. Supp 2d 222, 233

(D.D.C. 2013)).[22]

Here, the defendant argues that the plaintiffs' race-based and gender-based hostile work

environment claims collectively fail because they "merely seek to bootstrap numerous discrete

acts and do not show any sort of severe or pervasive harassment" and the claims allege only

"perceived slights" that are insufficient to establish a hostile work environment claim. Def.'s

Mot. at 30–34. The plaintiffs do not directly respond to the defendant's position. Rather, most

of the plaintiffs' opposition focuses on their DCWPA retaliatory hostile work environment

claims, rather than their Title VII and DCHRA gender-based and race-based hostile work

environment claims. See Pls.' Opp'n at 30–51. Where the plaintiffs do attempt to respond to the

defendant's specific challenge that they have not adequately stated claims for Title VII and

DCHRA race-based or gender-based hostile work environments, they merely contend that "the

gravamen of the Third Amended Complaint is that [the d]efendant created and maintained a

layered, intensely hostile work environment for [the p]laintiffs because of their race and gender

to dissuade them from complaining about discrimination, and to punish them when they did," id.

at 8, before returning to the "pattern and practice" framework that is inapplicable to their

individual hostile work environment claims, see, e.g., id. at 17 ("[U]nlike in other cases where a

single plaintiff attempted to extrapolate a pattern of disparate treatment from their own

experience, the Third Amended Complaint alleges specific allegations from multiple Black

women of the same nature and type, that have taken place over decades, to establish[] the

---

[22] The DCHRA was amended in 2022 to clarify that "[c]onduct need not be severe or pervasive to constitute harassment and no specific number of incidents or specific level of egregiousness is required." D.C. Code § 2-1402.11 (c-2)(3). This amendment took effect in October 2022, after the misconduct in this case is alleged to have occurred.

pattern."); <u>id.</u> at 13 ("In the instant case, [the p]laintiffs present the Court with more than 140 pages of 'concrete particulars,' that a reasonable jury could find indicative of a pattern and practice of race and gender discrimination that created a hostile work environment for [the p]laintiffs, and a continuing violation of unlawful retaliation at MPD.").

Although the plaintiffs do not individually respond to the defendant's Rule 12(b)(6) challenge, the Court, as it must, will address each plaintiffs' Title VII and DCHRA hostile work environment claims.

### 1. Whether Plaintiff Brinkley Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA

The defendant claims that Plaintiff Brinkley's hostile work environment claim amounts to nothing more than a series of "slights" that are "ordinary tribulations of the workplace." Def.'s Mot. at 30–31.  The Court finds that it need not assess whether these allegations are more than that because, throughout the Third Amended Complaint's twenty pages of "Facts Related to Plaintiff Brinkley's Individual Claims," 3d Am. Compl. at 40–60, Plaintiff Brinkley fails to show that the discrimination she alleges was rooted in racial or gender animus.  See <u>Lee v. McDonough</u>, No. 22-cv-319 (RBW), 2024 WL 3858820, at *9 (D.D.C. Aug. 19, 2024) (Walton, J.).  "[A] plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimina[tion] because of' the employee's protected status[,]" <u>Wright v. Lynch</u>, 196 F. Supp. 3d 76, 84 (D.D.C. 2016) (first and second alterations in original) (quoting <u>Oncale</u>, 523 U.S. at 81), and Plaintiff Brinkley's "failure to do so here is fatal to [her] hostile work environment claim[,]" <u>Lee</u>, 2024 WL 3858820, at *9.

Plaintiff Brinkley offers only "legal conclusions [about the cause of the discrimination] cast as factual allegations." <u>Hettinga</u>, 677 F.3d at 476.  For instance, she alleges that "[Sergeant] Boyd treated [her] and [Plaintiff] Mitchell more harshly and negatively than . . . non-Black

female officers," 3d Am. Compl. ¶ 272, without providing adequate information about how Sergeant Boyd treated non-Black female officers differently.  And even if Plaintiff Brinkley had made the necessary showing of racial or gender animus, her allegations of discriminatory treatment are not adequately linked together to form "a coherent hostile environment claim." Shanks, 134 F.4th at 597.  For example, there is nothing in the Third Amended Complaint that links Sergeant Boyd's issuance of a flea-infested cruiser in 2017, 3d Am. Compl. ¶ 273, to the foul language allegedly used by male officers towards female officers during Sergeant Brown's tenure in 2019, id. ¶ 293, or to Lieutenant Robinson's discipline for her arriving at work too early in 2020, id. ¶ 323.  Plaintiff Brinkley herself refers to the discrimination she allegedly faced as "micro-aggressive," id. ¶ 291, underscoring the Court's determination that it was neither severe nor pervasive enough to create a hostile work environment.  Accordingly, the Court must dismiss Plaintiff Brinkley's hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

2. **Whether Plaintiff Brown Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA**

Plaintiff Brown has also failed to tie the alleged hostile work environment to her membership in a protected class.  To the contrary, the "bullying" Plaintiff Brown alleges from 2015 to 2019 appears rooted in her assignment as a bike-certified Community Patrol Officer in the Fairfax Village neighborhood.  See id. ¶¶ 467–86.  The specific examples of "cyber-bullying" that Plaintiff Brown provides, comments from other officers that she was "a fake police officer, that she didn't work, and that she was a 'part-time' cop," id. ¶ 497, show that she faced harassment because of her assignment and not because of any protected characteristic.  Her claim that "[s]everal MPD Sergeants and Lieutenants were on the forum and participated in the cyber-bullying aimed at Plaintiff [Brown] because of her race and gender," id. ¶ 499, is

conclusory and not supported by the specific allegations in the Third Amended Complaint.  See

id.  Although Plaintiff Brown alleges that, by the summer of 2019, the forum in which she was

purportedly cyber-bullied was "rife with comments of a racist and sexist nature," id. ¶¶ 513–14,

she does not allege that any of those comments were directed at her and the only specific

examples of alleged cyber-bullying that she provides are in regards to her assignment as a bike-

certified Community Patrol Officer.  See id. ¶ 497.  Accordingly, her allegation that she "was

treated as a second-class citizen in her department because of her race and gender," id. ¶ 489, is

insufficient to state a race-based or gender-based hostile work environment claim.  Therefore, the

Court must dismiss Plaintiff Brown's hostile work environment claims in Count I, Count II,

Count IV, and Count V of the Third Amended Complaint.

### 3. Whether Plaintiff Carr Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA

Plaintiff Carr's asserted hostile work environment claim commenced in 1998 when she

alleges that her supervisors made it challenging for her to complete her Army Reserve

obligations but accommodated her male colleagues who were also military reservists.  Id.

¶¶ 554–621.[23]  Although Plaintiff Carr has alleged that this disparate treatment was because of

her gender, she has not adequately linked this occurrence in the late 1990s to any of the other

discrimination that she alleges she experienced over the course of her career such that it

constituted a coherent hostile environment claim.  See Baird, 792 F.3d at 168–69.  For example,

Plaintiff Carr alleges that, over the course of her career, she was denied assignments she pursued,

3d Am. Compl. ¶¶ 625–27; 639–42, was subjected to "snide and sexist" comments from her co-

workers, id. ¶ 654, was involuntarily transferred, id. ¶ 663, and was "given undesirable

assignments . . . , issued discipline for small mistakes[,] . . . and unfairly and harshly evaluated,"

---

[23] The allegations in the Third Amended Complaint jump from paragraph 560 to paragraph 620.

id. ¶ 668.  But unlike her allegations related to her Army Reserve requirements, Plaintiff Carr has

not adequately alleged that any of these other alleged discriminatory acts were because of a

protected characteristic.  Rather, she offers only unsubstantiated conclusory allegations "that she

was being discriminated against . . . because of her race and gender."  Id. ¶ 647.  Accordingly,

the Court must dismiss Plaintiff Carr's hostile work environment claims in Count I, Count II,

Count IV, and Count V of the Third Amended Complaint.

### 4. Whether Plaintiff Clark Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA

Plaintiff Clark's hostile work environment claim alleges a number of work-related

actions by various supervisors over the course of four years.  See id. ¶¶ 680–705.  These

allegations include that in 2017, Lieutenant Margiotta denied her request to transfer from the

night shift to the day shift, even though other "officers in the department who were not Black

women were allowed to switch from a night to a day schedule, or vice versa."  Id. ¶ 686.

Plaintiff Clark also alleges that in 2017, she was assigned full-time to the "Vice-Presidential

escort detail," but was given a vehicle without reinforced ballistic-proof doors while a white

female officer who was only on temporary assignment to the detail was given "a new ballistic

door SUV."  Id. ¶¶ 692–99.  Plaintiff Clark alleges that Lieutenant Margiotta denied her request

to change her car assignment, like the denial of her request to change her work schedule,

"because [he] harbored animus against her because of her race and gender."  Id. ¶¶ 688, 700.

However, the fact that Lieutenant Margiotta allegedly assigned a different female officer a "new

ballistic door SUV" severely undercuts Plaintiff Clark's argument that the vehicle assigned to

her was motivated by gender-based animus against her, and her claims that he was also

motivated by race-based animus are unsubstantiated.  She also claims that in 2020, both Captain

Glover and Commander Rivera "went out of [their] way to deny [her] job opportunities, and to

treat her harshly and with clear animus and hostility, because of her race and gender." Id. ¶ 729. Also in 2020, Plaintiff Clark contends that Commander Rivera "approved everyone in the department getting a #4 rating on their performance evaluation, except [for] Plaintiff Clark, who was given a #3 rating." Id. ¶¶ 741–42.

But these allegations, even if motivated by racial or gender bias, are not sufficient to support a hostile work environment claim. With respect to Plaintiff Clark's scheduling issues and performance review, "courts in this Circuit typically do not find these types of 'work-related actions by supervisors' to be sufficient for a hostile work environment claim[,]" Harris v. Mayorkas, No. 21-cv-1083 (GMH), 2022 WL 3452316, at *16 (D.D.C. Aug. 18, 2022) (internal quotations omitted), because they cannot "be characterized as sufficiently intimidating or offensive in an ordinary workplace context," id. (quoting Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009)). Other courts have "dismissed hostile work environment claims based on circumstances as or more oppressive than those [Plaintiff Clark] alleges." Id. (collecting cases). Moreover, "the alleged events are temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness." Nurriddin, 674 F. Supp. at 94. And, Plaintiff Clark has not adequately linked the actions of multiple supervisors spanning multiple years into a single, coherent hostile work environment claim. Accordingly, the Court must dismiss Plaintiff Clark's hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

5. **Whether Plaintiff Dickerson Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA**

Plaintiff Dickerson's basis for her hostile work environment claim commenced in 1990, when she alleges that she was offered money, clothes, and a car by two supervisors "in exchange for intimate dates and a willingness to perform sexual acts." 3d Am. Compl. ¶ 775. Plaintiff

Dickerson's next allegation occurred in 1995, when she contends that a different supervisor sexually harassed her and "made continued, unwanted sexual advances on Plaintiff Dickerson," id. ¶ 780, and when she complained, he "began to retaliate against her for reporting his behavior," id. ¶ 782. Next, Plaintiff Dickerson alleges that in 1997, a third supervisor "commented on Plaintiff Dickerson's physical attributes and described the sexual acts that he wanted to perform on her." Id. ¶ 787. Plaintiff Dickerson also alleges that from 1998 to 2001, a fourth supervisor "made repeated and continual sexual advances and comments" to her. Id. ¶ 793. Although a claim with "several individual acts" may "become actionable due to their cumulative effect," if they are "'adequately linked[,]'" Baird, 792 F.3d at 168–69 (internal quotation omitted), the allegations here are not adequately linked because the sexual harassment was allegedly committed by four different supervisors over the course of 11 years without any overlap in time. See Shanks, 134 F.4th at 597–98 (rejecting a hostile work environment claim that spanned 14 years and involved a variety of supervisors).

Plaintiff Dickerson's additional allegations include allegations that in 2008 a male officer entered the female locker room while Plaintiff Dickerson was showering, 3d Am. Compl. ¶¶ 802–03, and that a supervisor used the word "cunt" in an email in 2012, id. ¶ 820. These allegations are the kind of alleged disparate acts of discrimination that courts are reluctant to transform into a hostile work environment claim. See Dudley v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 141, 164 (D.D.C. 2013); Nagi v. Chao, No. 16-CV-2152 (KBJ), 2018 WL 4680272, at *3 (D.D.C. Sept. 28, 2018) (noting that "isolated incidents of offensive language and even ethnic or racial slurs do not affect the conditions of employment to a sufficiently significant degree to violate Title VII.") (internal quotations and alteration omitted); cf. Washington v. White, 231 F. Supp. 2d 71, 73 (D.D.C. 2002) (finding sufficient evidence of a hostile work

environment in part because a female supervisor "barged into the [men's locker ]room five to ten times without knocking or announcing herself" and, after the plaintiff complained, "returned to the locker room and stood over [the plaintiff] saying 'I'm back. What are you going to do about it?'").  Moreover, Plaintiff Dickerson's allegations that in 2018, 2019, and 2020, she was denied the opportunity to attend meetings and strategizing sessions, id. ¶ 838, was denied the opportunity to attend a terrorism seminar in Israel, id. ¶¶ 857–59, and that her supervisor "dismissed [her] presence in rooms filled with her subordinates or community members, id. ¶ 899, are the types of actions that are not severe enough to constitute a hostile work environment, see Holmes–Martin v. Sebelius, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (holding that plaintiff's claims that she was publicly criticized, received unwarranted criticism in her performance evaluations, given reduced job responsibilities, excluded from meetings, and received unrealistic deadlines were not sufficiently severe or pervasive to support a hostile work environment claim).  Accordingly, the Court must dismiss Plaintiff Dickerson's hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

6.  **Whether Plaintiff Grier Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA**

Plaintiff Grier has failed to adequately show a link between her race or gender and the allegedly hostile behavior.  She alleges that in 2002, she arrested and testified against a fellow officer and that, thereafter, she was "treated as a pariah, isolated and disrespected by management and by fellow officers." 3d Am. Compl. ¶ 952.  The specific disparate treatment Plaintiff Grier alleges between 2002 and her retirement in 2015 is limited to an incident where other officers did not respond to her call for backup assistance.  Id. ¶ 947.  It appears from the Third Amended Complaint that this was not gender-based or race-based harassment, but as

Plaintiff Grier herself alleges, "officers were so incensed about her 'snitching' that they refused to provide her back up on the job." Id. ¶ 946.

After she returned to the MPD in 2017, Plaintiff Grier alleges that she was "isolated in a work environment that was male dominated and jocular, [and] where inappropriate and disrespectful language towards women was used regularly." 3d Am. Compl. ¶¶ 934–37. But, the only example of such behavior she identifies is that a male officer "would regularly undress down to his underwear in front of [her,]" which she claims "was done to shock [her] and make her feel uncomfortable," id. ¶ 939, and her request to be assigned to a different office space was ignored, id. ¶ 942. However, even if it can be inferred that this officer undressed to make her feel uncomfortable, Plaintiff Grier still does not allege that she was subjected to a hostile work environment because of her race or gender, and the Court finds no further support in the Third Amended Complaint to substantiate that claim. She further alleges that she was assigned to a disproportionate number of special details, id. ¶ 985, and that she was not permitted to work from home during the COVID-19 pandemic, but again fails to link these allegations to her membership in a protected class. Moreover, even if she had done so, these are not the kind of allegations that are severe enough to create a hostile work environment. See Dieng v. Am. Insts. for Rsch. in Behav. Scis., 412 F. Supp. 3d 1, 14–15 (D.D.C. 2019) (dismissing Title VII hostile work environment claims based on "denial of teleworking," "yelling at [the plaintiff] during staff meetings," "ignoring [the plaintiff] at those meetings," and "constant questioning of [plaintiff's] work"). Therefore, the Court must dismiss Plaintiff Grier's hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

### 7.  Whether Plaintiff Hampton Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA

Plaintiff Hampton has failed to state a hostile work environment under Title VII or the DCHRA.  Plaintiff Hampton's claim boils down to an "attempt to bootstrap [her] alleged discrete acts of retaliation into a broader hostile work environment claim."  See Dudley, 924 F. Supp. at 164 (quoting Baloch v. Norton, 517 F. Supp. 2d. 345, 364 (D.D.C. 2007)).  These purported acts are the following. She alleges that in 2003 a supervisor asked her on a date and told her "he could make her life miserable" when she rejected his advances.  3d Am. Compl. ¶¶ 985–87.  She alleges that in 2007, she was harassed by community members in front of her home and she "did not receive the kind of concern or response she expected" from her chain of command.  Id. ¶¶ 993–95.  She alleges that in 2018, a Sergeant tried to kiss her.  Id. ¶ 1013.  She alleges that in 2019, she had to prove to a Lieutenant that a Commander had previously authorized her to participate in a recruiting event.  Id. ¶¶ 1016–17.  She alleges that also in 2019, she was "berated for not responding to the radio fast enough," id. ¶ 1022, and was subsequently involuntarily detailed to the Teletype Unit, id.  Finally, she alleges that in 2021, a Lieutenant undermined her attempt to discipline an officer for insubordination, id. ¶ 1030–31, and a Sergeant left her at a crime scene, id. ¶¶ 1040–44.

When viewed in their totality, and in conjunction with the additional allegations in the Third Amended Complaint, the Court is forced to conclude "that these acts are so different in kind and remote in time that they cannot possibly comprise part of the same hostile work environment." Mason v. Geithner, 811 F. Supp. 2d 128, 179 (D.D.C. 2011).  But, even if they were more closely connected, many of these acts are nothing more than "petty slights [or] minor annoyances," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), that do not amount to a workplace permeated with discriminatory intimidation, ridicule, and insult.

71

And again, as with several other plaintiffs, Plaintiff Hampton has not connected the alleged discrimination to gender-based or racial-based animus. See Peters v. District of Columbia, 873 F. Supp. 2d 158, 192 (D.D.C. 2012) ("Even a highly stressful work environment is not the same as a hostile work environment imbued with the requisite pervasive discriminatory animus to support a Title VII claim."). Indeed, the only time the words "race" or "gender" appear in the eight pages of facts specific to Plaintiff Hampton is in a single conclusory sentence which alleges that on one occasion Lieutenant Daee's usurpation of Plaintiff Hampton's authority "was disparate treatment based on Plaintiff Hampton's race and gender." 3d Am. Compl. ¶ 1033. Because Plaintiff Hampton has not stated a claim for a gender-based or race-based hostile work environment, the Court must dismiss her hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

### 8. Whether Plaintiff Lockerman Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA

Plaintiff Lockerman alleges that in 2020 after she became uncomfortable by Commander Bedlion's attempt to engage her in "conversation of a personal nature," id. ¶¶ 1240–41, he "began to retaliate against Plaintiff Lockerman for her cool reaction to his attempt at conversation on personal and private matters," id. ¶ 1243. Plaintiff Lockerman then proceeds to describe "the pattern of retaliation she was being subjected to by [Commander] Bedlion" throughout 2020. Id. ¶ 1264. The allegedly retaliatory actions include attempting to place her on a PIP, id. ¶ 1247; disciplining her for not posting on a social media platform about police activity in a particular neighborhood, id. ¶ 1250; ordering an administrative investigation into her for a "Potential Orders and Directives Violation" after she ordered an officer to wear a face mask during the COVID-19 pandemic, id. ¶ 1259; disciplining her for sending a subordinate to attend a meeting in her place due to another appointment she had, id. ¶¶ 1273–75; disciplining her for

72

alerting stakeholders of a robbery and kidnapping even though she claims it was not her responsibility to do so, id. ¶¶ 1286–88; denying her time off, id. ¶ 1293; and changing her schedule, id. ¶ 1303.

Ultimately, Plaintiff Lockerman alleges that "the PIP, the discipline and the change in schedule are acts of retaliation against her [because she complained about] race and gender discrimination." Id. ¶ 1313. But despite these allegedly retaliatory acts, the Third Amended Complaint does not include a Title VII or DCHRA retaliatory hostile work environment claim. The only additional claim in the section of the Third Amended Complaint titled "Facts Relevant to Plaintiff Lockerman's Additional Claim" is Count XX, which alleges a violation of the DCWPA, not Title VII or the DCHRA. 3d Am. Compl. at 168. The only Title VII and DCHRA hostile work environment claims are race-based and gender-based, and Plaintiff Lockerman does not adequately allege that these allegedly retaliatory acts are because of her race or gender. To the contrary, the Third Amended Complaint explicitly acknowledges that the lunch time conversation that made her uncomfortable and triggered this "pattern of retaliation" was "not sexual per se." Id. ¶ 1242.

Moreover, even if Commander Bedlion's action was because of Plaintiff Lockerman's race or gender, his actions are not severe or pervasive enough to create a hostile work environment. "A litany of cases shows that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim," Dudley, 924 F. Supp. 2d at 171 (collecting cases), and "courts typically do not find these types of work-related actions by supervisors to be sufficient for a hostile work environment claim," Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (internal quotation omitted) (dismissing Title VII hostile work environment claims predicated on "placement on [a] PIP" and "receipt of unfavorable feedback").

73

Construing all allegations in the Third Amended Complaint in Plaintiff Lockerman's favor, as it must at this stage of litigation, the Court finds that the alleged facts nonetheless fail to support a hostile work environment claim. Therefore, the Court must dismiss Plaintiff Lockerman's hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

9.  **Whether Plaintiff Mitchell Has Stated a Hostile Work Environment Claim Under Title VII and the DCHRA**

When Plaintiff Mitchell came out of retirement in 2017, she was partnered with Plaintiff Brinkley, so many of Plaintiff Mitchell's hostile work environment claims overlap with Plaintiff Brinkley's hostile work environment claims. Like Plaintiff Brinkley, Plaintiff Mitchell contends that she was assigned a K-9 cruiser that was "covered in dog hair and dander," 3d Am. Compl. ¶ 1345, and she allegedly was "berate[d]" by Sergeant Boyd when she complained to supervisors about the vehicle assignment and was given authorization by a Commander to use a different vehicle, id. ¶¶ 1356–59. Plaintiff Mitchell then complained to Lieutenant Taylor about the way Sergeant Boyd spoke to her and allegedly "[f]rom that point forward, [Sergeant] Boyd had personal animus against Plaintiff Mitchell, and acted to retaliate against her." Id. ¶¶ 1363–64. By Plaintiff Mitchell's own description, therefore, the hostility she faced was not because of racial animus or gender animus, but because Sergeant Boyd did not like that Plaintiff Mitchell made the complaint against him. Id. This precludes the Court from inferring that there "exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." Na'im, 626 F. Supp. at 73. Moreover, like Plaintiff Lockerman, Plaintiff Mitchel describes a "retaliatory" hostile work environment, but Counts I, II, IV, and V, again, do not allege a Title VII or DCHRA hostile work environment claim. The Court therefore finds that Plaintiff Mitchell's allegations about Sergeant Boyd do not create a gender-based or race-based hostile

work environment in violation of Title VII or the DCHRA.  And, Plaintiff Mitchell's other allegations are too distinct to form a coherent hostile work environment.

For example, Plaintiff Mitchell alleges that in 2017 she unfairly had her police powers suspended because of the drone incident discussed above, see 3d Am. Compl. ¶¶ 1367–86, but according to the Third Amended Complaint, all of the other officers involved also had their police powers suspended, id. ¶ 1379.  She also alleges that in 2017, a male officer urinated into a bottle in her presence, id. ¶ 1375, and that in 2020, on the first day of her return to work after being on medical leave for eight weeks because she was infected with the COVID-19 virus, a Sergeant ordered her to undergo a fitness for duty evaluation after she reported having a headache, id. ¶¶ 1402–06.  But the facts alleged in the Third Amended Complaint describing these incidents and the other disciplinary and administrative incidents Plaintiff Mitchell allegedly faced do not support an inference that these incidents were the result of her race or gender.  Title VII is not a "general civility code for the American workplace," Oncale, 523 U.S. at 80, and, like many of the other plaintiffs, the facts that Plaintiff Mitchell alleges do not support a gender-based or race-based hostile work environment claim.  Therefore, the Court must dismiss Plaintiff Mitchell's gender-based and race-based hostile work environment claims in Count I, Count II, Count IV, and Count V of the Third Amended Complaint.

E.      **Whether the Timely Allegations State Race-based or Gender-based Retaliation Claims Under Title VII and the DCHRA**

All ten plaintiffs also allege that they were subjected to discrete acts of retaliation in violation of Title VII and the DCHRA.  Title VII makes it unlawful "for an employer to discriminate against any of his [or her] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a

75

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a claim for retaliation under Title VII, a plaintiff must "plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by [her] employer, and (3) the two are causally connected."  Spence v. U.S. Dep't of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024), cert. denied, 145 S. Ct. 594 (2024) (internal quotation marks omitted) (alteration in original).  A DCHRA retaliation claim "requires the same showing."  Touvian v. District of Columbia, 330 F. Supp. 3d 246, 251 (D.D.C. 2018).

In the retaliation context, "an adverse action is one that is 'harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Mayorkas, 2022 WL 3452316, at *11 (alteration in original) (quoting Burlington N. & Santa Fe Ry., 548 U.S. at 57).  The anti-retaliation provision of Title VII "is not expressly limited to actions affecting the terms, conditions, or privileges of employment."  Chambers v. District of Columbia, 35 F.4th 870, 876 (D.C. Cir. 2022) (en banc). "However, actionable retaliation claims are [still] limited to those where an employer causes material adversity, not trivial harms[.]"  Mayorkas, 2022 WL 3452316, at *11 (first alteration in original) (internal quotations omitted).  And, to adequately allege a causal link, the "employee's protected activity must be the impetus for the employer's adverse and allegedly retaliatory employment action, and the action cannot have already been contemplated by the employer before it learned of the protected activity."  Salak v. Pruitt, 277 F. Supp. 3d 11, 22 (D.D.C. 2017) (internal quotation marks and citation omitted).  "In other words, 'retaliation claims must be proved according to traditional principles of but-for causation.'"  Toomer v. Carter, No. 11-cv-2216 (EGS/GHM), 2016 WL 9344023, at *22 (D.D.C. Mar. 24, 2016) (quoting Farzam v. Shell,

No. 12-cv-35 (RMC), 2015 WL 8664184, at *4 (D.D.C. Dec. 11, 2015)).  "However, but-for causation does not mean that retaliation must be the only cause of the employer's action—merely that the adverse action would not have occurred absent the retaliatory motive."  Farzam, 2015 WL 8664184, at *22.  "[W]hile causation can sometimes be inferred from a close temporal relationship between the protected activity and the allegedly adverse action in retaliation cases, the sequence truly matters[.]"  Id. at 22.  "The fact that the alleged retaliatory actions precede the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff."  Lewis v. Columbia, 653 F. Supp. 2d 64, 79 (D.D.C. 2009).

The defendant argues that the Court should dismiss "several of [the p]laintiffs' . . . retaliation claims, primarily because they fail to allege a causal connection between alleged protected activity and any materially adverse employment action."  Id. at 34.  In support of this position, the defendant argues that "courts in this Circuit have generally ruled that a three-month gap between the protected activity and the adverse employment action is too attenuated to prove causation."  Id. at 35 (citations omitted).

The plaintiffs respond that "the retaliation [they] suffered as a result of [their] protected activity was in the form of the creation of a hostile work environment over a period of time, and not one discrete retaliatory act."  Pls.' Opp'n at 37.  They argue that "[i]n essence, the hostile work environment was a violation of Title VII and the DCHRA as a form of race and gender discrimination; it was also a violation of Title VII, the DCHRA and [the] DCWPA as a form of unlawful retaliation for complaining and engaging in protected activity."  Id. at 31.  However, the Third Amended Complaint does not allege a retaliatory hostile work environment in violation

77

of Title VII or the DCHRA[24] and, because "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss[,]" McManus v. District of Columbia, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007), the Court will not construe Counts I, II, IV, or V to include retaliatory hostile work environment claims.

The Court will now assess each plaintiff's retaliation claim in turn.[25]

### 1. Whether Plaintiff Brinkley Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Brinkley has successfully stated a retaliation claim. Plaintiff Brinkley brought her complaints to Mr. Alphonso Lee in the MPD's EEO sometime around February 5, 2020.[26] 3d Am. Compl. ¶ 305. Plaintiff Brinkley alleges that "Mr. Lee told Ms. Doreen Haines and Ms. Ranae Lee before an investigation had been conducted regarding [her] complaint, as well as complaints from several other Black female officers, that [the] 'MPD would be better off if they figured out how to fire officers like [Plaintiff Brinkley] . . . because all they did was file complaints.'" Id. ¶ 311. Subsequently, Plaintiff Brinkley was separated from her long-time partner, Plaintiff Mitchell, sometime around March 25, 2020, id. ¶¶ 315, 317, and was disciplined for "arriving at work too early, something that in all her years in the MPD, [she] had never seen another officer disciplined for[,]" id. ¶ 323. The Court can draw a reasonable inference from these allegations that this conduct is sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination," Burlington N. & Santa Fe Ry., 548 U.S.

---

[24] By contrast, the Third Amended Complaint plainly alleges that each plaintiff was subjected to a retaliatory hostile work environment in violation of the DCWPA.

[25] The Court need not assess Plaintiff Knight's retaliation claim, as she failed to exhaust her administrative remedies as to this claim in her EEOC charge.

[26] Even though the statutory period for Plaintiff Brinkley commenced on February 27, 2020, and the EEO complaint was filed sometime around February 5, 2020, the alleged acts of discrimination nonetheless occurred within the statutory period, thus making them eligible for inclusion in this case. The defendant failed to address any of these events in its filings. See Def.'s Mot. at 36.

at 57, and the alleged comments from Mr. Lee indicate a causal connection between the EEO complaints and the subsequent actions taken against Plaintiff Brinkley.  Accordingly, the Court concludes that Plaintiff Brinkley may pursue her retaliation claims.

### 2.  Whether Plaintiff Brown Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Brown has failed to allege that she engaged in any statutorily protected action that could have triggered retaliatory actions against her before the filing of her EEOC Charge.[27] See 3d Am. Compl. ¶¶ 487, 526.  She also does not allege any retaliatory act following the filing of her EEOC Charge.  Accordingly, the Court must dismiss Plaintiff Brown's retaliation claims.

### 3.  Whether Plaintiff Carr Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Carr filed her EEO charge sometime around December 2019, id. ¶ 664, and subsequently in August 2020, she "got into a confrontation with [Sergeant Boyd]," id. ¶ 675.  Sergeant Boyd then "filed an EEO complaint against [Plaintiff Carr] for creating a hostile work environment for him," id. ¶ 676, resulting in Plaintiff Carr being "threatened with a 30-day suspension[,]" id. ¶ 679.  Based on these allegations, the threat of a suspension was not because Plaintiff Carr filed an EEO complaint in December 2019, but because she was the subject of an EEO complaint filed against her by Sergeant Boyd.  Accordingly, the Court must dismiss Plaintiff Carr's retaliation claims.

### 4.  Whether Plaintiff Clark Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Clark filed an EEO complaint before retiring on May 31, 2014, but she eventually resumed her employment with the MPD in February 2017.  Id. ¶¶ 676–80.  Any acts of retaliation that allegedly occurred following her return to the MPD lack any causal connection

---

[27] While the complaint states that "Plaintiff Brown engaged in protected activity when she reported . . . what she legitimately and reasonably believed to be unlawful police 'stop and frisk' conduct," 3d Am. Compl. ¶ 541, this has no relation to a Title VII protected activity, which "must in some way allege unlawful discrimination."  See Broderick v. Donaldson, 437 F.3d 1226, 1232 (2006).

79

to the filing of the pre-retirement EEO complaint and the available evidence provides no indication that Plaintiff Clark made any statutorily protected complaints after her return. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."). Accordingly, the Court must dismiss Plaintiff Clark's retaliation claims.

### 5. Whether Plaintiff Dickerson Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Dickerson alleges that "she was overlooked and denied [a] promotion to second in command [of the MPD] in retaliation for her complaints about both misconduct and systemic racism." 3d Am. Compl. ¶ 905. However, this is a "legal conclusions cast as [a] factual allegation[.]" See Hettinga, 677 F.3d at 476. Further, Plaintiff Dickerson alleges that in February 2021, she "raised concerns about Black women officers being disciplined for recording their conversations with their supervisors and [the] EEO." 3d. Am. Compl ¶ 890. Although she claims that her "concerns fell on deaf ears and resulted in backlash and retaliation against her," id. ¶ 892, she does not allege to whom she allegedly raised these concerns or what specific retaliation she faced in response. Accordingly, the Court must dismiss Plaintiff Dickerson's retaliation claims.

### 6. Whether Plaintiff Grier Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Grier alleges the defendant retaliated against her because she arrested and testified against Officer Effler, 3d Am. Compl. ¶ 950, but the Third Amended Complaint indicates that these events occurred in 2002, id. ¶ 944, and the other complaints that she made more recently appear to be informal complaints to her superiors that are not related to alleged acts of discrimination, see id. ¶ 958 (complaining that Plaintiff Grier was "singled out to be

assigned to every single detail"), which fall outside the scope of Title VII-protected activity, see Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, [a] complaint must in some way allege unlawful discrimination, not just frustrated ambition."). Although Plaintiff Grier alleges that she "was treated as a pariah, isolated and disrespected by management and by fellow officers" after she testified against Officer Effler, she has not adequately alleged that she was retaliated against because of any protected activity or characteristic. 3d Am. Compl. ¶ 952. Accordingly, the Court must dismiss Plaintiff Grier's retaliation claims.

### 7. Whether Plaintiff Hampton Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Hampton filed an EEO complaint against Captain Boteler after she was "involuntarily detailed to the Teletype Unit" in June 2019. Id. ¶ 1025. But Plaintiff Hampton identifies no further issues with Captain Boteler following that event. Instead, she then discusses how she was promoted to Sergeant in May 2021, see id. ¶ 1029, and how she was "targeted" for an event when she was not on duty by Lieutenant Daee, id. ¶ 1034. Because this alleged "targeting" seemingly occurred almost two years following the filing of her EEO complaint and was conducted by a person who was not the subject of her EEO complaint, the Court finds that there is no plausible causal link between the filing of Plaintiff Hampton's EEO complaint and any purported subsequent act of retaliation. Accordingly, the Court must dismiss Plaintiff Hampton's retaliation claims.

### 8. Whether Plaintiff Lockerman Has Stated Title VII and DCHRA Retaliation Claims

Plaintiff Lockerman submitted a complaint to the EEO on February 18, 2021. Id. ¶ 1264. However, it appears that no subsequent adverse employment action followed the filing of that complaint. Rather, Plaintiff Lockerman alleges that, "[o]n information and belief[,]" she was held "to a different standard than [ ] other lieutenants when it came to timely posting on

81

Next[]Door[,]" id. ¶ 1267, and that she was reprimanded for "direct[ing] her subordinate sergeant to attend [a] [ ] meeting" in her place, id. ¶¶ 1274–75.  Furthermore, Plaintiff Lockerman's difficulties with Commander Bedlion preceded the submission of her EEO complaint by almost a year, see, e.g., id. ¶¶ 1240–49, which undermines her burden to show that the EEO complaint is causally linked to any purported subsequent adverse employment action.  Accordingly, the Court must dismiss Plaintiff Lockerman's retaliation claims.

**9.   Whether Plaintiff Mitchell Has Stated Title VII and DCHRA Retaliation Claims**

Although Plaintiff Mitchell asserts that she was retaliated against for taking FMLA leave, id. ¶ 1425, she identifies no instance of engaging in protected activities that could give rise to a Title VII or DCHRA retaliation claim.  Accordingly, the Court must dismiss Plaintiff Mitchell's retaliation claims.

**F.     Whether Each Plaintiff's Allegations State a Claim Under the DCWPA**

The DCWPA prohibits employers from "tak[ing], or threaten[ing] to take, a prohibited personnel action or otherwise retaliat[ing] against an employee because of the employee's protected disclosure."  D.C. Code § 1-615.53.  "A plaintiff asserting a claim under the DCWPA must establish a prima facie case that (1) he made a 'protected disclosure'; (2) his supervisor took or threatened to take a 'prohibited personnel action' against him; and (3) the protected disclosure was a 'contributing factor' to the prohibited personnel action."  Johnson v. District of Columbia, No. 20-cv-2944 (RC), 2021 WL 3021458, at *5 (D.D.C. July 16, 2021) (quoting Bowyer v. District of Columbia, 793 F.3d 49, 52 (D.C. Cir. 2015)).

Protected disclosures under the DCWPA are different than protected disclosures under Title VII.  See D.C. Code. § 1–615.52(a)(6).  A protected disclosure under the DCWPA is

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:

82

> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E) A substantial and specific danger to the public health and safety.

Id.  A "public body" includes "[a]ny federal, District of Columbia, state, or local law enforcement agency, prosecutorial office, or police or peace officer."  Id. § 1–615.52(a)(7)(D). And a "supervisor" is

> an individual employed by the District government who meets the definition of a "supervisor" in § 1–617.01(d) or who has the authority to effectively recommend or take remedial or corrective action for the violation of a law, rule, regulation or contract term, or the misuse of government resources that an employee may allege or report pursuant to this section, including without limitation an agency head, department director, or manager.

Id. § 1–615.52(a)(8).

The DCWPA defines a "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the [employment] decision," D.C. Code § 1–615.52(a)(2), and "[c]ourts have found gaps of eight months and four months between the protected disclosures and the adverse personnel action insufficient to meet the 'contributing factor' prong."  Nunnally v. District of Columbia, 243 F. Supp. 3d 55, 71 (D.D.C. 2017) (internal citations omitted).  Moreover, "[w]ithout evidence . . . that 'the decision-maker[ ] responsible for the adverse action had actual knowledge of the protected activity,' [a plaintiff] has failed to create a disputed fact question about whether the decision was retaliatory."  Coleman v. District

83

of Columbia, 794 F.3d at 64 (quoting McFarland v. George Washington Univ., 935 A.2d 337, 357 (D.C. 2007)).  "[A] retaliatory hostile work environment is a violation of the [DCWPA]," McCall v. D.C. Hous. Auth., 126 A.3d 701, 707 (D.C. 2015), and each plaintiff alleges that she was subjected to a retaliatory hostile work environment in violation of the DCWPA, see 3d Am. Compl. ¶¶ 429, 544, 660[28], 755, 929, 978, 1051, 1232, 1330, 1451.

The defendant first argues that the plaintiff's DCWPA claims are time-barred under the DCWPA's one-year statute of limitations.  Def.'s Mot. at 28 (citing D.C. Code § 1-615.54(a)(2)). "[A] DCWPA action is timely if instituted 'within 3 years after a violation occurs' or 'within one year after the employee first became aware of the violation,' whichever occurs first." Nunnally, 243 F. Supp. 3d at 70 (quoting D.C. Code § 1–615.54(a)(2)).  The plaintiffs respond that, given the "slow-moving, cumulative type of retaliation" they faced, they have timely pled their DCWPA retaliatory hostile work environment claims after becoming aware of the alleged DCWPA violations.  See Pls.' Opp'n at 18, 30–34.  Because these claims are alleged as retaliatory hostile work environments that may not have been immediately apparent to the plaintiffs, and construing the Third Amended Complaint in favor of the plaintiffs, the Court will not dismiss the plaintiffs' DCWPA claims based on a violation of the statute of limitations.

The defendant's remaining challenges to the plaintiffs' DCWPA retaliation claims largely mirror the challenges raised against the plaintiffs' Title VII and DCHRA retaliation claims.  See Def.'s Mot. at 34–41.  But, the defendant makes several arguments focused specifically on certain plaintiffs' DCWPA claims.  In regard to Plaintiff Mitchell, the defendant argues that reporting Sergeant Horos for urinating into a bottle was not a protected disclosure.  Def.'s Mot. at 37.  The Third Amended Complaint alleges that Plaintiff Mitchell "reasonably believed [the

---

[28] On page 86 of the Third Amended Complaint, after paragraph 698 the paragraph numbering restarts at paragraph 657.  This citation to paragraph 660 refers to the paragraph 660 on page 86 of the Third Amended Complaint.

urination incident] to be a violation of department policy[] and constituted lewd and inappropriate behavior." 3d Am. Compl. ¶ 1448.  However, the defendant is correct that under the DCWPA, complaining about perceived violations of department of policy is not a protected disclosure.  See D.C. Code. § 1–615.52(a)(6).  The Court must therefore dismiss Plaintiff's Mitchell's DCWPA claim in Count XXI.

In regard to Plaintiff Grier, the defendant argues that "even if her participation in Officer Effler's arrest and prosecution in 2002 constituted protected activity, far too much time has passed since her alleged protected activity to establish any causal connection" to the alleged retaliation.  Def.'s Mot. at 38.  The Court agrees.  Although Plaintiff Grier alleges that after testifying against Officer Effler she was labeled a "snitch," 3d Am. Compl. ¶ 973,  she has not adequately alleged that this label was a contributing factor to any of the allegedly retaliatory actions she purportedly faced after she returned to the MPD in 2017.  The Court must therefore dismiss Plaintiff Grier's DCWPA claim in Count XVII.

In regard to Plaintiff Clark, the defendant does not make any DCWPA-specific argument, but generally argues that Plaintiff Clark has not asserted any factual allegations to state a claim of retaliation.  Def.'s Mot. at 40–41.  Plaintiff Clark's DCWPA claim alleges that she "engaged in protected activity when she reported a credible threat to the life of [the] First Lady of the United States in 2012." 3d Am. Compl. ¶ 752.  Even if this constituted a protected disclosure, her claim that when she returned to the MPD five years after making this report, she "worked for officers who were still angry about her reporting of the threat to Michelle Obama," id. at ¶ 753, is a factual conclusion unsupported by the specific facts in the Third Amended Complaint that support the conclusion.  The Court must therefore dismiss Plaintiff's Clark DCWPA claim in Count XIII.

But for Plaintiff Brinkley, Plaintiff Carr, Plaintiff Hampton, Plaintiff Lockerman, Plaintiff Dickerson, Plaintiff Knight, and Plaintiff Brown, the defendant's arguments focus on the causation of various discrete allegations, rather than disputing the plaintiffs' complaints of being subjected to retaliatory hostile work environments.  Although, moving forward, the plaintiffs' remaining DCWPA retaliatory hostile work environment claims "face[] a high hurdle[,]" Fields v. Vilsack, 207 F. Supp. 3d 80, 92 (D.D.C. 2016), the Court concludes that, for now, the allegations described in detail in the preceding sections have "nudged [the plaintiffs'] claims across the line from conceivable to plausible[,]" Twombly, 550 U.S. at 570; see Moore v. Castro, 192 F. Supp. 3d 18, 47 (D.D.C. 2016), aff'd sub. nom. Moore v. Carson, 775 F. App'x 2 (Mem.) (D.C. Cir. Aug. 9, 2019) ("While the parties' evidence may reveal that the alleged misconduct does not rise to the level of severity or pervasiveness called for by the law . . . , the conduct as stated is sufficiently offensive and frequent to survive a motion to dismiss."), and therefore avoid dismissal.

## G.      Whether Plaintiff Brinkley's and Plaintiff Clark's Allegations State Age-based Discrimination in Violation of the ADEA and the DCHRA

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or discharge . . . or discriminate against any individual [who is at least forty (40) years old] . . . because of such individual's age." Singleton v. Potter, 402 F. Supp. 2d 12, 25 (D.D.C. 2005) (quoting 29 U.S.C. § 623(a)(1) (alterations in original)).  The DCHRA likewise prohibits age-based discrimination and "courts of the District of Columbia 'look[] to federal court decisions interpreting the [ADEA] when evaluating age discrimination claims under the DCHRA." Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 376 (D.C. Cir. 2010) (quoting Wash. Convention Ctr. Auth. v. Johnson, 953 A.2d 1064, 1073 n.7 (D.C. 2008)).

Plaintiff Brinkley and Plaintiff Clark allege that they were discriminated against and retaliated against, in part, because of their age in violation of the ADEA and the DCHRA. Specifically, Plaintiff Brinkley alleges that she was "denied sick leave, weekend days off, duty assignments, training, and health assessments, while these same opportunities were given to much younger police officers." 3d Am. Compl. ¶ 437. Plaintiff Brinkley also alleges that she was terminated, "[a]t least in part," because of her age, id. ¶ 438, and that she was "subjected to a hostile work environment because of her age," id. ¶ 440. Plaintiff Clark makes the same hostile work environment allegations. Id. ¶¶ 762–69.

As indicated in the previous sections, "[i]n employment discrimination cases involving ADEA or Title VII claims, [the plaintiffs] need not plead facts establishing a prima facie case." Montgomery, 961 F. Supp. 2d at 183. Nonetheless, the plaintiffs must "plead sufficient facts to show a plausible entitlement to relief." Id. (quoting Fennell v. AARP, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)). And, "[t]here are two essential elements of an age discrimination claim under the ADEA: (1) that the plaintiff suffered an adverse employment action, (2) because of the plaintiff's age." Id. (citing Baloch, 550 F.3d at 1196).

Here, the defendant claims that the Third Amended Complaint "lacks any factual allegations that show an inference of age discrimination under either the ADEA or the DCHRA," but "[i]nstead, [the plaintiffs] make . . . conclusory allegations," Def.'s Mot. at 45.[29] The plaintiffs argue in response that "[t]hey both clearly assert that they are over the age of 40, suffered harassment, bullying, adverse employment actions, and a pattern of insulting and

_____

[29] The same exhaustion requirement that applies to Title VII also applies to claims brought under the ADEA. Montgomery, 961 F. Supp. 2d at 181. The defendant argues the plaintiffs did not exhaust their administrative remedies regarding their ADEA claims, but because the Court concludes that Plaintiff Brinkley and Plaintiff Clark have not stated a claim for age discrimination and because "failure to exhaust administrative remedies under the ADEA . . . is an affirmative defense, not a jurisdictional requirement," Latson v. Holder, 82 F. Supp. 3d 377, 386 (D.D.C. 2015), it need not address the question of whether they exhausted their administrative remedies.

harmful acts from MPD to create a hostile work environment based on age."  Pls.' Opp'n at 60.

But that is not sufficient, because the Court agrees with the defendant that the allegations in the

Third Amended Complaint are merely conclusory.  Moreover, nothing in the Third Amended

Complaint connects the purported discrimination Plaintiff Brinkley and Plaintiff Clark allegedly

faced was due to their age.  The mere fact that these two plaintiffs were more than 40 years old

does not, alone, support an age discrimination claim.  Accordingly, the Court must dismiss the

plaintiffs' age discrimination claims asserted in Count VII, Count VIII, Count XIV, and XV of

the Third Amended Complaint.

**H.      Whether Plaintiff Brinkley's Allegations State Disability-based Discrimination in Violation of the ADA and DCHRA**

"The ADA prohibits discrimination in the workplace 'against a qualified individual on

the basis of disability.'"  Hodges v. District of Columbia, 959 F. Supp. 2d 148, 153 (D.D.C.

2013) (quoting 42 U.S.C. § 12112(a)).  The ADA defines a "disability" as "(A) a physical or

mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment."  42

U.S.C. § 12102(1).  "Due to the substantial similarity between the [DCHRA] and the [ADA,]

cases interpreting the ADA are equally applicable when analyzing a claim under the [DCHRA]."

Badwal v. Bd. of Trs. of Univ. of D.C., 139 F. Supp. 3d 295, 308 (D.D.C. 2015).  The Court

must therefore consider both of Plaintiff Brinkley's disability discrimination claims under the

ADA standard.  Id.

In Count IX and Count X, Plaintiff Brinkley alleges that she was discriminated against

based on her disability in violation of the ADA and the DCHRA.  3d Am. Compl. ¶¶ 447–65.

Plaintiff Brinkley alleges that her disability-discrimination took the form of disparate treatment

and retaliation and that she was forced to endure a hostile work environment because of her disability.  Id.  "A disability discrimination claim can take one of four forms: (1) intentional discrimination, otherwise known as disparate treatment; (2) disparate impact; (3) hostile work environment; or (4) failure to accommodate."  Badwal, 139 F. Supp. 3d at 308 (citing Lee v. District of Columbia, 920 F. Supp. 2d 127, 132–33 (D.D.C. 2013)).  Because Plaintiff Brinkley does not make any retaliation or hostile work environment allegations that are unique to her disability, and because her race-based and gender-based retaliation and hostile work environment claims have been addressed already, the Court will focus here exclusively on Plaintiff Brinkley's disability-based disparate treatment claim.

To state a claim for disparate treatment, a plaintiff must "allege facts sufficient to show that [she] (1) had a disability within the meaning of the statute, (2) was qualified for the position with or without a reasonable accommodation, and (3) suffered an adverse employment action because of his or her disability."  Badwal, 139 F. Supp. 3d at 308 (first citing Hodges v. D.C., 959 F. Supp. 2d at 154; and then citing Duncan v. Wash. Metro. Area. Transit Auth., 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc)).

Here, Plaintiff Brinkley alleges that she suffered from "depression and an anxiety condition for which she was under the care of medical professionals" after the death of her husband.  3d Am. Compl. ¶ 449.  She claims that "as a result of having an episode related to depression and anxiety, [her] supervisor made negative comments about her to her colleagues and threatened to send her for a fitness for duty evaluation," which she alleges was "a threat to her future employment and a reprisal for her suffering from a disability."  Id. ¶ 453.  She also alleges that when she complained about her concerns regarding the MPD's failure to comply with CDC guidelines during the COVID-19 pandemic, she was "ignored or humiliated for

89

raising the issue," id. ¶ 454, and later "disciplined for not obtaining a health assessment upon entering [an MPD] building," id. ¶ 455, which she claims was "intended to mock [her] for suffering from anxiety," id. ¶ 456.

The defendant does not dispute that Plaintiff Brinkley had a disability within the meaning of the ADA, rather the defendant argues that she "fails to meet the second and third requirements" necessary to state a claim under the ADA and DCHRA.  Def.'s Mot. at 46.  The defendant's position is straightforward: "[Plaintiff Brinkley] does not allege anywhere in her complaint that she can perform the job of SPO with or without a reasonable accommodation." Id.  Plaintiff Brinkley responds that she "claim[ed] with specificity that she was a qualified person for the position of SPO," Pls.' Opp'n at 61, but identifies nothing in the Third Amended Complaint to substantiate that claim and the Court can find none anywhere else in the record. Rather, Plaintiff Brinkley merely represents that she had been a police officer for many years and devotes most of her opposition to explaining how plaintiffs can succeed on ADA claims even if they are "perceived to have a disability"" by their employer.  Id. at 60–63.  Because the defendant appears to concede that Plaintiff Brinkley had a disability, this response misses the mark and Plaintiff Brinkley's conclusory allegations that she was qualified to be an SPO solely because she had been a police officer for many years and was terminated in part because of her disability are inadequate to state an ADA claim.  See Iqbal, 556 U.S. at 679.  In other words, Plaintiff Brinkley has not alleged sufficient information regarding what her duties were as a police officer that qualified her for the SPO position, and she also has not provided sufficient information as to what the responsibilities of the SPO position were.  Accordingly, the Court must dismiss Plaintiff Brinkley's disability-based discrimination claims in Count IX and Count X of the Third Amended Complaint.

**I.      Whether the Plaintiff's Allegations State Violations of Section 1981 and the Fifth Amendment, and a Negligent Supervision Claim**

Count III of the Third Amended Complaint is titled "Violation of the Civil Rights Act of 1866 "Discrimination Based on Race in the Making and Enforcing of Contracts 42 U.S.C. § 1981(a) by way of, through and via 42 U.S.C. § 1983, Disparate Treatment, Hostile Work Environment and Retaliation based on Race." 3d Am. Compl. at 34. The substance of the Count asserts "a violation of 42 U.S.C. § 1981 enforced via Section 1983 based on a violation of the Fifth Amendment to the Constitution as applied to the District of Columbia," id. ¶ 222, and alleges that there are "municipal policies that are actionable under the [Fourteenth] Amendment to the Constitution,"[30] id. ¶ 223. Count III also includes an allegation that the "MPD's failure to properly train, educate, supervise, manage and control its personnel has a statistically significant disparate impact on Black women officers as compared to their peers, and also subjects them to rampant disparate treatment." Id. ¶ 242.

Although the plaintiffs cannot sue the defendant, a state actor, directly under Section 1981, they may do so through the enforcement mechanism of 42 U.S.C. § 1983. Olatunji v. District of Columbia, 958 F. Supp. 2d 27, 30–31 (D.D.C. 2013). The plaintiffs can also sue the defendant through Section 1983 for alleged Fifth Amendment violations. See Shuler v. District of Columbia, 744 F. Supp. 2d 320, 324 (D.D.C. 2010). Negligent supervision is a distinct claim, but because the plaintiffs did not respond to the defendant's motion to dismiss their negligent supervision claims, the Court will treat that claim as conceded and dismiss those claims. See General Order for Civil Cases Before the Honorable Reggie B. Walton at ¶ 5(e) ("[I]f a party

---

[30] Because the Fourteenth Amendment applies only to the states and the District of Columbia is not a state, see Bolling v. Sharpe, 347 U.S. 497, 498–99 (1954), supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294 (1955), the Court will, consistent with the plaintiffs' other claim, construe this as a Fifth Amendment claim.

fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded."), ECF No. 4.  The claims remaining are therefore Section 1981 and Fifth Amendment claims, both brought pursuant to Section 1983.  Both claims are rooted in the actions of the MPD's EEO Office, which the plaintiffs allege discriminated against them by "maintaining a system-wide pattern and practice of disparate treatment against Black women officers," id. ¶ 224, and that the Chiefs of Police "have been on notice of [the situation], and have failed to take action to repair a totally dysfunctional and non-complaint EEO Department," id. ¶ 228.  The Court will first address the Section 1981 claims, before addressing the Fifth Amendment claims.

Section 1981 protects the rights of all persons to, inter alia, make and enforce contracts. 42 U.S.C. § 1981(a).  Section 1981 defines the term "make and enforce contracts" as "including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b), and "Section 1981 can encompass employment discrimination and retaliation claims," Olatunji, 958 F. Supp. 2d at 31 (citing CBOCS West, Inc. v. Humphries, 553 U.S. 442, 450–52, (2008)). Similarly, "[t]he Equal Protection Clause, which applies to the District of Columbia via the Fifth Amendment requires state actors to treat similarly situated persons alike."  Grissom v. District of Columbia, 853 F. Supp. 2d 118, 126 (D.D.C. 2012) (internal quotations and citations omitted).

Because Section 1983 is the enforcement mechanism for both alleged violations, "in order to impose liability on the District . . . [the plaintiffs] must show also that the District's custom or policy caused the violation."  Shuler, 744 F. Supp. 2d at 327 (citing Feirson v. District of Columbia, 506 F.3d 1063, 1066 (D.C. Cir. 2007)); see Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978) (requiring a plaintiff to plead facts that demonstrate the

municipality's "policy or custom" caused the injury).  To satisfy this requirement, the plaintiffs must show an "affirmative link" between a municipal policy and their injury.  Grissom, 853 F. Supp. 2d at 122–23 (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985)).  This link could be

> [(1)] the explicit setting of a policy by the government that violates the Constitution; [(2)] the action of a policy maker within the government; [(3)] the adoption through a knowing failure to act by a policy maker of actions by his [or her] subordinates that are so consistent that they have become "custom[;]" or [(4)] the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations[.]

Id. (internal citations omitted).

Here, the defendant argues that the plaintiffs' Section 1983 claims fail for four reasons. Def.'s Mot. at 42.  First, the defendant argues that "[the plaintiffs'] allegations are conclusory and thus do not state a plausible claim."  Id.  Second, the defendant argues that "[the plaintiffs] fail to allege deliberate indifference on the part of the Chief[s] of Police."  Id.  Third, the defendant argues that the plaintiffs' allegation "'that the Chief[s] of Police maintains a degree of supervision over the Department's various managers and its Equal Employment Office' . . . does not advance their cause as it alleges only respondeat superior liability."  Id. at 43.  Finally, it argues that Plaintiff Brinkley's "alleged email notice to Chief Newsham, which occurred on October 31, 2020," was the only "allegation[] of notice to the Chief of Police . . . within the statute of limitations."  Id.

The plaintiffs responded that they have appropriately asserted municipal liability on two bases: "the explicit policies of the MPD EEO Department which violated their Constitutional rights" and "the adoption through the knowing failure of the Chiefs of Police to curb the racist, and retaliatory actions of their subordinates."  Pls.' Opp'n at 55.  As already noted, the "explicit

policies" that purportedly violated the plaintiffs' Constitutional rights all involve the MPD EEO office.  See id.  Those alleged policies are "(1) "playing recordings of complainants to the persons they complained about[;]" (2) "refusing to allow EEO investigators to talk to management personnel and using the MPD EEO Department head to coordinate management responses to undermine complaints[;]" (3) "requiring [the] EEO to investigate complainants in order to find reasons to discredit their claims of discrimination or credibility[;]" (4) "editing and manipulating investigative reports to prevent substantiation of any claim of discrimination[;]" (5) "berating, humiliating, disciplining[,] and ultimately terminating EEO counselors who substantiated claims of discrimination[;]" and (6) "threatening to open disciplinary investigations into persons who complain about discrimination."  Id. (internal citations omitted).

Although the plaintiffs do not expressly link these policies to a Constitutional deprivation, when considering collectively all the allegations in the Complaint, particularly the affidavits from the MPD EEO employees attached to the Third Amended Complaint as Exhibits 1 through 4, the Court can reasonably infer that these policies may give rise to an equal protection violation.  Moreover, it can be inferred that the alleged policies infringe on the plaintiffs' enjoyment of all benefits, privileges, terms, and conditions of their contractual relationship with the MPD.  Therefore, at this stage of the litigation, the Court concludes that Count III of the Third Amended Complaint has stated "some factual basis for the allegation of a municipal policy or custom[,]" Atchinson v. District of Columbia, 73 F.3d 418, 422 (D.C. Cir. 1996), although the plaintiffs "will need to prove more about the District's [municipal policy or custom] to prevail on the merits," id.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes it must grant in part and deny in part the defendant's motion.

**SO ORDERED** this 27th day of March, 2026.[31]

REGGIE B. WALTON
United States District Judge

---

[31] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.